No. 17-2445 (Consolidated with 17-2433)

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

        Plaintiffs-Appellants,

    v.

ANTHONY M. STAR, *et al.*,

        Defendants-Respondents.

On Appeal from a Final Judgment of the United States District Court
for the Northern District of Illinois, No. 17 CV 1164

## BRIEF OF PLAINTIFFS-APPELLANTS

Jonathan D. Schiller
David A. Barrett
BOIES, SCHILLER FLEXNER LLP
575 Lexington Ave., 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Email: *dbarrett@bsfllp.com*
      *jschiller@bsfllp.com*

Stuart H. Singer
Pascual Oliu
BOIES, SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Email: *ssinger@bsfllp.com*
     *poliu@bsfllp.com*

Donald B. Verrilli, Jr.
   *Counsel of Record*
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, DC 20004
Telephone: (202) 220-1100
Email: *Donald.Verrilli@mto.com*

Henry Weissmann
Fred A. Rowley, Jr.
Mark R. Yohalem
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave., Ste. 5000
Los Angeles, CA 90071
Telephone: (213) 683-9100
Email: *Henry.Weissmann@mto.com*
     *Fred.Rowley@mto.com*
     *Mark.Yohalem@mto.com*

(Additional Counsel Listed on Inside Cover)

Leonard A. Gail
Suyash Agrawal
Paul Berks
MASSEY & GAIL LLP
50 E. Washington St., Suite 400
Chicago, IL  60602
Telephone:  (312) 283-1590
Email:  *lgail@masseygail.com*
        *sagrawal@masseygail.com*
        *pberks@masseygail.com*

Jonathan S. Massey
MASSEY & GAIL LLP
1325 G Street, N.W., Suite 500
Washington, DC  20005
Telephone:  (202) 652-4511
Email:  *jmassey@masseygail.com*

*for Plaintiffs-Appellants*

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __17-2445 & 17-2433__

Short Caption: __Electric Power Supply Association v. Star__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Electric Power Supply Association; Dynegy Inc.; Eastern Generation, LLC; NRG Energy, Inc.;

   and Calpine Corporation

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Boies Schiller Flexner LLP

   Massey & Gail LLP

   Munger, Tolles & Olson LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   See attached

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   See attached

Attorney's Signature: _____/s/ Donald B. Verrilli_____     Date: _____8/28/17_____

Attorney's Printed Name: _____Donald B. Verrilli_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes _X_     No ___

Address: __Munger, Tolles & Olson LLP, 1155 F. Street, NW, 7th Floor, Washington, DC 20004-1361__

Phone Number: __(202) 220-1100__     Fax Number: __(202) 220-2300__

E-Mail Address: _____Donald.Verrilli@mto.com_____

rev. 01/08 AK

i

(3) If the party or amicus is a corporation:

      i) Identify all its parent corporations, if any; and
(See below)

      ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
(See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No:  17-2445 & 17-2433

Short Caption:  Electric Power Supply Association v. Star

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

   [  ]      PLEASE CHECK  HERE IF ANY INFORMATION ON THIS FORM  IS NEW OR REVISED
            AND INDICATE  WHICH   INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Electric Power Supply Association; Dynegy Inc.; Eastern Generation, LLC; NRG Energy, Inc.;

   and Calpine Corporation


(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Boies Schiller Flexner LLP

   Massey & Gail LLP

   Munger, Tolles & Olson LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   See attached

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   See attached

Attorney's Signature:  _____ /s/ Henry Weissmann _____     Date:  _____ 8/28/17 _____

Attorney's Printed Name:  _____ Henry Weissmann _____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes ___        No X

Address:   Munger, Tolles & Olson LLP, 350 South Grand Ave., Los Angeles, CA 90071


Phone Number:  (213) 683-9100 _____     Fax Number:  (213) 687-3702

E-Mail Address:  _____ *Henry.Weissmann@mto.com* _____

rev. 01/08 AK

(3) If the party or amicus is a corporation:

> i) Identify all its parent corporations, if any; and
> (See below)

> ii) list any publicly held company that owns 10% or more of the
party's or amicus' stock:
> (See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company.  Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares.  No publicly held company has a 10% or greater ownership interest in NRG.  NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG.  NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

Appellate Court No: __17-2445 (consolidated with 17-2433)____

Short Caption: _Electric Power Supply Association v. Star_____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

   [X ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
            AND INDICATE WHICH  INFORMATION IS NEW OR REVISED

       This disclosure form includes the law firm Munger, Tolles & Olson, which joined as additional counsel after
       the last disclosure form was filed.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

       ELECTRIC POWER SUPPLY ASSOCIATION; DYNEGY INC., EASTERN GENERATION, LLC,;_____

       NRG ENERGY, INC., and CALPINE CORPORATION_____

       _____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

       Boies, Schiller Flexner LLP_____

       Massey & Gail LLP_____

       Munger, Tolles & Olson LLP_____

(3)  If the party or amicus is a corporation:

     i)  Identify all its parent corporations, if any; and

        See attached_____

     ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
        See attached_____

Attorney's Signature:  _/s/ Jonathan S. Massey_____     Date:  _08/30/17_____

Attorney's Printed Name:  _Jonathan S. Massey_____

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes ___          No
X_____

Address:  _1325 G. Street, N.W., Suite 500, Washington, D.C. 20005_____

Phone Number:  _(202) 652-4511_____     Fax Number:  _(312) 379-0467_____

E-Mail Address:  _jmassey@masseygail.com_____

v

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any; and
(See below)

    ii) list any publicly held company that owns 10% or more of the
party's or amicus' stock:
(See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2445 (consolidated with 17-2433)

Short Caption: Electric Power Supply Association v. Star

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

   [X]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
          AND INDICATE WHICH INFORMATION IS NEW OR REVISED

       This disclosure form includes the law firm Munger, Tolles & Olson, which joined as additional counsel after
       the last disclosure form was filed.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

       ELECTRIC POWER SUPPLY ASSOCIATION; DYNEGY INC., EASTERN GENERATION, LLC,;

       NRG ENERGY, INC., and CALPINE CORPORATION


(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

       Boies, Schiller Flexner LLP

       Massey & Gail LLP

       Munger, Tolles & Olson LLP

(3)  If the party or amicus is a corporation:

     i) Identify all its parent corporations, if any; and

       See attached

     ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
       See attached


Attorney's Signature:  /s/ Leonard A. Gail                    Date: 08/30/17

Attorney's Printed Name:  Leonard A. Gail

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes ___    No X

Address:   50 E. Washington, Suite 400, Chicago, IL 60602

Phone Number:  (312)283-1590              Fax Number:  (312) 467-1229

E-Mail Address:  lgail@masseygail.com

(3) If the party or amicus is a corporation:

      i) Identify all its parent corporations, if any; and
(See below)

      ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
      (See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

Appellate Court No:  17-2445 cons with 17-2433

Short Caption:  Electric Power Supply Association v. Star

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

   [X ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
           AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Electric Power Supply Association; Dynegy Inc.; Eastern Generation, LLC; NRG Energy, Inc.; and Calpine Corporation

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

       Munger, Tolles & Olson LLP (this is new information)

       Boies Schiller Flexner, LLP

       Massey & Gail, LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       See attached

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
       See attached

Attorney's Signature:  /s/ Jonathan D. Schiller                         Date:  08/30/17

Attorney's Printed Name:  Jonathan D. Schiller

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____    No  X

Address:   Boies Schiller Flexner LLP, 575 Lexington Avenue, New York, NY 10022

Phone Number:  212-446-2300                    Fax Number:  212-446-2350

E-Mail Address:  jschiller@bsfllp.com

rev. 01/08 AK

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any; and
(See below)

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
(See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2445 cons with 17-2433

Short Caption: Electric Power Supply Association v. Star

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[X]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
       AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Electric Power Supply Association; Dynegy Inc.; Eastern Generation, LLC; NRG Energy, Inc.; and Calpine Corporation

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Munger, Tolles & Olson LLP (this is new information)

Boies Schiller Flexner, LLP

Massey & Gail, LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

See attached

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

See attached

Attorney's Signature:  /s/ Stuart H. Singer                          Date:  08/30/17

Attorney's Printed Name:  Stuart H. Singer

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____    No  X

Address:  Boies Schiller Flexner LLP, 401 East Las Olas Blvd., Suite 1200, Fort Lauderdale, FL 33301

Phone Number:  954-356-0011                          Fax Number:  954-356-0022

E-Mail Address:  ssinger@bsfllp.com

rev. 01/08 AK

xi

(3) If the party or amicus is a corporation:

      i) Identify all its parent corporations, if any; and
(See below)

      ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
(See below)

- Plaintiff-Appellant Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company and no publicly held companies own more than 10% of Dynegy's shares.

- Plaintiff-Appellant Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff-Appellant NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff-Appellant Calpine Corporation ("Calpine") has no parent corporation, and no publicly held companies own 10 percent or more of Calpine stock.

## STATEMENT CONCERNING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument.  This case presents important questions of federal preemption and Commerce Clause interpretation arising from a subsidy given by Illinois to certain in-state nuclear power plants that has profound implications for the wholesale electric market.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT**Error! Bookmark not defined.**

STATEMENT CONCERNING ORAL ARGUMENT ................................. i

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................1

STATEMENT OF THE CASE ...................................................................2

    A.    Facts .........................................................................................4

        1.    The Federal Regulatory Scheme .....................................4

        2.    The ZEC Program's Manipulation of Wholesale Markets ..................................................................................6

        3.    Illinois' Targeted Subsidies for the Exelon Plants.......12

    B.    Procedural History ................................................................13

SUMMARY OF ARGUMENT ..................................................................15

ARGUMENT ...........................................................................................19

II.    STANDARD OF REVIEW ...............................................................19

III.    PLAINTIFFS' FEDERAL PREEMPTION CLAIMS ARE JUSTICIABLE. ................................................................................19

    A.    The District Court Erred in Finding Plaintiffs Lacked Article III Standing to Challenge the Price Adjustment Component of the Illinois ZEC Subsidy. ...............................19

    B.    The District Court Erred in Concluding that Congress Impliedly Foreclosed Private Party Enforcement of the FPA. .......................................................................................26

        1.    The FPA Confirms, Rather than Forecloses, a Private Remedy. ............................................................28

        2.    The FPA Is Judicially Administrable. ..........................36

IV.    THE ZEC PROGRAM IS PREEMPTED BY THE FEDERAL POWER ACT. ..................................................................................39

# TABLE OF CONTENTS
## (continued)

Page

A.    The ZEC Program Is Preempted Because It Intrudes upon an Exclusively Federal Field of Law by Ensuring that Certain Favored Power Generators Receive Payments in Connection with Their Wholesale Electricity Sales Over and Above the Rates that FERC Has Determined Are Just and Reasonable. ...........................39

    1.    The ZEC Program Is Functionally Indistinguishable from the Program that Was Found Preempted in *Hughes*. .........................41

    2.    Preemption of the ZEC Program Leaves Illinois with Ample Authority to Achieve Legitimate Policy Objectives Within Its Protected Sphere of Authority Under the FPA. .............................51

B.    The ZEC Program Conflicts with Federal Law that Requires Wholesale Rates to Be Determined in Approved Auction Markets. .....................................54

V.    PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE COMMERCE CLAUSE. ....................................60

A.    Plaintiffs Have Standing to Raise Commerce Clause Claims. ...................................................................60

B.    Plaintiffs State a Claim for a Commerce Clause Violation. ..................................................................62

    1.    The ZEC Subsidy is a *Per Se* Violation of the Commerce Clause. .........................................63

    2.    The ZEC Subsidy Inflicts Harms on Interstate Commerce that Outweigh Any Putative Local Interests. .................................................67

VI.    PLAINTIFFS ARE ENTITLED TO A HEARING ON THEIR MOTION FOR A PRELIMINARY INJUNCTION. ........................70

CONCLUSION ...........................................................71

# TABLE OF CONTENTS
## (continued)

**Page**

Certificate of Compliance ............................................................73

Circuit Rule 30(d) Statement ......................................................74

Certificate of Service ..................................................................74

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*AEP Texas N. Co. v. Texas Indus. Energy Consumers,*
    473 F.3d 581 (5th Cir. 2006) ...................................................28

*All. for Clean Coal v. Miller,*
    44 F.3d 591 (7th Cir. 1995) ..................................... 60, 65, 70

*Appalachian Power Co. v. Public Service Comm'n of W. Va.,*
    812 F.2d 898 (4th Cir. 1987) ...............................................28

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    135 S. Ct. 2652 (2015) ........................................................22

*Ark. Power & Light Co. v. Mo. Public Service Comm'n,*
    829 F.2d 1444 (8th Cir. 1987) .............................................28

*Armstrong v. Exceptional Child Center, Inc.,*
    135 S. Ct. 1378 (2015) ...........................................2, passim

*Ass'n of Am. R.R.s v. South Coast Air Quality Mgmt. Dist.,*
    622 F.3d 1094 (9th Cir. 2010) ............................................ 32

*Aux Sable Liquid Prods. v. Murphy,*
    526 F.3d 1028 (7th Cir. 2008) .............................................56

*Bacchus Imps., Ltd. v. Dias,*
    468 U.S. 263 (1984) ............................................................63

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs,*
    27 F.3d 1499 (10th Cir. 1994) .............................................48

*Brown v. MCI WorldCom Network Services, Inc.,*
    277 F.3d 1166 (9th Cir. 2002) .............................................31

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
    476 U.S. 573 (1986) ............................................................62

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Burlington N. & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs*,
  367 F.3d 675 (7th Cir. 2004) ....................................................................19

*C & A Carbone, Inc. v. Town of Clarkstown, New York*,
  511 U.S. 383 (1994) .................................................................. 64, 65, 70

*Cal. Indep. Sys. Operator Corp. v. FERC*,
  372 F.3d 395 (D.C. Cir. 2004) ...............................................................54

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) ...............................................................................63

*Chicago & N. W. Transp. Co. v. Kalo Brick & Tile Co.*,
  450 U.S. 311 (1981) ...............................................................................47

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ........................................................................... 69

*Coalition for Competitive Elec. v. Zibelman*,
  No. 16-cv-08164-VEC, 2017 WL 3172866
  (S.D.N.Y. Jul. 25, 2017)...................................................... 15, 29, 34, 39

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) ...............................................................................36

*Duncan v. Walker*,
  533 U.S. 167 (2001) ...............................................................................30

*FERC v. Elec. Power Supply Ass'n*,
  136 S. Ct. (2016)....................................................................... 37, passim

*First Jersey Sec., Inc. v. Bergen*,
  605 F.2d 690 (3d Cir. 1979) ...................................................................29

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
  841 F.3d 133 (2d Cir. 2016) ............................................................ 30, 38

## TABLE OF AUTHORITIES
### (continued)

Page

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh,*
  975 F.2d 1267 (7th Cir. 1992) .................................................63

*Heng v. Heavner, Beyers & Mihlar, LLC,*
  849 F.3d 348 (7th Cir. 2017) .................................................19

*Hughes v. Alexandria Scrap Corp.,*
  426 U.S. 794, 809 (1976) .......................................................70

*Hughes v. Talen Energy Marketing, LLC,*
  136 S. Ct. 1288 (2016) ...............................................3, passim

*Int'l Paper Co. v. Ouellette,*
  479 U.S. 481 (1987) ...............................................................55

*Iowa Mut. Ins. Co. v. LaPlante,*
  480 U.S. 9 (1987)...................................................................29

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,*
  559 U.S. 573 (2010) ...............................................................29

*Johnson v. United States Office of Personnel Management,*
  783 F.3d 655 (7th Cir. 2015) .........................................24, 25

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,*
  422 F.3d 490 (7th Cir. 2005) .........................................22, 23

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...............................................................19

*Maryland v. Louisiana,*
  451 U.S. 725 (1981) ...............................................................59

*Minnesota v. Clover Leaf Creamery,*
  449 U.S. 456, 471 (1981) (quoting *Philadelphia*, 437 U.S. at 624) ....69

*Miss. Power & Light Co. v. Miss. ex rel. Moore,*
  487 U.S. 354 (1988) ...............................................................46

# TABLE OF AUTHORITIES
## (continued)

Page

*N.J. Bd. of Public Utils. v. FERC,*
  744 F.3d 74 (3d Cir. 2014)..........................................................5

*N.J. Realty Title Ins. Co. v. Div. of Tax Appeals,*
  338 U.S. 665 (1950) ...............................................................48

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.,*
  372 U.S. 84 (1963).............................................. 40, 46, 47, 50

*N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.,*
  991 F.2d 458 (8th Cir. 1993) ...............................................32

*Nantahala Power & Light Co. v. Thornburg,*
  476 U.S. 953 (1986) ...............................................................46

*Nat'l Meat Assoc. v. Harris,*
  565 U.S. 452 (2012) ...............................................................47

*Nat'l Paint & Coatings Ass'n v. City of Chicago,*
  45 F.3d 1124 (7th Cir. 1995) ...............................................68

*New Energy Co. of Ind. v. Limbach,*
  486 U.S. 269 (1988) ...............................................................70

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
  491 U.S. 350 (1989) ...............................................................28

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.,*
  673 F.3d 84 (2d Cir. 2012)....................................................28

*Oneok, Inc. v, Learjet, Inc.,*
  135 S. Ct. 1591 (2015) ...........................................................55

*PPL Energy Plus, LLC v. Solomon,*
  766 F.3d 241 (3d Cir. 2014) ..................................................28

## TABLE OF AUTHORITIES
### (continued)

Page

*PPL EnergyPlus, LLC v. Nazarian,*
　753 F.3d 467 (4th Cir. 2014) ..................................................... 56, 58, 59

*Pike v. Bruce Church, Inc.,*
　397 U.S. 137 (1970) ........................................................................ 63, 69

*Pub. Util. Dist. No. 1 v. IDACORP Inc.,*
　379 F.3d 641 (9th Cir. 2004) .............................................................. 57, 58

*Public Service Co. v. Patch,*
　167 F.3d 15 (1st Cir. 1998)...................................................................28

*Retail Indus. Leaders Ass'n v. Fielder,*
　475 F.3d 180 (4th Cir. 2007) ..............................................................48

*S.D. Mining Ass'n v. Lawrence Cty.,*
　155 F.3d 1005 (8th Cir. 1998) ..............................................................48

*Sayles Hydro Assocs. v. Maughan,*
　985 F.2d 451 (9th Cir. 1993) ...............................................................28

*Schneidewind v. ANR Pipeline Co.,*
　485 U.S. 293 (1988) ...........................................................................50

*Seminole Tribe of Florida v. Florida,*
　517 U.S. 44 (1996)...............................................................................32

*Shaw v. Delta Air Lines, Inc.,*
　463 U.S. 85 (1983)...............................................................................26

*Verizon Maryland, Inc. v. Public Service Commission of Maryland,*
　535 U.S. 635 (2002) ....................................................................... 26, 35

*W. Lynn Creamery, Inc. v. Healy,*
　512 U.S. 186 (1994) ....................................................................... 26, 65

*Warth v. Seldin,*
　422 U.S. 490 (1975) ............................................................................22

# TABLE OF AUTHORITIES
## (continued)

Page

*Wiesmueller v. Kosobucki,*
 571 F.3d 699 (7th Cir. 2009) ..................................................... 22, 61, 62

*Wos v. E.M.A.,*
 568 U.S. 627 (2013) ....................................................................... 46, 49

*Ex Parte Young,*
 209 U.S. 123 (1908) ........................................................................ 33, 34

STATE CASES

*Commercial Nat'l Bank of Chicago v. City of Chicago,*
 432 N.E.2d 227 (Ill. 1982) ....................................................................62

*Kakos v. Butler,*
 63 N.E.3d 901 (Ill. 2016) .......................................................................24

*Lee v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago,*
 201 N.E.2d 361 (Ill. 1964) ......................................................................24

*People ex rel. Chicago Bar Ass'n v. State Bd. of Elections*
 558 N.E.2d 89 (Ill. 1990) ........................................................................23

REGULATORY CASES

*Am. Energy Co.,*
 91 FERC ¶ 62 (2000) ..............................................................................11

*MISO,*
 139 F.E.R.C. ¶ 61,199 (2012) .................................................................11

*PJM Interconnection, LLC,*
 119 FERC ¶ 61,318 (2007) .....................................................................56

*Promoting Wholesale Competition Through Open Access Non-
 Discriminatory Transmission Servs. by Pub. Utils.,* FERC
 Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996)................6

# TABLE OF AUTHORITIES
## (continued)

**Page**

*WSPP*,
    139 FERC ¶ 61,061 (2012) .................................................................54

**FEDERAL STATUTES**

16 U.S.C. § 824(a) ..........................................................................39

16 U.S.C. § 824(b)(1) .......................................................................4

16 U.S.C. §§ 824, *et seq* .......................................................1, passim

16 U.S.C. § 824a-3(h)(2)(B) ..........................................................35

16 U.S.C. § 824d(a)..................................................................3, passim

16 U.S.C. § 824d(e)........................................................................43

16 U.S.C. § 824e(a) ............................................................... 4, 37, 40

16 U.S.C. § 825p ................................................................. 16, 28, 29

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1292(a)(1) ....................................................................1

28 U.S.C. § 1331 ................................................................. 1, 26, 35

42 U.S.C. § 1983 ..............................................................................1

Public Utility Holding Company Act, 42 U.S.C. §§ 16451, *et seq.* ..........11

**STATE STATUTES**

20 ILCS 3855/1-10 .........................................................................12

20 ILCS 3855/1-75(c)(1)(E) ..........................................................52

20 ILCS 3855/1-75(d-5)(1)............................................................12

20 ILCS 3855/1-75(d-5)(1)(B) .................................................. 8, 21

# TABLE OF AUTHORITIES
## (continued)

Page

20 ILCS 3855/1-75(d-5)(1)(C) ............................................................ 12, 66

Act of Dec. 7, 2016, Sec. 1.5, 2016 Ill. Legis. Serv.
  P.A. 99-906 (S.B. 2814) ...........................................................66

H.R. 1146, 98th Gen. Assemb., Reg. Sess. (Ill. 2014)..............................66

## TREATISES

15 Moore's Federal Practice § 101.42 (3d ed. 2015) ................................23

## OTHER AUTHORITIES

*Black's Law Dictionary* ..............................................................50

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action in the Northern District of Illinois (Manish S. Shah, J.) to enjoin the Defendant State officials from enforcing the so-called Zero Emissions Credit ("ZEC") portion of an Illinois statute, the Future Energy Jobs Act ("FEJA").  Plaintiffs assert that the ZEC program is preempted by the Federal Power Act ("FPA"), 16 U.S.C. §§ 824, *et seq.* and violates the Commerce Clause.  Appendix ("App.") 6 (Complaint ("Compl."), District Court ECF Docket no. ("ECF") 1 ¶¶ 12-13.  The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

The district court denied Plaintiffs' motion for a preliminary injunction and entered final judgment dismissing the action. Memorandum Opinion and Order ("Op."), ECF 107; Judgment, ECF 108.  This Court has jurisdiction under 28 U.S.C. §§ 1291, 1292(a)(1).

