NO. 17-2445 (CONSOLIDATED WITH 17-2433)
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**
_____

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

v.

ANTHONY M. STAR (AS DIRECTOR OF THE
ILLINOIS POWER AGENCY), *et al.*,

*Defendants-Appellees.*
_____

On Appeal from a Final Judgment of the United States District Court
for the Northern District of Illinois, Eastern Division, No. 17-1164
_____

**BRIEF OF *AMICI CURIAE* AMERICAN PETROLEUM INSTITUTE AND
NATURAL GAS SUPPLY ASSOCIATION**

FILED IN SUPPORT OF PLAINTIFFS-APPELLANTS
SEEKING REVERSAL OF THE DISTRICT COURT DECISION
_____

BEN NORRIS                          DENA WIGGINS
AMERICAN PETROLEUM INSTITUTE         NATURAL GAS SUPPLY ASSOCIATION
1220 L Street, N.W.                  1620 I Street, N.W., Suite 700
Washington, D.C.  20005             Washington, D.C.  20006
(202) 682-8251                      (202) 326-9310
norrisb@api.org                     dena.wiggins@ngsa.org

*Counsel for Amici Curiae*

September 5, 2017

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the corresponding Circuit Rule, American Petroleum Institute (API) states that it is a not-for-profit trade association based in Washington, D.C. charged with promoting the interests of its over 625 members in the United States. API is not a publicly held corporation.  It has no parent companies, and no companies have a ten percent or greater ownership interest in API.

Pursuant to Federal Rule of Appellate Procedure 26.1 and the corresponding Circuit Rule, Natural Gas Supply Association (NGSA) states that it is a non-for-profit trade association based in Washington, D.C. that represents the interest of natural gas producers and marketers in the United States.  NGSA is not a publicly held corporation.  It has no parent companies, and no companies have a ten percent or greater ownership interest in NGSA.

*/s/ Ben Norris*              */s/ Dena Wiggins*

BEN NORRIS                    DENA WIGGINS
AMERICAN PETROLEUM INSTITUTE   NATURAL GAS SUPPLY ASSOCIATION
1220 L Street, N.W.           1620 I Street, N.W., Suite 700
Washington, D.C.  20005       Washington, D.C.  20006
(202) 682-8251                (202) 326-9310
norrisb@api.org               dena.wiggins@ngsa.org

*Counsel for Amici Curiae*

September 5, 2017

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.......................................................................... ii

GLOSSARY.........................................................................................vi

STATUTES AND REGULATIONS ........................................................1

INTRODUCTION AND  STATEMENT OF INTEREST OF *AMICI CURIAE* ............................................................................................2

SUMMARY OF ARGUMENT ................................................................7

ARGUMENT ......................................................................................11

I.      The District Court's Decision Is Based On A Misunderstanding Of Wholesale Markets And A Misapplication Of *Hughes*..................................11

     A.      The Organized Wholesale Electricity Markets Are Designed to Support Fuel-Neutral, Least-Cost Supply of Electricity.....................11

     B.      The Illinois ZEC Program Is Preempted Under *Hughes*.....................14

II.     The District Court's Decision Should Be Reversed Because The Court Misapplied *Armstrong* ..................................................................18

     A.      The District Court Erred Because Both Parts of *Armstrong's* Two Part Test Have Not Been Met ....................................................19

          1.      *Enforcement of FERC's Exclusive Ratemaking Authority Under the FPA Is "Judicially Administrable"* ........................22

          2.      *The FPA Does Not Establish a "Sole Remedy" for Agency Enforcement of Violations*............................................24

     B.      The District Court Failed To Distinguish *Armstrong* On Grounds That The FPA Is Not Spending Clause Legislation, Under Which Third-Party Enforcement Rights Must Be "Unambiguously Conferred"................................................................27

CONCLUSION .....................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*,
   461 U.S. 375 (1983)........................................................................12

*Ark. La. Gas Co. v. Hall*,
   453 U.S. 571 (1981)........................................................................1, 4

*Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*,
   548 U.S. 291 (2006)........................................................................28

*Armstrong v. Exceptional Child Ctr., Inc.*
   ——— U.S. ———, 135 S.Ct. 1378 (2015)........................................*passim*

*City of Orangeburg v. FERC*,
   No. 15-1274 (D.C. Cir. June 21, 2016) ............................................18

*Fed. Power Comm'n v. Hope Nat. Gas Co*.,
   320 U.S. 591 (1944)........................................................................12

*German All. Ins. Co. v. Home Water Supply Co*.,
   226 U.S. 220 (1912)........................................................................28

*Hughes v. Talen Energy Marketing*,
   136 S. Ct. 1288 (2016)....................................................................*passim*

*Marks v. United States*,
   430 U.S. 188 (1977)........................................................................21

*Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of
   Snohomish Cty.*,
   554 U. S. 527 (2008)........................................................................10

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan*.,
   372 U.S. 84 (1963)..........................................................................1

*Nat.l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) (Roberts, C.J.) ................................................28

iii

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989)...................................................................................1

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. ——, ——, 135 S.Ct. 1591 (2015) .................................1, 10

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981).................................................................................28, 29

*Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co.*,
273 U.S. 83 (1927)...................................................................................11

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988)...................................................................................1

*Tohono O'odham Nation v. Ducey*,
130 F. Supp. 3d 1301 (D. Ariz. 2015) ...................................................26

*Town's Friends of the E. Hampton Airport, Inc. v. Town of E.
Hampton*,
841 F.3d 133 (2d Cir. 2016), *cert. denied* 137 S. Ct. 2295 (2017)..............25, 26