Judgment was entered on July 14, 2017 (ECF 108), and Plaintiffs timely filed their Notice of Appeal on July 17, 2017 (ECF 109; FRAP 4(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

"The State of Illinois created a 'zero emission credit' program to effectively subsidize nuclear power generation and corresponding sales

1

of nuclear power in the wholesale market." Op. 1, ECF 107.  The issues

on appeal are:

1.  Whether Plaintiffs, who are injured by subsidies granted to competitors through the Illinois ZEC program, have standing.

2.  Whether *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), which interpreted the Medicaid Act, precludes private suits in equity to enforce the FPA, overruling decades of precedent allowing such private enforcement.

3.  Whether Plaintiffs' complaint states a claim that the Illinois ZEC program is subject to field or conflict preemption because it mandates that certain favored producers receive payments in connection with their wholesale electricity sales that exceed the FERC-approved auction clearing price and distort the wholesale electricity market.

4.  Whether the complaint states a claim that the ZEC program violates the dormant Commerce Clause by discriminating in favor of subsidized in-state nuclear plants.

5.  Whether the district court erred in denying Plaintiffs' motion for preliminary injunction.

## STATEMENT OF THE CASE

Illinois enacted FEJA to keep Exelon's unprofitable Clinton and

Quad Cities nuclear power plants in operation.  App. 26 (Compl. ¶ 58).

These two Illinois plants, like the plants that Plaintiffs operate, sell

electricity in wholesale auctions conducted under the supervision of the

Federal Energy Regulatory Commission ("FERC").  App. 15-17, 25, 32 (Compl. ¶¶ 36, 38, 54, 55, 72).  Clinton and Quad Cities were operating at a loss and, but for the ZEC subsidy, would have shut down to stem continuing losses.  App. 2, 26 (Compl. ¶¶ 2, 57).  To keep these plants operating, the ZEC program provides subsidies, over and above the FERC-approved auction rates, for the electricity they sell into wholesale auctions.  App. 26 (Compl. ¶ 58).

In providing ZEC subsidies tied to participation in wholesale markets, Illinois has usurped FERC's exclusive authority under the FPA to set just and reasonable rates received in connection with sales of electricity into wholesale auctions.  The Illinois ZEC program is identical in substance to a state program that the Supreme Court unanimously invalidated as preempted in *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).  The program invades FERC's exclusive jurisdiction because it replaces the FERC-determined just and reasonable prices for wholesale electricity with a different rate determined by the State.  ZEC subsidies also distort wholesale auction outcomes in conflict with FERC's policy of using auctions to set wholesale electricity prices.  Finally, the ZEC program favors two in-

state nuclear plants at the expense of out-of-state generators who compete in the same FERC auction markets, thereby violating the dormant Commerce Clause.

## A.    Facts

### 1.    The Federal Regulatory Scheme

The FPA gives FERC broad and exclusive authority over "the sale of electric energy at wholesale in interstate commerce," 16 U.S.C. § 824(b)(1), including regulation of any charges "in connection with" wholesale rates and any "rules and regulations affecting or pertaining to such rates or changes."  16 U.S.C. §§ 824d(a), 824e(a).  FERC has "exclusive jurisdiction over 'rates and charges ... received ... for or in connection with' interstate wholesale sales," *Hughes*, 136 S. Ct. at 1297 (quoting 16 U.S.C. § 824d(a)), and has exclusive authority to ensure that wholesale electricity rates are "just, reasonable, and not unduly discriminatory or preferential," *id*.

FERC has determined that the just and reasonable rates for wholesale energy and capacity should be set by competitive energy markets and auctions, rather than traditional cost-of-service ratemaking, in regions that have elected to join wholesale electricity markets, such as those at issue in this case.  *See* App. 12 (Compl. ¶ 29);

4

*N.J. Bd. of Public Utils. v. FERC*, 744 F.3d 74, 81 (3d Cir. 2014) ("FERC now seeks to ensure that market-based rates are 'just and reasonable' largely by overseeing the integrity of the interstate energy markets."). In states such as Illinois, regional transmission organizations and independent system operators manage the auctions that determine the wholesale rates energy producers receive, under rules and procedures that FERC has approved. *See* App. 12-13 (Compl. ¶ 30); *N.J. Bd*, 744 F.3d at 82. Chicago and northern Illinois are served by PJM Interconnection, L.L.C. ("PJM"). The rest of Illinois is served by Midcontinent Independent System Operator, Inc. ("MISO"). App. 12-13 (Compl. ¶¶ 29-31).

PJM and MISO operate two main types of wholesale auctions: energy and capacity. App. 13 (Compl. ¶ 31). Both auctions employ "stacking" of bids from lowest to highest until the requisite quantity is covered. App. 14, 18 (Compl. ¶¶ 35, 41). The price of the highest-stacked bid sets the "market clearing price," which all bidders at or below that price receive. *Id*. The clearing price is by definition the FERC-approved "just and reasonable" rate. *Hughes*, 136 S. Ct. at 1297.

5

In "energy" auctions, generators bid the price they will accept to sell a specified quantity of electrical output. App. 14-15 (Compl. ¶¶ 34-35). In "capacity" auctions, PJM or MISO purchase the option to call upon the generator to produce a specified amount of energy if and when needed, which insures the reliability of the electric system. App. 16-17 (Compl. ¶ 38).

FERC adopted the supply-demand based auction process "to bring more efficient, lower cost power to the Nation's electricity consumers" by aligning incentives. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996). "A high clearing price in the capacity auction encourages new generators to enter the market, increasing supply and thereby lowering the clearing price in same-day and next-day auctions three years' hence; a low clearing price discourages new entry and encourages retirement of existing high-cost generators." *Hughes*, 136 S. Ct. at 1293. Over time, the FERC-approved market design is self-correcting and leads to efficient economic equilibrium. App. 18 (Compl. ¶ 40).

### 2. The ZEC Program's Manipulation of Wholesale Markets

6

The Illinois ZEC program disrupts FERC's market-based approach to setting wholesale rates. To keep Exelon's Quad Cities and Clinton plants in operation, the ZEC program provides a subsidy payment for each megawatt of electricity these plants sell into the wholesale auction, over and above the FERC-approved auction price. It thus countermands the outcome of the FERC-regulated auction process, which sets rates too low to allow those plants to operate profitably. In so doing, the ZEC program artificially inflates supply, which depresses the auction clearing price to the disadvantage of more efficient wholesale market participants, including Plaintiffs.

The ZEC subsidy for Quad Cities and Clinton is expressly tethered to wholesale prices resulting from the PJM and MISO auctions. As auction prices decrease, the ZEC subsidy increases, and vice versa, thereby guaranteeing that the plants will be paid for wholesale electricity sales at the rate Illinois prefers, despite the prices resulting from the PJM and MISO auctions. App. 2-3 (Compl. ¶¶ 3-5).

The statutorily prescribed formula for calculating the ZEC price starts with a Base Subsidy Amount,[1] which the statute sets at $16.50 per megawatt hour ("MWh") through 2023, increasing by $1 per MWh annually thereafter through 2027. 20 ILCS 3855/1-75(d-5)(1)(B). The formula continues with a Price Adjustment, which is calculated as the amount by which a market price index exceeds a wholesale price baseline. *Id*. The market price index is calculated based on forward energy prices in PJM and the average of forward PJM and MISO capacity prices. *Id*. The price baseline is $31.40 per MWh, which was based on the historical wholesale prices in PJM and MISO. *Id*.; *see also* App. 30 (Compl. ¶ 30). (The operation of the ZEC pricing formula is explained in the Declaration of David DeRamus, ECF 38-3, App. 43 ("DeRamus Decl.").)

The upshot is that, from now through 2023, the subsidized plants are guaranteed a combined rate of $47.90 per MWh (the $16.50 Base Subsidy Amount plus the $31.40 price baseline) as long as the market-price index is between $31.40 and $47.90 per MWh, regardless of

---

[1] FEJA refers to this amount as the "Social Cost of Carbon," but because Plaintiffs dispute its derivation and allege it is simply a dollar amount designed to keep Clinton and Quad Cities in business, Plaintiffs refer to it instead as the Base Subsidy Amount.

fluctuations in the wholesale market prices within that collar. To the extent revenue from wholesale auctions fall short of that guaranteed price, the ZEC subsidy makes up the difference. Even if wholesale prices fall below $31.40 per MWh, the plants will receive a subsidy of $16.50. The operation of the ZEC as a collar on wholesale prices can be shown as follows:



App. 59 (DeRamus Decl., fig. 4, ECF 38-3). Illinois has effectively decreed that, until FERC's prices increase to a level deemed sufficient

by the State, the plants receiving ZECs will be paid for wholesale electricity sales at a rate established by the State.

Illinois requires "load serving entities" (LSEs)—local utilities that purchase power at wholesale and sell it at retail to end-use consumers—to make the ZEC subsidy payments to the favored nuclear power plants in addition to the FERC-approved auction rates that they pay for the wholesale power they purchase. LSEs pass the cost of the subsidy on to consumers. App. 5-6, 20-21 (Compl. ¶¶ 10-11, 46).

While FEJA does not expressly mandate that the plants receiving ZEC subsidies bid into the PJM and MISO auctions, it presupposes that they will do so. The whole purpose of FEJA was to shore up the Quad City and Clinton plants' economic performance by guaranteeing them more than they would receive in the PJM and MISO auctions. App. 2, 5, 21, 26 (Compl. ¶¶ 2, 9, 47, 57). The complaint alleges that these nuclear plants have no choice but to bid into those auctions. App. 5, 15-17, 25-26, 29-30, 32 (Compl. ¶¶ 10, 36, 38, 54, 55, 56, 64, 66, 72); Op. 30-32, ECF 107 (recognizing that "in practice," the ZEC program "ha[s] the effect of conditioning payment on clearing the wholesale auction"). Unlike plants whose output can be adjusted quickly in response to

fluctuations in demand, nuclear generators (including Quad Cities and Clinton) run continuously at maximum output. App. 15 (Compl. ¶ 36). Because they cannot store their production or sell it elsewhere, Quad Cities and Clinton typically bid into energy auctions as "price takers," selling their entire output at the market clearing price. *Id*. Exelon is legally obligated to bid Quad Cities and Clinton into the PJM and MISO capacity auctions, respectively. *See* App. 102-03 (Brief of Amicus PJM 10-11, ECF 88); *MISO*, 139 F.E.R.C. ¶61,199, at 260 (2012); Op. 30, ECF 107. Moreover, as an Exempt Wholesale Generator ("EWG") under the Public Utility Holding Company Act, 42 U.S.C. §§ 16451, *et seq*., Clinton must sell its electricity only at wholesale. *Am. Energy Co.*, 91 FERC ¶ 62,049 (2000).

The ZEC program changes not only the prices that result from FERC's auction-based system, but also the market's signal that certain plants are uneconomic and should close. Enabling the two state-favored nuclear plants to remain open increases capacity above economically efficient levels, reducing the value of other, more efficient generators' capacity. App. 12-13, 20-21, 31 (Compl. ¶¶ 30, 46, 66). In turn, the ZEC subsidies' manipulation of the wholesale market will deter investment

11

in and entry of efficient new generators, including zero-carbon renewables like wind and solar. The long-term result will be higher prices to consumers. App. 20-24 (Compl. ¶¶ 46, 49, 50).

### 3. Illinois' Targeted Subsidies for the Exelon Plants

Although the ZEC program is ostensibly open to any nuclear generator connected to PJM or MISO, 20 ILCS 3855/1-10 (definition of "Zero emission facility"), the only intended and actual recipients of the ZEC subsidies are Quad Cities and Clinton. App. 26 (Compl. ¶ 58). FEJA was enacted in response to Exelon's threat to close those plants. App. 2, 26 (Compl. ¶¶ 2, 57-58, 88).

ZECs are awarded through a "procurement process" run by the Illinois Power Agency and the Illinois Commerce Commission, based on "public interest criteria." App. 26-27 (Compl. ¶ 59) (citing 20 ILCS 3855/1-75(d-5)(1)(C)). Those "criteria" effectively require the agencies to select Clinton and Quad Cities. *Id.* For example, the statute references reports on the harmful effects of closing Clinton and Quad Cities, and it limits the ZEC program to 16% of the State's electricity needs—almost exactly the amount produced by these plants. 20 ILCS 3855/1-75(d-5)(1); App. 87-88 (DeRamus Decl. ¶ 115, ECF 38-3). When he signed

12

FEJA into law, the Governor said it would protect jobs at Clinton and Quad Cities, and on that same day, long before the "procurement process" even began, Exelon reversed its decision to close the plants and announced new hiring and capital improvements.  App. 27-28 (Compl. ¶ 61).  On an earnings call two months later, Exelon was so confident of the outcome of the so-called procurement process that it announced it was including ZEC revenue in its financial projections.  *Id.*

## B.    Procedural History

Plaintiffs filed the Complaint on February 14, 2017, and moved for a preliminary injunction on March 31, 2017.  App. 1 (Compl., ECF1); Mot., ECF 38.  A similar case brought by ratepayers was transferred to Judge Shah.  Motions to dismiss were filed both by the State Defendants and intervenor Exelon.  ECF Nos. 51, 53.  Judge Shah invited FERC to state its views on the issues, but it declined.  ECF Nos. 81, 91.  The court held the preliminary injunction motion in abeyance while it heard the motions to dismiss.  Op. 43, ECF 107.

In its order granting the motions to dismiss, the court first concluded that Plaintiffs lack Article III standing to challenge "the price adjustment feature of the ZEC program," but do have standing to seek a

13

prohibition on "enforcement of the ZEC program altogether." *Id*. 12-14. The court further concluded, however, that under *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), the FPA bars private plaintiffs from bringing "an equitable cause of action to enjoin the ZEC program on the basis of [FPA] preemption." *Id*. 22-23.

The court nevertheless proceeded to the merits. As to field preemption, the court held that the ZEC program did not impinge upon FERC's exclusive authority because, unlike the Maryland program in *Hughes*, the Illinois program did not impose a formal legal requirement on the nuclear plants to participate in and clear the capacity or energy auction in order to receive a subsidy. *Id*. 32. The court also found that Plaintiffs had not stated a claim for conflict preemption because FERC could "address any problem the ZEC program creates with respect to just and reasonable wholesale rates." *Id*. 34.

The court held that Plaintiffs lacked Article III standing to assert their Commerce Clause claims because the injuries are not "traceable to discrimination against the commerce of other states." *Id*. 16-17. The court then rejected the Commerce Clause claims on the merits, reasoning that the State's environmental and public-health rationales,

14

even though allegedly pretextual, outweighed the "alleged harm to out-of-state power generators who will be competing in auctions against subsidized participants." *Id*. 39-40.

Having granted the motions to dismiss, the court denied the preliminary injunction motion because "plaintiffs cannot show a likelihood of success on the merits." *Id*. 43 n.37.

Plaintiffs appealed.  Notice, ECF 109.

After the district court's decision in this case, a challenge to New York's ZEC program was dismissed. *Coalition for Competitive Elec. v. Zibelman*, No. 16-cv-08164-VEC, 2017 WL 3172866 (S.D.N.Y. Jul. 25, 2017).  That decision has been appealed to the Second Circuit.

## SUMMARY OF ARGUMENT

1.     Plaintiffs have standing because they are injured by the ZEC program's subsidization of their competitors, which will reduce their revenue.  The district court acknowledged as much but wrongly truncated Plaintiffs' standing, allowing Plaintiffs to challenge only the "creation of a minimum subsidy" but not the price adjustment feature that reduces the ZEC subsidy as wholesale market prices increase. FEJA makes clear, however, that the legislature viewed the price

15

adjustment as inextricably linked to the minimum price in computing the ZEC subsidy. Plaintiffs plausibly prayed for relief (invalidation of the ZEC subsidy as a whole) that would redress their injury.

2. Plaintiffs properly invoked the district court's equity jurisdiction to enjoin enforcement of the ZEC program as preempted by the FPA. Unlike the Medicaid Act construed in *Armstrong*, 135 S. Ct. 1378, the FPA does not evidence an intent to withdraw equity jurisdiction. On the contrary, the FPA expressly confers jurisdiction on district courts over "all suits in equity." 16 U.S.C. § 825p. Neither of the aspects of the Medicaid Act that led the Supreme Court in *Armstrong* to conclude that Congress had foreclosed equity jurisdiction—that the withholding of federal funds was the "sole remedy" provided in the Medicaid Act, and that the specialized statutory standard was not judicially administrable—are present in this case. The FPA provides an equitable remedy, and the determination of whether state law is preempted is within the traditional competence of the judiciary. Plaintiffs do not ask the Court to determine what rate is just and reasonable, but only to enforce FERC's jurisdiction to establish the just and reasonable rate via the auction process.

16

3.    On the merits, *Hughes*, 136 S. Ct. 1288, establishes that Illinois' ZEC program is field preempted because it intrudes into FERC's exclusive jurisdiction over wholesale power transactions.  Just as Maryland, in *Hughes*, could not effectively set a rate through a contract for differences that changed the amount wholesale power generators received for their sales, Illinois cannot do so through the expedient of calling its subsidization a "zero emissions credit" that manipulates the rate two favored nuclear plants receive for electricity they sell in the wholesale market.  In both cases, the state has effectively set a wholesale rate.