**Statutes**

20 ILCS 3855/1-75...................................................................................15

20 ILCS 3855/1-75(d-5), *incl. subparts*...........................................16, 17

16 U.S.C. 824d(a) .....................................................................................7

16 U.S.C. § 824(b)(1)...............................................................................22

16 U.S.C. § 824a-3(h)(2)(B) ...................................................................26

16 U.S.C. § 824e(a)................................................................................9, 22

16 U.S.C. § 825m(a) ................................................................................25

Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A) ...............................9, 20, 21, 23,24, 25

Natural Gas Act, 15 U.S.C. § 717....................................................*passim*

iv

Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95–617,
92 Stat 3117 ........................................................................................26

**Other Authorities**

*Policy Statement on Natural Gas and Electric Price Indices*, *available at*
http://www.energymarketers.com/Documents/Policy_Statement_on_P
rice_Indices_july_24_2003.pdf .......................................................17

U.S. ENERGY INFORMATION ADMINISTRATION, Short-Term Energy Outlook, *at*
https://www.eia.gov/outlooks/steo/data/browser/#/?v=23&f=A&s=&start=
2012&end=2018&map=&ctype=linechart&maptype=0&id=&linechart=C
LTOCON_EL_US~NGTOCON_EL_US~PATOCON_EL_US .......................2

*Wholesale Competition in Regions with Organized Electric Markets*,
Order No. 719, 125 FERC ¶ 61,071, at P 1 (Oct. 17, 2008)..............................13

# GLOSSARY

| | |
|---|---|
| API | American Petroleum Institute |
| Decision | *Vill. of Old Mill Creek v. Star*, No. 17 CV 1163, 2017 WL 3008289, (N.D. Ill. July 14, 2017) |
| EPSA or Plaintiffs-Appellants | Electric Power Supply Association, Dynegy Inc., NRG Energy, Inc. and Calpine Corporation |
| EPSA Br. | Brief for Plaintiffs-Appellants filed in Case No. 17-2445, Docket No. 40, on Aug. 28, 2017 (re-submitted Aug. 31, 2017) |
| FPA | Federal Power Act, 16 U.S.C. §§ 824 *et. seq.* |
| FERC | Federal Energy Regulatory Commission |
| ICE | Intercontinental Exchange, Inc. |
| NGA | Natural Gas Act, 15 U.S.C. §§ 717 *et. seq.* |
| NGSA | Natural Gas Supply Association |
| MISO | Midcontinent Independent System Operator, Inc. |
| PJM | PJM Interconnection, L.L.C. |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the Plaintiffs-Appellant's brief.  Of note, the District Court decision and Appellant's brief filed in this Court cite nearly a half dozen natural gas industry cases, four of which were decided pursuant to the Natural Gas Act.  *See Oneok, Inc. v. Learjet, Inc*., 575 U.S. ——, ——, 135 S.Ct. 1591 (2015); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493 (1989); *Schneidewind v. ANR Pipeline Co*., 485 U.S. 293, 307–08 (1988); *N. Nat. Gas Co. v. State Corp. Comm'n of Kan*., 372 U.S. 84 (1963).

## INTRODUCTION AND
## STATEMENT OF INTEREST OF *AMICI CURIAE*

The American Petroleum Institute (API) and Natural Gas Supply Association (NGSA) (collectively, *Amici*) are two of the largest national trade associations for the natural gas industry, representing members engaged in all aspects of supply and delivery of natural gas to electricity generators nationwide. Natural gas is now the leading fuel source for electricity generation in the United States, with natural-gas fired generators providing over a third of the nation's electricity supply in 2016.[1]  Accordingly, *Amici* are uniquely situated to provide insight into the significant adverse impacts of the District Court's erroneous decision on the nation's organized wholesale energy markets and the natural gas industry supplying those markets.  *Amici* timely notified counsel of record for all parties (Plaintiffs-Appellants Electric Power Supply Association, et al.; Plaintiffs-Appellants Village of Old Mill Creek, et al.; Defendants-Appellees Anthony Star, et al.; Intervenor-Appellee Exelon Generation Company, L.L.C.) that they intended to submit this brief.  All parties consented to the filing.

---

[1] About 33.8 percent of the current U.S. electricity generation is fired by natural gas.  *See* U.S. Energy Information Administration, Short-Term Energy Outlook, *at* https://www.eia.gov/outlooks/steo/data/browser/#/?v=23&f=A&s=&start=2012&end=2018&map=&ctype=linechart&maptype=0&id=&linechart=CLTOCON_EL_US~NGTOCON_EL_US~PATOCON_EL_US.

API has more than 625 members, including natural gas producers, gathering and processing facility operators, intra- and inter-state pipeline companies, natural gas marketers, and operators of liquefied natural gas (LNG) import and export facilities in the United States and around the world, as well as owners, operators, and manufacturers of essential technology and equipment used all along the natural gas value chain.   API is charged with, among other things, representing its members' interests in all administrative and legal proceedings that impact the natural gas supply and delivery chain, including cases involving the exclusive authority of the Federal Energy Regulatory Commission (FERC) to regulate wholesale and interstate energy markets under the Federal Power Act, 16 U.S.C. § 824 *et seq*. (FPA) and its companion statute, the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (NGA).