The district court erroneously concluded that *Hughes* does not apply because FEJA, unlike the Maryland statute in *Hughes*, does not formally mandate that ZEC recipients participate in the wholesale auctions.  But FERC's exclusive jurisdiction cannot be so easily evaded. Quad Cities and Clinton were already participating in the PJM and MISO auctions, and they have no choice but to continue to do so.  There was no need for the statute to require that ZEC-subsidized plants participate in and clear the auctions because the reality of their business compels it.  Because, as the district court acknowledged, the

ZEC program "effectively subsidize[s] nuclear power generation and corresponding sales of nuclear power in the wholesale markets" (Op. 1, ECF 107), the ZEC price "effectively replac[es] the auction clearing price" (*id.* 10). As such, the Illinois ZEC program is no different from the Maryland program that the Supreme Court held in *Hughes* was preempted.

4.    The district court also erred in dismissing Plaintiffs' conflict preemption claim on the basis that FERC could take steps to accommodate, *i.e.*, offset, the deleterious effects of the state scheme. States cannot thwart federal policy by shifting the burden to the federal agency to devise a mechanism that might partially ameliorate those effects.

5.    The district court further erred in pretermitting the factually intensive inquiry required to adjudicate a Commerce Clause claim where a statute operates to benefit only two in-state businesses.

6.    Because the district court denied a preliminary injunction based on its finding that Plaintiffs failed to state a claim, that decision must be reversed as well.

18

# ARGUMENT

## II.   STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's decision granting a motion to dismiss under Rule 12(b)(6), accepting all well-pleaded factual allegations in the complaint as true and drawing all reasonable inferences in favor of the appellants." *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 351 (7th Cir. 2017) (citation omitted). Denial of a preliminary injunction is reviewed for abuse of discretion, but no deference is given where, as here, the "decision… is premised on an error of law." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs*, 367 F.3d 675, 678 (7th Cir. 2004).

## III.   PLAINTIFFS' FEDERAL PREEMPTION CLAIMS ARE JUSTICIABLE.

### A.   The District Court Erred in Finding Plaintiffs Lacked Article III Standing to Challenge the Price Adjustment Component of the Illinois ZEC Subsidy.

To establish standing, Plaintiffs must show (1) an injury in fact, (2) fairly traceable to defendants' conduct, and (3) that likely would be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs allege that the ZEC program will harm them by depressing auction prices and producing lower revenues. App.

19

5 (Comp. ¶ 10).  These allegations establish an injury in fact traceable to defendants' conduct.  Plaintiffs also meet the redressability requirement.  They seek "a declaration that the portions of FEJA establishing the ZEC nuclear subsidies are invalid," and "a permanent injunction preventing Defendants from implementing FEJA's ZEC program."  App. 39 (Prayer).  Because the ZEC program causes the injury Plaintiffs allege, an injunction against its operation would redress that injury.

The district court nevertheless concluded that Plaintiffs had standing to challenge only one part of the ZEC subsidy price (the $16.50 Base Subsidy Amount) but not the interlocking Price Adjustment part.  Op. 12-14, ECF 107.  The court opined that Plaintiffs' harms are not traceable to the Price Adjustment because "eliminating the price adjustment feature would leave in place a fixed ZEC price that is equal to the [Base Subsidy Amount]," which would create a larger subsidy and thus more harm.  *Id.* 12-13.  While cast in terms of traceability, the district court's reasoning actually sounds in redressability: the court assumed that the remedy if Plaintiffs prevail would be an order "eliminating" only the Price Adjustment while "leav[ing] in place" the

20

Base Subsidy Amount.  *See id.* 13 ("injury would exist even if the statute were cured of its ties to the wholesale auction prices").

The text of FEJA, however, makes clear that the Base Subsidy Amount and Price Adjustment comprise a unitary subsidy.  The price per ZEC is "an amount that equals the [Base Subsidy Amount]…. However*, to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase*, the price in an applicable delivery year shall be reduced below the Base Subsidy Amount by the amount [of the] ('Price Adjustment')…."  20 ILCS 3855/1-75(d-5)(1)(B) (emphasis added).  This makes the Price Adjustment integral to the calculation of the subsidy.  The legislature capped the overall subsidy in relation to the wholesale price as a means "*to ensure*" that the cost to retail customers "remains affordable."

Plaintiffs plausibly prayed for relief that would redress their injury, namely, invalidation of the ZEC subsidy as a whole.  No more is required at this stage to establish standing.  The district court's assumption that, if Plaintiffs prevail, the remedy might be to invalidate only the Price Adjustment and not the Base Subsidy Amount constituted a premature consideration of the merits, *i.e.*, the relief the

21

court may grant if Plaintiffs were to prevail.  Op. 13, ECF 107.

Standing, however, "in no way depends on the merits."  *Warth v. Seldin*,

422 U.S. 490, 500 (1975); *see also Ariz. State Legislature v. Ariz. Indep.*

*Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (holding that

plaintiffs had standing, despite also holding that plaintiffs' claims failed

on the merits).

    *Lac Du Flambeau Band of Lake Superior Chippewa Indians v.*

*Norton*, 422 F.3d 490 (7th Cir. 2005), sets forth the correct approach.  In

that case, the plaintiff challenged a provision in a compact between an

Indian tribe and a state and sought an order severing that provision

from the compact.  The defendant argued that severance was not an

available remedy under the statute; instead, if plaintiff prevailed, the

case would be remanded to the agency, which might reapprove the

compact.  This Court rejected that argument as "confus[ing] standing

with the merits."  *Id*. at 501.  Because plaintiff's position regarding

available remedies was not "frivolous," redressability "depends upon the

relief requested, not the relief [plaintiff] could prove it was entitled to

on the merits.  Here, there is a substantial likelihood that the requested

relief would alleviate the harm."  *Id*. at 502.  *See also Wiesmueller v.*

*Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009) (standing exists "as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress"); 15 Moore's Federal Practice § 101.42 (3d ed. 2015) ("Redressability does not require that the plaintiff actually be entitled to the relief sought; it is enough that the requested relief, if granted, would redress the plaintiff's injury." (citing *Lac Du Flambeau*)).

Here, the "relief requested"—invalidation of the ZEC subsidy as a whole—would redress the harm alleged. Given the integrated nature of the Base Subsidy Amount and the Price Adjustment, that requested relief is hardly "frivolous," and the possibility is much more than "slight" that such relief will be granted.

In fact, the Price Adjustment could not be severed from the Base Subsidy Amount. Under Illinois law, despite a general severability clause, statutory provisions cannot be severed when they "are so mutually 'connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole.'" *People ex rel. Chicago Bar Ass'n v. State Bd. of Elections*, 558 N.E.2d 89, 98-99 (Ill. 1990). In

23

*Lee v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 201
N.E.2d 361, 363 (Ill. 1964), a limitation on eligibility for a benefit was
held inseverable because eliminating the limitation would "extend the
benefits to a much larger group and to greatly increase the burden on
taxpayers."  As in *Lee*, severing the Price Adjustment would render the
ZEC subsidy "essentially different in its effect and operation from what
it would be were the whole law valid," and the remedy therefore must
be to hold the ZEC subsidy "invalid as a whole."  *Id.*; *see also Kakos v.
Butler*, 63 N.E.3d 901, 911-12 (Ill. 2016) (unconstitutional "provision
reducing the size of the jury" could not be severed because it worked in
tandem with provision "raising the amount to be paid per juror" and the
legislature did not intend for the "cost of jury trials [to] dramatically
increase without any offset").

The principal case on which the district court relied to reject
standing, *Johnson v. United States Office of Personnel Management*,
783 F.3d 655 (7th Cir. 2015), is wholly inapposite.  *Johnson* is an
extremely unusual case in which a Senator and his staff member
challenged regulations under the Affordable Care Act that allowed them
"to receive more *favorable* treatment than they believe they are entitled

24

to—specifically, a pre-tax healthcare contribution from the government and insurance purchased from a SHOP exchange." *Id.* at 660 (emphasis original). The plaintiffs nevertheless asserted that they were injured by the portion of the regulation that required them to determine which members of the Senator's staff would be covered by the regulation. The Court rejected that theory, holding that any claimed administrative burden did not give the plaintiffs "standing to challenge the aspects of the Rule that they allege are illegal, which are *unrelated* to the imposition of an administrative burden." *Id.* at 661 (emphasis added). That holding has no bearing on this case, where the text of the statute expressly links the Base Subsidy Amount to the Price Adjustment. The *Johnson* court emphasized that the rule before it was "divisible," that it "substantively amend[ed] six separate regulations," and that plaintiffs' "alleged administrative burden is caused by amendments to a different regulation" than the one whose lawfulness they challenged. *Id.* at 663. In contrast, Plaintiffs challenge a single integrated subsidy.

By "analyz[ing] separately two parts of an integrated regulation," the district court impermissibly reframed Plaintiffs' claims and "divorced" the Base Subsidy Amount from the Price Adjustment,

contrary to the legislature's intent.  *Cf. W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).  Plaintiffs have standing to challenge the ZEC subsidy.

### B. The District Court Erred in Concluding that Congress Impliedly Foreclosed Private Party Enforcement of the FPA.

The district court also erred in holding that the FPA impliedly forecloses private suits for injunctive relief.  Op. 19, ECF 107.  This extraordinary ruling, if accepted, would wipe out a whole category of long-established federal jurisdiction under the FPA, and would similarly bar preemption claims to enforce many other federal statutes.

Plaintiffs seek injunctive and declaratory relief to prevent enforcement of a state law on the grounds that it is preempted by the FPA.  This is a classic invocation of equity jurisdiction.  In *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), the Court said it had "no doubt that federal courts have jurisdiction under [28 U.S.C.] § 1331 to entertain" a suit seeking a declaration that a state order was unlawful, and an injunction prohibiting its enforcement, on the grounds that it was preempted by federal law.  *Id*. at 642 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85,

96 n. 14 (1983)).  In *Armstrong*, 135 S. Ct. 1378, the Court reaffirmed its "long recogni[tion]" that where private plaintiffs assert that state action is preempted by federal law, "the court may issue an injunction upon finding the state regulatory actions preempted. … The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Id.* at 1384.

To be sure, as the *Armstrong* Court acknowledged, the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Id.* at 1385.  But the Court set a high bar for finding an implied limitation on the courts' equity jurisdiction.  It concluded that two interrelated features of the Medicaid Act "establish Congress's 'intent to foreclose' equitable relief."  *Id.*  First, the "sole remedy … for a State's failure to comply with Medicaid's requirements" was withholding of funds by the agency.  While this provision "might not, *by itself*, preclude the availability of equitable relief," it did so "when combined with the judicially unadministrable" standard expressed in the statute.  *Id.* (emphasis original).  Neither of these considerations applies to the FPA.

27

### 1.    The FPA Confirms, Rather than Forecloses, a Private Remedy.

In stark contrast to the Medicaid Act construed in *Armstrong*, the FPA expressly confers jurisdiction on district courts over "*all suits in equity* and actions at law," 16 U.S.C. § 825p (emphasis added).  That express grant of equity jurisdiction confirms the background presumption, reaffirmed in *Armstrong*, that courts possess equity jurisdiction to enjoin state laws that are preempted.

Federal courts have frequently exercised such equity jurisdiction to adjudicate private suits seeking to enjoin state action as preempted by the FPA.[2]  When Congress amended the FPA in 1978, 1980, 1986, 1992, 2005, and 2015, it is presumed to have known of that consistent

---

[2] *See, e.g.*, *PPL Energy Plus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014); *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84 (2d Cir. 2012); *AEP Texas N. Co. v. Texas Indus. Energy Consumers*, 473 F.3d 581 (5th Cir. 2006); *Public Service Co. v. Patch*, 167 F.3d 15 (1st Cir. 1998); *Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451 (9th Cir. 1993); *Appalachian Power Co. v. Public Service Comm'n of W. Va.*, 812 F.2d 898 (4th Cir. 1987); *Ark. Power & Light Co. v. Mo. Public Service Comm'n*, 829 F.2d 1444 (8th Cir. 1987).  *See also New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) (in a suit brought by a utility for declaratory and injunctive relief against a ratemaking order on the grounds that it was preempted by the FPA, holding that district court erred in abstaining); *Hughes*, 136 S. Ct. at 1296 n. 6 (because no party challenged whether plaintiffs could seek declaratory relief, Court "assumes without deciding that they may").

line of cases.  Under the prior construction canon, the Court may infer

that Congress adopted that interpretation of the FPA.  *See Jerman v.*

*Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 590

(2010); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987).

The district court nevertheless construed the FPA as evidencing

an intent to foreclose private enforcement actions for three reasons,

each of which is unavailing.

First, the court noted that the FPA authorizes FERC "to bring an

action in federal court to enjoin [unjust or unreasonable] acts or

practices."  Op. 20, ECF 107; *see also Coalition for Competitive Elec. v.*

*Zibelman,* No. 16-CV-8164 (VEC), 2017 WL 3172866, at *5 (S.D.N.Y.

July, 25, 2017).  But unlike the Medicaid Act, 16 U.S.C. § 825p does not

give FERC sole authority to enforce the FPA.  Instead, it confers federal

jurisdiction over "all" suits in equity, and this language must be

interpreted to include to private suits.  *First Jersey Sec., Inc. v. Bergen*,

605 F.2d 690, 694 (3d Cir. 1979) ("primary purpose" of statutory

provision granting jurisdiction over "'all suits in equity and actions at

law … '" is to "provide exclusive federal jurisdiction for suits brought by

the [agency] or private parties").  FERC's authority under other

provisions of the FPA to institute administrative or judicial proceedings
(Op. 20, ECF 107) cannot be read to negate Congress's express grant of
district court jurisdiction over "all suits in equity."  Rather, both
provisions can, and therefore must, be given effect by reading the FPA
to allow for parallel private and agency enforcement.  *E.g.*, *Duncan v.
Walker*, 533 U.S. 167, 174 (2001) (discussing anti-surplusage canon).
That is why these remedies have coexisted in the federal courts for
decades.  Neither *Armstrong* nor any other case has even remotely
suggested that the government's ability to bring an action forecloses a
private suit in equity.  *Friends of the E. Hampton Airport, Inc. v. Town
of E. Hampton*, 841 F.3d 133, 146 (2d Cir. 2016) (*Armstrong* did not
preclude equity jurisdiction under the Airport Noise Control Act
because "[t]he fact that Congress conferred such broad enforcement
authority on the FAA, and not on private parties, does not imply its
intent to bar such parties from invoking federal jurisdiction … to
preclude a municipal entity from subjecting them to local laws enacted
in violation of federal requirements").  And because nearly every federal
statute can be enforced by the federal government, the district court's
novel holding would wipe out the long-recognized right of private

30

parties to bring equitable suits to enjoin state action that is preempted by federal law.

Second, the district court pointed to the FPA's establishment of administrative remedies before FERC, and suggested that Plaintiffs' purported "failure to exhaust" those remedies was "problematic." Op. 21, ECF 107. The FPA, however, does not condition its express grant of equity jurisdiction on the exhaustion of administrative remedies. *See Brown v. MCI WorldCom Network Services, Inc.*, 277 F.3d 1166, 1173 (9th Cir. 2002) (when a federal statute "does not require that a plaintiff exhaust his administrative remedies before proceeding to federal court," the "plaintiff[] may elect to proceed either before the [agency] or in district court").

As *Armstrong* illustrates, the existence of an alternative agency remedy does not, alone, "preclude the availability of equitable relief"; it was the Medicaid Act's "sole remedy … *combined with*" substantive standards ill-suited to judicial decisionmaking that precluded such relief. 135 S. Ct. at 1385 (emphasis added). The FPA is just one of many federal statutes that allow an aggrieved party to pursue administrative remedies, and yet have been enforced by private parties

31

in injunction suits against preempted state action. *See, e.g., Ass'n of Am. R.R.s v. South Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096 (9th Cir. 2010) (considering preemption claim under the Interstate Commerce Commission Termination Act of 1995, even though statute also allows administrative remedies); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 463 (8th Cir. 1993) (considering preemption claim under the Hazardous Materials Transportation Act, even though statute provides for administrative remedies).

In attempting to cast FERC's regulatory and remedial authority as exclusive, the district court erroneously relied on *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). That case involved the Indian Gaming Regulatory Act ("IGRA"), which created an integrated right (to good faith negotiation with the State regarding a gaming compact) and remedy (a judicial order to negotiate for 60 days, followed by mediation, followed by a decision by the Secretary of the Interior). After concluding that the remedial provisions were unconstitutional, *id.* at 73, the Court held that a judicially created remedy would "cast[] aside" remedial "limitations" on the substantive right created by the statute.

*Id*. at 74-76. By contrast with the "quite modest set of sanctions" in IGRA, an equitable action under *Ex Parte Young*, 209 U.S. 123 (1908), would expose the state official "to the full remedial powers of a federal court." *Id*. at 75. Because there would be no reason to follow the "intricate," limited remedial scheme set forth in IGRA if "complete and more immediate relief would be available under *Ex Parte Young*," the Court concluded that such an equitable action was incompatible with the statute. *Id*.

The FPA is completely different. It does not say or imply that it can be enforced only in an administrative proceeding, or otherwise establish specific and limited remedies for violation of its substantive commands. On the contrary, the FPA expressly confers equity jurisdiction on the federal courts, thereby giving both FERC and private parties the prerogative to invoke the jurisdiction of the federal courts to enforce the FPA against states. Whereas IGRA "impose[d] upon the State a liability that is significantly more *limited* than would be the liability imposed upon the state officer under *Ex parte Young*," 517 U.S. at 75-76, the FPA includes no such limitation. It all but uses the phrase *Ex Parte Young*.

Third, the district court erroneously concluded that the Public

Utility Regulatory Policies Act ("PURPA") demonstrates that the FPA

forecloses private equitable relief.  Op. 20, ECF 107; *see also Coalition*

*for Competitive Elec.,* 2017 WL 3172866, at *6.  The court invoked the

presence of an express private right of action in PUPRA to infer that

the absence of a similar express private right of action in the FPA was

"intentional."  Op. 20, ECF 107.  Plaintiffs, however, do not claim that

the FPA creates a private right of action.  As *Armstrong* explained, the

"ability to sue to enjoin unconstitutional actions by state … officers" is a

"judge-made remedy" grounded in the courts' equitable power.  135 S.

Ct. at 1384.  It does not require a general "private right of action."  *Id*.

As noted, many cases have entertained preemption claims for

declaratory and injunctive relief, without regard to the existence of a

private right of action under the FPA.  *See supra* note 2.

   *Verizon Maryland* is on point.  There, the Court found no need to

decide whether the Telecommunications Act of 1996 created a private

cause of action because the claim that the state's action was preempted

fell within traditional federal question jurisdiction to entertain an

equitable action.  535 U.S. at 642-43.  The Court also rejected the

argument that the Act stripped the courts of such jurisdiction by including a private right of action to obtain judicial review of certain types of state decisions (but not the one at issue in that case) for conformity with the standards set forth in the statute.  The statute "merely makes *some other* actions by state commissions reviewable in federal court.  This is not enough to eliminate jurisdiction under § 1331."  *Id.* at 643 (emphasis original).  Under *Verizon Maryland*, PURPA's creation, decades after the FPA, of a private right of action to enforce *different* substantive standards, cannot be read to foreclose private enforcement actions.

The district court also interpreted PURPA's requirement that parties exhaust FERC administrative remedies before instituting an action in federal court, 16 U.S.C. § 824a-3(h)(2)(B), to suggest that Plaintiffs' failure to exhaust administrative remedies in this case was "problematic."  Op. 21, ECF 107.  On the contrary, the inclusion of an express exhaustion requirement in PURPA, contrasted with the absence of such a requirement under the FPA, suggests that exhaustion is *not* required under the FPA.  Of course, that assumes PURPA is relevant at all to the interpretation of the scope of equity jurisdiction

35

under the FPA, but "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117-18 (1980) (quotations omitted).