Founded in 1965, NGSA is the only national trade association that solely focuses on producer-marketer issues related to the downstream natural gas industry.   NGSA maintains a narrow but deep focus on the regulatory issues that affect natural gas producer-marketers and has been involved in a substantive manner in every one of FERC's significant natural gas rulemakings since FERC's creation in 1977, including the restructuring of the natural gas industry though Orders Nos. 436, 636 and 637.   NGSA has consistently advocated for well-

3

functioning wholesale markets for natural gas and electricity; policies that support market transparency, efficient nomination, and scheduling protocols; just and reasonable transportation rates; non-preferential terms and conditions of transportation services; and the removal of barriers to developing needed natural gas infrastructure.  NGSA has a long-established commitment to ensuring a public policy environment that fosters a growing, competitive market for natural gas.

This case is critically important to API and NGSA members given: (1) long-standing precedent establishing that the FPA and NGA are to be read in *pari materia* (*see Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) ("[A]s we have previously said, the relevant provisions of the [FPA and NGA] 'are in all material respects substantially identical.'…we therefore follow our established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." (citations omitted)); (2) the role of FERC's exclusive authority under these statutes in ensuring fair and effective functioning of wholesale markets for electricity and natural gas, consistent with the Supreme Court's decision in *Hughes v. Talen Energy Marketing,* 136 S. Ct. 1288 (2016),  which held that the FPA preempts state programs that "impermissibly intrude[] upon the wholesale electricity market" by "adjusting an interstate wholesale rate," *id.* at 1292, 1297; and (3) the importance of maintaining the right of participants in wholesale

4

markets for electricity and natural gas to seek equitable relief under the FPA and NGA consistent with *Armstrong v. Exceptional Child Ctr., Inc*. —— U.S. ——, 135 S.Ct. 1378 (2015).

If allowed to stand, the District Court's decision would allow Illinois and other states to enact laws that change the wholesale rates received by electric generation suppliers participating in organized wholesale electricity markets, favoring uncompetitive in-state nuclear generators with subsidies, while discriminatorily depressing the prices received by other suppliers, with the express intention of protecting in-state industry and favoring one fuel source over another. Many other large power-consuming states are pursuing or considering similar programs, including Connecticut, New Jersey, New York, Ohio, and Pennsylvania. The District Court's decision would throw open the door to an ever-growing patchwork of discriminatory intervention in wholesale markets.   This is in contravention of recent U.S. Supreme Court precedent and would have serious adverse consequences for fair competition and the efficient functioning of the nation's energy markets.

The United States is in the midst of an energy renaissance, which has transformed the country from a projected major natural gas importer to a net natural gas exporter in the span of a few short years, with abundant supplies of

natural gas expected to last decades.  Natural gas, when used to fuel electricity generation, offers substantial benefits over other fossil fuels, including lower greenhouse gas and other harmful air emissions, low cost, and a reliable and integrated nationwide delivery system.  Indeed, it is the overwhelming market advantages offered by natural gas that have spurred the nuclear energy industry to seek unprecedented and blatantly discriminatory subsidies from various states through direct intervention in the design and operation of the organized wholesale electricity markets.  The nation's suppliers, transporters, and purchasers of low-cost, natural gas used for electricity generation should not be intentionally and unduly disadvantaged in the organized wholesale electricity markets due to such state policies.  And the problem is compounded if, as the District Court held, regulated entities are no longer allowed to bring suits in equity to enforce the exclusive authority of the FERC to regulate wholesale sales and the transmission of electricity in interstate commerce under the FPA.  This would run counter to the fundamental principles underlying the FPA, and by extension the NGA, reversing decades of FERC efforts to foster market-based competition in the wholesale electricity and natural gas sectors for the benefit of consumers.

## SUMMARY OF ARGUMENT

The District Court improperly dismissed Plaintiffs-Appellants' suit in equity to enjoin the State of Illinois from implementing its Zero Emission Credit (ZEC) program. *Amici* support the arguments of Plaintiffs-Appellants Electric Power Supply Association, Dynegy Inc., NRG Energy, Inc. and Calpine Corporation[2] that the ZEC program impermissibly impinges on FERC's exclusive authority to regulate the "rates and charges made, demanded, or received … for or *in connection with*" wholesale sales. *Hughes,* 136 S. Ct. at 1292 (emphasis added); 16 U.S.C. 824d(a); EPSA Br. at 37. Further, *Amici* agree that the *effect* of the ZEC program is to impermissibly favor nuclear over non-nuclear generation suppliers in organized energy markets. *Id.* at 42-43. This discriminatory intervention in wholesale power markets is improper, undermines open-access, market-based competition, and discriminates against natural-gas-fired generators supplied by *Amici*'s member companies.

Illinois' ZEC program is precisely the type of law that Congress sought to prevent and undo when it enacted the FPA and NGA in the 1930's. And the design and intended effect of the ZEC program is identical to one the Supreme Court

---

[2] Plaintiffs-Appellants in Case No. 17-2445 are Electric Power Supply Association, Dynegy Inc., NRG Energy, Inc. and Calpine Corporation. The consolidated proceeding, Case No. 17-2433, involves different Plaintiffs-Appellants.

7

recently held was preempted under the FPA in *Hughes*, 136 S. Ct. at 1292. The District Court's misapplication of *Hughes* is based on a fundamental misunderstanding of the ZEC program and its impact on wholesale power markets, and must be reversed.