### 2.    The FPA Is Judicially Administrable.

In *Armstrong*, the Supreme Court concluded that the Medicaid Act's remedy provision "by itself" might not preclude equitable relief, but did so "when combined with the judicially unadministrable nature of § 30(A)'s text" and the "sheer complexity" of the statute's health-care mandate.  135 S. Ct. at 1385; *see also id.* at 1388 (Breyer, J., concurring) (emphasizing the "broad and nonspecific" nature of the statutory mandate).  That mandate directed states to provide for Medicaid rates "'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of … care and services.'" *Id.* at 1385 (citation omitted).  In concluding that Plaintiffs' action turned on a similarly "judicially unadministrable" standard (Op. 22, ECF 107), the district court misconstrued Plaintiffs' claims.

The standards applicable to Plaintiffs' preemption claim are well within the traditional competence of the courts, and a far cry from the

health-care mandate in *Armstrong*. Plaintiffs ask the court to determine whether Illinois' ZEC program impinges upon FERC's exclusive regulatory authority over rates and charges "received ... in connection with" wholesale electricity rates and "rules and regulations pertaining to or affecting such rates or charges." 16 U.S.C. § 824d(a); *see also* § 824e(a). The FPA provisions allocate regulatory responsibility between the federal government and the states, an issue familiar to the courts. The statutory text delimiting FERC's power cannot be compared, either in breadth or "sheer complexity," to Section 30(A) of the Medicaid Act. It describes the jurisdictional nexus to wholesale electricity rates using phrases ("in connection with" and "pertaining to or affecting") that courts frequently encounter in statutes. *See FERC v. Elec. Power Supply Ass'n (EPSA)*, 136 S. Ct. at 764, 774 (2016) (construing FERC's "affecting" jurisdiction under the FPA and referencing "similar terms like 'relating to' or 'in connection with'"). Because courts routinely apply these sorts of statutory limitations, they cannot be equated with a "judgment laden standard" requiring determinations about "efficiency, economy, and quality of care." *Armstrong*, 135 S. Ct. at 1385; *accord Friends of East Hampton*, 841

F.3d at 147 (distinguishing *Armstrong* and recognizing equity jurisdiction because a "federal court can evaluate … compliance with [the Airport Noise Control Act] without engaging in [a] 'judgment-laden review…'").

The judicial administrability of the FPA's jurisdictional standards is confirmed by the decades of precedent resolving FPA preemption questions, including in *Hughes*, where the Supreme Court applied identical preemption principles, grounded in the same FPA provisions. *See infra* p. 42.   Because the Supreme Court had no trouble applying the FPA's provisions establishing FERC power, and because Plaintiffs' action rests upon the same provision, the district court was wrong to conclude that their suit "would require the application of 'judicially unadministrable' standards." Op. 21, ECF 107.  Even the district court in *Coalition for Competitive Energy* disagreed with this conclusion. 2017 WL 3172866, at *6-7.

The district court was equally wrong in suggesting that Plaintiffs' suit would require it to apply the "'judgment-laden'" standard for "just and reasonable" rates.  The issue in this case is not what rates should be set, but who should set them.  Like the plaintiffs in *Hughes*,

Plaintiffs are not asking the court to set "just and reasonable" wholesale rates—or to set any rates at all. FERC has already established that the "just and reasonable" rate is the one fixed by wholesale auctions, and Plaintiffs seek merely to enforce that determination. That is the same relief, requiring the same preemption analysis, that the district court would need to weigh if FERC itself challenged Illinois' ZEC program.

## IV. THE ZEC PROGRAM IS PREEMPTED BY THE FEDERAL POWER ACT.

### A. The ZEC Program Is Preempted Because It Intrudes upon an Exclusively Federal Field of Law by Ensuring that Certain Favored Power Generators Receive Payments in Connection with Their Wholesale Electricity Sales Over and Above the Rates that FERC Has Determined Are Just and Reasonable.

Congress invested FERC with exclusive power over the field of interstate wholesale electricity sales. 16 U.S.C. § 824(a) (FERC's exclusive jurisdiction covers "the sale of [electric] energy at wholesale in interstate commerce"). In particular, the FPA gives FERC exclusive authority over "[a]ll rates and charges … received by any public utility for or in connection with the … sale of electric energy" for resale. *See Id*. § 824d(a), 824e(a).

FERC's authority to ensure just and reasonable wholesale rates is cast in encompassing terms. That authority is not limited to regulating

39

the specific rates that utilities pay directly "for" wholesale electricity, but extends to "[a]ll" payments that sellers "receive[]" from whatever source "in connection with" wholesale sales, as well as to "all rules and regulations affecting or pertaining to such rates." *Id.* § 824d(a). As the Supreme Court has explained, this statutory text makes crystal clear that "[t]he FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'" *EPSA*, 136 S. Ct. 760, 780 (2016) (quoting *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 91 (1963)). Because state programs that provide for additional payments to producers "in connection with" their sale of electricity into the wholesale market "invade[] FERC's regulatory turf," they are preempted by the FPA. *Hughes*, 136 S. Ct. at 1297.

When the rates for wholesale electricity sales in PJM and MISO are established via the FERC-approved auction process, those rates are by definition the rates that FERC has determined to be just and reasonable. *See supra* pp. 4-6. A state's attempt to augment those rates through additional payments to wholesale sellers is necessarily an

40

attempt to change the rate that FERC has approved.  That is precisely
what Illinois has done.  Its ZEC program is therefore preempted.

    **1.    The ZEC Program Is Functionally
Indistinguishable from the Program that Was
Found Preempted in *Hughes*.**

    The ZEC program ensures that Exelon's two Illinois nuclear
plants receive payments for their wholesale electricity sales that exceed
the just and reasonable rates established by the FERC-approved PJM
and MISO auctions.  These ZEC subsidy payments guarantee that, over
a wide range of market clearing prices, the two favored plants receive
the rate that Illinois deems appropriate (currently $47.90 per MWh),
rather than the FERC-approved rates set at auction.  To the extent the
FERC-approved auction rates fall below $47.90, the favored producers
receive ZEC payments to make up the difference (up to a maximum
subsidy of $16.50 per MWh).

    In substance, the Illinois ZEC program is identical to the
Maryland subsidy program that the Supreme Court unanimously held
pre-empted in *Hughes*.  Maryland required LSEs to enter into
"contract[s] for differences" with a favored power plant.  136 S. Ct. at
1294.  If the plant cleared the PJM capacity auction, but the clearing

41

price fell below the state's target price, LSEs paid the difference to the plant; if the PJM price rose above the target, the plant paid the difference to the LSEs. *Id. at* 1295. As long as the plant cleared the capacity auction, it was guaranteed to receive the legislature's target rate. *See id.*

The Supreme Court had no difficulty seeing that Maryland's program impermissibly "sets an interstate wholesale rate, contravening the FPA's division of authority between state and federal regulators." *Id.* at 1297; *accord id.* at 1300 (Sotomayor, J., concurring); *id.* at 1301 (Thomas, J., concurring in the judgment). It did not matter that Maryland's goal was to encourage construction of new generators. "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Id.* at 1298.

The Illinois ZEC program intrudes on FERC's exclusive authority over wholesale rates in the same way. Just as in *Hughes*, the State requires LSEs to make up the difference between the legislature's target rate and the FERC-approved market rates. Just as in *Hughes*, the amount of the subsidy varies inversely with FERC-approved auction

rates—as market prices rise, the subsidy falls, and as market prices fall, the subsidy goes up. And just as in *Hughes*, the subsidy is necessarily "received" by the favored producers "in connection with" the sale of electricity on wholesale markets. 16 U.S.C. §§ 824d(a), 824d(e).

*All* of the electricity that these favored producers generate must be bid into and clear the PJM and MISO auctions. The complaint alleges—and it is a well-understood reality—that the nuclear plants eligible for ZEC payments have sold their output into the PJM and MISO auctions (App. 25, 32 (Compl. ¶¶ 54, 72)), and "will continue to bid into the wholesale market auctions" (App. 5 (Compl. ¶ 10)), because they "have no alternative" (App. 15 (Compl. ¶ 36)), such that the ZEC subsidy "will not occur unless the 'winning' nuclear generators sell their energy into the wholesale markets" (App. 30 (Compl. ¶ 64)). *See also* App. 16-17, 25, 31-32 (Compl. ¶¶ 38, 54, 55, 56 66, 72); App. 56 (DeRamus Decl. ¶ 35, ECF 38-3 ("In PJM and MISO, there is simply no practical means for a selected nuclear unit to avoid bidding into, and ultimately clearing, the wholesale energy markets, if it is to receive any ZEC payments.")). The ZEC program is therefore preempted for the same reasons that Maryland's program was preempted. PJM, the

43

FERC-regulated entity that administers the auctions, agrees: "The proposed ZEC payments here, in their structure, effect, and apparent purpose, appear to be economically equivalent to the contract for differences at issue in *Hughes* and should be treated the same." App. 106 (PJM Amicus Brief 14, ECF 88).

The district court's effort to distinguish *Hughes* is wholly unpersuasive. The district court acknowledged that the ZEC program does exactly what *Hughes* held a State may not do: it "effectively replac[es] the auction clearing price." Op. 10, ECF 107; *see also id.* 1 (ZEC program "effectively subsidize[s] nuclear power generation and corresponding sales of nuclear power *in the wholesale markets*" (emphasis added)). The court nevertheless justified its departure from *Hughes* by seizing on the one ostensible difference between Maryland's program and the ZEC program—the fact that FEJA does not expressly mandate participation in the auctions as a condition of receiving the ZEC. But Illinois had no need to impose such a formal requirement. Unlike the new gas plant Maryland sought to encourage in *Hughes* (App. 105 (PJM Amicus Brief 13, ECF 88)), Illinois' goal was to prop up two existing nuclear power plants, which the Illinois legislature knew

44

were *already* participating, and had no choice but to participate, in the auctions. Indeed, the legislature enacted the ZEC program in direct response to the plants' inability to remain profitable at wholesale auction rates. Nevertheless, for the district court the absence of a formal "express condition" mandating that a producer clear the wholesale auction was sufficient to defeat preemption, even though the ZEC program "in practice (and when combined with other market forces), ha[s] the effect of conditioning payment on clearing the wholesale auction." Op. 32, ECF 107.

The district court's conclusion cannot be reconciled with *Hughes* and other precedents enforcing the FPA's jurisdictional boundaries, or with the Supreme Court's clear direction about how preemption analysis proceeds. The Maryland program at issue in *Hughes* was preempted because it "set[] an interstate wholesale rate" by ensuring that a favored producer would receive additional state-required payments in connection with the wholesale electricity it sold at auction. 136 S. Ct. at 1297. The ZEC program does the exact same thing. It does not matter whether a state sets a wholesale rate through variable subsidies *expressly* conditioned on clearing the auction, or through

45

variable subsidies "that in practice … have the effect of conditioning payment on clearing the wholesale auction."  Op. 32, ECF 107.  "The FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'"  *EPSA*, 136 S. Ct. at 780 (quoting *N. Nat. Gas Co.*, 372 U.S. at 91); *accord Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 360-64 (1988) (invalidating state attempt to second-guess the reasonableness of interstate wholesale rates); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956-62 (1986) (same).

The Supreme Court has been emphatic that "[p]reemption is not a matter of semantics," *Wos v. E.M.A.*, 568 U.S. 627, 636 (2013), and has repeatedly rejected the kind of form-over-substance evasions in which the district court engaged here:

> a State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect…. In a preemption case … a proper analysis requires consideration of what the state law in fact does, not how a litigant might choose to describe it.

568 U.S. at 636.  *Accord Nat'l Meat Assoc. v. Harris*, 565 U.S. 452, 462-64 (2012) (holding state law preempted based on its practical operation).

46

Similarly, in *Northern Natural Gas Co. v. State Corporation Commission of Kansas*, 372 U.S. 84 (1963), the Court held that a state rule requiring an interstate pipeline to purchase gas ratably from producers was preempted because its practical effect was to regulate wholesale gas prices. While the state rule did not expressly regulate wholesale prices, "our inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases …. The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, or for state regulations which would indirectly achieve the same result." *Id*. at 90-91 (citations omitted); *see also Chicago & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325 (1981) (state causes of action based on railroad's discontinuation of operation are preempted because their practical effect is to sanction the carrier for abandonment, which is within the federal agency's exclusive jurisdiction).[3]

---

[3] *See also  N.J. Realty Title Ins. Co. v. Div. of Tax Appeals,* 338 U.S. 665, 673 (1950) ("Our inquiry is narrowed to whether in practical operation and effect the tax is in part a tax upon federal bonds … regardless of the accounting label employed in describing it."); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192-95 (4th Cir. 2007) (preempting law that "effectively mandated" conduct subject to exclusive federal jurisdiction, as it left employers with no other

Seeking a way around this binding authority, the district court

hypothesized that the ZEC program *might* differ in practice from the

Maryland program preempted in *Hughes* because generators *might*

"receive ZECs even if they do not clear the capacity auction and even if

they do not participate in the energy auction." (Op. 30.)  That

speculation was impermissible.  The complaint alleges that Clinton and

Quad Cities have bid and must continue to bid in the wholesale energy

markets administered by PJM and MISO.  Because the district court

was required to accept those allegations as true (and because they are

true), "what the state law in fact does," *Wos*, 568 U.S. at 637, is no

different from what the law preempted in *Hughes* did.

---

"rational choice" but to follow a certain course); *S.D. Mining Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998) (ordinance that prohibited the "only practical way" of mining in an area deemed a "de facto ban" on all mining in that area and therefore held preempted); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1508 (10th Cir. 1994) (local law imposing "explicit or de facto" ban on federally encouraged activity can be preempted).  The district court distinguished these cases on the ground that they involve state action that effectively prohibited conduct that federal law authorized.  Op. 29 n.28, ECF 107.  But the principle that courts look to the practical effect of a state law in evaluating preemption applies in all preemption cases.

The Clinton and Quad Cities plants are not only practically required to bid into the wholesale markets; they are legally mandated to do so, both because Exelon is a member of PJM and MISO, whose FERC tariffs require such participation (App. 102-03 (PJM Amicus Brief 10-11, ECF 88)), and because Clinton is an EWG (*see* App. 25 (Compl. ¶ 56)). The district court nevertheless speculated that "Clinton could forego its EWG status and seek [Illinois Commerce Commission] approval to sell its energy at retail…." Op. 30 n.30, ECF 107. In addition to ignoring the allegations in the complaint (*see* App.15-16 (Compl. ¶ 36)), the district court cited no case supporting the proposition that a state regulation escapes preemption if the state *might* subsequently approve a change that would remove regulated entities from the federal sphere. The rule is the opposite: if a state regulation "presents the 'prospect of interference with the federal regulatory power,' then the state law may be pre-empted even though 'collision between the state and federal regulation may not be an inevitable consequence.'" *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (quoting *N. Nat. Gas Co.*, 372 U.S. at 91-92).

49

The district court's errors stem in significant part from its misreading of the Supreme Court's *EPSA* decision. *EPSA* did not give states a green light to "effectively" set wholesale rates as long as they avoided doing so explicitly or "nominally." Op. 27, ECF 107. The *EPSA* majority and dissent sparred over whether a FERC regulation that had an effect on *opportunity costs* of retail transactions would "effectively" set retail rates. *See EPSA*, 136 S. Ct. at 777. The majority concluded that "altering consumers' incentives to purchase that product" by changing the "cost of a foregone economic opportunity" is not the same as setting a rate for the product, *id*. at 777-78, and the dissent disagreed, *id*. at 784. But every member of the Court agreed that a regulation sets retail rates if it "establish[es] the amount of money a consumer will hand over in exchange for power," *id*. at 777—whether it does so "nominally," "effectively," "expressly," or in any other manner. *See id*.; *id. at* 786-87 (Scalia, J., dissenting) (citing *Black's Law Dictionary* for the idea that "the very definition of price" is "[t]he amount of money or other consideration asked for or given in exchange for something else" (internal quotations omitted)). The ZEC program establishes a target amount of money that certain nuclear plants will

50

receive in connection with their wholesale electricity sales, and thus

sets a rate under the definitions of both the *EPSA* majority and dissent.

Properly understood, *EPSA* refutes the district court's analysis.

> ### 2. Preemption of the ZEC Program Leaves Illinois with Ample Authority to Achieve Legitimate Policy Objectives Within Its Protected Sphere of Authority Under the FPA.

Preempting Illinois' ZEC program merely removes one particular

"regulatory means that intrude[s] on FERC's authority over interstate

wholesale rates." *Hughes*, 136 S. Ct. at 1298.  Illinois retains ample

authority to promote power generation and to protect the health and

welfare of its citizens through other means not tethered to the FERC-

approved rates set by wholesale auctions.  The State can provide tax

incentives or land grants, construct state-owned generation facilities,

opt out of the deregulated market entirely, or even provide direct

subsidy payments not tethered to wholesale markets.  *See id.* at 1299

(identifying but not addressing the permissibility of such measures).

But what the State cannot do is dictate the amounts that plants receive

in connection with their sales of electricity at wholesale.

In particular, Plaintiffs do not allege that state Renewable Energy

Credit ("REC") programs are preempted.  Typical REC programs allow

qualified renewable energy sources, such as solar, wind, or biomass, to earn RECs for each unit of output.  App. 23-24 (Compl. ¶ 51).  States may require LSEs to acquire RECs or make an alternative compliance payment.  *Id*.  The purpose of RECs is to induce new entry by renewable generators, not to bail out existing generators that have failed in a competitive market they chose to enter.

For purposes of the preemption analysis in this case, the fundamental difference between ZECs and RECs is how the prices are determined.  Whereas the ZEC subsidy is tethered to wholesale prices, REC prices are essentially determined by supply and demand of renewable energy: as LSEs seek to buy more RECs, the price goes up,[4] as does the incentive for producers to generate additional clean energy.  App. 24 (Compl. ¶ 52).  As such, the price of RECs can rise or fall based on forces independent of wholesale production (namely, the supply of and demand for renewable energy).  Because RECs do not set wholesale rates as the ZEC program does, they lack the ZEC program's "fatal defect."  *Hughes*, 136 S. Ct. at 1299.  *See also* App. 102 (PJM Amicus Brief 10 n.4, ECF 88) (whereas ZEC payments "are targeted to

---

[4] Illinois caps the price of RECs and the aggregate retail rate impact of RECs.  20 ILCS 3855/1-75(c)(1)(E).

supplementing wholesale market revenues," other subsidies for renewables "are both determined and awarded in a manner entirely separate from the wholesale market").

Nonetheless, the district court assumed that "RECs are similar to ZECs," in that they both purport to provide compensation for the environmental attributes of certain generation sources. Op. 32, ECF 107. But the field preemption analysis does not turn on whether Illinois' true goal was environmental. *But see* App. 26 (Compl. ¶ 58) (alleging that true purpose was to protect jobs). The flaw in ZECs, which does not apply to RECs, is that they are tethered to the wholesale market. "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes*, 136 S. Ct. at 1298.

In a pre-*Hughes* decision, *WSPP*, 139 FERC ¶ 61,061 (2012), FERC addressed a REC program that had no connection to an organized market with energy and capacity auctions, let alone one tethered to the wholesale price set by such auctions. FERC explained that "based on available information," RECs were outside its jurisdiction if they did not provide for payments "in connection with"

the sale of electricity at wholesale.  *Id.* ¶ 24.  FERC was careful to limit its holding to the features of the particular REC program before it, stating that "although a transaction may not directly involve the transmission or sale of electric energy, the transaction could still fall under the Commission's jurisdiction because it is 'in connection with' or 'affects' jurisdictional rates or charges."  *Id.* ¶ 22.  FERC noted that it would have jurisdiction over programs "that directly affect the rate or are closely related to the rate."  *Id.* (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004)).  Contrary to the district court's analysis (Op. 32-33, ECF 107), the identification of a renewable attribute separate from the energy commodity was not alone sufficient to avoid FERC's jurisdiction; FERC emphasized the lack of a connection between the REC program at issue in *WSPP* and wholesale rates—the polar opposite of the ZEC program.

## B.     The ZEC Program Conflicts with Federal Law that Requires Wholesale Rates to Be Determined in Approved Auction Markets.