The District Court also misapplied the Supreme Court's decision in *Armstrong,* erroneously finding that Congress in the FPA implicitly foreclosed suits in equity to enforce FERC's exclusive authority to set rates for the wholesale sale of electricity. Where the relevant statute does not expressly prohibit such suits, as is the case for the FPA, *Armstrong* establishes a two-part test for determining whether Congress has done so implicitly. Congress can demonstrate its intent to foreclose such suits where: (1) the statute establishes a distinct "sole remedy" on the part of the administering agency to enforce the relevant provision; *and* (2) the law presents a "judicially unadministrable" standard. As both Justice Scalia's opinion and Justice Breyer's concurrence in *Armstrong* make clear, both parts of this two-part test must be met.

The District Court misapplied both parts of the *Armstrong* test, but especially egregiously with regard to the second part. The District Court mistakenly focused on the FPA's substantive ratemaking standard, *i.e.*, FERC's duty to ensure that wholesale rates are "just and reasonable." Decision at *9

8

(citing 16 U.S.C. § 824e(a)).  But Plaintiffs-Appellants are not challenging the Illinois ZEC program under the "just and reasonable" standard, and there is no cause for the Court to interpret that standard in this case.  Rather, the issue here is whether the Illinois program improperly impinges on FERC's exclusive authority over wholesale rates.    The Supreme Court has rendered recent decisions interpreting the scope of FERC's exclusive authority – making plain that the relevant standard is far from "judicially unadministrable," as further explained below.  And although this alone is sufficient basis for reversal of the District Court's decision, the Court also misapplied the first part of the *Armstrong* test.  Unlike the Medicaid statute at issue in *Armstrong*, the FPA does not create a "sole remedy" providing for agency enforcement of the relevant provision.  Rather, the FPA provides for a broad array of remedies, including injunctive relief, evidencing no intention to foreclose private suits at equity to enforce the statute.  More generally, *Armstrong* was predicated on the unique characteristics of the Medicaid Act, including its status as Spending Clause legislation, making the District Court's extension of *Armstrong* to the FPA clearly inapposite.

For all these reasons, the District Court's finding that the FPA evidences implied congressional intent to foreclose private enforcement of FERC's exclusive jurisdiction to set wholesale rates for electricity under the FPA must be reversed.  Plaintiffs-Appellants' action at equity should be allowed to proceed.  This result is

9

consistent with not only the FPA, but also the NGA, which, as described above, is generally interpreted *in pari materia*. *See*, *e.g.*, *Oneok,* 135 S. Ct. at 1601–1602 (discussing FPA cases in determining the preemptive scope of the NGA).

Preclusion of private suits at equity to enforce FERC's exclusive authorities under the FPA or NGA would be contrary to Congress's intent to foster competitive interstate and wholesale energy markets, and would have serious adverse impacts on such markets. FERC has broad responsibilities, limited resources, and a backlog of cases. Congress never intended that FERC would bear the sole responsibility for policing legislative and regulatory activities in fifty states to defend against encroachment on its exclusive ratemaking authority under the FPA, or under the NGA. Rather, private suits play a key role in protecting FERC's exclusive authority "to ensure 'just and reasonable'… [] rates" and its critical role in "break[ing] down regulatory and economic barriers that hinder a free market in wholesale electricity." *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. 527, 532, 536 (2008) (quoted in *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768, 193 L. Ed. 2d 661 (2016), *as revised* (Jan. 28, 2016)). Multiple other states are pursuing similar subsidy programs that are contrary to the design and operation of the organized wholesale electricity markets, making the availability of private suits all the more important.

**ARGUMENT**

## I.    THE DISTRICT COURT'S DECISION IS BASED ON A MISUNDERSTANDING OF WHOLESALE MARKETS AND A MISAPPLICATION OF *HUGHES*

The District Court misunderstood the ZEC price-setting mechanism – and therefore its closely-tethered relationship with rates for wholesale sales of electricity – resulting in misapplication of the law.  Specifically, the Court failed to recognize that the Illinois' ZEC program impermissibly interferes with the "single clearing price" structure of organized electricity markets and FERC's ratemaking jurisdiction and is therefore preempted under *Hughes*, 136 S. Ct. 1288, 1292.

### A.    The Organized Wholesale Electricity Markets Are Designed to Support Fuel-Neutral, Least-Cost Supply of Electricity

Before the FPA became law, most electricity was sold by vertically integrated utilities that built, owned and operated power plants, transmission lines, and local delivery systems.  Although there were some interconnections among utilities, most operated as separate, local monopolies subject to state or local regulation. Their sales were "bundled," meaning that consumers paid a single charge that included both the cost of the electric energy and the cost of its delivery.  Competition among utilities was not prevalent.  State regulators had authority over intrastate sales and retail rates, but states were precluded from regulating the *interstate* sale of electricity.  *Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927).

Congress passed the FPA in 1935 to establish federal regulation over the wholesale sale of electricity in interstate commerce, motivated in part by the notion that monopoly suppliers had to be regulated in order to keep prices competitive and avoid "economically inefficient behavior." *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 394 (1983). Three years later, Congress passed the NGA "to protect consumers against exploitation at the hands of natural gas companies." *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944). Together, the statutes give FERC exclusive jurisdiction over wholesale sales of electricity and transmission of electricity and natural gas in interstate commerce, tasking FERC with ensuring that jurisdictional rates are just and reasonable and not unduly discriminatory.