Even if it does not intrude on a preempted federal field, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Oneok, Inc. v,*

54

*Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (internal quotation marks omitted), or if it "interferes with the methods by which the federal statute was designed to reach this goal," *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

The method FERC has chosen to achieve the statutory goal of just and reasonable rates for wholesale power transactions is to rely on auctions administered by PJM and MISO. In its review and approval of PJM and MISO rules, FERC seeks to balance competing interests. Rates should be high enough to encourage development of new generation when demand exceeds supply or when power can be generated more efficiently. Rates should be low enough to encourage the retirement of inefficient facilities if more efficient generators can meet expected demand; rates should be affordable based on current needs but also sufficient to encourage investment to satisfy projected future needs; rates should encourage innovation without discouraging investment by undermining settled expectations; and so forth. *See, e.g.*, *Hughes*, 136 S. Ct. at 1293; *PJM Interconnection, LLC*, 119 FERC ¶ 61,318, ¶ 2 (2007).

The intended and actual effect of Illinois' ZEC program is to ensure that Exelon's Illinois nuclear plants will be compensated for their wholesale electricity sales at rates above what FERC has determined they should receive. *See Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1037 (7th Cir. 2008) (conflict preemption analysis considers not only the text of the law, but also whether conflict will arise in practice). Illinois has done so to ensure that these two plants remain in operation despite their inability to compete at FERC-approved rates. In this way, the ZEC program directly interferes with the policy objectives reflected in FERC's market-based ratesetting. *See PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 479 (4th Cir. 2014) ("[T]he [contracts for differences] are structured to actually set the price received at wholesale. They therefore directly conflict with the auction rates approved by FERC."), *affirmed on other grounds sub. nom. Hughes*, 136 S. Ct. 1288; *Pub. Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 650 (9th Cir. 2004) ("[B]y asking the court to set a fair price, Grays Harbor is invoking a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach it goals (specifically, FERC regulation of wholesale

electricity rates).”); App. 93 (PJM Amicus Brief 1, ECF 88 (FEJA “will substantially harm the wholesale electricity markets” and “will frustrate Congress’ intent to promote competition”)); App. 99 (*id.* 7 (“[g]enerators that receive subsidies to prevent them from retiring in response to the price signals coming from the PJM market represent uneconomic generation whose continued participation distorts PJM’s market outcomes by suppressing prices”)).

The distortive effects of the ZEC program radiate through the FERC-approved auction process in multiple ways.  Because the favored plants are guaranteed a rate of $47.90 per MWh across a wide range of market-clearing prices, Clinton and Quad Cities will bid all of their output into the MISO and PJM energy auctions for the next decade. Further, because the ZEC subsidy provides sufficient additional revenue to keep the plants in the black, Clinton and Quad Cities have every incentive to bid into the capacity auctions at a price they will clear, even zero, taking the market clearing price of the capacity auctions.  The ZEC not only insulates these generators from FERC’s ratesetting (which should “encourage[] retirement of existing high-cost generators,” *Hughes*, 136 S. Ct. at 1293), but also distorts price signals

to all other plants in the market by artificially increasing supply and depressing the market rates. That, in turn, discourages investment in more efficient generation and may lead to the retirement of plants that, under FERC's approved ratesetting, would otherwise remain in the market. *See id.; see also Nazarian*, 753 F.3d at 478-79 (finding that state ratesetting "has the potential to seriously distort the PJM auction's price signals, thus 'interfer[ing] with the method by which the federal statute was designed to reach its goals'" (quoting *Pub. Util. Dist.*, 379 F.3d at 650)).

The district court brushed aside this conflict on the theory that "FERC can address any problem the ZEC program creates with respect to just and reasonable rates," *id. at* 34-35. But that gets matters exactly backwards. Illinois "cannot regulate in a domain Congress assigned to FERC and then require FERC to accommodate [the State's] intrusion." *Hughes*, 136 S. Ct. at 1298 n. 11. *See also Maryland v. Louisiana*, 451 U.S. 725, 751 (1981) ("FERC need not adjust its rulings to accommodate the [state program]. To the contrary, the State may not trespass on the authority of the federal agency."); *accord Nazarian*, 753 F.3d at 479 ("The fact that FERC was forced to mitigate the

Generation Order's distorting effects using the MOPR, however, tends to confirm rather than refute the existence of a conflict."). The ZEC program establishes an alternative rate that conflicts with the market-based rates FERC has already established; even if FERC could partially mitigate that conflict—and the district court did not explain how it could actually do so—FERC is not required to "accommodate" this state-imposed ratesetting.

This does not mean that Illinois lacks authority to take any measures that may have an effect on the price signals that the FERC-approved auction rates provide to the market. But Illinois cannot distort the price signals that the auctions send by ensuring that certain favored produces will be guaranteed to receive a state-approved rate for wholesale electricity sales, rather than the FERC-approved rate. That is the necessary consequence of the FPA's allocation of authority between the federal government and the States. Because the ZEC program interferes in a direct and substantial way with FERC's regulation of the wholesale market, it is preempted.

59

## V.    PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE COMMERCE CLAUSE.

The Commerce Clause protects Plaintiffs from the "competitive injury" caused by "the 'inability to compete on an equal footing'" with the subsidized Illinois plants.  *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594-95 (7th Cir. 1995).  The ZEC subsidy was enacted for the purpose of allowing those Illinois plants to prevail in interstate competition against Plaintiffs, thereby preserving local jobs.  This protectionism violates the Commerce Clause.

### A.    Plaintiffs Have Standing to Raise Commerce Clause Claims.

Plaintiffs have standing to raise their Commerce Clause claims because ZEC subsidies inflict a competitive injury upon them in the interstate market for wholesale energy, and the ZEC program was enacted to benefit local plants.  The district court repeated the same severability error it made with respect to the Price Adjustment when it concluded that Plaintiffs lack standing because "the injury to the generator plaintiffs is from the ZEC subsidy, not the identity of the ZEC recipient" and that the subsidy "would continue to exist even if the legislation were cured of the alleged discrimination."  Op. 16, 17, ECF 107 (citation and internal quotations omitted).

60

FEJA injures Plaintiffs because it allows the Exelon plants to continue dumping their energy, at what would otherwise be an insupportable loss, by paying a subsidy for every MWh the plants generate.  Absent the subsidy, the plants would close.  Whether Plaintiffs' "injuries would continue to exist even if the legislation were cured of the alleged discrimination" depends on the remedy selected, and it is premature to decide that question now or to assume that the remedy would not include invalidation of the ZEC subsidy.  *See supra* pp. 21-23.

Plaintiffs have standing because it cannot be said with certainty that Illinois would provide the ZEC subsidy without directing it to the in-state Exelon plants.  *Wiesmueller*, 571 F.3d at 703.  As the complaint and FEJA's history—indeed, its very name: "Future Energy *Jobs* Act"—establish, directing the subsidy to those plants, and thereby protecting their local "good paying jobs," was the whole point.  App. 27-28 (Compl. ¶ 61 & nn.5-8).  There is far more than a "nonnegligible" and "nontheoretical" chance, *Wiesmueller*, 571 F.3d at 703, that Illinois would have forgone the subsidy altogether rather than compelling Illinois electricity consumers to provide a $3 billion subsidy to out-of-

state generators, propping up out-of-state jobs rather than local ones.
Moreover, under Illinois law, "if a proviso operates to limit the scope of
the act in such a manner that by striking out the proviso the remainder
of the statute would have a broader scope either as to subject or
territory, then the whole of the act is invalid because such an extended
operation would not be in accordance with the legislative intent."
*Commercial Nat'l Bank of Chicago v. City of Chicago*, 432 N.E.2d 227,
241 (Ill. 1982).  Giving the ZEC subsidy "broader scope as to subject
[and] territory"—by allowing out-of-state plants to benefit—"would not
be in accordance with the legislative intent."  *Id.*

Because striking down the protectionist aspect of the ZEC subsidy
would end the subsidy altogether, Plaintiffs have standing.

### B.   Plaintiffs State a Claim for a Commerce Clause Violation.

Courts apply "a two-tiered approach to analyzing state economic
regulation under the Commerce Clause."  *Brown-Forman Distillers
Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).  Under
the first "tier," a state law is *per se* invalid if it discriminates against
interstate commerce on its face, *see, e.g., Camps Newfound/Owatonna,
Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997); has the "practical

effect" of favoring in-state economic businesses, *see, e.g., Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1277-78 (7th Cir. 1992); or evinces a protectionist purpose, *see, e.g., Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984). Under the second "tier," even a state law that survives the first tier because it "is neutral on its face, has only indirect or incidental effects on interstate commerce, and regulates evenhandedly," *Gov't Suppliers*, 975 F.2d at 1277, is invalid if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The ZEC subsidy fails both tiers of Commerce Clause scrutiny.

### 1.    The ZEC Subsidy is a *Per Se* Violation of the Commerce Clause.

MISO and PJM are hubs of interstate commerce; they operate integrated markets covering 13 States (PJM) and 15 States (MISO). App. 12-13 (Compl. ¶ 30). Plaintiffs compete directly with the in-state Exelon plants in this interstate market. App. 15-16 (Compl. ¶ 36). These plants, however, have failed in the interstate wholesale power markets administered by MISO and PJM, leading Exelon to close the plants unless "the State enacted 'adequate legislation' to provide

billions of dollars in ratepayer-funded subsidies." *See* App. 25-26 (Compl. ¶¶ 54-55, 57). Illinois enacted FEJA to provide those subsidies. App. 26 (Compl. ¶ 58). Governor Rauner signed the bill at an Exelon plant, flanked by Exelon executives, promising to protect the "Clinton and Quad Cities' plants" and the jobs they provide. App. 27-28 (Compl. ¶ 61 & nn.5-8).

FEJA's market manipulation to prop up local businesses presents a textbook Commerce Clause violation. For instance, the town in *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383 (1994), determined "that special financing [was] necessary to ensure the long-term survival" of a local solid waste transfer station. Like Illinois, it decided to "employ discriminatory regulation to give that project an advantage over rival businesses." *Id.* at 394. The Supreme Court held this was impermissible because the station operated on "the open market to earn revenues" and though the regulation did not "in explicit terms seek to regulate interstate commerce, it [did] so nonetheless by its practical effect and design." *Id.* Likewise, in *Alliance for Clean Coal*, Illinois sought to prop up its local coal industry by encouraging the use of scrubbers to allow the continued burning of Illinois coal. This

ran afoul of the Commerce Clause by "neutralizing the advantage possessed by lower cost out of state producers." 44 F.3d at 595. This Court recognized that "even ingenious discrimination is forbidden by the Commerce Clause." *Id.* at 596 (quoting *West Lynn Creamery*, 512 U.S. 186). Plaintiffs similarly allege that the ZEC program discriminates on its face, and in effect and purpose, by deliberately propping up the in-state Exelon plants via a distortion of the interstate energy market. App. 26-27 (Compl. ¶¶ 58-59).

While FEJA does not expressly state that the ZEC subsidies will be awarded only to the in-state Exelon plants, Plaintiffs have plausibly alleged that this outcome is foreordained, and that the "procurement process" is a "sham" because it can only come out in favor of the Exelon plants. App. 26-28 (Compl. ¶¶ 59-61). FEJA directs officials to give weight to "the premature closure of existing nuclear power plants in Illinois."[5] H.R. 1146, 98th Gen. Assemb., Reg. Sess. (Ill. 2014); *see* Act

---

[5] The district court observed that the statute also directs State officials to consult other reports and apparently credited Exelon's assertion that some of them concern non-Illinois plants. Op. 37 n.34, ECF 107. This improperly drew inferences against Plaintiffs, and neither Exelon nor the court even identified the reports. Resolution 1146 reports are the only reports specifically identified in the statute. *See* 20 ILCS 3855/1-75(d-5)(1)(C).

of Dec. 7, 2016, Sec. 1.5, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814);

20 ILCS 3855/1-75(d-5)(1)(C) (both referencing H.R. 1146). The

complaint alleges that FEJA, by design, protects the in-state plants

that could no longer fairly compete in the wholesale market. App. 26-28

(Compl. ¶¶ 58-61). There is no doubt as to the outcome of the

"procurement process": Exelon *promptly added ZEC subsidy revenues to

its projected income before any selection took place.* App. 28 (Compl. ¶

61).

The district court nevertheless found that the "statute gives

neutral, non-discriminatory standards to the agencies," and was

unwilling to accept that "the agencies will deliberately flout the ZEC

bid-selection process." Op. 37, ECF 107. But as even the district court

acknowledged, the complaint alleges that "the scales are tipped in favor

of Clinton and Quad Cities." *Id.* 36-37. Plaintiffs do not need to plead

that the agencies will discriminate against out-of-state bids, because

the law itself already accomplishes that discrimination with its "tipped"

scales.

In arriving at the contrary conclusion, the district court

disregarded the allegations in the complaint and substituted its own

implausible surmise as to what the facts would show. Op. 39, ECF 107 ("*Notwithstanding the allegations of the complaint*, the circumstances surrounding the enactment of the statute do not warrant an inference of discrimination.") (emphasis added). The court speculated that perhaps the bill's environmental standards "would justify a decision to select only Illinois generators." Op. 36, ECF 107. But the standards themselves were designed to ensure Exelon would win the bids.

Because the ZEC subsidy on its face, and in effect, interferes with interstate commerce by subsidizing the local Exelon plants in their competition against out-of-state generators in the MISO and PJM auction, and because tilting the playing field in favor of the local Exelon plants was the motive of the subsidy, the law triggers all three concerns that apply at the first "tier" of Commerce Clause scrutiny. *See supra* page 63. For that reason, the subsidy is *per se* a Commerce Clause violation, and there is no need to weigh the putative local interests.

> **2.    The ZEC Subsidy Inflicts Harms on Interstate Commerce that Outweigh Any Putative Local Interests.**

Even if there were some legitimate interest for a measure intended to protect two in-state facilities, the complaint pleads that the

harm to interstate competition in the wholesale energy market outweighs that interest. For that reason, the subsidy would fall at the second tier just as it must at the first. The complaint alleges that the ZEC program imposes market-distorting burdens that will drive out, and deter entry of, more cost-efficient, environmentally friendly out-of-state generators. App. 20-23 (Compl. ¶¶ 45-50). Further, any reduction of carbon emissions can be achieved more effectively by non-discriminatory means. App. 7, 37-38 (Compl. ¶¶ 14, 89). At a minimum, determining the balance of benefits and burdens requires an evidentiary record that precludes judgment on the pleadings, for such balancing "may be impossible to apply without some factual inquiries." *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995).

To escape those factual inquiries, the district court misapplied *Pike*. The court asserted that, "*[a]s a matter of law*, the state's legitimate interests include not only environmental concerns, but also the right to participate in or create a market, and the right to encourage power generation of its choosing." Op. 40, ECF 107 (emphasis added) (citations omitted). Whether those interests are legitimate may be a

legal question, but whether they are pretextual is a factual question, and Plaintiffs have plausibly pleaded that this "state law purporting to promote environmental purposes is in reality 'simple economic protectionism.'" *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 471 (1981) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

Next, the district court asserted that while, "ordinarily, the fact-dependent balancing required to assess a dormant commerce clause challenge would preclude dismissal under Rule 12(b)(6)," that was not so here because "where the complaints allege a state-created commodity that only indirectly burdens other generators' ability to compete in wholesale auctions, they fail to state a dormant commerce clause claim." Op. 40, ECF 107. But the complaint alleges—and FEJA's provisions establish—a market manipulation in favor of the local Exelon plants that directly burdens Plaintiffs' ability to compete by allowing the Exelon plants to dump their power in the wholesale electricity market. Unlike the direct state market *participation* in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809 (1976), Illinois' subsidy to Exelon "cannot plausibly be analogized to the activity of a

private purchaser." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988). Illinois is not paying Exelon to provide energy to the state government; it is subsidizing Exelon's sales to third-parties in transactions not involving the state. That is like the market *manipulation* found offensive in *C & A Carbone* and *Alliance for Clean Coal*.

At the motion to dismiss stage, the question is not whether Illinois ultimately will be able to show that it had a legitimate, non-protectionist motive for subsidizing the Exelon plants that predominates over the harm to the interstate market in wholesale energy. Instead, the question is whether, *given the facts alleged in the complaint*, Plaintiffs are entitled to an opportunity to prove the contrary. Plaintiffs should be given that opportunity in light of the facts pled in the complaint showing invidious protectionism, supported by FEJA's text and history.

## VI. PLAINTIFFS ARE ENTITLED TO A HEARING ON THEIR MOTION FOR A PRELIMINARY INJUNCTION.

After staying briefing on Plaintiffs' preliminary injunction motion and dismissing Plaintiffs' Complaint, the court denied the preliminary injunction motion without a hearing because "plaintiffs cannot show a

likelihood of success on the merits." Op. 43 n.37, ECF 107. As noted, however, the Complaint states valid preemption and Commerce Clause causes of action. The expert declaration of Dr. DeRamus, filed with the preliminary injunction motion, provides strong evidentiary support for the Complaint's allegations.

The denial of the preliminary injunction motion should be reversed.

## CONCLUSION

The decision granting defendants' motion to dismiss should be reversed and the case remanded with instructions to consider Plaintiffs' motion for preliminary injunction.

Dated:  August 30, 2017

Respectfully submitted,

By:  */s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
Henry Weissmann
Fred A. Rowley, Jr.
Mark Yohalem
MUNGER, TOLLES &
 OLSON LLP

Jonathan D. Schiller
David A Barrett
Stuart H. Singer
Pascual Oliu
BOIES, SCHILLER
 FLEXNER LLP

Leonard A. Gail
Jonathan S. Massey
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL LLP

*Attorneys for Plaintiffs-Appellants*

## <u>Certificate of Compliance</u>

1.  This brief complies with the type-volume limit of Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,949 words, as determined by Microsoft Word 2010.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)  and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.


By:  */s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Attorney for*
*Plaintiffs-Appellants*

## Circuit Rule 30(d) Statement

I certify that all materials required by Circuit Rule 30(a) and 30(b) are attached to the brief or included in a separately bound Appendix.


## Certificate of Service

I HEREBY CERTIFY that on August 30, 2017, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

By:  */s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Attorney for*
*Plaintiffs-Appellants*

74

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VILLAGE OF OLD MILL CREEK, *et al.*,

        Plaintiffs,

    v.

ANTHONY M. STAR , in his official
capacity as Director of the Illinois
Power Agency, *et al.*,

        Defendants.

and

ELECTRIC POWER SUPPLY ASSOCIATION,
*et al.*,

        Plaintiffs,

    v.

ANTHONY M. STAR , in his official
capacity as Director of the Illinois
Power Agency, *et al.*,

        Defendants.

No. 17 CV 1163 and
No. 17 CV 1164

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

The state of Illinois created a "zero emission credit" program to effectively

subsidize nuclear power generation and corresponding sales of nuclear power in the

wholesale market. The Future Energy Jobs Act[1] amended the Illinois Power Agency

Act, 20 ILCS 3855/1-1 *et seq.*, and created a new commodity, the ZEC. The statute

---

[1] *See* SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016), available at
http://www.ilga.gov/legislation/99/SB/PDF/09900SB2814enr.pdf.

grants ZECs to certain qualifying energy-generating facilities. Those facilities are likely to be two nuclear power plants owned by Exelon in Illinois. Utilities that sell electricity to consumers must purchase ZECs from the qualifying power plants, and those utilities will pass the costs of ZECs onto their customers. The result is money in the coffers of Exelon from the sale of ZECs that will give it a benefit when pricing its energy in the wholesale market relative to competing energy producers that do not receive ZEC payments.

Two sets of plaintiffs filed suit to challenge the statute. In one case, the plaintiffs, Village of Old Mill Creek, Ferrite International Company, Got It Maid, Inc., Nafisca Zotos, Robert Dillon, Richard Owens, and Robin Hawkins, are delivery services customers of Commonwealth Edison Company in Illinois. In the second suit, plaintiff Electric Power Supply Association is a national industry association for competitive electric power producers, and plaintiffs Calpine Corporation, Dynegy Inc., Eastern Generation, LLC, and NRG Energy, Inc. are independent power producers that operate generators nationwide and provide wholesale electricity to utilities. Both the consumer plaintiffs and the generator plaintiffs bring claims against Anthony Star in his official capacity as Director of the Illinois Power Agency and the Commissioners of the Illinois Commerce Commission in their official capacities, seeking to invalidate the statute. Exelon intervened in both actions to defend the ZEC program.