Under the FPA, FERC has fostered the development of open-access-based, regional organized wholesale electricity markets which operate pursuant to complex rules[3] designed to ensure workable competition in those markets and the reliable operation of the electric grid. The organized electricity markets were established under the exclusive jurisdiction of FERC on the basis that a "megawatt is a megawatt;" that is, one electric generating resource should not be favored over another based on fuel type, and these markets are intentionally designed to select

---

[3] These rules are embodied in tariffs that are filed with and accepted by FERC.

the *lowest cost* resources needed to meet demand.[4]  This market structure is intended to provide the appropriate economic signals to market participants, who on this basis determine, among other things, whether and how to invest in new resources, or alternatively, retire uneconomic resources.  This design encourages fair competition, and selects the least-cost supply options for meeting the nation's electricity needs – benefitting the ultimate consumer consistent with the mandate of Congress in the FPA.  *See, e.g.*, *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071, at P 1 (Oct. 17, 2008) ("National policy has been, and continues to be, to foster competition in wholesale electric power markets.").  In effect, FERC has already acted on concerns with respect to the adverse impact of uneconomic resources through its implementation of rules for each of the organized markets.

Large-scale subsidy programs for a narrow set of nuclear generation suppliers that contravene the design and operation of the organized wholesale electricity markets artificially inhibit the economically efficient functioning of those markets and undermine FERC's ability to properly regulate these markets. The organized markets were not designed to accommodate mechanisms whereby

---

[4] FERC has also undertaken significant, successful efforts to enhance competition in the natural gas markets over the years.  This point was discussed at a recent FERC Technical Conference in FERC Docket No. AD17-11-000, *available at* https://www.ferc.gov/CalendarFiles/20170523170542-AD17-11-000PostTC.pdf.

large, existing baseload resources (like nuclear plants) obtain significant compensation from sources external to the organized electricity markets. Any programs designed to promote such activity must be closely regulated by FERC to ensure the provision of just and reasonable rates. Further, establishment of precedent that would allow a patchwork of differing state subsidy programs tethered to wholesale markets, each designed to promote state-specific goals, would disrupt the wholesale energy markets and undermine FERC's ability to carry out its statutory function.

### B.     The Illinois ZEC Program Is Preempted Under *Hughes*

The District Court's decision is based on a misunderstanding of the ZEC program and its impact on wholesale electricity markets, and misapplies the Supreme Court's decision in *Hughes*. The Court in *Hughes* concluded that the FPA preempted a Maryland regulation that sought to promote the development of new generation resources through a "contract for differences" subsidy mechanism. The Court held that, "[b]y adjusting an interstate wholesale rate [for electricity], Maryland's program invade[d] FERC's regulatory turf." 136 S. Ct. at 1297. It suggested that other measures might be permissible, if they were "untethered to a generator's wholesale market participation." *Id.* at 1299.

In the decision below, the District Court concluded that, because the Illinois ZEC program regulates "sales of credits… and it does not regulate the rate or

14

transaction terms of wholesale power, the program does not run afoul of *Hughes*." Decision at *12.  This determination was coupled with the District Court's finding that Illinois did not expressly require nuclear plants to participate in and clear auctions, such that it did not "directly" affect a wholesale transaction.  *Id.* at *13.

These conclusions are incorrect.  First, as a practical matter, the two in-state nuclear generation plants that are the beneficiaries of subsidies provided through the Illinois ZEC program *have no alternative but to participate in the organized wholesale electricity markets* administered by PJM and MISO, as EPSA's brief clearly explains.  EPSA Br. at 43.  The Illinois legislature thus had no need to expressly require their participation in the organized wholesale electricity markets. And the fact that Illinois did not include such a requirement cannot shield the legislation from preemption under the FPA; such a result would merely reward technical obfuscation.  Instead, it is the real-world operation and impact of Illinois' subsidy program on which this Court's inquiry should focus.

Second, the ZEC price mechanism plainly and directly "tethers" the ZEC-based subsidy to wholesale market rates, in contravention of *Hughes*, because the subsidy is calculated based on actual rates received for wholesale sales that have or will occur in the wholesale markets.  The ZEC price itself is calculated by the

"social cost of carbon" as reduced by a specified "price adjustment."[5]    And

significantly, the ZEC program's "price adjustment" mechanism is *calculated

based on the wholesale price* a ZEC recipient receives.    Specifically, it is equal to

the amount by which the market price index for the applicable delivery year

exceeds the baseline market price index for the consecutive 12-month period

ending May 31, 2016.    *See* 20 ILCS 3855/1-75(d-5).

Breaking that equation down into its component parts, the ***market price

index*** is based on the sum of (i) actual rates received for sales of capacity in the

organized markets,[6] and (ii) actual rates for energy sold in the bilateral forward

markets, as reflected in price indices reported by the Intercontinental Exchange

(ICE).    *Id.* (d-5)(1)(B)(iii)).    (ICE computes and publishes representative forward

market prices using price and other information from actual forward fixed price

wholesale transactions.)    Then, the ***baseline market price index*** is based on the

sum of *actual rates received* for the sale for energy and capacity in the organized

---

[5] Federal agencies use estimates of the social cost of carbon to value the climate impacts of rulemakings.    It is a measure, in dollars, of the long-term damage done by a ton of carbon dioxide emissions in a given year.    The U.S. Interagency Working Group on Social Cost of Carbon set the price for the Social Cost of Carbon at $16.50 per megawatt hour in August 2016.    *See* 20 ILCS 3855/1-75(d-5)(1)(B)(i).