Defendants and Exelon each filed motions to dismiss the complaints. The motions are granted.

2

## I.     Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When analyzing a motion under Rule 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, but a court need not accept legal conclusions or conclusory allegations. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) *as amended* (Jan. 3, 2012) (citing *Iqbal*, 556 U.S. at 680–82). Rule 12(b)(6) limits a court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *see also* Fed. R. Evid. 201(b). A challenge to plaintiffs' standing to bring a claim is a challenge to the court's subject-matter jurisdiction, and as in a Rule 12(b)(6) motion, the facts of the complaint are accepted as true. *Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015).

## II.     Background

These two lawsuits are companion cases. The complaints are substantially similar, except that the consumer plaintiffs have an additional claim under the equal protection clause. In responding to defendants' and Exelon's motions to

dismiss, the consumer plaintiffs largely adopted the generator plaintiffs' arguments.[2]

## A.    The Federal Power Act, FERC, and Wholesale Energy Markets

The Federal Power Act, 16 U.S.C. § 791a *et seq.*, allows both the Federal Energy Regulatory Commission and the states to regulate aspects of the electricity industry. Under the Federal Power Act, FERC has exclusive jurisdiction over wholesale sales of electric energy in the interstate market; it has the power to regulate wholesale electricity rates and any rule or practice that affects such rates.[3] 16 U.S.C. §§ 824(b), 824e(a). The states may regulate "any other sale" of electricity, which includes retail electric energy sales. *Id.* § 824(b).

FERC regulates wholesale rates of electric energy via interstate auctions. [1] ¶¶ 29–30. For most of Illinois, wholesale electricity is exchanged through auctions conducted by the Midcontinent Independent System Operator, Inc.[4] *Id.* ¶ 30. In Chicago and parts of northern Illinois, wholesale electricity is exchanged through auctions conducted by PJM Interconnection, L.L.C.[5] *Id.* Gaps between the supply and demand of electric energy can cause "uncontrolled widespread blackouts." *Id.* ¶ 32. To prevent such gaps, MISO and PJM continuously run two types of wholesale

---

[2] Bracketed numbers refer to entries on the district court docket, and unless otherwise noted, citations are to the 17-cv-1164 docket; referenced page numbers are from the CM/ECF header placed at the top of filings.

[3] A "wholesale" sale is the sale of electric energy to a buyer "for resale" to another buyer. 16 U.S.C. § 824(d).

[4] MISO is an independent system operator that serves fifteen states as well as one Canadian province. [1] ¶ 30.

[5] PJM is a regional transmission organization that serves thirteen states and the District of Columbia. [1] ¶ 30.

4

auctions, "energy" and "capacity," because electricity cannot be stored economically or in sufficient quantities. *Id.* ¶¶ 31–32.

Both MISO and PJM run day-ahead and real-time energy auctions. *Id.* ¶ 31. In the day-ahead energy auction, generators submit a bid for a price at which they are willing to generate a particular quantity of electricity to be delivered the next day. *Id.* ¶ 34. In the real-time energy auction, MISO and PJM each increase or decrease the prices of electric energy every five minutes to signal the need for generators to produce more or less electricity as conditions change in real time. *Id.* "In contrast to the energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to purchase electricity." *Id.* ¶ 38 (emphasis original). MISO and PJM calculate the generating capacity needed for the electric grid to run reliably each year and they establish the amount of capacity that retail electric suppliers, known as load serving entities, must purchase to meet customer demand in their territory each year.[6] *Id.* ¶ 37. To satisfy capacity obligations, load servicing entities may either enter into bilateral contracts with generators or they may participate in an auction market conducted by MISO or PJM. *Id.* "Each generator that sells capacity in the MISO and PJM capacity markets is required to participate in the day-ahead energy market, and to respond in real-time, if conditions warrant." *Id.* ¶ 38.

---

[6] FERC oversees this process and requires MISO to purchase annual capacity obligations one month before the relevant delivery period and PJM to purchase capacity obligations three years ahead of the relevant delivery period. [1] ¶ 39.

For both energy and capacity auctions, MISO and PJM use a process called "stacking" to accept generators' bids. *Id.* ¶¶ 41–42. The generators' bids are stacked from lowest to highest in price, and MISO and PJM accept bids in that order until the demand has been met. *Id.* ¶ 41. Each bid that is accepted is said to "clear the market." *Id.* The price of the highest-accepted bid is called the "market clearing price"; all generators receive that price for each bid they submitted that cleared the market, even if a generator submitted a bid at a lower price. *Id.* ¶¶ 35, 41. Since nuclear generators run continuously at maximum output and have no alternative to selling their output in MISO and PJM auctions, they submit conservative bids in the hopes of clearing the auction.[7] *Id.* ¶ 36. During times of oversupply, nuclear generators will even pay to offload their energy output onto the grid, by submitting a bid for a negative price, so that they have room to generate more energy in the future. *Id.* This bidding strategy results in lower market clearing prices. *Id.*

## B.    Illinois's Future Energy Jobs Act and the ZEC Program

Exelon Corporation announced that it would shut down two of its nuclear generator facilities, Clinton and Quad Cities, unless the Illinois General Assembly passed "adequate legislation." [38-4] at 2–3. The two plants had lost more than $800 million over the last six years; but closing the plants would result in the estimated loss of 4,200 direct and secondary jobs, as well as approximately $1.2 billion in economic activity within four years. Succumbing to that pressure, the Illinois

---

[7] Generators' sources of compensation are predominantly their energy market and capacity market revenues; to a much lesser extent they also receive compensation from their ancillary services. [1] ¶ 43.

General Assembly created the zero emission credit program in the Future Energy Jobs Act.[8] The statute amends the Illinois Power Agency Act. *See* 20 ILCS 3855/1-1 *et seq*. When the governor signed the legislation into law, Exelon confirmed that Clinton and Quad Cities would operate for another ten years due to the new legislation. [38-11] at 2–3.

According to plaintiffs, the legislature's asserted goal for the statute, "environmental protection," was mere pretext for a bailout for Exelon's Clinton and Quad Cities plants. [1] ¶ 58. The actual purpose of the statute—to save jobs and local tax revenues—was clear from its title, "Future Energy Jobs Act." *Id*. Plaintiffs also noted that when the governor signed the bill into law, he said, "The Future Energy Jobs bill protects taxpayers, ratepayers, and the good-paying jobs at the Clinton and Quad Cities' plants." *Id*. ¶ 61.

The statute created a new commodity called a zero emission credit. A ZEC is a tradeable credit that represents the environmental attributes of one megawatt hour of energy produced from a zero emission facility (a nuclear power plant interconnected with MISO or PJM). 20 ILCS 3855/1-10. The Illinois Power Agency confers ZECs on those facilities that are "reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16%[9] of the

---

[8] *Illinois governor signs energy bill to help Exelon nuclear plants*, S&P GLOBAL PLATTS, (Dec. 7, 2016), available at http://www.platts.com/latest-news/electric-power/washington/illinois-governor-signs-energy-bill-to-help-exelon-21280324.

[9] Plaintiffs are suspicious of the 16% figure since it perfectly aligns with the amount of electricity that Clinton and Quad Cities provide. [100] at 24:2–8. They believe that the fact that the legislature used the 16% figure instead of calculating a competitive environmental amount that is universally beneficial is further proof that this is not an "open-ended

7

actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014."[10] 20 ILCS 3855/1-75(d-5)(1). Utilities are required to enter into contracts to purchase the ZECs from the winning zero emission facilities. *Id.* § 1-75(d-5)(1)(C-5). The contracts will have a term of ten years, ending May 31, 2027. *Id.* § 1-75(d-5)(1).

The retail suppliers must purchase all of the ZECs conferred on the selected zero emission facilities in each delivery year. *Id.* The price for each ZEC is the Social Cost of Carbon[11]; but, it may be reduced according to a "Price Adjustment," which is "the amount [. . .] by which the market price index[12] for the applicable delivery year

---

program" in which other plants can compete, but it is a subsidy for Clinton and Quad Cities. *Id.* at 24:2–8, 30:11–17.

[10] The Illinois statute modeled the ZEC program on Renewable Energy Credit programs, which many states, including Illinois, have enacted. [38-3] ¶ 46; [1] ¶ 51; *see also* 20 ILCS 3855/1-75(c). Generally, under such programs, "qualified renewable generators (such as solar, wind, and biomass) earn RECs for each MWh of electricity they generate," and retail suppliers "are required to acquire a certain number of RECs each year or make an Alternative Compliance Payment." [1] ¶ 51. All qualified renewable generators create RECs. *Id.* ¶ 52. "RECs are competitively traded outside of the wholesale energy markets, so that their value varies based on supply and demand." *Id.*

[11] The U.S. Interagency Working Group on Social Cost of Carbon set the price for the Social Cost of Carbon at $16.50 per megawatt hour in August 2016. 20 ILCS 3855/1-75(d-5)(1)(B)(i).

[12] The market price index each delivery year is the sum of projected energy and capacity prices. 20 ILCS 3855/1-75(d-5)(1)(B)(iii). Projected energy prices are calculated using the energy forward prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year. *Id.* § 1-75(d-5)(1)(B)(iii)(aa). Projected capacity prices are calculated using the sum of fifty percent of the Base Residual Auction price, as determined by PJM, divided by twenty-four hours per day, and multiplied by fifty percent of the resource auction price, as determined by MISO's resource auction, divided by twenty-four hours per day. *Id.* § 1-75(d-5)(1)(B)(iii)(bb). PJM's Base Residual Auction is held each year during the month of May; it determines capacity obligations for a delivery year three years in advance. *See RPM Base Residual Auction FAQs*, PJM, available at https://www.pjm.com/~/media/markets-ops/rpm/rpm-auction-info/rpm-base-residual-auction-faqs.ashx.

exceeds the baseline market price index[13] for the consecutive 12-month period ending May 31, 2016." *Id.* § 1-75(d-5)(1)(B). The purpose of the price adjustment is "to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase." *Id.*

To receive ZECs, facilities must participate in a procurement process and submit eligibility information, such as annual power generation and cost projections, to the Illinois Power Agency. *Id.* § 1-75(d-5)(1)(A). The IPA will publish its proposed zero emission standard procurement plan, which will explain how bids will be selected based on "public interest criteria," such as minimizing carbon dioxide emissions that result from electricity consumed in Illinois, and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of Illinois. *Id.* § 1-75(d-5)(1)(C). The procurement plan will also provide a detailed explanation about how the IPA will consider and weigh each public interest factor. *Id.* In developing the plan, the IPA will review "any reports issued by a State agency, board, or commission [. . .], as well as publicly available analyses and studies performed by or for regional transmission organizations that serve the State and their independent market monitors." *Id.*

---

[13] The baseline market price index for the consecutive twelve-month period ending May 31, 2016 is $31.40 per megawatt hour. 20 ILCS 3855/1-75(d-5)(1)(B)(ii). This is based on the sum of the average of PJM's day-ahead energy auction price, fifty percent multiplied by the Base Residual Auction capacity price, as determined by PJM, divided by 24 hours per day, and fifty percent multiplied by the Planning Resource Auction capacity price, as determined by MISO, divided by 24 hours per day. *Id.*

### C.    Effects of the ZEC Program

The sale of ZECs will provide those selected nuclear plants with out-of-market payments for each megawatt hour of electricity they produce, "effectively replacing the auction clearing price received by these plants with the alternative, higher price preferred by the Illinois General Assembly." [1] ¶ 4. This will affect the FERC-approved energy market auction structure not only because the nuclear plants will not retire as scheduled, but also because they will continue to bid into the wholesale market auctions at artificially lower prices. *Id.* ¶¶ 6, 10.[14] Lower auction prices lead to lower revenues for all generators. *Id.* ¶ 10. In turn, low revenues could cause generators that are more efficient than the ZEC recipients to exit the market or it could deter potential new generators from entering the market. *Id.* Additionally, "artificially suppressed wholesale market prices are likely to result in higher energy bills for retail ratepayers as they are forced to pay the nuclear subsidy as a charge on their retail electric bills." *Id.* ¶ 11. ZECs are estimated to cost Illinois' ratepayers $235 million per year over ten years. *Id.* ¶ 3.

The generator plaintiffs believe that they will incur millions of dollars in damages because they will lose auctions they otherwise would have won and they will receive less revenue from auctions they do win. *Id.* ¶ 66. Meanwhile, the consumer plaintiffs will face higher utilities bills as Commonwealth Edison Company and Amaren Illinois increase retail charges pursuant to the automatic

---

[14] At current wholesale prices, for every megawatt hour of energy the subsidized nuclear plants sell into the FERC-jurisdictional market, they will receive the locational price of energy (approximately $18 and $25 per MWh at Quad Cities and Clinton, respectively), plus a ZEC payment subsidy (approximately $16.50 in 2017, with possible increases in future years). [1] ¶ 7.

adjustment tariffs.[15] 17-cv-1163, [28] ¶ 2 (citing 20 ILCS 3855/1-75(d-5)(1)(B) and (d-6)(6)).

Plaintiffs seek to invalidate the ZEC program by arguing that it is preempted by the Federal Power Act and that it violates the dormant commerce clause. *See* [1] ¶¶ 76–93. The consumer plaintiffs also allege that the program denies them the equal protection of federal laws governing the wholesale electricity markets, in violation of the Fourteenth Amendment. 17-cv-1163, [1] ¶¶ 88–94.

## III.    Analysis

### A.    Standing

Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. Const., art. III, § 2. To establish constitutional standing, plaintiffs must show an "injury in fact" that is "fairly traceable" to the defendant's conduct and that is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). At the pleading stage, the plaintiffs must clearly allege facts that demonstrate each element. *Id.* To establish "prudential"[16] or statutory standing, plaintiffs must show that the statutory cause of action encompasses the plaintiffs' claim. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). The presumption is that "a statutory cause of action extends only to plaintiffs whose

---

[15] Commonwealth Edison Company, a subsidiary of Exelon, filed a proposed tariff modification with the ICC, which will allow Commonwealth Edison Company to bill all retail customers a ZEC charge of 0.195 cents per kilowatt hour beginning June 1, 2017. 17-cv-1163, [65] at 2; [65-1]. One of the consumer plaintiffs has already received a bill for the "Zero Emission Standard" charge. 17-cv-1163, [70] at 2.

[16] *See Lexmark International v. Static Control Components*, 134 S. Ct. 1377, 1386 (2014) (describing the "prudential" label as misleading).

interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). Courts use "traditional tools of statutory interpretation" to decide whether a plaintiff is within the zone of interests and therefore has statutory standing. *Bank of Am.*, 137 S. Ct. at 1303. The inquiry is not whether Congress *should have* authorized the plaintiff's cause of action, but whether Congress *in fact* authorized it. *Lexmark*, 134 S. Ct. at 1388 ("Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, [. . .] it cannot limit a cause of action that Congress has created merely because 'prudence' dictates.").

1. *The Generator Plaintiffs Do Not Have Article III Standing to Challenge the Price Adjustment*

The generator plaintiffs take issue with the price adjustment feature of the ZEC program. [1] at ¶ 63. The plaintiffs argue that the state has tied, or tethered, its subsidies to auction prices and participation in a manner that is preempted by federal law. The price adjustment is characterized as a "price collar," since it ensures that the ZEC price decreases if wholesale market prices increase, up to a limit, and it increases if wholesale market prices decrease. [83] at 24, 27 (citing [38-3] ¶ 40).[17] A price collar insulates ZEC recipients from changes in wholesale market prices, the generator plaintiffs argue. As Exelon points out, though, eliminating the

---

[17] "The amount of the ZEC payment received by a generator will thus fluctuate between \$0 and \$16.50/MWh, depending on future wholesale energy and capacity prices in Illinois. A participating nuclear generator (i.e., Exelon) will receive no ZEC payments in a given delivery year if projected energy and capacity prices in Illinois rise above \$47.90/MWh for that year (= \$31.40 baseline market index + \$16.50 SCC). Within these two bookends, the ZEC payment varies in a formulaic way based on current and projected wholesale energy and capacity prices." [38-3] ¶ 39.

price adjustment feature would leave in place a fixed ZEC price that is equal to the Social Cost of Carbon. This would create a larger subsidy for ZEC recipients, which would cause more harm to the generator plaintiffs, under their theory. The injury caused by the ZEC subsidy is not traceable to the price adjustment, because that injury would exist even if the statute were cured of its ties to wholesale auction prices. *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 661–62 (7th Cir. 2015).

The generator plaintiffs argue that *Johnson* is distinguishable from their case because the plaintiffs in *Johnson* were injured by amendments to a different rule than the one they were challenging, whereas the generator plaintiffs challenge the same regulation that they allege injured them. What the generator plaintiffs gloss over, however, is that the court rejected the argument that a plaintiff has standing to challenge a rule as a whole simply because that rule is "indivisible" and one part of the rule injured the plaintiff. *Id.* at 662–63. The court reasoned that "demonstrating an injury caused by one aspect of a legislative action [is] not sufficient to give [. . .] standing to challenge other aspects of that action." *Id.* at 662. The generator plaintiffs do not have standing to challenge the ZEC program's price adjustment.

But the generator plaintiffs have alleged an injury by a ZEC priced at the Social Cost of Carbon, and that injury is traceable to an aspect of the challenged statute—the creation of a minimum subsidy that rewards a nuclear power plant and leads to subsidized participation in the federally regulated market. A court

order prohibiting enforcement of the ZEC program altogether would redress that injury. *See Allco Fin. Ltd. v. Klee*, No. 16-2946, 2017 WL 2782856, at *8–9 (2d Cir. June 28, 2017). The generator plaintiffs present a case or controversy over the ZEC program.

> 2. *The Consumer Plaintiffs Do Not Have Prudential Standing for Preemption Claims*

The states have the power to regulate retail sales of electricity and to impose charges on retail bills. Nevertheless, the consumer plaintiffs challenge the ZEC program on preemption grounds, arguing that they will be harmed by the resulting charges on their utility bills and that their payments will be used by utilities to purchase ZECs. 17-cv-1163, [1] ¶¶ 9, 11–12. Since the ZEC program authorizes utilities to recover its costs from all retail customers through an "automatic adjustment clause tariff," the consumer plaintiffs note that even customers who purchase electricity from competitive suppliers and not the utilities will see increased charges. *Id.* ¶¶ 52, 62.

The consumer plaintiffs are injured by the ZEC charges on their bills, which are traceable to the Illinois statute and would be redressed if the charges were prohibited. They have Article III standing, but that does not mean that they can bring preemption claims under the Federal Power Act. Courts look to the provision upon which the plaintiff relies, not the overall purpose of the legislation in question, to determine if the plaintiffs' interest is within the statute's zone of interests. *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). The consumer plaintiffs' complaint refers to 16 U.S.C. §§ 824 and 824d. Section 824 states that "the business of

transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that while federal regulation "of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" is necessary, it should not extend to matters that are subject to regulation by the states. 16 U.S.C. § 824(a). The consumer plaintiffs' claim is expressly excluded from § 824's interests because the states have the power to regulate retail sales of electricity and impose retail charges that are subject to state regulation.

Although § 824d is titled, "Rates and charges; schedules; suspension of new rates; automatic adjustment clauses," it refers only to FERC's authority and obligation to ensure that wholesale electricity rates, and the rules and regulations affecting them, are "just and reasonable." 16 U.S.C. § 824d. It describes what public utilities may and may not do with respect to charges, but those directives refer to FERC as the enforcer. *Id.* § 824d(b)–(e). Section 824d also provides that FERC must review public utilities' practices under automatic adjustment clauses and, after an evidentiary hearing, FERC may order a public utility to modify the terms or practices in connection with an automatic adjustment clause. *Id.* § 824d(f). Section 824d does not grant similar authority or establish any such obligation on public utilities or retail consumers. Given that the consumer plaintiffs' injury involves the retail surcharge, their interests are outside of the zone of interests of the federal statutes. *See Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 809 (9th Cir. 2015).