[6] While the ZEC program and the District Court refer to these capacity prices as "projected," the ZEC program provides that they are actual prices as determined in the capacity auctions administered by PJM and MISO.    *See id.* 3855/1-75 (d-5)(1)(B)(iii)(bb)).

markets administered by PJM and MISO between June 1, 2015 and May 31, 2016. *See* 20 ILCS 3855/1-75 (d-5)(1)(B)(ii).[7]  So in fact, the ZEC subsidy is calculated based on actual rates received for wholesale sales that have or will occur in the wholesale market.[8]

Finally, the District Court failed to address the purpose and intent of the Illinois program, which is to secure more favorable wholesale rates for two in-state nuclear generation suppliers to protect in-state industry and revenues at the expense of other generation suppliers, including low-cost out-of-state natural gas and natural gas-fired generation. Here, the ZEC price mechanism plainly is aimed at adjusting FERC-jurisdictional wholesale rates, contrary to *Hughes*.  And as in *Hughes*, a financial instrument is used to compensate favored resources.

---

[7] The bilateral forward sales transactions used to compute the index are within FERC's exclusive jurisdiction (which is why FERC has asserted jurisdiction over natural gas and electric energy price index developers and data providers to ensure that they meet certain minimum standards).  *See* FERC, *Policy Statement on Natural Gas and Electric Price Indices*, *available at* http://www.energymarketers.com/Documents/Policy_Statement_on_Price_Indices_july_24_2003.pdf.

[8] Further, building on its factual misunderstanding of the adjusted ZEC price mechanism, the District Court erroneously concluded that the "projected and composite prices" that make up the price adjustment "are not within FERC's jurisdiction."  Decision at *13.  But here, again, the "projected and composite" prices as determined in the wholesale electricity markets are actual wholesale rates that are exclusively within FERC's ratemaking jurisdiction.  *Hughes,* 136 S. Ct. at 1294.

17

For the reasons set forth above, Illinois' ZEC program is preempted by the FPA as interpreted by *Hughes*.  The District Court's decision, based on a misunderstanding of the ZEC program and its impact on the organized wholesale electricity markets, is illogical and if allowed to stand would not only disrupt those markets, but also the upstream natural gas markets which provide the fuel used to produce over a third of the nation's electricity.  Therefore, the District Court's decision should be reversed.

## II.     THE DISTRICT COURT'S DECISION SHOULD BE REVERSED BECAUSE THE COURT MISAPPLIED *ARMSTRONG*

Preclusion of a private right of action at equity under the FPA would invite more state legislatures to test — or outright ignore — FERC's exclusive ratemaking jurisdiction under the FPA, and by extension, the NGA.  It therefore is not surprising that FERC has taken the position that the FPA allows such suits.  *See* Brief of Respondent FERC in *City of Orangeburg v. FERC*, No. 15-1274 at 36 (D.C. Cir. June 21, 2016) (noting that an "entity that believes it is harmed by a state's action that conflicts with the Federal Power Act may pursue its claim in state or federal court…").

This case does not present considerations of traditional "cooperative federalism" in which federal and state regulators are actively engaged in a co-regulatory partnership.  Rather, states have substantial incentives to interfere with

18

the design and operation of wholesale electricity markets to protect or promote in-state generation suppliers, which is why a number of other states have adopted or are considering subsidy programs similar to the Illinois program challenged here.

The District Court committed reversible error when it failed to properly apply the two-part test in *Armstrong* and did not distinguish the FPA from the Medicaid Act – Spending Clause Legislation, under which third-party enforcement rights must be unambiguously conferred.  Accordingly, the lower court decision should be reversed, and EPSA's suit at equity should be allowed to move forward. Failure to allow this case, and others like it, to proceed would incentivize expanded state intervention in wholesale markets, with serious adverse effects on the low-cost natural gas fired generators and fuel suppliers that operate in those markets.

### A.     The District Court Erred Because Both Parts of *Armstrong's* Two Part Test Have Not Been Met

The sole question before the Court is whether Congress through the FPA *implicitly* foreclosed EPSA's suit based on the two-part test identified by the Supreme Court in *Armstrong*:[9] namely, whether (1) Congress in the statute established a distinct "sole remedy" on the part of the administering agency to

---

[9] The parties do not dispute that courts may "adjudicate[] requests for equitable relief" and "may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc*., 135 S. Ct. 1378, 1384, 1390 (2015).  Nor do they dispute that the FPA does not *expressly* preclude this suit.

enforce the provision, implying an intent to preclude private suits at equity, and (2) whether the FPA sets forth a "judicially unadministrable" standard suitable for FERC to resolve, rather than a court. *Armstrong*, 135 S. Ct. at 1385.

Justice Scalia's opinion in *Armstrong* makes clear that the Court's decision was predicated on satisfaction of both parts of his two-part test:  both the provision of a "sole remedy" exercised by the administering agency, and the suit's attempt to privately enforce a "judicially unadministrable" standard.  *Id*. ("The provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief.") (emphasis in original).  If anything, Justice Scalia's opinion rests more heavily on the second part concerning judicial administrability.  Justice Breyer concurred in part with the decision and concurred in the judgment, finding that "*several characteristics of the federal statute before us, when taken together*, make clear that Congress intended to foreclose" a private suit at equity challenging the state action at issue in that case.  *Id.* at 1388 (emphasis added).  Justice Breyer placed special emphasis on the fact that the provision at issue, Section 30(A)[10] of the Medicaid Act, includes "broad and

---

[10] Medicaid is a federal–state program that subsidizes the states' provision of medical care to low-income individuals.  Section 30(A) of the Medicaid Act requires that state Medicaid plans contain procedures to ensure that reimbursement rates for health care providers are consistent with "quality of care and are sufficient to enlist enough providers" in the geographic area.  42 U.S.C. § 1396a(a)(30)(A).