3.    *Plaintiffs Do Not Have Article III Standing for Dormant Commerce Clause Claims*

"[A] plaintiff must demonstrate standing for each claim he seeks to press. This means that, for each claim of wrongdoing alleged, a plaintiff must demonstrate [. . .] that he has suffered (or is imminently threatened with) an injury that is traceable to the wrongdoing alleged *in that* particular claim." *Johnson*, 783 F.3d at 661 (internal citations omitted) (emphasis original). The dormant commerce clause challenges raise a standing issue distinct from the other claims. The injuries are similar—the market impact on wholesale prices and increased rates passed onto consumers—but if those harms are not traceable to discrimination against the commerce of other states, then plaintiffs do not present a case or controversy under the dormant commerce clause.

The generator plaintiffs say the ZEC program favors the Clinton and Quad Cities nuclear plants (because of the weighted factors in the ZEC procurement process), and thereby discriminates against non-Illinois nuclear generators. [1] ¶ 90. But the injury to the generator plaintiffs is from the ZEC subsidy, not the identity of the ZEC recipient.[18] If the procurement process were non-discriminatory, the out-

---

[18] One of the members of plaintiff EPSA is a nuclear plant in Pennsylvania, [38-3] at 47 n.93, and it claims that it is injured by not being able to receive ZECs. Although this allegation was not in the complaint, I do consider it. This entity is more likely to have an injury traceable to in-state favoritism, but it does not allege that it intends to seek ZECs or that it is in fact prohibited from participating in the ZEC procurement process. Its injury, then, is like the other generator plaintiffs'. It is harmed by the subsidy, whether or not that subsidy is awarded on the basis of in-state economic protectionism. Moreover, EPSA brings this action "as an organization," *see* [1] ¶ 15 n.3, so this additional fact about one of its members does not change the organization's discrimination theory, and it remains true that the allegations in the complaint are insufficient to confer standing for the dormant commerce clause claims.

16

of-state, non-nuclear plaintiffs would still be injured. Similarly, the general market-distorting effects on non-nuclear plants outside of Illinois would still be felt if the ZEC procurement process subsidized nuclear plants without favoring in-state interests. Finally, the retail surcharges passed onto the consumer plaintiffs would be the same even if the utilities purchased ZECs from out-of-state facilities.

The generator plaintiffs respond that they have alleged an inability to compete "on equal footing" in the interstate market and that courts have found Article III standing for similarly injured plaintiffs. *See All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (quoting *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993)). But in these cases, the discrimination against out-of-state plaintiffs caused the injury; here, favoritism for Clinton and Quad Cities is a feature of the overall legislation, but it is not the source of the injury. The plaintiffs' "injur[ies] would continue to exist even if the [legislation] were cured" of the alleged discrimination. *Johnson*, 783 F.3d at 662. Regardless of whether ZEC recipients are in Illinois or not, the generator plaintiffs' injury from lower wholesale prices remains the same, and the consumer plaintiffs will receive higher bills. Since plaintiffs' injuries are not traceable to the alleged in-state favoritism, they do not have Article III standing to challenge it.[19]

---

[19] I do not reach Exelon's arguments that plaintiffs do not fall within the zone of interests of the dormant commerce clause. I note, however, that the consumer plaintiffs are not like the plaintiffs in *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997). The plaintiffs in *Tracy* were directly burdened by the challenged law. The consumer plaintiffs here are not the direct target of discrimination by the ZEC program; their activity in interstate commerce is not altered by Illinois's statute. The consumer plaintiffs also argue that since the ZEC

The plaintiffs' preemption and dormant commerce clause claims are, in large part, not justiciable. But since the generator plaintiffs have adequately alleged standing to challenge the ZEC program in part, and since the consumer plaintiffs bring an equal protection claim (the increased electricity rates they will pay give them standing to bring such a claim), the cases do present controversies that are within the judicial power to adjudicate. I therefore address the merits of defendants' motions to dismiss for failure to state a claim. *But see Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 805 (7th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) (courts must not reach the merits if standing is lacking).

### B.     The Preemption Cause of Action

The ability to sue to enjoin unconstitutional actions by state or federal officers is a judge-made remedy that does not rest on an implied right of action in the supremacy clause. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). While federal courts retain the power to enjoin such unlawful action, that power is subject to express and implied statutory limits. *Id.* at 1385.

In *Armstrong*, the Supreme Court considered § 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(30)(A), and found that Congress explicitly conferred enforcement of a "judgment-laden standard" exclusively on the Secretary of Health and Human Services, and held that plaintiffs could not bring a private right of action to enforce

---

program provides for an automatic pass-through of the costs, it harms the consumers and not the utilities, which are mere conduits. But, it does not follow from the automatic pass-through of costs that the utilities have no injury and no standing. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (wholesalers paying a discriminatory tax have standing to challenge the tax even though they pass the costs of the tax onto their customers).

the act. *Id.* at 1385. Specifically, the Court explained: "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.* Plaintiffs distinguish the Federal Power Act from § 30(A) of the Medicaid Act by arguing that the Federal Power Act does not provide a sole remedy and it expressly gives district courts exclusive jurisdiction over "all *suits in equity* and actions at law." [83] at 42 (citing 16 U.S.C. § 825p). The act does not expressly prohibit a private suit for injunctive relief, but that is not the only way for Congress to signal a limitation on judicial power, and the cause of action it did authorize does not provide the answer plaintiffs suggest. Section 825p of the Federal Power Act gives district courts jurisdiction over suits that FERC is authorized to bring under § 825m(a), but such vesting jurisdiction in the district courts does not create a *private* cause of action. *See Montana-Dakota Utilities Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 249 (1951).

Plaintiffs' preemption claims do not constitute "proper cases" for private suits for injunctive relief. *See Armstrong*, 135 S. Ct. at 1384. First, "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996); *see also Ex parte Young*, 209 U.S. 123 (1908). In the wholesale electricity markets arena, parties can bring a complaint to FERC if they believe a practice interferes with the markets or creates

unjust or unreasonable rates or practices[20]; FERC can take corrective actions to ensure that wholesale rates and practices remain just and reasonable; and parties that disagree with FERC's decision can seek review in the circuit courts. 16 U.S.C. §§ 824d(e), 824e(a), 824l(b). Relatedly, if FERC discovers that rates or the practices affecting rates are unjust or unreasonable, it is expressly authorized to bring an action in federal court to enjoin such acts or practices. 16 U.S.C. § 825m(a). Express provisions, such as these, which provide for the enforcement of a substantive rule, signal Congress's intention to preclude other methods of enforcing the same substantive rule. *Armstrong*, 135 S. Ct. at 1385 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

Additionally, Congress provided a private cause of action under the Federal Power Act in the Public Utility Regulatory Policies Act. The act authorizes a private cause of action to challenge state rules governing small power production facilities if the private party had already petitioned FERC to bring suit itself. 16 U.S.C. § 824a-3(h)(2)(B). By its terms, the act does not apply to this case. It demonstrates, however, Congress's intention to create only a limited private remedy in the Federal Power Act. As Exelon asserts, the omission of a general private right of action in the Federal Power Act should, therefore, be understood as intentional. *See also Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of

---

[20] Exelon points out that some plaintiffs have already brought such a complaint to FERC. [53-1] at 35 n.12. FERC does not have a quorum, [91] at 2, so it is not surprising that plaintiffs look to the courts. But FERC's current paralysis does not change the structural limitations on judicial power.

reading others into it." (citation omitted)). It also shows that even when Congress chose to create a private cause of action in the Federal Power Act, it required administrative exhaustion, *see* 16 U.S.C. § 824a-3(h)(2)(B), which would suggest that plaintiffs' failure to exhaust here is also problematic. Finally, a coherent regulatory policy for interstate electricity markets is a desirable outcome, and it is one that private suits undermine. *See Armstrong*, 135 S. Ct. at 1385. Following the reasoning of *Armstrong*, I conclude that the Federal Power Act does not authorize a private cause of action for injunctive relief against the defendants.

Plaintiffs argue that this court can issue a declaratory judgment or an injunction against defendants in their official capacities under *Ex parte Young*. The doctrine of *Ex parte Young* provides a narrow exception to Eleventh Amendment immunity for claims brought against state officers in their official capacities if the complaint seeks prospective injunctive relief in order to end a continuing federal law violation. *Seminole*, 517 U.S. at 73. *Ex parte Young* actions historically involved a party bringing a preemptive action against a state official, to challenge a possible enforcement proceeding under state law. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring). Plaintiffs agree that they are not the potential target of any state enforcement proceedings. That leaves the prospect of an *Ex parte Young*-style equitable action discussed in *Armstrong*, 135 S. Ct. at 1385. Such an action is foreclosed if it would require the application of "judicially unadministrable" standards. *Id.*

The Federal Power Act directs FERC to ensure that wholesale electricity rates, and the rules and practices affecting those rates, are "just and reasonable." 16

21

U.S.C. § 824e(a). This is the kind of "judgment-laden" standard that is "judicially unadministrable." *Armstrong,* 135 S. Ct. at 1385; *see also Montana-Dakota Utilities*, 341 U.S. at 251 ("Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of [FERC].").

Plaintiffs insist that the relief they seek is not judicially unadministrable because they are "ask[ing] the Court only to decide whether, as in *Hughes*, a state regulatory program 'impermissibly intrudes upon the wholesale electricity market, a domain Congress reserved to FERC alone.'" [83] at 43 (citing *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016)). But, the parties in *Hughes* did not challenge whether the plaintiffs were entitled to seek declaratory relief under the Supremacy Clause, so the Court "assume[d] without deciding that they may." 136 S. Ct. at 1296 n.6. Therefore, citing to *Hughes* on this point does not advance plaintiffs' claim. Furthermore, as Exelon argues, as a practical matter, plaintiffs are asking the court to do more than just declare the ZEC program unlawful. While it may be possible to simply declare a program preempted and enjoin it in its entirety, the gist of plaintiffs' claims requires more. Plaintiffs agree that states can affect the wholesale market by subsidizing local industry, but they argue that this program distorts the market too much. [83] at 12, 38. The declaration sought by plaintiffs would require a court to draw some lines, to give the state direction on how not to interfere with

22

wholesale rates while acting within its undisputed authority to regulate, and once a court enters that arena, it treads on FERC's exclusive expertise.

Plaintiffs cannot bring an equitable cause of action to enjoin the ZEC program on the basis of preemption.[21]

### C.    Federal Power Act Preemption

Preemption of a state law by federal law may be express or implied; it "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983) (citation omitted). Implied preemption takes two forms: field preemption, "where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," and conflict preemption, where "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Preemption results from congressional action and agency action when the federal agency acts within the scope of its authority. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986).

The plaintiffs argue that Illinois's ZEC program is preempted by the Federal Power Act and FERC's exclusive authority. The parties rely on and discuss at length three Supreme Court cases: *Oneok, Inc. v. Learjet, Inc.*,[22] *F.E.R.C. v. Elec. Power Supply Ass'n*,[23] and *Hughes*,[24] as well as one FERC decision: *WSPP*.[25]

---

[21] I nevertheless reach the merits of plaintiffs' preemption claims, in the event their claims can be read to seek a blanket injunction with no reference to the reasonableness of wholesale pricing.

[22] 135 S. Ct. 1591 (2015).

[23] 136 S. Ct. 760 (2016) *as revised* (Jan. 28, 2016).

In *Oneok*, the Supreme Court warned courts to proceed cautiously when considering a state law that may apply to energy sales within the federal agency's jurisdiction, and find "pre-emption only where detailed examination convinces [the court] that a matter falls within the pre-empted field as defined by our precedents." 135 S. Ct. at 1599. Like earlier cases, *Oneok* reiterated "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Id.* (emphasis original). *Oneok* upheld an antitrust law that a state applied to regulate wholesale gas prices, which inevitably affected the wholesale market, because its purpose was to combat antitrust violations, not regulate wholesale prices. *Id.* at 1599–60.

Defendants assert that under *Oneok*, FERC does not have exclusive jurisdiction over *everything* that affects wholesale sales or rates. Since *Oneok* rejected the argument that state laws affecting wholesale rates or sales are field preempted, defendants conclude that the Federal Power Act does not impliedly occupy the entire field of things affecting wholesale rates or sales. Plaintiffs acknowledge that laws "aimed at 'subjects left to the States to regulate,' such as generally applicable state antitrust laws, blue sky laws, tax laws, and recycling laws, are not field preempted because their impact on interstate wholesale rates is incidental or indirect." [83] at 22 (citing *Oneok*, 135 S. Ct. at 1600–01). But, plaintiffs argue that the ZEC program is not a broadly applicable law because ZECs are only available to specifically selected, non-viable nuclear plants, as determined

---

[24] 136 S. Ct. 1288.

[25] 139 FERC ¶ 61061 (Apr. 20, 2012).

by the Illinois Power Agency.[26] Moreover, they believe that the program was aimed at the wholesale market, because the point of the ZECs is to keep the nuclear power plants generating electricity for sale into the wholesale market.

Plaintiffs' theory that the ZEC program is preempted because it intends to alter the outcomes of the wholesale auctions is not supported by *Oneok* or *Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas*, 489 U.S. 493 (1989), on which *Oneok* relied. *Northwest Central* upheld state regulation that was "[d]esigned as a counterweight to market, contractual, and regulatory forces," and it expressly rejected a version of plaintiffs' argument: "To find field pre-emption of [state] regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production" because "there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations." 489 U.S. at 497, 514. *Oneok* does not stand for the proposition that a state law that regulates generation is invalid if the state knew the law would affect the wholesale market.

States may influence, through regulation, which generators participate in FERC's market, even though the end result may affect the wholesale market. Plaintiffs do not dispute that REC programs, tax incentives, and carbon taxes, which are within the states' jurisdiction, are lawful. *See* [83] at 26 n.12, 31–32. REC

---

[26] The ZEC program does not expressly exclude any generators from applying. It describes a detailed bid selection process and the criteria that will be considered in that process, but plaintiffs do not explain how those or other provisions lead to the conclusion that the ZEC program does not apply broadly.

programs and tax incentives encourage renewable generators to produce, while carbon taxes discourage fossil fuel generation. Similarly, the ZEC program is aimed at a certain type of electricity generation facilities. Although the ZEC program will affect wholesale electricity rates, those rates were not its target[27]; thus, the general rule supplied by *Oneok* (and *Northwest Central*) does not require preemption.

The parties agree that *EPSA* defined FERC's exclusive jurisdiction as that which "directly affects" the wholesale rate. [52] at 19; [83] at 27–28; *see also* 136 S. Ct. 760. The Supreme Court explained:

> FERC has the authority [. . .] to ensure that rules or practices 'affecting' wholesale rates are just and reasonable. [. . .] [T]hat statutory grant could extend FERC's power to some surprising places. [. . .] So if indirect or tangential impacts on wholesale electricity rates sufficed, FERC could regulate now in one industry, now in another, changing a vast array of rules and practices to implement its vision of reasonableness and justice. We cannot imagine that was what Congress had in mind. For that reason, [. . .] we now approve, a common-sense construction of the [Federal Power Act]'s language, limiting FERC's 'affecting' jurisdiction to rules or practices that 'directly affect the [wholesale] rate.'

*EPSA*, 136 S. Ct. at 774 (citation omitted).

Plaintiffs allege that ZECs, by providing out-of-market payments, effectively replace the auction clearing price, and they argue that *EPSA* should not be read to limit FERC's jurisdiction to only those transactions that establish the amount of money a purchaser will hand over in exchange for wholesale power. Plaintiffs also

---

[27] Defendants note that while plaintiffs argue that the statute's stated purpose was pretext, the complaint does not allege that the statute's true aim or purpose was to adjust or disregard wholesale rates. Instead, plaintiffs allege that its actual purpose was to save jobs and generate local tax revenues. *See* [1] ¶ 58.

argue that "a state regulation that substantially affects the quantity or terms of wholesale sales is preempted." [83] at 28 n.14 (citing *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 307–08 (1988); *N. Nat. Gas. Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 90–93 (1963); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014), *aff'd sub nom. Hughes*, 136 S. Ct. 1288).

*EPSA* stands for the opposite of what plaintiffs describe. First, *EPSA* defined rate-setting as establishing the amount of money a purchaser will "hand over in exchange for [wholesale] power." *EPSA*, 136 S. Ct. at 777. Second, *EPSA* expressly rejected the argument that a law could "effectively" regulate wholesale rates when it did not do so "nominal[ly]"; the Supreme Court reasoned that such an argument made "[t]he modifier 'effective' [do] more work than any conventional understanding of rate-setting." *Id.* Nothing in the Federal Power Act, the Court said, even "suggest[ed]" that "expansive" of a definition of rate-setting. *Id.* at 777–78. Furthermore, as Exelon notes, *EPSA* explained that FERC cannot take action that transgresses states' authority over generation, "no matter how direct, or dramatic," the program's "impact on wholesale rates." [92] at 19 (quoting 136 S. Ct. at 775, 780 n.10).

*EPSA* recognized that wholesale and retail markets in electricity cannot be "hermetically sealed" from one other. 136 S. Ct. at 776. As a result, transactions in the wholesale market will have "natural consequences" at the retail level, as will FERC's regulation of wholesale matters. *Id.* Although the opinion addressed a

question of FERC encroaching on the state, the analysis applies equally to the states encroaching on FERC. Thus, under *EPSA*, a state regulation that substantially affects the quantity and terms of wholesale sales is not necessarily preempted. *Id.* ("[A] FERC regulation does not run afoul of § 824(b)'s proscription just because it affects—even substantially—the quantity or terms of retail sales."). The key inquiry is whether FERC or the state is regulating what takes place in their respective markets, because when the state regulates what takes place in the retail market, in furtherance of its charge to improve that market, then the effect on wholesale rates is irrelevant. *Id.* ("whatever the effects at the retail level," when "every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules" there is no preemption).

*Hughes* involved a state regulatory program that provided subsidies through state-mandated contracts benefitting new generators on the condition that the new generator would sell its capacity into a FERC-regulated wholesale auction. 136 S. Ct. at 1292. Competitors of the new generators brought suit, and ultimately, the Supreme Court held that the state's regulatory scheme invaded FERC's exclusive jurisdiction. *Id.* The Court's holding was "limited":

> We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC. [. . .] Nothing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.' So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable.

28

*Id.* at 1299 (internal citations omitted). Based on this passage, defendants and Exelon argue that the ZEC program is distinguishable from the regulatory scheme that *Hughes* rejected. They argue that because the ZEC program exclusively regulates separate sales of credits that represent environmental benefits of nuclear power generation and it does not regulate the rate or transaction terms of wholesale power, the program does not run afoul of *Hughes*.

Plaintiffs respond that *Hughes* is not distinguishable because the facilities' receipt of ZECs is conditioned on their participation in the wholesale auction. Plaintiffs explain that generators can only receive ZECs if they produce electricity and they can only dispose of that electricity by selling it in the wholesale auctions; and since generators have to dispose of electricity to be able to make more, they have to sell electricity to the wholesale auctions to continue receiving ZECs. According to plaintiffs, *Hughes* "[cannot] be read to allow state measures that in reality intrude on exclusive federal jurisdiction just because they do not contain express language to that effect. A *de facto* implicit requirement is enough." [83] at 23 n.10 (citing *N.J. Realty Title Ins. Co. v. Div. of Tax Appeals in Dep't of Taxation & Fin. of N.J.*, 338 U.S. 665, 673 (1950); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192–95 (4th Cir. 2007); *S. Dakota Min. Ass'n, Inc. v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers*, 27 F.3d 1499, 1508 (10th Cir. 1994)).[28]

---

[28] In these cases, the state effectively prohibited conduct that federal law authorized.