nonspecific" standards to the setting of rates. *Id.* He underscored that hearing private suits at equity to enforce the Act's substantive rate-setting standard would require courts to "*engage in direct rate-setting*" that "approximate[s] the cost of quality care provided efficiently and economically." *Id.* at 1389 (citation omitted) (emphasis added). He judged it unlikely that Congress intended to allow injunctive actions that would require judges to engage in such a fraught exercise, and found that private injunctive relief appeared unnecessary where, under the statute, the Secretary of Health and Human Services could simply "withhold federal funds" to compel State compliance with the law. *Id.*

Under *Marks v. United States*, 430 U.S. 188, 193 (1977), where the Justices fail to converge on a single majority rationale, the "holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193. Justice Breyer's opinion, which focuses on the Medicaid Act's substantive ratemaking provision along with several other unique characteristics of that statute "taken together," represents the narrowest ground for the holding in *Armstrong*. 135 S. Ct. 1388-89. Regardless, whether the Court applies Justice Breyer's concurrence – as *Marks* would require – or whether the Court instead directly applies Justice Scalia's two-part test, there is no question that *at least* the two parts identified by Justice Scalia must be satisfied to find implicit statutory preclusion of private suits at equity.

21

1.   *Enforcement of FERC's Exclusive Ratemaking Authority Under the FPA Is "Judicially Administrable"*

The decision below is based on a patent misapplication of the second part of the *Armstrong* test: the District Court's finding that the FPA's requirement that wholesale rates be "just and reasonable" (16 U.S.C. § 824e(a)) was "judicially unadministrable."   The FPA's substantive "just and reasonable" ratemaking standard is not the requirement on which this suit is premised.   Plaintiffs-Appellants challenge the ZEC program on the grounds that it seeks to adjust wholesale rates in violation of FERC's exclusive ratemaking authority.  *See* 16 U.S.C. § 824(b)(1).  Their suit does not ask or require the Court to evaluate the justness and reasonableness of wholesale rates as affected by Illinois' ZEC program (or to find that this program is preempted because it results in wholesale rates that are not just and reasonable).

There can be no question that the FPA's grant of exclusive authority to regulate "the sale of electric energy at wholesale in interstate commerce," 16 U.S.C. § 824(b)(1), does not present a "judicially unadministrable" standard.  The Court has made clear that the test for whether a state program contravenes FERC's exclusive ratemaking authority is whether the state rule or practice directly affects "interstate wholesale rates."  *See Hughes*, 136 S. Ct. at 1299.  Further, over the past three decades, dozens of federal court decisions – including from the Supreme

22

Court and nearly every Court of Appeals – have interpreted the scope of FERC's ratemaking authority. *See* EPSA Br. at 38. In short, the federal courts plainly are quite capable of administering the FPA standard at issue in this case – *i.e.,* the scope of FERC's exclusive jurisdiction to set wholesale rates.

FERC's exclusive *jurisdiction* over wholesale ratemaking under the FPA is in no way analogous to Section 30(A) of the Medicaid Act, which is a highly complex, substantive rate-setting provision. Section 30(A) mandates that a state plan for medical assistance "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan. . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care . . . ." 42 U.S.C. § 1396a(a)(30)(A). Evaluation of the provision's substantive provisions as against state law would require deep policy expertise in the complex underlying markets. As Justice Scalia emphasized, "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Armstrong,* 135 S. Ct. at 1385 (citations omitted). In contrast, here, the Court need only speak to the jurisdictional parameters of FERC's

23

exclusive ratemaking authority under the FPA to determine whether a state law impermissibly sets or adjusts a wholesale rate in contravention of that authority. This is exactly the type of question that courts routinely resolve – as the Supreme Court and other decisions cited above make plain.

Since *Armstrong* requires satisfaction of both parts of its two-part test, and courts have readily and repeatedly proven capable of "administering" the scope of FERC's exclusive jurisdiction to set wholesale rates, the District Court's judgment should be reversed on this ground alone.

### 2. The FPA Does Not Establish a "Sole Remedy" for Agency Enforcement of Violations

In any event, the first part of the *Armstrong* two-part test – whether the statute provides a "sole remedy" enforceable by the agency – is not satisfied either.

In *Armstrong*, the Court emphasized that Congress's intent to foreclose private suits at equity to enforce Section 30(A) was demonstrated in part by the fact that the "sole remedy" the Medicaid Act established to remedy a state's breach was a provision authorizing the Secretary of Health and Human Services to withhold funding from states in noncompliance with the Act. *Id.* The Court read this provision to indicate congressional intent to give the Secretary alone authority to enforce Section 30(A) – implicating a lack of alternative judicial recourse.

The FPA, by contrast, does not establish with FERC a "sole remedy" for enforcing its provisions —such that Congressional intent to preclude a private suit in equity could be inferred.

To be sure, where a state fails to comply with the FPA and impinges on FERC's exclusive wholesale ratemaking authority, FERC may bring an action in federal court "to enjoin such acts or practices and to enforce compliance with this Act or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond." 16 U.S.C. § 825m(a). But as EPSA emphasizes, the FPA also confers federal jurisdiction over "all" suits in equity, which encompasses private suits. EPSA Br. at 28. This is a far cry from the exclusive remedy scheme Congress provided under the Medicaid Act.