PJM requires all generators in its region to offer their capacity into the PJM capacity auction; if a generator's capacity clears, PJM requires the generator to sell into PJM's energy market.[29] Since the ZECs provide insufficient revenue to support the plant, PJM argues in its amicus brief, "the nuclear plant must offer below its real costs to ensure it clears the wholesale auction," which gives them revenue from the auction in addition to revenue from future ZECs for continued operation. [88] at 12. Finally, PJM argues that because PJM requires generators to participate in the wholesale markets, the ZEC program did not need to include a condition similar to the one included in *Hughes*; therefore, in practice, the ZEC program is not distinguishable from the regulatory scheme in *Hughes*.

Illinois does not require participation in wholesale auctions in order to receive ZECs. PJM requires participation in the capacity auction, but generators are not required to clear that auction. In fact, they can receive ZECs even if they do not clear the capacity auction and even if they do not participate in the energy auction. Generators in MISO's region are not required to participate in or clear any auctions in order to receive ZECs.[30] It is true that: (1) bid stacking creates an incentive for generators to submit low enough bids to clear the auction so that they can offload their supply; and (2) ZEC-selling generators will have an additional

[29] PJM "is exploring" ways to change its participation requirement to "remove subsidized resources from the price formation process and thus accommodate state subsidies in a manner that might be acceptable to FERC and PJM's stakeholders." [88] at 12 n.6.

[30] Plaintiffs argue that because Clinton is designated as an Exempt Wholesale Generator under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et seq.*, it can only sell its electricity in MISO's wholesale auction. But, Clinton could forego its EWG status and seek ICC approval to sell its energy at retail, and then it would no longer be limited to selling its electricity in MISO's wholesale auctions.

incentive to clear the auction, and therefore, they are perhaps more likely to submit low bids. Nevertheless, the ZEC program does not *mandate* auction clearing in PJM or MISO, and the state, while taking advantage of these attributes to confer a benefit on nuclear power, is not imposing a condition directly on wholesale transactions.[31]

Plaintiffs also argue that the ZEC program is analogous to the state regulatory scheme in *Hughes* because ZECs are "tethered" to the generators' wholesale market participation through the program's price adjustment feature. [83] at 24. As discussed above, the initial price of ZECs (the Social Cost of Carbon) has nothing to do with wholesale prices. *See* 20 ILCS 3855/1-75(d-5)(1)(B). The price adjustment allows the price of ZECs to fall below that initial price, and the amount by which it decreases is calculated using a composite of projected prices from the energy and capacity markets; therefore, even an adjusted ZEC price is not based on the wholesale price a ZEC recipient receives. *Id.* § 1-75(d-5)(1)(B). These projected and composite prices are not within FERC's jurisdiction. Thus, the "tether" in this case is not to wholesale participation or transactional pricing; the tether is to broader, indirect wholesale market forces.

Read together, *EPSA* and *Hughes* stand for the proposition that preemption applies whenever a tether to wholesale rates is indistinguishable from a direct effect on wholesale rates. The qualifier "direct" is important; influencing the market

---

[31] *See Allco*, No. 16-2946, 2017 WL 2782856, at *10 (rejecting a claim that a state program compelled wholesale transactions where the program directed certain contracts, but did not guarantee that the wholesale transaction would occur).

by subsidizing a participant, without subsidizing the actual wholesale transaction, is indirect and not preempted. Since a generator can receive ZECs for producing electricity and the credits are not directly conditioned on clearing wholesale auctions, ZEC payments do not suffer from the "fatal defect" in *Hughes*, *see* 136 S. Ct. at 1299, nor do they alter the amount of money that is exchanged for wholesale electricity, *see EPSA*, 136 S. Ct. at 777. *Hughes* should not be extended to invalidate state laws that do not include an express condition, but that in practice (and when combined with other market forces), have the effect of conditioning payment on clearing the wholesale auction. That is not the kind of market participation that worried the Court in *Hughes*, and to read *Hughes* to apply to this program would intrude on the state's authority to regulate power generation.

RECs are similar to ZECs, and the parties do not suggest that RECs are preempted. In *WSPP*, FERC held that when RECs are "unbundled" and sold independently of electricity, the REC transaction falls outside of FERC's jurisdiction. 139 FERC ¶ 61,061, ¶ 24 (2012). FERC reasoned that an REC sale is "not a charge in connection with a wholesale sale," and it does not set or even "affect wholesale electricity rates." *Id.* Plaintiffs note that *WSPP* was not a "sweeping ruling," it was an uncontested proceeding that was limited to facts involving RECs; it does not require this court to reach a similar decision as to ZECs. [83] at 34. That is true, but FERC's conclusion that it is possible to unbundle an environmental attribute credit from the sale of electricity without stepping on FERC's toes is persuasive when applied to ZECs. Illinois's ZECs, unlike RECs, must be purchased

by utilities in an amount proportional to their retail sales, which in turn are proportional to their wholesale electricity purchases, but this does not mean the ZEC transaction is bundled with wholesale transactions. A bundled, or dependent transaction is one where a credit sale takes place as part of the same transaction as a wholesale energy sale. 139 FERC ¶ 61,061, at ¶ 24. The ZEC transactions required by the Illinois statute are distinct from wholesale energy sales. While not dispositive, FERC's acknowledgment that RECs are outside its jurisdiction indicates that similar programs that authorize transactions in state-created credits that are distinct from wholesale transactions are not preempted.

Plaintiffs argue that the ZEC program invades FERC's field of exclusive jurisdiction because it provides nuclear plants with substantial out-of-market payments, thereby directly affecting the revenue that nuclear generators will be paid and effectively replacing the auction clearing price. I conclude, however, that the ZEC program falls within Illinois's reserved authority over generation facilities; Illinois has sufficiently separated ZECs from wholesale transactions such that the Federal Power Act does not preempt the state program under principles of field preemption.

State law that conflicts with federal law is preempted. *English*, 496 U.S. at 79 (citations omitted). Such conflicts occur where: (1) "it is impossible for a private party to comply with both state and federal requirements," or (2) "[the] state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Conflict preemption asks whether the state law does "clear damage" to the goals of federal legislation. *Nw. Cent.*, 489 U.S. at 522

33

("Unless clear damage to federal goals would result, FERC's exercise of its authority must accommodate a State's regulation of production.").

Plaintiffs contend that the ZEC program conflicts with federal law because it interferes with the wholesale auction process, which FERC has selected as the method for establishing just and reasonable rates. A core principle of conflict preemption is that "courts must be careful not to confuse the 'congressionally designed interplay between state and federal regulation,' [. . .] for impermissible tension that requires pre-emption under the Supremacy Clause." *Hughes*, 136 S. Ct. at 1300 (Sotomayor, J., concurring) (quoting *Nw. Cent.*, 489 U.S. at 518).

Plaintiffs' allegations that the ZEC program will affect FERC's wholesale auction process do not support a finding that the ZEC program does "clear damage" to FERC's goals. The market distortion caused by subsidizing nuclear power can be addressed by FERC and the interplay between state and federal regulation can continue to exist.[32] Plaintiffs' theory of conflict preemption is that distorting the wholesale market conflicts with FERC's preference for competitive auctions. This is too broad a theory of preemption and would inappropriately limit state authority. So long as FERC can address any problem the ZEC program creates with respect to just and reasonable wholesale rates—and nothing in the complaints suggest that

---

[32] Not surprisingly, Exelon was opposed to these kinds of subsidies until it was a beneficiary of them. *See* [83] at 37. That it has taken both sides of the policy debate over subsidies is irrelevant to whether the state-created market distortions at issue here conflict with federal regulations. There is no dispute that ZECs will affect the market and that Illinois has created a subsidy that favors certain participants in the wholesale auctions. The program, however, does not require auction clearing and does not prevent FERC from setting wholesale rates. Exelon's biases notwithstanding, Illinois is not in conflict with FERC.

FERC is hobbled in any way by the state statute—there is no conflict. The complaint certainly alleges that ZECs will cause billions of dollars in market impact, but it does not allege that FERC is damaged in its ability to determine just and reasonable rates. The regulatory structure remains unaltered, and FERC's power undiminished.[33] Consequently, the ZEC program does not conflict with the Federal Power Act.

### D. The Commerce Clause

The commerce clause provides that Congress shall have power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const., art. I, § 8, cl. 3. The clause includes an implicit restraint on state authority to regulate interstate commerce, even in the absence of a conflicting federal statute. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This dormant commerce clause guards against "the evils of 'economic isolation' and protectionism," while also "recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24 (1978).

---

[33] Plaintiffs argue that the subsidies will stand as an obstacle to the federal plan for competitive wholesale auctions and that Illinois is doing indirectly what it cannot do directly—adjusting wholesale auction-clearing prices. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987). But indirect effects are permissible under *EPSA* and *Hughes*, and, in my view, the proper articulation of the federal interest here is in setting just and reasonable wholesale rates. FERC can continue to use all the tools at its disposal to set just and reasonable rates, and the possible need to react to ZECs is not sufficient to amount to clear damage to wholesale rate-setting.

A law that discriminates against interstate commerce on its face, has the effect of favoring in-state economic interests over out-of-state interests, or harbors a discriminatory purpose, is subject to a per se rule of invalidity. *United Haulers*, 550 U.S. at 338. The state may only overcome the per se rule of invalidity by showing that it has no other means to advance a legitimate local purpose. *Id.* at 338–39. By contrast, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In balancing the *Pike* factors, courts consider the nature of the local interest involved and whether an alternative existed that could promote the local interest with a lesser impact on interstate commerce. *Id.* Accordingly, dormant commerce clause claims, especially of the latter category, turn on a "sensitive, case-by-case analysis" of the facts, including the "purposes and effects" of the law at issue. *See*, *e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). Cases involving facially neutral laws typically require an evidentiary record to be developed before resolution is possible. *See United Haulers*, 550 U.S. at 337.

Plaintiffs argue that the state statute discriminates against interstate commerce on its face because: (1) "ZECs solely benefit certain in-state wholesale producers of nuclear energy in Illinois, to the disadvantage of out-of-state producers who compete in the wholesale market," [83] at 46 (citing [1] ¶¶ 58–59); and (2) "the purported 'procurement process,' based on 'public interest criteria,' is a sham, as

36

Clinton and Quad Cities have been pre-determined to be the 'winners' of the ZEC contracts," *id.* (citing [1] ¶ 59).[34] I disagree. The statute is not facially discriminatory because it does not preclude out-of-state generators from submitting bids for ZECs. The alleged sham process to select ZEC recipients indicates that the scales are tipped in favor of Clinton and Quad Cities, but that does not mean that the agencies charged with selecting the recipients will discriminate. The statute gives neutral, non-discriminatory standards to the agencies, and plaintiffs do not allege that the agencies will deliberately flout the ZEC bid-selection process. *See Pac. States Box & Basket Co. v. White*, 296 U.S. 176, 186 (1935). Since the complaint does not include any plausible allegations that the ICC will ignore its statutory duties, there is no support for the conclusion that the procurement process is facially discriminatory. *See Godfrey v. United States*, 997 F.2d 335, 338 n.4 (7th Cir. 1993) (only "clear evidence to the contrary" will persuade a court that "public officers" have not "properly discharged their official duties").

Plaintiffs also contend that the statute has the clear effect of favoring in-state economic interests over out-of-state interests. Assuming that only Illinois nuclear

---

[34] Plaintiffs say that "[the statute] directs the IPA to consider reports under House Resolution 1146," and one such report identifies the Clinton and Quad Cities plants as plants that will potentially close; this is relevant because preserving zero emission facilities is a factor in the "public interest" criteria of the bid selection process. [83] at 46. The same provision that plaintiffs draw on, however, directs the IPA to consider other reports, some of which, Exelon argues, are about out-of-state plants. 20 ILCS 3855/1-75(d-5)(1)(C). Considering such reports does not facially favor in-state plants. Additionally, the ICC and not the IPA selects the plants that will receive ZECs. Since the ICC may only consider three neutral environmental criteria—(1) "minimizing carbon dioxide emissions that result from electricity consumed in Illinois," (2) "minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State," and (3) "the incremental environmental benefits resulting from the procurement," *Id.* § 1-75(d-5)(1)(C-5)(i)–(ii)—it does not discriminate based on a plant's geographic location.

generators are selected, the ZEC program would not be invalid, necessarily, because there are many ways to explain how a valid program could produce that end. For example, it is possible that no out-of-state generator will submit a bid, thereby mooting plaintiffs' discriminatory effects claim. It is also possible that the ICC will decide that Illinois generators are in the best position to reduce air pollutants in Illinois, which would justify a decision to select only Illinois generators. In light of plaintiffs' facial challenge, and accepting the allegations of how the program will work in practice, I conclude that there is a substantial possibility that the statute will be non-discriminatory in effect.

Plaintiffs also argue that the statute has a discriminatory purpose. They say that it was enacted for political reasons, to save jobs and property tax revenues tied to Clinton and Quad Cities. Plaintiffs point to the statements Governor Rauner made when he signed the bill into law: "The Future Energy Jobs bill protects taxpayers, ratepayers, and the good-paying jobs at the Clinton and Quad Cities' plants." [83] at 47. Plaintiffs argue that the stated environmental purpose was a mere pretext; they cite the original version of the statute, which set the ZEC price as the difference between the nuclear generator's costs and revenues from energy and capacity markets.[35] Plaintiffs explain that this price formula was changed in the final version in response to *Hughes. Id.* (citing 20 ILCS 3855/1-75(d-5)(1)(B)).

Defendants say that the statute was intended to advance public health and protect the environment by reducing the emissions of air pollutants created by

---

[35] [83] at 19 n.7 (citing S.A. 3, S.B. 1585, at 82–83, 99th Gen. Assemb. (Ill. May 12, 2016), available at http://www.ilga.gov/legislation/99/SB/PDF/09900SB1585sam003.pdf.

energy generators; it attempts to achieve these goals by offering credits to zero-emission generators. Courts must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the Court] to conclude that they 'could not have been a goal of the legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (citation omitted). The statute was both environmental legislation and job-saving legislation. Notwithstanding the allegations of the complaint, the circumstances surrounding the enactment of the statute do not warrant an inference of discrimination. Plaintiffs do not cite any language in the legislation that would support such an inference. The governor's and some legislators' celebratory remarks about the potential job-saving effects of the law do not negate the ZEC program's environmental purpose and public health interests. These statements suggest political favoritism on the part of some for the local economy, but they do not evince an intent to discriminate against out-of-state commerce. The law may have been underinclusive in the breadth of the subsidy, because Illinois could have subsidized more nuclear power, but that does not mean its purpose was protectionist, instead of environmental.

The statute is not subject to a per se rule of invalidity. Plaintiffs argue that the ZEC program fails the *Pike* test because its impacts on interstate commerce far outweigh any claimed environmental benefits. Specifically, the complaint alleges that the ZEC program distorts the market by driving out and deterring the entry of more cost-efficient, environmentally-friendly, out-of-state generators, [1] ¶¶ 45–50;

and that the reduction of carbon emissions can be achieved through means that do not discriminate against interstate commerce, *id.* ¶¶ 14, 89. Exelon notes that the state offers a payment through the ZEC program, but the state allows all other actors to participate in commerce freely, which does not make interstate commerce more difficult. The commerce clause is not concerned with the burdens created when a state participates in a market and exercises the right to favor its own citizens over others. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976). The creation of the ZEC has created a new market, and while that market may affect the wholesale energy market, it is an incidental burden on the channels of interstate commerce in which plaintiffs participate.

Ordinarily, the fact-dependent balancing required to assess a dormant commerce clause challenge would preclude dismissal under Rule 12(b)(6). But here, where the complaints allege a state-created commodity that only indirectly burdens other generators' ability to compete in wholesale auctions, they fail to state a dormant commerce clause claim. As a matter of law, the state's legitimate interests include not only environmental concerns, *see Clover Leaf*, 449 U.S. at 471, but also the right to participate in or create a market, *see Alexandria Scrap*, 426 U.S. at 810, and the right to encourage power generation of its choosing, *see Hughes*, 136 S. Ct. at 1299. The alleged harm to out-of-state power generators who will be competing in auctions against subsidized participants is not clearly excessive when balanced against these weighty and traditional areas of permissible state regulation.

### E.    The Equal Protection Clause

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV). Under the rational basis test, which the parties agree applies in this case, "the [state's] action simply 'cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001)).

The consumer plaintiffs allege that the ZEC program violates the equal protection clause because it favors Illinois-based nuclear generators over other electricity producers by imposing wholesale electricity costs on Illinois consumers but not on electricity consumers of the several other states in the MISO and PJM regions. 17-cv-1163, [1] ¶ 65. They argue that the ZEC program does not pass the rational basis test because it makes Illinois electricity consumers "second-class consumers" in the MISO or PJM regions for ten years. 17-cv-1163, [58] at 19–20 (citing *Zobel v. Williams*, 457 U.S. 55 (1982); *Williams v. Vermont*, 472 U.S. 14 (1985); and *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612 (1985)). Specifically, plaintiffs argue, "an additional ZEC charge will be added to the bills of Illinois electricity consumers, but not to bills of electricity consumers in other states in PJM or MISO *even if they purchase electricity generated by Clinton or Quad Cities*, for the wholly

41

arbitrary reason that Clinton and Quad Cities are located in Illinois." 17-cv-1163, [58] at 20 (emphasis original). The Constitution only requires Illinois to treat equally the people within its jurisdiction. As such, Illinois does not run afoul of the Fourteenth Amendment by treating Illinoisans differently from citizens from other states that live in the MISO or PJM regions. Furthermore, the complaint does not allege that Illinois could have imposed a surcharge on people in the MISO and PJM regions that lived outside of Illinois.

The consumer plaintiffs also allege that the ZEC program does not pass the rational basis test because the stated environmental purpose of the ZEC program was an attempt to mask the legislature's true goal of subsidizing the Clinton and Quad Cities plants and such "[*u*]*ltra vires* and unlawful purposes can never be legitimate government purposes." 17-cv-1163, [58] at 21. Yet, "[w]hen dealing with local economic regulation, 'it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (citation omitted). The rational basis test requires courts to presume legislation is valid and to uphold it as long as there is a rational relation to some legitimate end. *Id.* (citation omitted). "Once [the court] identif[ies] a plausible basis for the legislation, [the] inquiry is at its end." *Id.* (citation omitted).

The rational basis for the ZEC program is outlined in § 1.5 of the statute, which states in relevant part: "The General Assembly therefore finds that it is necessary to establish and implement a zero emission standard, which will increase

42

the State's reliance on zero emission energy through the procurement of zero emission credits from zero emission facilities, in order to achieve the State's environmental objectives and reduce the adverse impact of emitted air pollutants on the health and welfare of the State's citizens." *See* SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016).[36] These reasons are plausible; accordingly, I look no further. The consumer plaintiffs do not state an equal protection claim.

## IV.    Conclusion

Defendants' and Exelon's motions to dismiss are granted. The plaintiffs' claims are dismissed in part for lack of subject-matter jurisdiction and in part for failure to state a claim. The plaintiffs' motions for a preliminary injunction are denied.[37] The Clerk shall enter final judgment and terminate these cases.

ENTER:

Manish S. Shah
United States District Judge

Date:  July 14, 2017

---

[36] Available at http://www.ilga.gov/legislation/publicacts/99/099-0906.htm.

[37] Because the complaints fail to state a claim, plaintiffs cannot show a likelihood of success on the merits and preliminary injunctive relief would not be appropriate. Courts usually give plaintiffs an opportunity to amend a complaint after a first dismissal. Here, however, the deficiencies in plaintiffs' claims cannot be cured with different allegations. These plaintiffs cannot pursue the legal theories they have articulated (or they do not have standing to do so). Therefore, I decline to give them leave to amend.

43

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Electric Power Supply Association, et al.,

Plaintiff(s),

v.

Anthony Star, et al.,

Defendant(s).

Case No. 17-cv-01164
Judge Manish Shah

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

    which ☐ includes $ pre–judgment interest.
        ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: in favor of defendants and against plaintiffs.

---

This action was *(check one)*:

☐ tried by a jury with Judge Manish Shah presiding, and the jury has rendered a verdict.
☐ tried by Judge Manish Shah without a jury and the above decision was reached.
☒ decided by Judge Manish Shah on a motion.

Date: 7/14/2017

Thomas G. Bruton, Clerk of Court

Susan McClintic , Deputy Clerk