In this regard, FERC's exclusive ratemaking authority under the FPA is similar to the statute at issue in *Friends of East Hampton Airport*, in which the Second Circuit held that the Airport Noise and Capacity Act of 1990 (ANCA) – a federal law controlling noise levels at airports – did not preclude a private suit at equity. *Town's Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 145 (2d Cir. 2016), *cert. denied* 137 S. Ct. 2295 (2017).

The Second Circuit held that the fact that Congress "conferred such broad enforcement authority on the FAA, and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements." *Id.* at 146 (citations omitted).  *See also Tohono O'odham Nation v. Ducey,* 130 F. Supp. 3d 1301, 1314-16 (D. Ariz. 2015) (finding that notwithstanding that a statute created three specific causes of action, an equitable cause of action may not be foreclosed under *Armstrong* because the statue did not evince Congress' intent to "exclude all other types of action," including equitable remedies).

In mistakenly finding a congressional intent to preclude private suits at equity under the FPA, the District Court also relied on the Public Utility Regulatory Policies Act of 1978 (PURPA), which expressly provides for a private right of action.  16 U.S.C. § 824a-3(h)(2)(B).  However, Section 210 of PURPA (providing a private right of action) did not even amend the FPA.  *See* Pub. L. No. 95–617, 92 Stat 3117 (1978).  Congress's crafting of private enforcement provisions in a different statute four decades later cannot be taken as indicative of Congressional intent under the provisions in the FPA granting FERC exclusive ratemaking authority.

26

In sum, unlike the Medicaid Act provisions at issue in *Armstrong*, or the referenced provisions in PURPA, the FPA does not establish a "sole remedy" for recourse to enforce FERC's exclusive ratemaking authority under the Act. To the contrary, the FPA includes broad judicial enforcement provisions and expressly contemplates federal court jurisdiction over "all" suits at equity, including private suits. Accordingly, there is no basis under the first part of the *Armstrong* two-part test for inferring that Congress intended to foreclose private actions for equitable relief from a state program, like the Illinois program here, that conflicts with FERC's exclusive authority under the FPA.

### B. The District Court Failed To Distinguish *Armstrong* On Grounds That The FPA Is Not Spending Clause Legislation, Under Which Third-Party Enforcement Rights Must Be "Unambiguously Conferred"

While the Medicaid statute evaluated in *Armstrong* allows a federal agency to wield the "power of the purse" to ensure enforcement of federal requirements, state legislatures are not so similarly incentivized to respect the boundaries of FERC's exclusive jurisdiction to regulate wholesale electricity rates. The Supreme Court in *Armstrong* emphasized that the Medicaid Act is Spending Clause legislation that operates "in the nature of a contract" between the federal government and a state, and doubted in the first instance that providers operating within the federal-state Medicaid scheme as "incidental beneficiaries" possessed

27

the right to sue under the Act as "intended beneficiaries." *Armstrong*, 135 S. Ct.. at 1387 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576-77 (2012) (plurality) (Roberts, C.J.); *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

As the United States argued in its *amicus* brief in *Armstrong*, traditional contract principles require that third parties have judicially enforceable contract rights only where a contract is intended to confer on them a legally enforceable right. *See* Brief for the United States as Amicus Curiae Supporting Petitioners, *Armstrong v. Exceptional Child Center, Inc*., No. 14-15, 2014 WL 6660918, at *9 (2014). Consistent with those principles, the *Armstrong* Court determined that providers receiving benefits under the Act should not have a private right of action unless "unambiguously conferred." *Armstrong*, 135 S. Ct. at 1377-88 (citation omitted). *See also German All. Ins. Co. v. Home Water Supply Co*., 226 U.S. 220, 230-231 (1912) (courts distinguish between an intention to benefit a third party and the intention that the third party may enforce that intention).

The FPA and FERC's exclusive ratemaking authority thereunder is not authorized under the Spending Clause, and accordingly must be evaluated outside the framework of legislation that operates "in the nature of a contract" between the federal government and a state, with "incidental" and "intended" beneficiaries. *Armstrong* at 1387; *Pennhurst,* 451 U.S. at 17. For this reason as well, the District Court erred.

## CONCLUSION

For the foregoing reasons, the Court should reverse the determination of the District Court and allow EPSA's suit to proceed.


Respectfully submitted,


/s/ Ben Norris                        /s/ Dena Wiggins

BEN NORRIS                           DENA WIGGINS
AMERICAN PETROLEUM INSTITUTE          NATURAL GAS SUPPLY ASSOCIATION
1220 L Street, N.W.                   1620 I Street, N.W., Suite 700
Washington, D.C.  20005               Washington, D.C.  20006
(202) 682-8251                        (202) 326-9310
norrisb@api.org                       dena.wiggins@ngsa.org

*Counsel for Amici Curiae*

September 5, 2017

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and the

corresponding Circuit Rule, I hereby certify that the foregoing brief was produced

using the Times New Roman 14-point typeface and contains 6,340 words.


*/s/ Ben Norris*

BEN NORRIS
AMERICAN PETROLEUM INSTITUTE
1220 L Street, N.W.
Washington, D.C.  20005

*Counsel for American Petroleum Institute*

September 5, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which sends a Notice of Electronic Filing to all counsel of record.

*/s/ Ben Norris*

BEN NORRIS
AMERICAN PETROLEUM INSTITUTE
1220 L Street, N.W.
Washington, D.C.  20005
(202) 682-8251
norrisb@api.org

*Counsel for American Petroleum Institute*

September 5, 2017

31