**No. 17-2433 (Consolidated with 17-2445)**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

VILLAGE OF OLD MILL CREEK, *et al.*,

Plaintiffs-Appellants,

v.

ANTHONY STAR, in his official capacity as Director
of the Illinois Power Agency, *et al.*,

Defendant-Appellee,

and

EXELON GENERATION COMPANY, LLC,

Intervenor-Appellee.

_____

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

Plaintiffs-Appellants,

v.

ANTHONY STAR, in his official capacity as Director
of the Illinois Power Agency, *et al.*,

Defendants-Appellees,

and

EXELON GENERATION COMPANY, LLC,

Intervenor-Appellee.

_____

On Appeals from the United States District Court for the Northern District of Illinois,
Nos. 1:17-cv-01163 & 1:17-cv-01164, Hon. Manish S. Shah, District Judge

_____

### BRIEF OF INTERVENOR-APPELLEE
### EXELON GENERATION COMPANY, LLC

Matthew E. Price
David W. DeBruin
Zachary C. Schauf
William K. Dreher
JENNER & BLOCK LLP
1099 New York Ave. NW Ste. 900
Washington, D.C. 20001
(202) 639-6000

*Counsel for Intervenor-Appellee Exelon Generation Company, LLC*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: _17-2433 & 17-2445_

Short Caption: _Village of Old Mill Creek v. Star_

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    _Exelon Generation Company, LLC_

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    _Jenner & Block LLP_

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       _Exelon Corporation_

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       _Exelon Corporation is a publicly held company, and no public company owns 10% or more of its stock._

Attorney's Signature: _s/ Matthew E. Price_      Date: _7-21-17_

Attorney's Printed Name: _Matthew E. Price_

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _✕_    **No** _____

Address: _Jenner & Block LLP, 1099 New York Ave. NW Suite 900_

         _Washington, DC 20001_

Phone Number: _202-639-6873_      Fax Number: _202-639-6066_

E-Mail Address: _mprice@jenner.com_

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: ___17-2433 & 17-2445___

Short Caption: ___Village of Old Mill Creek v. Star___

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Exelon Generation Company, LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Jenner & Block LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        Exelon Corporation

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        Exelon Corporation is a publicly held company, and no public company owns 10% or more of its stock.

Attorney's Signature: ___s/ David W. DeBruin___    Date: ___7-24-17___

Attorney's Printed Name: ___David W. DeBruin___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ☒

Address: ___Jenner & Block LLP, 1099 New York Ave. NW Suite 900___

         ___Washington, DC 20001___

Phone Number: ___202-639-6015___    Fax Number: ___202-639-6066___

E-Mail Address: ___ddebruin@jenner.com___

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___17-2433 & 17-2445___

Short Caption: ___Village of Old Mill Creek v. Star___

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

___Exelon Generation Company, LLC___

_____

_____

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

___Jenner & Block LLP___

_____

_____

(3) If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

___Exelon Corporation___

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

___Exelon Corporation is a publicly held company, and no public company owns 10% or more of its stock.___

Attorney's Signature: ___s/ Zachary C. Schauf___          Date: ___7-25-17___

Attorney's Printed Name: ___Zachary C. Schauf___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ___X___

Address: ___Jenner & Block LLP, 1099 New York Ave. NW Suite 900___

___Washington, DC 20001___

Phone Number: ___202-637-6379___          Fax Number: ___202-639-6066___

E-Mail Address: ___zschauf@jenner.com___

iii

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 17-2433 & 17-2445

Short Caption: Village of Old Mill Creek v. Star

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Exelon Generation Company, LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP

(3)  If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

  Exelon Corporation

  ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

  Exelon Corporation is a publicly held company, and no public company owns 10% or more of its stock.

Attorney's Signature: s/ William K. Dreher          Date: 7/28/2017

Attorney's Printed Name: William K. Dreher

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Jenner & Block LLP, 1099 New York Avenue, NW, Suite 900

Washington DC  20001

Phone Number: 202-639-3898          Fax Number: 202-639-6066

E-Mail Address: wdreher@jenner.com

rev. 01/15 GA

# TABLE OF CONTENTS

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT........... i

TABLE OF AUTHORITIES ........................................................... vii

JURISDICTIONAL STATEMENT.................................................1

STATEMENT OF THE CASE .......................................................1

    A.    The FPA's Scheme of Cooperative Federalism. ......................... 4

    B.    The ZEC Program. ...................................................... 8

    C.    Administrative Remedies. ..........................................12

SUMMARY OF ARGUMENT .....................................................13

ARGUMENT ..........................................................................15

I.    Plaintiffs Lack a Preemption Cause of Action. ....................15

    A.    Plaintiffs Cannot Sue Under *Armstrong* ...................15

        1.    Plaintiffs Do Not Seek Relief That Courts of Equity Historically Provided. ......................................15

        2.    Congress Intended to Foreclose Suits of This Type. ........16

        3.    The FPA's Jurisdictional Provision Is a Red Herring. .... 23

    B.    Retail Plaintiffs Lack Prudential Standing................................ 25

II.    Plaintiffs' Field Preemption Claim Was Properly Dismissed. ........................................................................ 26

    A.    The Court Applies a Presumption Against Preemption............ 26

    B.    The ZEC Program Is Lawful Because It Regulates Generation. ................................................................ 27

        1.    States May Regulate Generation, Regardless Whether Generators Sell at Wholesale........................... 28

2.  FERC Has Upheld State Environmental Credit Programs Tied to Production—Even When That Electricity Is Subsequently Sold at Wholesale. ............... 29

3.  *Hughes* Confirms That the ZEC Program Is Valid Because It Conditions Payment on Generation, Not Wholesale Sales. ............................................. 32

4.  The Line Drawn in *Utah Power*, *WSPP*, and *Hughes* Meaningfully Identifies State Programs That Intrude on FERC's Domain. ........................... 35

C.  Plaintiffs' Attempts to Broaden *Hughes* Are Without Merit. ................................................................ 37

1.  The ZEC Program Does Not "Presuppose" Auction Participation and, Regardless, That Would Not Matter. ............................................................. 38

2.  Plaintiffs' Arguments About the ZEC Price Are Irrelevant. .......................................................... 45

III.  The ZEC Program Is Not Conflict Preempted. ................................... 52

IV.  Plaintiffs' Dormant Commerce Clause Claim Was Properly Dismissed. ................................................................ 58

A.  Plaintiffs Lack Standing. .......................................................... 58

B.  The Dormant Commerce Clause Does Not Apply to Subsidy Programs Like the ZEC Program. ............................................. 59

C.  Plaintiffs' Discrimination Claim Fails. ....................................... 61

D.  Plaintiffs' *Pike* Claim Fails. ....................................................... 65

CONCLUSION ................................................................ 66

# Table of Authorities

## CASES

*Advanced Energy Management Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) .......................................................57

*Allco Finance Ltd. v. Klee*, 805 F.3d 89 (2d Cir. 2015) ............................... 20

*Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017)............... 6, 35, 38, 66

*Allco Finance Ltd. v. Klee*, No. 15-cv-608, 2016 WL 4414774 (D. Conn. Aug. 18, 2016), *aff'd on other grounds*, 861 F.3d 82 (2d Cir. 2017).............................................................................. 60

*Allen v. Wright*, 468 U.S. 737 (1984) ............................................. 47

*Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) .............. 60, 61

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) ........................................ 26

*Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission* 461 U.S. 375 (1983) ............................................. 26

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) ........................................... 15, 16, 18, 19, 20, 21, 22, 23

*Association of Public Agency Customers v. Bonneville Power Administration*, 733 F.3d 939 (9th Cir. 2013) ....................................... 25

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984).................................. 64

*Bassler v. Central National Bank in Chicago*, 715 F.2d 308 (7th Cir. 1983) ............................................................................... 24

*Blue Circle Cement, Inc. v. Board of County Commissioners*, 27 F.3d 1499 (10th Cir. 1994)...................................................... 44

*Calpine Corp. v. FERC*, 702 F.3d 41 (D.C. Cir. 2012)................................. 39

*Cavel International, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007)...................................................................... 58, 65, 66

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......................................... 30

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ............................ 63

*Coalition for Competitive Electricity v. Zibelman*, No. 16-cv-8164, 2017 WL 3172866 (S.D.N.Y. July 25, 2017), *appeal docketed*, No. 17-2654 (2d Cir.) ................................................... 2

*Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) .................................................... 5, 55

*Connecticut Light & Power Co. v. FPC*, 324 U.S. 515 (1945) ...................... 29

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008) ......................................................................... 61

*Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606 (2012) ............................................................ 16

*Eastern Kentucky Resources v. Fiscal Court of Magoffin County*, 127 F.3d 532 (6th Cir. 1997) ................................................... 65

*Edmonson v. Lincoln National Life Insurance Co.*, 725 F.3d 406 (3d Cir. 2013) ........................................................... 48

*EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) ................................................................................. 8

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) ...................... 64

*FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016) ............ 2, 25, 34

*FPC v. Southern California Edison Co.*, 376 U.S. 205 (1964) ............... 27, 44

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) ..................................... 16

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90 (E.D.N.Y. 2015), *vacated in part on other grounds*, 841 F.3d 133 (2d Cir. 2016) ................................................................. 18

*Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950 (D.C. Cir. 2000) ........................................................... 25

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ................................. 30

*Honeywell International, Inc. v. EPA*, 705 F.3d 470 (D.C. Cir. 2013) ............................................ 48

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) ............... 59, 60, 61

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) ............................ 2, 4-5, 8, 14, 19, 27, 33, 34, 35, 36, 42, 49, 50, 57

*Hummel v. St. Joseph County Board of Commissioners*, 817 F.3d 1010 (7th Cir. 2016) ................................. 47

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ......................................... 64

*Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960) ............................................ 26

*International Franchise Ass'n v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015) ........................................ 65

*Johnson v. United States Office of Personnel Management*, 783 F.3d 655 (7th Cir. 2015) ............................. 46, 47, 48

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................. 57

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016) ......................................... 24

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ............ 64, 65

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988) ......................................... 56

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951) ................................. 21, 23

*National Solid Waste Management Ass'n v. Pine Belt Regional Solid Waste Management Authority*, 389 F.3d 491 (5th Cir. 2004) ............................................ 59

ix

*New Jersey Board of Public Utilities v. FERC*, 744 F.3d 74 (3d Cir. 2014) ................................................................................41

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987) ................ 64

*Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963) ...........................................................................45

*Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*, 489 U.S. 493 (1989)......................................14, 45, 52, 53, 56, 66

*Northwest Requirements Utilities v. FERC*, 798 F.3d 796 (9th Cir. 2015)...............................................................................25

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .......................................... 65

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) ..................19

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013) ................................................................................. 26, 27

*Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927) ............................................................ 28

*Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007).................................................................................. 44

*Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99 (2d Cir. 1985).................................................26, 51

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ................................................................................. 63

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) .......................17-18

*South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005 (8th Cir. 1998)........................................................................... 44

*Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013) ............................................... 46

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)................................ 24

*United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607 (7th Cir. 2015) .................................................. 25

*Utah Power & Light Co. v. Pfost*, 286 U.S. 165 (1932) .......................... 28, 29

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002) ........................................ 23, 24

*Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011) ................................................ 16

*Wheelabrator Lisbon, Inc. v. Connecticut Department of Public Utility Control*, 531 F.3d 183 (2d Cir. 2008)........................ 6, 30

*Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1 (1st Cir. 2007) ................................................ 58

*Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) .................................. 43

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................ 26

*Zero Zone, Inc. v. United States Department of Energy*, 832 F.3d 654 (7th Cir. 2016)........................................ 10

## STATUTES

20 ILCS 3855/1-10 ................................ 9, 27, 30, 31, 61

20 ILCS 3855/1-75(c)(1)(D) .......................................... 52

20 ILCS 3855/1-75(d-5)(1) ..........................................9, 31

20 ILCS 3855/1-75(d-5)(1)(B)......................................10, 11, 12, 46

20 ILCS 3855/1-75(d-5)(1)(C)......................................10, 61, 62

20 ILCS 3855/1-75(d-5)(1)(C-5) ....................................61, 62

220 ILCS 5/16-108(m)(1)..........................................16

16 U.S.C. § 824(b)(1) .............................................. 5

16 U.S.C. § 824a-3(h)(2)(B) ........................................ 20

16 U.S.C. § 824d(a) .............................................. 5, 34

16 U.S.C. § 824d(e) .............................................. 17

16 U.S.C. § 824e(a) ................................................................. 12, 17

16 U.S.C. § 824*l*(b) .......................................................................19

16 U.S.C. § 825m(a) .....................................................................19

16 U.S.C. § 825p .................................................................... 23, 24

28 U.S.C. § 41(1) (1934) ............................................................. 24

Md. Code Ann., Pub. Util. §7-704.1 .......................................... 9, 51

N.J. Stat. Ann. § 48:3-87.1 ....................................................... 9, 51

## LEGISLATIVE MATERIALS

H.R. Rep. No. 74-1318 (1935) .................................................... 29

S. Rep. No. 74-621 (1935) ......................................................... 29

SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016) ................................................... 8, 9, 36, 49, 53

## ADMINISTRATIVE RULINGS

*California Independent System Operator Corp.*, 141 FERC ¶61,237 (2012)................................................................ 6

*California Independent System Operator Corp.*, 145 FERC ¶61,254 (2013) ............................................................. 55

*California Public Utilities Commission*, 132 FERC ¶61,047 (2010)...............................................................................17

*California Public Utilities Commission*, 133 FERC ¶61,059 (2010).............................................. 5, 30, 34, 55

*Edison Electric Institute*, 69 FERC ¶61,344 (1994)..................... 6

*ISO New England Inc.*, 158 FERC ¶61,138 (2017) ...................... 42

*Midwest Power System*, 78 FERC ¶61,067 (1997) ....................... 17

*MISO*, 139 FERC ¶61,199 (2012) ................................................ 40

*New York State Public Service Commission*, 158 FERC ¶61,137,
2017 WL 496267 (2017) .......................................................... 54

*PJM Interconnection, LLC*, 119 FERC ¶61,318 (2007)................................. 54

*Southern California Edison Co.*, 71 FERC ¶61,269 (1995)........................... 55

*Transmission Planning & Cost Allocation*, 139 FERC ¶61,132
(2012) ....................................................................................... 5

*Utilization of Electric Storage*, 158 FERC ¶61,051 (2017) ...................... 5, 54

*West-Wide Must-Offer Requirements*, 157 FERC ¶61,051 (2016) ............. 32

*WSPP, Inc.*, 139 FERC ¶61,061 (2012).............. 6, 7, 14, 27, 30, 31, 32, 35, 51

## OTHER AUTHORITIES

Lowell E. Alt, Jr., *Energy Utility Rate Setting* (2006).................................51

Amicus Br. of United States, *Hughes v. Talen Energy Marketing,
LLC*, 136 S. Ct. 1288 (2016), 2016 WL 344494 .................... 33, 35, 42, 54

EWG Notification, Docket EG00-53-000 (FERC Feb. 9, 2009)................ 40

IPA, Zero Emission Standard Procurement Plan (July 31, 2017) .............. 38

Ivan Gold & Nidhi Thakar, *A Survey of State Renewable
Portfolio Standards: Square Pegs for Round Climate Change
Holes?*, 35 Wm. & Mary Envtl. L. & Pol'y Rev. 183 (2010).................... 52

Motion to Amend, and Amendment to Complaint, *Calpine Corp.
v. PJM Interconnection, LLC*, Docket EL16-49-000 (FERC
Jan. 9, 2017)............................................................................12

Notice Inviting Post-Technical Conference Comments, Docket
No. AD17-11-000 (FERC May 23, 2017) ...................................13

Notice of Technical Conference, Docket No. AD17-11-000 (FERC
Mar. 3, 2017)............................................................................13

PJM, *PJM Economic Analysis of EPA's Proposed Clean Power
Plan* (Mar. 2, 2015), http://bit.ly/2pdKToc.............................. 62

*Restatement (Third) of Torts* § 26 cmt. b (2010) ........................................ 47

Transcript of Oral Argument, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), http://bit.ly/2q6rjeq .............................................................. 50

WSPP Submission, *WSPP, Inc.*, Docket ER12-1144-000 (FERC Feb. 22, 2012) .................................................................... 7, 31

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statements are complete and correct.

## STATEMENT OF THE CASE

States have long regulated electricity's production—a power expressly preserved by the Federal Power Act ("FPA").  Production often goes hand-in-hand with wholesale sales, because electricity must be delivered instantaneously.  But the law is clear that States keep authority over generation even when generators sell output exclusively in wholesale transactions, and even when States impose burdens or provide benefits to generators on a "per megawatt hour" (MWh) basis.[1]  States often exercise this authority to protect the environment and citizens' health by regulating and taxing polluting generation, and by granting loans, subsidies, or tax credits to clean generation.  "Cap-and-trade" programs, for example, require polluters to purchase allowances for each MWh generated.  Renewable energy credit ("REC") programs, meanwhile, provide state subsidies for each MWh of generation by renewable sources.  The Federal Energy Regulatory Commission ("FERC") has upheld all these programs.

Illinois's Zero Emission Credit ("ZEC") Program is an exercise of this authority.  Nuclear generation, like renewable generation, produces

---

[1] A MWh is the electricity equivalent of a barrel of oil.

1

electricity without emitting carbon dioxide or other pollutants. Yet those benefits are at risk because, unlike renewable generators, nuclear plants have not received payments reflecting this value. Many are at risk of retirement, and would be replaced by polluting fossil-fuel generation. So, Illinois created the ZEC Program to value the environmental benefits of nuclear generation. The Program is open to nuclear generators regardless of location or how they sell electricity. It targets subsidies where they will do the most good: nuclear plants that provide environmental benefits to Illinois but might otherwise retire.

As the district court held, the ZEC Program is lawful because it respects the jurisdictional line entrenched in the FPA and recently applied in *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).[2] Where, as here, a State conditions a tax or subsidy on electric generation, it acts within its sphere. But if the State conditions payment on wholesale sales in FERC's auctions, the State is *really* paying for the auction sales, and so enters FERC's sphere. Thus in *Hughes*, the Supreme Court struck down a state subsidy because it "condition[ed] receipt" on completing auction sales—which the Court described as its "fatal defect." *Id.* at 1292, 1299.

---

[2] A New York district court recently upheld a similar ZEC program. *Coalition for Competitive Electricity v. Zibelman*, No. 16-cv-8164, 2017 WL 3172866 (S.D.N.Y. July 25, 2017), *appeal docketed*, No. 17-2654 (2d Cir.).

Plaintiffs concede that the ZEC Program "does not expressly mandate participation in the auctions as a condition of receiving the ZEC."  Br. 44.[3] ZEC payments are triggered by electricity's production, not auction sales. Even so, Plaintiffs contend the Program is preempted for two reasons.  First, they assert that Illinois "presuppose[d]" that every ZEC plant will sell every MWh of electricity into FERC's wholesale auctions every day of the Program's 10-year duration.   Br. 10.  But Plaintiffs do not allege any facts suggesting that Illinois even thought about that issue, much less cared about it.  Illinois did not need to condition payment on auction sales because the Program achieves its environmental purpose regardless how or where ZEC generators sell electricity.   The Program is indifferent about how, or to whom, plants sell electricity or "capacity" (a commitment to sell electricity in the future).   Some eligible plants sell electricity and capacity in bilateral contracts outside the auctions.  Some do not sell capacity at all.  And some sell electricity at retail.  Any of these generators can receive ZECs.  Moreover, Plaintiffs' theory would upend longstanding precedent allowing States to regulate generators selling at wholesale.

---

[3] "Br." refers to Appellants' brief in No. 17-2445; "Retail Br." to Appellants' brief in No. 17-2433.

Second, Plaintiffs argue that the program's pricing formula guarantees generators a particular price for wholesale sales. Their argument is based on a mischaracterization of what the statute does. The ZEC Program provides a per-MWh credit based on the social cost of carbon—an independent estimate of the value of pollution avoided. This credit can adjust downward (only downward) based on broad forecasts of future electricity prices and an amalgam of capacity prices that no generator will ever receive. This adjustment keeps the Program affordable for consumers by reducing payments when bills are high. But it does not guarantee generators any particular price. A generator's actual revenues play no role in determining the ZEC price. In contrast, the pricing mechanism in *Hughes* could go both down *and* up, and moved in response to the *actual* wholesale price received by the generator for every completed sale the generator made.

The ZEC Program is a legitimate response of the State of Illinois to preserve carbon-free generation affecting Illinois residents. Plaintiffs lack standing and a cause of action to challenge the Program, but if the Court finds otherwise, it should affirm on the merits.

### A.    The FPA's Scheme of Cooperative Federalism.

*FPA jurisdiction.* "The process through which consumers obtain energy stretches across state and federal regulatory domains." *Hughes*, 136

S. Ct. at 1299 (Sotomayor, J., concurring). The FPA gives States a "zone of exclusive state jurisdiction" over electricity production, *FERC v. Electric Power Supply Ass'n* ("*EPSA*"), 136 S. Ct. 760, 767 (2016)—that is, "over facilities used for the generation of electric energy." 16 U.S.C. §824(b)(1). FERC then regulates wholesale electricity sales, ensuring that "rates and charges made, demanded, or received … for or in connection with" such sales are "just and reasonable." *Id.* §824d(a). Last, States regulate sales to retail consumers. *Id.* §824(b)(1).

   ***State regulation of generation.*** States, with FERC's blessing, have long regulated generation in ways that affect wholesale markets. Some States guarantee generators full cost recovery, sustaining plants that otherwise would close. *See Utilization of Elec. Storage*, 158 FERC ¶61,051, P.22 (2017). Others "grant loans, subsidies, or tax credits to particular facilities" to encourage cleaner generation, *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62 (2010), or impose environmental controls and taxes on polluting generation, *Transmission Planning & Cost Allocation*, 139 FERC ¶61,132, P.5 (2012). FERC accepts these policies, notwithstanding that they "driv[e] significant changes in the mix of resources, resulting in the early retirement" of certain generators, and the preservation and new entry of others. *Id.*; *Conn. DPUC v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009).

These programs often provide payments, or impose penalties, on a per-MWh basis. Cap-and-trade programs for example, require polluting generators to purchase emissions allowances when they generate. *Cal. ISO*, 141 FERC ¶61,237, P.5 (2012). FERC recognizes that these programs impose "a per-megawatt-hour cost" that affects "energy bids from affected units," "impact[ing] … the wholesale price." *Id.* Nonetheless, FERC has acknowledged States' authority to enact such programs, even for generators selling electricity at wholesale. *Edison Elec. Inst.*, 69 FERC ¶61,344, 62,288-89 (1994).

Another long-accepted example are the RECs that many States provide to renewable generators to keep them operating or, as Plaintiffs concede, to "induce [their] new entry." Br. 52. RECs are "state-created and state-issued" production credits "certifying that electric energy was generated pursuant to certain requirements and standards." *WSPP Inc.,* 139 FERC ¶61,061, P.21 (2012). One REC memorializes one MWh of clean generation. States require utilities to buy RECs—thereby paying renewable generators for each MWh produced. *Wheelabrator Lisbon, Inc. v. Conn. DPUC*, 531 F.3d 183, 186 (2d Cir. 2008). REC programs have existed since 1999, and 29 states have them. *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 92 n.8 (2d Cir. 2017).

In 2012, 300 utilities in the Western System Power Pool ("WSPP") asked FERC to "confirm" that "unbundled REC transactions" were "not subject to the Commission's jurisdiction." *WSPP*, 139 FERC ¶61,061, P.9. As WSPP explained, in an "unbundled" REC transaction, RECs are "sold separately from the renewable energy that underlies [them]," whereas a "bundled" REC transaction involves the sale of both RECs *and* the underlying electricity in the same transaction.[4] FERC agreed that it lacked jurisdiction over unbundled REC transactions, explaining that they are not sales of "electric energy at wholesale," but instead sales of "state-created" certificates reflecting how electricity was *produced*. *Id.* at P.21. FERC concluded, therefore, that payments for unbundled RECs are not charges "in connection with" wholesale sales, even when received by renewable generators selling their electricity at wholesale. *Id.* at P.24.

**Regulation of wholesale sales.** FERC regulates wholesale electricity sales. In some regions, some wholesale prices are set in auctions administered by private grid operators, such as the Midcontinent Independent System Operator ("MISO") and PJM Interconnection ("PJM"). A.12-13; A.136-37. These entities administer one auction for wholesale

---

[4] WSPP Submission at 4, *WSPP, Inc.*, Docket ER12-1144-000 (FERC Feb. 22, 2012) ("WSPP Filing"). FERC filings can be located by docket number here: https://elibrary.ferc.gov/idmws/docket_search.asp.

energy and another for capacity. A.13-15; A.16-17; A.137-39; *Hughes*, 136 S. Ct. at 1293; *see* Op. 4-6. FERC also allows wholesale buyers and sellers to enter bilateral contracts—with their own contract price—outside the auctions. A.16; A.138.

### B.    The ZEC Program.

In December 2016, Illinois enacted the ZEC Program together with energy efficiency funding, a community solar fund, job training for low-income communities, and an expanded REC program. SB2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016) ("SB2814").

The ZEC Program applies the REC model to preserve retiring nuclear generation, which provides the nation's most reliable and efficient source of pollution-free generation. SB2814 §1.5(6) (SA.4).[5] Nuclear plants recently have been squeezed—between fossil-fuel generators that "reap[] the benefits" of selling electricity "without bearing all of the costs" of pollution they create, *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1593 (2014), and renewable generators that receive subsidies and REC payments. Unlike renewables, nuclear plants had not received compensation reflecting the "valu[e] of the environmental benefits [they] provided." SB2814 §1.5(8) (SA.5). Illinois noted that this skewed playing field had forced many nuclear

---

[5] "SA" is the Supplemental Appendix attached to this brief.

plants to retire prematurely—and, because they were replaced largely by fossil-fuel generation, carbon emissions and other pollution had spiked.  *Id.*

In response, Illinois sought to "[r]educ[e] emissions of carbon dioxide and other air pollutants," *id.* §1.5(1)-(2) (SA.3), by attaching "value [to] the environmental attributes" of "nuclear power," *id.* §1.5(3) (*id.*), to preserve retiring nuclear generation.  It did so through the ZEC Program.  Just like a REC, a ZEC is a "credit that represents the environmental attributes of one megawatt hour of energy produced" by a nuclear plant.  20 ILCS 3855/1-10.

As many States do with RECs, Illinois set up a competitive procurement process to award ZECs to selected facilities.  *E.g.*, N.J. Stat. Ann. §48:3-87.1; Md. Code Ann., Pub. Util. §7-704.1 (awarding RECs similarly).[6]  Any nuclear plant interconnected with PJM or MISO may apply. After recommendations from the Illinois Power Agency ("IPA"), the Illinois Commerce Commission ("ICC") selects plants based on environmental criteria: "minimizing carbon dioxide emissions that result from electricity consumed in Illinois"; "minimizing sulfur dioxide, nitrogen dioxide, and particulate matter emissions that adversely affect the citizens" of Illinois; and

---

[6] The number of ZECs procured each year (16% of the State's electricity consumption) was set equal to the average number of RECs procured over the next five years.  20 ILCS 3855/1-75(d-5)(1).

"any existing environmental benefits that are preserved by" selection of the winning facilities.  20 ILCS 3855/1-75(d-5)(1)(C).

The ICC then directs the State's utilities to buy ZECs—but not energy or capacity—from the winning plants.  *Id.*  Indeed, the ZEC Program is indifferent regarding how or to whom the plants sell energy or capacity. Many nuclear plants in PJM and MISO sell energy and capacity in bilateral contracts; others do not sell capacity at all; and some sell energy at retail. Nuclear plants do not exclusively sell in the auctions.  *Infra* 38-42.

The ZEC price is based on the social cost of carbon, which is a federal interagency task force's estimate of the damage caused by carbon emissions—currently $16.50 per megawatt-hour.  *Id.* 1-75(d-5)(1)(B)(i); *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677-78 (7th Cir. 2016).  To protect consumers, the ZEC price can fall *below* carbon's social cost—but can never rise above it.  The ZEC price adjustment works as follows.  Each year, the ICC calculates a "market price benchmark" based on forecasted energy prices (derived from an energy futures price index at a regional trading hub), and the average of MISO and PJM capacity prices.  Illinois does not pay the benchmark; rather, the benchmark is used as a referent to potentially reduce the ZEC price.   If the benchmark is above $31.40/MWh (a historical approximation of electricity prices), the ZEC price is reduced below the social

cost of carbon by the difference.  20 ILCS 3855/1-75(d-5)(1)(B).  Thus, the ZEC price is capped at the environmental value the plants provide, but the Program "remains affordable for retail customers" if their electricity costs rise. *Id.*

Plaintiffs assert that, because of the price adjustment, "the subsidized plants are guaranteed a combined rate of $47.90/MWh," which creates a "price collar."  Br. 8.  That is false. Plaintiffs' assertion is based on the erroneous premise that individual ZEC generators earn the benchmark price for their wholesale sales, so that the ZEC price moves in tandem with the generator's wholesale revenues, and they combine to equal $47.90.

But the benchmark is not based on a generator's actual wholesale revenues, and no generator earns the benchmark price.  As the district court recognized, the benchmark "is calculated using a composite of projected prices from the energy and capacity markets; therefore, even an adjusted ZEC price is not based on the wholesale price a ZEC recipient receives."  Op. 31.  A plant's actual energy receipts will differ from a futures price at a regional trading hub, and no plant receives the composite capacity price used in the benchmark.  And the statute has no true-up provision to reconcile deviations between the benchmark and a generator's actual revenues.

Instead, the statute uses the price adjustment to track "broader, indirect wholesale market forces." *Id.*

Thus, the price adjustment does not guarantee facilities a particular level of total revenue, as Plaintiffs repeatedly try to suggest. Br. 8-9, 41, 42-43. Rather, true to its purpose, it ensures that the Program can remain affordable, even if Illinois consumers (who ultimately pay for the ZEC Program through their monthly electric bills) are forecast to pay higher electricity prices. 20 ILCS 3855/1-75(d-5)(1)(B).

## C. Administrative Remedies.

FERC has mechanisms stakeholders can invoke if they believe a state program prevents "just and reasonable" wholesale prices. 16 U.S.C. §824e(a). EPSA and its members have pursued these remedies.[7] In January 2017, they asked FERC to apply a "minimum offer price rule" to ZEC plants selling capacity in PJM's wholesale markets. That market rule change would effectively exclude ZEC plants from wholesale capacity markets by forcing them to bid above the markets' expected clearing price.[8] EPSA did not claim that the ZEC Program ran afoul of FERC's *existing* rules; instead, it urged FERC to "expan[d]" its rules.[9] That relief, EPSA said, would "be broad

---

[7] Mot. to Amend, and Amendment to, Compl., *Calpine Corp. v. PJM Interconnection, LLC*, Docket EL16-49-000 (FERC Jan. 9, 2017).

[8] *Id.* at 2-3, 16-18 & n.66.

[9] *Id.* at 2.

enough to address the threat" posed by the ZEC Program, without need to "address preemption."[10]

In May 2017, FERC held a technical conference to address "the increasing interest by states to support particular … resource attributes," in light of FERC's desire to "respect state policies."[11]    Right now, FERC is reviewing policy proposals and stakeholder comments from that conference. Its options include: (1) maintaining the status quo, under which States regulate in parallel with FERC; (2) integrating state regulatory objectives into federal market design; and (3) making other proposed market rules changes, only one of which is EPSA's proposal.[12]

## SUMMARY OF ARGUMENT

I.    As bystanders not regulated by the ZEC Program, Plaintiffs cannot assert an equitable cause of action under *Ex parte Young*.  And even if they could, the FPA would not allow it: Congress did not create a detailed and complex administrative remedial scheme, nor grant extensive policy discretion to FERC, only to allow litigants like Plaintiffs to bypass that scheme and FERC's decision-making process and sue in federal court.

---

[10] *Id.* at 11 n.46, 16; *see id.* at 3.

[11] Notice of Technical Conference 2, Docket No. AD17-11-000 (FERC Mar. 3, 2017).

[12] Notice Inviting Post-Technical Conference Comments 2, Docket No. AD17-11-000 (FERC May 23, 2017).

II.    The ZEC Program is not field preempted because it pays generators for *production* of electricity, not for its wholesale sale.  In *WSPP*, 139 FERC ¶61,061, FERC held that materially indistinguishable REC programs, which pay generators a per-MWh production incentive, are within States' jurisdiction *even when* those generators sell their electricity at wholesale.  And in *Hughes*, the Court expressly declined to "foreclose" States' authority to enact such direct subsidy programs as long as the State did not "condition payment" on completing wholesale sales.  136 S. Ct. at 1299.

III.    The ZEC Program is not conflict preempted.  Plaintiffs have not identified any FERC policy that the ZEC Program would "clear[ly] damage." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 518, 522 (1989).  In fact, FERC has recognized States' authority to enact programs like this one, notwithstanding that they affect wholesale prices.  Plaintiffs agree that States can "affect" wholesale markets and prices, but claim that the ZEC Program, somehow, "distorts" them instead.  That is a distinction only FERC can draw.

IV.    The dormant Commerce Clause claim was properly dismissed.  Plaintiffs lack standing to claim the Program discriminates against out-of-state nuclear plants because they own no such plants.  Their claim also fails on the merits.  Subsidy programs like the ZEC Program are not subject to the

dormant Commerce Clause because they do not burden commerce.  And Plaintiffs' discrimination and *Pike* challenges fail because Plaintiffs have not established even "mild" discrimination against interstate commerce.

## ARGUMENT

## I. Plaintiffs Lack a Preemption Cause of Action.[13]

### A. Plaintiffs Cannot Sue Under *Armstrong*.

Before *Armstrong v. Exceptional Child Center, Inc.*, many lower courts believed the Supremacy Clause itself provided an implied private cause of action to seek equitable relief.  135 S. Ct. 1378, 1383-84 (2015).  *Armstrong* rejected that view, holding that absent a statutory cause of action (which Plaintiffs concede is lacking here), preemption plaintiffs can only bring a "judge-made action at equity," *id.* at 1386, seeking relief that "courts of equity" historically provided against "illegal executive action," *id.* at 1384. Such relief, moreover, is unavailable if Congress "inten[ded] to foreclose" it. *Id.* at 1385 (quotation marks omitted).  Each of these limitations forecloses Plaintiffs' suit.

### 1. Plaintiffs Do Not Seek Relief That Courts of Equity Historically Provided.

Historically, courts in equity enjoined executive action only in cases, like *Ex parte Young*, involving "pre-emptive assertion in equity of a defense

---

[13] Plaintiffs' standing to challenge the ZEC price adjustment is addressed *infra* at 46-48.

that would otherwise have been available in the State's enforcement proceedings at law." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (*VOPA*) (Kennedy, J., concurring); *accord Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.).  But Plaintiffs are not regulated by the ZEC Program, and thus could not face state "enforcement proceedings" requiring assertion of a preemption defense.[14]  They are bystanders trying to enforce federal law against others.  Accordingly, Plaintiffs' preemption claim falls outside of *Ex parte Young*, and Plaintiffs lack an equitable cause of action.  *See Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144-46 (2d Cir. 2016) (granting cause of action to plaintiffs claiming preemption as an anticipatory defense to "escalating fines and other sanctions," but suggesting bystander plaintiffs who seek "to enforce federal law themselves" lack a cause of action).

### 2.    Congress Intended to Foreclose Suits of This Type.

Even if Plaintiffs' suit did fall within *Ex parte Young*'s historical scope, the FPA "establish[es] Congress's intent to foreclose equitable relief" here. *Armstrong*, 135 S. Ct. at 1385 (quotation marks omitted).  *Armstrong*

---

[14] The ZEC Program authorizes utilities to charge retail customers for the cost of the program. 220 ILCS 5/16-108(m)(1).  But Illinois could never bring an *enforcement action* against customers under the Program.

identifies two indicia of intent, but does not establish a rigid two-factor test. Rather, the touchstone is what Congress intended. Here, three features of the FPA—including the two in *Armstrong*—show intent to foreclose this suit.

**Administrative scheme.**    First, the FPA provides a detailed administrative scheme tailor-made to address complaints from bystanders, like Plaintiffs, regarding how state actions affect FERC's markets.

A person who believes a state program interferes with FERC's wholesale markets, or their ability to produce "just and reasonable" rates, may bring a "complaint" to FERC, as Plaintiffs themselves have done. 16 U.S.C. §§824d(e), 824e(a); *supra* 12-13. FERC also can act on its own initiative. 16 U.S.C. §§824d(e), 824e(a). And it can solicit stakeholders' views, as in the recent technical conference, *supra* 13, and then decide whether to act. FERC can also calibrate any response: it can do nothing, modify its rules, or deem the program preempted. FERC has authority to resolve preemption claims. *E.g., Cal. PUC*, 132 FERC ¶61,047, PP.1-2 (2010); *Midwest Power Sys.*, 78 FERC ¶61,067 (1997).

Plaintiffs can thus complain to FERC about "distortion" of its wholesale markets, and FERC can remedy any such distortion. Given that "detailed remedial scheme," a "court should hesitate" before allowing a bystander to pursue equitable relief. *Seminole Tribe of Fla. v. Florida*, 517

U.S. 45, 74 (1996); *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 104 (E.D.N.Y. 2015) (AIAA's "comprehensive administrative enforcement scheme" precluded suit), *vacated in part on other grounds*, 841 F.3d 133 (2d Cir. 2016).  That is especially so when FERC may opt for a more nuanced remedy because it regards preemption as an "inappropriate application" of the FPA.  *Armstrong*, 135 S. Ct. at 1385. Congress did not intend to allow private parties to circumvent the expert agency whenever parties feel their claims might be more persuasive to a non-expert district judge.

Plaintiffs assert that "[f]ederal courts have frequently exercised ... equity jurisdiction" over FPA preemption claims.  Br. 28 & n.2.  But the cases they cite precede *Armstrong*, and not one *considered* the equitable-cause-of-action issue.  Moreover, they spotlight what is missing here.  All but one involved a classic *Ex parte Young* claim, brought by plaintiffs directly regulated by the challenged state action—which, for example, set the plaintiff's retail rates or denied a permit.  The plaintiffs thus were not complaining about state action that indirectly harmed them through its effects on FERC's wholesale markets, but about state actions that directly

harmed them *outside* those markets.[15]   When the Supreme Court first addressed a bystander FPA preemption suit in *Hughes*, it *sua sponte* questioned the availability of an equitable cause of action.  136 S. Ct. at 1296 n.6.[16]

*Limited remedies.*   Second, as in *Armstrong*, Congress provided specific but limited "sole remed[ies]" for enforcing FERC's authority over wholesale sales.  135 S. Ct. at 1385.  Congress expressly provided federal-court causes of action three times in the FPA, and each time declined to authorize bystander suits like this one.

First, individuals that have brought a complaint before FERC may seek judicial review of FERC's resulting order.  16 U.S.C. §824*l*(b).  But Congress did not authorize such individuals to bypass FERC and sue in district court.

Second, the United States may bring suits like this one: "an action" in federal court "to enjoin" "any acts or practices which … violat[e]" the FPA.  *Id.* §825m(a).  But Congress did not authorize private individuals to bring such suits.

-----

[15] The "prior construction canon," Br. 29, does not apply.   Only when "judicial interpretations have settled the meaning of an existing statutory provision" is "repetition of the same language … presumed to incorporate that interpretation."  *Armstrong*, 135 S. Ct. 1386 (quotation marks omitted).  Plaintiffs' cases did not address the equitable-cause-of-action issue, much less "interpret[] … language" that Congress subsequently repeated, much less allow bystanders like Plaintiffs to sue.

[16] Plaintiffs' only other bystander case, *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), was pending before the Supreme Court when it decided *Hughes*.

Third, in one context not applicable here (concerning sales by small power producers), individuals may sue in district court to challenge state rules as inconsistent with FERC rules "treated as ... enforceable under the Federal Power Act." *Id.* § 824a-3(h)(2)(B). Tellingly, even then, Congress first channeled review through FERC. *Id.*; *Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 91-92 (2d Cir. 2015).

Congress's "express provision of [these] method[s] of enforcing" these FERC-administered provisions "suggests that Congress intended to preclude others." *Armstrong*, 135 S. Ct. at 1385 (quotation marks omitted); *id.* at 1389 (Breyer, J., concurring).

***Complexity of enforcement.*** Also like *Armstrong*, the "sheer complexity" of FERC's wholesale-market regulation confirms that Congress intended to foreclose bystander suits regarding effects on those markets. *Id.* at 1385. Regulating interconnected interstate electricity markets, and determining how those markets should interact with state authority, requires the "expertise, uniformity, widespread consultation, and resulting administrative guidance" that FERC's oversight brings. *Id.* (quotation marks omitted).

Suits like this one threaten to upend FERC's role in crafting coherent national policy. Plaintiffs' suit would short-circuit FERC's recently initiated

20

process to develop policies accommodating state subsidy programs. *See supra* 13. The dueling positions of PJM and MISO, *compare* A.92-107, *with* SA.6-15, confirm that FERC should be the one to resolve this policy issue in the first instance.

The vagueness of the standard administered by FERC reinforces that Congress did not intend federal courts to apply it. It is "difficult to imagine a requirement broader and less specific than" that rates be "just and reasonable." *Armstrong*, 135 S. Ct. at 1385. Yet below, Plaintiffs unabashedly asked the district court to make a rate-setting judgment. They argued the ZEC Program was field preempted because of its "significant price suppressive effect," but had to acknowledge that many state actions affect wholesale prices. A.33, ¶74; Op. 22. Plaintiffs thus argued that "this program distorts the market *too much,*" Op. 22 (emphasis added), asking the district court to identify some threshold (one dollar? five dollars?) at which price effects move from permissible to not. But only FERC can "reduce the abstract concept of reasonableness to concrete expression in dollars and cents." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951).

Plaintiffs have abandoned their "too much distortion" theory—along with others—on appeal,[17] and contend that *now* their suit is judicially administrable. Br. 36, 41. But even if "courts might in particular instances be able to resolve" FPA-based "requests for injunctive relief quite easily," the question is whether Congress would have wanted *all* FPA suits to be adjudicated in federal court. *Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring) (explaining there is "no easy way to separate in advance the potentially simple sheep from the more harmful rate-making goats"). Congress could not sensibly have intended to encourage plaintiffs to split a field preemption claim and litigate certain theories (like Plaintiffs' "distortion" theory) at FERC, but others (like their theory on appeal) in federal court.

Moreover, Plaintiffs' conflict-preemption theory *still* is that state programs can permissibly "[a]ffect" wholesale prices, but cannot "distort" them—asking this Court to draw that unadministrable line. Br. 59. And as to field preemption, Plaintiffs claim they "seek merely to enforce" FERC's auction methodology, Br. 39, but the *Armstrong* plaintiffs likewise sought

---

[17] Plaintiffs also have abandoned their field-preemption arguments that the ZEC Program "directly affects" or is improperly "aimed at" wholesale markets. Br. 39-54 (never mentioning those theories).

"only to enforce [a] federally approved methodology." *Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring).

### 3. The FPA's Jurisdictional Provision Is a Red Herring.

Plaintiffs argue that 16 U.S.C. §825p, which confers "jurisdiction" over "all suits in equity and actions at law," *id.*, "must[] be given effect by reading the FPA to allow" their suit. Br. 30.

That confuses jurisdiction with a cause of action. Plainly, there is subject matter jurisdiction to hear Plaintiffs' suit. "[V]esting jurisdiction," however, "does not create causes of action, but only confers jurisdiction to adjudicate those [claims] arising from other sources." *Montana-Dakota Utils.*, 341 U.S. at 249. *Armstrong* itself illustrates the flaw in Plaintiffs' theory. The *Armstrong* Court (like every federal court) unquestionably "ha[d] jurisdiction under [28 U.S.C.] § 1331 to entertain" the action. Br. 26. Yet *Armstrong* rejected a "judge-made action at equity." 135 S. Ct. at 1386. Jurisdiction is beside the point.

Plaintiffs' reliance on *Verizon Maryland* confirms their confusion. Plaintiffs cite a discussion of whether a specific *jurisdictional* provision stripped federal courts of "*jurisdiction* under § 1331." *Verizon Md., Inc. v.*

*PSC of Md.*, 535 U.S. 635, 643 (2002) (emphasis added).  That discussion did not address a cause of action.[18]

Plaintiffs place weight on Section 825p's reference to "all suits in equity." Br. 33.  But that language was common in New Deal-era statutes, and merely confers the same jurisdiction federal courts have under §1331. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1575 (2016).  This Court has rejected the argument that identical jurisdictional language in other statutes "implied" that Congress anticipated private enforcement.  *Bassler v. Cent. Nat'l Bank in Chicago*, 715 F.2d 308, 312-13 (7th Cir. 1983); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576-77 & n.17 (1979).

Section 825p was added for two reasons unrelated to a cause of action: first, it makes federal jurisdiction over FPA suits "exclusive" (unlike §1331's concurrent jurisdiction), 16 U.S.C. §825p, and second, it eliminates the amount-in-controversy requirement then applicable under §1331, 28 U.S.C. §41(1) (1934).  The Court should reject Plaintiffs' efforts to read anything more into it.

---

[18] *Verizon Maryland* also did not involve the FPA and was not a bystander suit; the plaintiff complained about interconnection fees imposed directly on it by the State.  535 U.S. at 639-40.

### B.     Retail Plaintiffs Lack Prudential Standing.

Retail Plaintiffs' preemption claims should also be dismissed because their injury is outside the FPA's "zone of interests." *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 617 (7th Cir. 2015). They claim injury from a charge imposed by retail utilities on their retail bills. But States have exclusive authority over retail charges. *See* Op. 14; *EPSA*, 136 S. Ct. at 775. Accordingly, their claims fall outside the consumer's zone of interests under the FPA, which extends only to the interest "in being charged non-exploitative [*wholesale*] rates." *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000) (quotation marks omitted).

Retail Plaintiffs cite two FERC decisions, but those address administrative complaints, not a federal cause of action. Retail Br. 13-14. They also cite a Ninth Circuit decision about a different statute regulating *retail* sales. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 955 (9th Cir. 2013). But the same court later denied retail consumers prudential standing under the FPA, which regulates only *wholesale* sales. *Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 809 (9th Cir. 2015).

## II.   Plaintiffs' Field Preemption Claim Was Properly Dismissed.

The ZEC Program is lawful because it conditions payment on generation, not wholesale sales.

### A.   The Court Applies a Presumption Against Preemption.

This Court "must assume that Congress did not intend to supersede" States' "historic police powers." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). That presumption is heightened because the ZEC Program lies at the intersection of two "field[s] traditionally occupied by the States." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008); *see Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (presumption requires only "the historic presence of state law," not "absence of federal regulation"). States have "traditional[]" authority over both "regulation of utilities" and generation, *Arkansas Electric Cooperative Corp. v. Arkansas PSC*, 461 U.S. 375, 377 (1983), and environmental regulation, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960). The presumption is stronger still under the FPA, which was "drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *Rochester Gas & Elec. Corp. v. PSC of N.Y.*, 754 F.2d 99, 104 (2d Cir. 1985) (quoting *Panhandle E. Pipe Line Co. v. PSC of Ind.*, 332 U.S. 507, 517-18 (1947)). The presumption is overcome only if displacing state authority was

Congress's "clear and manifest purpose." *Patriotic Veterans*, 736 F.3d at 1046.

## B.  The ZEC Program Is Lawful Because It Regulates Generation.

The ZEC Program respects a "bright line" that is commonsense and well-settled. *FPC v. S. Cal. Edison*, 376 U.S. 205, 215 (1964).  The FPA gives regulation of generation to States, so payments and taxes triggered by generation (rather than wholesale sale) fall within States' sphere.  Thus, FERC has held that emissions allowances and RECs are lawful because they tie payments to how energy is *produced*.  *WSPP*, 139 FERC ¶61,061, PP.21-24.  Conversely, state payments triggered by wholesale auction sales (rather than generation) are payments for such sales, and are preempted.  Thus, in *Hughes*, Maryland entered FERC's domain because it "condition[ed] payment[s]" on completing a wholesale auction sale.  136 S. Ct. at 1299.

The ZEC Program complies with this line.  A ZEC is created when electricity is generated, regardless of whether, how, or to whom the electricity is sold: It represents "the environmental attributes of one megawatt hour of energy *produced* from a zero emission facility."  20 ILCS 3855/1-10 (emphasis added).  As Plaintiffs concede, Illinois does not condition payment on "participation in the auctions."  Br. 44.  Nevertheless, they claim this line elevates form over substance, because (they allege) ZEC

27

plants will in practice sell at wholesale.  Br. 42-43.  But Congress preserved State authority over generation *even when* generators sell exclusively at wholesale, precisely to avoid gutting state authority as Plaintiffs' theory does. FERC and the Supreme Court have affirmed that line.  Moreover, the line is not form over substance.  It has consequences for what and how Illinois may regulate.

### 1.    States May Regulate Generation, Regardless Whether Generators Sell at Wholesale.

In the FPA, Congress gave States authority over generation, even when generators sell at wholesale and every megawatt generated goes hand-in-hand with a wholesale sale.  So long as States regulate the activity of generation, they stay within their domain.

The distinction between generation of electricity and its wholesale sale predates the FPA.  In 1927, the Supreme Court held that the dormant Commerce Clause prevented States from regulating interstate wholesale sales.  *PUC of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927).  Five years later, the Supreme Court clarified that States retain their authority over *generation*, even when the resulting electricity is sold interstate.  *Utah Power & Light Co. v. Pfost*, 286 U.S. 165, 179 (1932).  The Court knew it was drawing a fine line, acknowledging that electricity is "not stored in advance," so transmission and sale are "substantially instantaneous" with generation.

28

*Id.*  Nonetheless, the Court treated generation as "separable and distinct."
*Id.*  Thus, a tax "imposed in respect of generation" was "not invalidated by"
the generator's "intent … to transport [the resulting electricity] across state
lines," even if "substantially all" the electricity passed immediately into
interstate commerce.  *Id.* at 178, 182.

The FPA carried forward *Utah Power*'s distinction between regulation
of electricity's *generation* and of its wholesale *sale*.  The initial Senate bill
proposed stripping States of their *Utah Power* jurisdiction over "generating
facilities which produce energy for interstate [wholesale] sale."  S. Rep. No.
74-621, at 48 (1935) (discussing *Utah Power*).  But Congress opted against
that "usurpation" of existing "State regulatory authority," and amended the
bill to preserve State authority over *all* generating facilities, including those
selling only at wholesale.  H.R. Rep. No. 74-1318, at 8, 27 (1935); *see Conn.
Light & Power Co. v. FPC*, 324 U.S. 515, 525-27 (1945).

### 2. FERC Has Upheld State Environmental Credit Programs Tied to Production—Even When That Electricity Is Subsequently Sold at Wholesale.

Seventy years later, FERC applied Congress's distinction to confirm
that REC programs fall within state authority.  RECs "certif[y] that electric
energy was *generated* pursuant to certain requirements and standards";
thus, a REC is created when electricity is produced, regardless of whether or

how that electricity is sold. *WSPP*, 139 FERC ¶61,061, P.21 (emphasis added). Because RECs are triggered by generation, not wholesale sales, FERC views them as "separate commodities" that "are not compensation for capacity and energy," but rather for a particular method of generation. *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62. Hence, when RECs are sold unbundled from electricity, the payment is "not a charge in connection with a wholesale sale" and does not set or "affect wholesale electricity rates" in a manner that triggers federal jurisdiction. *WSPP*, 139 FERC ¶61,061, P.24; *Wheelabrator*, 531 F.3d at 190 (FERC has "not evince[d] an intent to occupy the ... field [of] regulation of [RECs]"). That is so even though electricity is sold instantaneously with its production, often at wholesale.

Plaintiffs do not dispute *WSPP*'s holding, which is "dispositive" "unless ... inconsistent with clearly expressed congressional intent." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985); *see City of Arlington v. FCC*, 569 U.S. 290, 307 (2013). FERC's reasoning straightforwardly applies to ZECs. Like RECs, ZECs are credits representing environmental attributes of production. *See* 20 ILCS 3855/1-10. Like RECs, ZECs are created when electricity is generated, regardless of whether, how, or to whom electricity is sold. *Id.* And ZECs are sold separately from

electricity; utilities contract only for ZECs, not ZEC plants' electricity. *Id.* 1-75(d-5)(1).[19]

Plaintiffs assert that FERC "was careful to limit its holding to the features of the particular REC program before it." Br. 54. But no "particular" REC program was before FERC. It was addressing REC sales by 300 utilities scattered across "many of the states with [REC] programs."[20] Those statutes varied, and neither FERC nor WSPP's filing discussed their particulars. So FERC could not have made any judgment about a "particular REC program." Br. 54. FERC *categorically* upheld the REC concept, explaining that production-based credits for environmental attributes sold separately from electricity are neither wholesale sales nor payments "in connection with" such sales. *WSPP*, 139 FERC ¶61,061, P.24.

Plaintiffs also cannot distinguish *WSPP* on the ground that, there, generators might have been selling at retail. FERC acknowledged in *WSPP* that some REC recipients are exempt wholesale generators ("EWGs") selling exclusively at wholesale. *Id.* at P.9 n.15. And as FERC knew, in several of the States addressed in *WSPP*, renewable generators were subject to FERC

---

[19] Plaintiffs argued below that ZEC sales were "bundled," for reasons the district court correctly rejected. Op. 33. They have abandoned that argument.
[20] WSPP Filing 3.

tariffs requiring them to bid into wholesale auctions ("must-offer" requirements).[21] Yet *WSPP* upheld those States' REC programs.

Plaintiffs claim that *WSPP* "stat[ed]" that unbundled REC transactions "could still fall under [FERC's] jurisdiction" if they were "in connection with" or "affect[ed]" wholesale rates. Br. 54 (quoting 139 FERC ¶61,061, P.22). But Plaintiffs are selectively quoting *WSPP*'s rote description of FERC's jurisdiction. Two paragraphs later, in a passage Plaintiffs omit, FERC *applied* that standard and held, categorically, that "an unbundled REC transaction … does not affect wholesale electricity rates" and unbundled REC payments are "not … charge[s] in connection with a wholesale sale." *WSPP*, 139 FERC ¶61,061, P.24. If Plaintiffs are suggesting FERC might change its view if faced with the ZEC Program, that only underscores that their complaint belongs at FERC.

### 3. *Hughes* Confirms That the ZEC Program Is Valid Because It Conditions Payment on Generation, Not Wholesale Sales.

*Hughes* confirms the same line that Congress drew in the FPA and FERC applied in *WSPP*. There, Maryland offered subsidies to a new generator, but unlike REC programs and here, Maryland "condition[ed]"

---

[21] *See West-Wide Must-Offer Requirements*, 157 FERC ¶61,051, PP.2-3 (2016) (generation in western half of country, including California, Oregon, Washington, Nevada, Arizona, and Colorado, subject to must-offer mandate from 2001 to 2016).

receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction." 136 S. Ct. at 1292. The generator received no subsidy "if its capacity fail[ed] to clear." *Id.* at 1295. That state-imposed condition, the Court held, was the program's "fatal defect." *Id.* at 1299. Because Maryland tied payment to wholesale sales, not generation, the payment was "received … in connection with" that sale and "set[] [the] interstate wholesale rate." *Id.* at 1297 & n.9 (quoting 16 U.S.C. §824d(a)).

*Hughes*'s holding was intentionally narrow. The Court knew that States had long subsidized generators, including generators selling exclusively at wholesale. Indeed, FERC's brief emphasized the range of "[p]ermissible state programs," and twice specifically stated that REC programs were valid. Amicus Br. of United States at 19, 34, *Hughes*, 136 S. Ct. 1288, 2016 WL 344494 ("U.S. Amicus Br."). Accordingly, the Court "limited" its holding, stressing that it was *not* invalidating "various other measures States might employ to encourage development of … clean generation, including … direct subsidies." 136 S. Ct. at 1299. It underscored that "[n]othing in this opinion should be read to foreclose … States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Id.* (quoting Br. for Resp't 40). That is, "[s]o long as a State does not condition payment

33

of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Id.* The ZEC Program does not condition payment on auction clearance, so it does not suffer this "fatal defect." *Id.*

*EPSA* confirms that States do not invade FERC's domain by compensating generators for particular methods of generation. *EPSA* explained that under the FPA, a regulation does not "set a [wholesale] electricity rate" unless it "establish[es] the amount ... a consumer will hand over *in exchange for* [*wholesale*] *power.*" 136 S. Ct. at 777-78 (emphasis added).[22] REC and ZEC payments do not do so because they are made "in exchange for" *producing* electricity using a particular method, not as "compensation for capacity and energy." *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62. *EPSA* rejected any broader definition of rate-setting that would cast a State as "effectively" setting a wholesale rate merely by compensating generators for methods of generation. Op. 27; *EPSA*, 136 S. Ct. at 777.[23] Instead, a State sets a wholesale rate when it conditions payment on

---

[22] EPSA defined *retail* rate-setting under the FPA, but the FPA uses the same term— "rates"—to define FERC's wholesale-price jurisdiction. 16 U.S.C. § 824d(a). Plaintiffs do not dispute that *EPSA*'s definition applies to wholesale rate-setting. Br. 50-51.

[23] Plaintiffs absurdly claim the district court "acknowledged" that the ZEC Program "effectively replac[es] the auction clearing price." Br. 44. Plaintiffs quote the district court quoting *Plaintiffs' own allegation*, Op. 10, a legal allegation the court then rejected, Op. 26.

34

wholesale auction sales, because that changes "the amount" received "in exchange for [wholesale] power."

After *Hughes* and *EPSA*, the Second Circuit confirmed that REC programs remain "within the scope of what Congress and FERC have traditionally allowed the States to do." *Allco*, 861 F.3d at 98-100, 106.[24] ZECs do as well.

### 4.   The Line Drawn in *Utah Power*, *WSPP*, and *Hughes* Meaningfully Identifies State Programs That Intrude on FERC's Domain.

The line drawn from *Utah Power*, through *WSPP*, to *Hughes* was drawn for a reason: States that require wholesale auction participation do so because interference with wholesale auctions is their aim.

In *Hughes*, for example, the State could only achieve its purpose by conditioning payment on auction sales. Maryland wanted to encourage "new in-state generation" to bid into the PJM auction to reduce wholesale electricity prices. *Hughes*, 136 S. Ct. at 1294; *see* U.S. Amicus Br. 10 (Maryland's concern was that "lack of new generation caused Maryland consumers to pay too high a price" at wholesale). But if the *Hughes* generator did not clear the wholesale auction, it would not reduce auction

---

[24] *Allco* emphasized that the REC sales there were subject to FERC review, 861 F.3d at 99-100, but (as *WSPP* explains, 139 FERC ¶61,061, P.24) that was necessary because those RECs, *unlike* ZECs, were sold "bundled" *with* electricity as part of the same transaction. *Allco*, 861 F.3d at 89.

prices.  Accordingly, the condition was essential to Maryland's aim.  *Hughes* prevents States from using the auctions in this way as "regulatory means" to their "ends."  136 S. Ct. at 1298.

By contrast, Illinois's purpose is to support clean generation and prevent pollution from fossil-fuel generation.  SB2814 § 1.5 (SA.2-5).  That is achieved whenever clean electricity is generated and consumed, regardless whether it is sold in wholesale auctions, bilateral contracts, or at retail. Illinois did not, and did not need to, condition payment on selling in the wholesale auctions.[25]  Thus, for example, Quad Cities can still receive ZECs, even though, as Plaintiffs acknowledge, it failed to clear the PJM capacity auction for 2019-20 (and also for 2018-19 and 2020-21).  A.25, ¶55.

Second, in *Hughes*, the auction-clearance requirement was necessary because the State tied its subsidy to the generator's actual wholesale auction revenues.  Consequently, if the generator failed to clear the auction (and so had lower wholesale revenues), the *State* would have had to make up the lost revenue.  Maryland therefore had a direct financial interest in whether the generator cleared the wholesale auction, and so required it.

---

[25] Plaintiffs say they have alleged that Illinois's "true purpose was to protect jobs."  Br. 53. But that purpose, too, does not depend on whether or how generators sell electricity.  *See* Op. 26 n.27 ("[T]he complaint does not allege that the statute's true aim or purpose was to adjust or disregard wholesale rates.").

Here, Illinois has no financial stake in whether ZEC generators clear the wholesale auctions, because the ZEC price is not tied to a generator's actual wholesale revenues. Even if a ZEC plant fails to clear the auction (like Quad Cities did), or sells outside of the auction for what turns out to be a lower price, Illinois does not pay more to make up the difference. Rather, the ZEC price stays the same, because it is tied to the social cost of carbon and a regional price index—*not* the generator's actual revenues. Illinois is indifferent to how these plants sell electricity.

### C.    Plaintiffs' Attempts to Broaden *Hughes* Are Without Merit.

Plaintiffs claim the ZEC Program is preempted because, in two ways, it is "in substance" identical to the *Hughes* program. First, Plaintiffs allege that, in fact, participating generators will sell their electricity at auction, and that the ZEC Program "presupposes that they will." Br. 10; *see id.* at 43, 45. Second, Plaintiffs claim that the ZEC Program is "economically equivalent" to *Hughes*' contract-for-differences. Br. 44. These claims mischaracterize the statute. The ZEC Program does not presuppose auction sales, and its pricing mechanism differs from *Hughes*' contract-for-differences. Moreover, Plaintiffs are wrong on the law. From *Utah Power* to *WSPP* to *Hughes*, the line has turned on whether *the State* has conditioned regulation on production or instead on wholesale sales—not on whether particular

generators in practice sell at wholesale due to "business" "reality" or market rules, nor on pricing mechanisms.  Br. 17.

##### 1.    The ZEC Program Does Not "Presuppose" Auction Participation and, Regardless, That Would Not Matter.

***The ZEC Program does not "presuppose" auction participation.***  Plaintiffs contend that the ZEC Program "presupposes" that ZEC generators will sell at wholesale auction.  Br. 10.  But the statute does not require generators to sell at wholesale.  Generators can receive ZEC payments even if they are owned by "vertically integrated" utilities—utilities that own generators and sell their electricity directly to retail customers.  *See* IPA, Zero Emission Standard Procurement Plan 47 (July 31, 2017) (ZEC Program "does not prohibit facilities with costs recovered through regulated rates from participating").[26]  That includes the 25% of Quad Cities owned by MidAmerican.  A.45 n.2  The statute is also open to plants selling through bilateral contracts outside the auctions, like "the vast majority of utilities in MISO[]," SA.13, and as Plaintiffs admit Quad Cities and Clinton have done.  A.142, ¶54; A.16, ¶37; *cf. Allco*, 861 F.3d at 98-100 (state influence over bilateral sales not impermissible under *Hughes*).  And Quad Cities can still

---

[26] Available at: https://www.illinois.gov/sites/ipa/Documents/2018ProcurementPlan/Zero-Emission-Standard-Procurement-Plan-ICC-Filing.pdf.

receive ZECs, even though, as noted above, it failed to clear the PJM capacity auctions for 2018-2021.  A.25, ¶55.  ZEC plants can also receive ZECs for electricity they generate and consume at an "affiliated, off-site facility," even though that electricity is not sold at wholesale.  *Calpine Corp. v. FERC*, 702 F.3d 41, 42, 47-50 (D.C. Cir. 2012) (such "remote self-supply" not within "FERC's wholesale jurisdiction").  Nor, as discussed above, is the statute's purpose predicated on generators' wholesale auction sales.  Illinois will achieve its environmental purpose regardless how electricity is sold.  Op. 26 & n.27.

Plaintiffs allege that the ZEC Program was designed for Quad Cities and Clinton, and that these particular plants are required (for reasons unrelated to Illinois) to sell at wholesale.  Br. 10.  But Plaintiffs cannot ignore that the statute is open to all.  If other plants better satisfy its neutral criteria, they will be selected.

Regardless, Plaintiffs are wrong that Quad Cities and Clinton are destined to sell only through FERC-regulated auctions.  First, Plaintiffs suggest that ZEC plants are "Exempt Wholesale Generators" ("EWGs"), which "must sell … only at wholesale."  Br. 11.  Yet Plaintiffs do not assert Quad Cities is an EWG (it is not).  And FERC's dockets show that Clinton is not an EWG.  *Compare* Br. 11 (citing FERC's 2000 acceptance of EWG

status), *with* EWG Notification, Docket EG00-53-000 (FERC Feb. 9, 2009) (withdrawal of EWG status).

Second, Plaintiffs assert that "PJM and MISO" require the plants to "bid into the wholesale markets." Br. 49. But MISO—where Clinton is located—does not require generators to bid or clear in its markets. Op. 30; SA.13 ("[T]he vast majority of utilities in MISO's footprint arrange for supply resources to serve their demand well in advance of MISO's residual capacity auction").[27]  PJM, meanwhile, usually requires generators to bid in its capacity market, but only requires generators to bid in its energy market if their capacity market bids are accepted. A.102, A.114-15. That is significant because Quad Cities has not cleared the capacity auction for three years running. *Supra* 36. So, Quad Cities is free to sell energy outside the auctions (*e.g.*, via bilateral contracts), while still receiving ZECs.

PJM also removes the must-offer requirement for generators selling to utilities that have opted out of PJM's capacity auctions by satisfying the "Fixed Resource Requirement" (or "FRR")—in essence, proving they have enough generation to meet their needs, either owned directly or acquired

---

[27] Plaintiffs claim MISO requires generators to participate in a utility's "resource adequacy plan." *MISO*, 139 FERC ¶61,199, P.260 (2012) (cited at Br. 11). That confuses the "resource adequacy plan" with the auction. Resource adequacy plans can include retail and bilateral sales. *Id.* P.39. FERC made clear that MISO's auction remained "voluntary," *id.*, and that "most [utilities] will continue to obtain most—if not all—of their supplies outside the auction," *id.* P.187.

through bilateral contracts. *N.J. BPU v. FERC*, 744 F.3d 74, 84 (3d Cir. 2014). Generators in FRR plans "lose[] the ability to participate in the auctions." *Id.* Nothing prevents ZEC plants from participating in FRR plans. Moreover, PJM said below that it was "exploring ways to create exceptions" for state-subsidized generation to the "must-offer" requirements that exist "[a]t present." A.103 & n.6. Yet even if it does, plants can still receive ZECs. Plaintiffs have also urged FERC to adopt market rule changes that could prevent ZEC generators from selling capacity. *Supra* 12. Yet ZEC generators would still receive ZECs. Nothing in the statute "presupposes" auction sales. Br. 10.

Third, Plaintiffs contend that, even if plants are not required by any rule (let alone by Illinois) to sell at wholesale, the "reality" of their business "compels" them to sell into wholesale auctions, at least for now. Br. 17, 43, 48. But their own allegations contradict this claim. They admit that both Quad Cities and Clinton have sold electricity outside of the auctions through bilateral contracts. A.142, ¶54; A.16, ¶37.

Here is the bottom line: Nothing requires ZEC plants, for the Program's 10-year term, to sell all their electricity and capacity via FERC-regulated auctions, and nothing in the statute turns on whether they do. Indeed, the two plants Plaintiffs focus on, by their own admission, have not

done so in recent years.  The Program thus cannot have "presuppose[d]" that every ZEC plant will do so.  Br. 10.  The ZEC Program rewards clean energy production, without regard to whether FERC tariffs, market rules, or private business decisions result in wholesale sales.

*FPA preemption does not turn on whether, in fact, plants sell at wholesale*.  Plaintiffs are also wrong on the law.  Their notion that preemption turns on what States "presuppose[]," Br. 10, contradicts the FPA's "bright line" between regulation of generation and of wholesale sales. As explained, in drafting the FPA, Congress preserved States' authority over all generation—regardless whether the electricity generated is sold at wholesale.  *Supra* 28-29.  Consistent with that scheme, a State exceeds its authority only when the *State* has tied its subsidy to wholesale market participation.  Thus, *Hughes* asked whether the *State* had "condition[ed] payment" on auction clearance.  136 S. Ct. at 1299.  Likewise, FERC understands that a utility's "decision to bid its purchased capacity into the auction is different from a state mandate to do so."  U.S. Amicus Br. 31. Hence, FERC has interpreted *Hughes* as "not 'foreclos[ing]'" state payments "so long as" the "*state initiatives* [do] not 'condition payment'" on auction clearance.  *ISO New England Inc.*, 158 FERC ¶61,138, P.8 n.19 (2017) (emphasis added) (quotation marks omitted).  The ZEC Program does not

require, prohibit, or regulate wholesale sales or wholesale market participation. Per Plaintiffs' citation, requiring wholesale sales is not what "the *state law* in fact does." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013) (emphasis added).

Were alleged "presuppositions" by the State enough for a preemption claim, the consequences would be staggering. As Plaintiffs note, PJM requires *all* existing generators (except those in FRR plans) to bid in capacity auctions, and, if successful, to sell in wholesale energy markets. Br. 49. Generators that clear—including renewable generators receiving RECs—sell exclusively at wholesale. Thus, if Plaintiffs' theory were true, states could not make REC payments to renewable generators. Plaintiffs' theory is especially untenable given *WSPP*, as the generators receiving RECs in that case were themselves subject to must-offer requirements. *Supra* 31-32. Yet FERC approved the programs. State cap-and-trade programs, *see supra* 6, and carbon taxes would also be illegal, as they impose costs on fossil-fuel generators selling at wholesale.

Plaintiffs' theory is also unadministrable. If state programs could become preempted based on beneficiaries' business "realities," then States could not know whether a proposed regulation is permissible without first canvassing the universe of potential beneficiaries and determining their

(often confidential) business plans. Likewise, federal courts confronting field preemption claims would need third-party discovery into whether "realities" actually compel auction sales—all to determine whether the State regulated generation or wholesale sales. That is not the "bright line easily ascertained" Congress drew in the FPA. *S. Cal. Edison*, 376 U.S. at 215.

Plaintiffs cite various preemption cases involving other statutes, Br. 46-48 & n.3, but they are inapposite. Many are conflict preemption cases, and focus not on whether the *State* is acting in the federal field, but on whether the State's actions conflict with a federal goal—where effects may be relevant. *E.g.*, *S.D. Mining Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998). Others are express preemption cases, which turn on statutory language. *E.g.*, *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192-95 (4th Cir. 2007). The few field preemption cases hold merely that a state law that "de facto" prohibits conduct can be preempted—but even under these cases, any such *de facto* prohibition must still be imposed by *the State*. *E.g.*, *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1508 (10th Cir. 1994). Plaintiffs do not argue that the ZEC Program mandates ZEC plants to sell at wholesale, "de facto" or otherwise; they contend the Program *assumes* private ZEC plants will do so.

Plaintiffs imply that *Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963), forbids States from paying for generation, because that would "indirectly" set wholesale rates. But in that case, as in *Hughes*, the State directly regulated interstate gas pipelines' wholesale purchases, even though such sales fall within FERC jurisdiction. *Id.* at 88-89, 92. This case would be *Northern Natural* if Illinois instructed PJM or MISO how to run auctions, or ZEC plants how to bid or where to sell. As *Northwest Central* explains, as long as States regulate *production* (rather than wholesale sales), it is irrelevant whether their regulation will "have some effect on interstate rates." 489 U.S. at 513.

### 2.     Plaintiffs' Arguments About The ZEC Price Are Irrelevant.

Alternatively, Plaintiffs contend that the ZEC Program is preempted because ZEC prices can adjust downward from carbon's social cost based on an index related to wholesale price projections. Plaintiffs identify this price adjustment as the "fundamental difference" between ZECs and RECs, and assert that the ZEC Program is "economically equivalent" to *Hughes'* contract-for-differences. Br. 44, 52 (quotation marks omitted). This argument also fails. First, if the price adjustment is the problem with the ZEC Program, Plaintiffs lack standing to challenge it. Second, the ZEC price adjustment is a far cry from *Hughes'* contract-for-differences. Third,

regardless, *Hughes* is indifferent to what pricing mechanisms States use, prohibiting only programs that condition payment on auction clearance.

**Plaintiffs lack standing.**  Plaintiffs lack standing to challenge a price adjustment that makes them better off.  Op. 13.  For Article III standing, a plaintiff must show traceability—that "inclusion of" the "*specific aspect*[]" of a statute that is allegedly illegal "actually *caused* him injury."  *Johnson v. U.S. OPM*, 783 F.3d 655, 662 (7th Cir. 2015) (emphases added).

That rule applies here.  EPSA claims injury from "lower auction prices" and "revenues" due to "below-cost bids" by ZEC generators.  A.5, 31, ¶¶10, 66.  Retail Plaintiffs claim injury from the ZEC charge on their retail bills.  A.131, ¶¶9, 11-12.  Those injuries do not result from the price adjustment.  Indeed, the price adjustment *mitigates* those alleged injuries by reducing the ZEC price.  20 ILCS 3855/1-75(d-5)(1)(B).  Consequently, Plaintiffs' "injury … is not *traceable* to the price adjustment."  Op. 13 (citing *Johnson*, 783 F.3d at 662 (emphasis added)); *see Texas v. EPA*, 726 F.3d 180, 184, 198 (D.C. Cir. 2013) (plaintiffs lack standing to challenge aspects of rule that "mitigated, rather than caused, their asserted injuries").  Because the district court's holding turned on traceability, Plaintiffs were required to address that issue in their opening brief.  They did not, and thereby waived review.

*Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1021 (7th Cir. 2016).

Plaintiffs respond with a nonsequitur about redressability. They say the price adjustment is not severable, and thus, if they prevail, the remedy could be "invalidation of the ZEC subsidy as a whole"—which "would redress the[ir alleged] harm." Br. 23. But traceability and redressability are separate requirements. Traceability "examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas [redressability] examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Showing redressability thus does not establish traceability. *See id.* *Johnson* recognized as much, holding that "*even if* vacatur of the entire" rule in that case "were the only possible remedy … th[at] fact … *would not* provide [plaintiffs] the standing to challenge aspects of that [rule] that *have not caused them injury*." 783 F.3d at 663 (emphasis added).

Plaintiffs misconstrue *Johnson*'s statement that plaintiffs lack standing if their "injury would continue to exist even if the [challenged provisions] were cured of all of its alleged infirmities." 783 F.3d at 662. That statement articulates a common test of *but-for causation*, not redressability. *See Restatement (Third) of Torts* § 26 cmt. b (2010) ("an act is a factual cause

... if, in the absence of the act, the outcome would not have occurred"). Courts routinely employ but-for causation principles in assessing traceability. *E.g.*, *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 472 (D.C. Cir. 2013); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013).

Plaintiffs also claim that in *Johnson*, the rule's allegedly illegal aspects were "unrelated to" or "divisible" from the injury-causing aspects, whereas the "Price Adjustment" is "integrated" with the base ZEC price.  Br. 25. Again, *Johnson* rejects that reasoning: "[D]emonstrating an injury caused by one aspect of a legislative action [is] not sufficient to give [a plaintiff] standing to challenge other aspects of that action."  783 F.3d at 662.  That is so even if the provisions are "related," and "regardless of [a provision's] organizational relationship to other provisions (illegal or not) that do" allegedly cause injury.  *Id.* at 661, 663.

**The ZEC Program differs from** Hughes's **contract-for-differences.**  On the merits, the district court properly rejected Plaintiffs' argument that ZEC prices are allegedly "tethered to wholesale prices" and therefore "economically equivalent" to the contract-for-differences in *Hughes*.  Br. 44, 52.  The ZEC pricing mechanism differs greatly from *Hughes*'s contract-for-differences.

48

The *Hughes* contract's defining feature was that, by design and in effect, it insulated the generator absolutely from fluctuations in wholesale prices by moving in tandem with the generator's actual wholesale revenues. It paid the generator "the difference between … the clearing price" *received by the generator* and the "price guaranteed in the contract for differences." *Hughes*, 136 S. Ct. at 1295.

In contrast, the ZEC price neither insulates generators from market risk, nor is based on the generator's actual wholesale revenues. The ZEC price is capped at the social cost of carbon, and thus does not protect ZEC plants from market risk if prices fall. And the ZEC price can only be adjusted downward based on a composite of market forecasts—not based on a generator's actual wholesale revenues, or even on actual wholesale prices. *Supra* 10-12. No generator will ever receive the "benchmark" used in the price adjustment, and there is no true-up to actual revenues. *Supra* 11-12. The adjustment is a consumer protection measure that can lower ZEC prices when consumers' electricity bills are expected to rise. *Id.* That is why it looks to "broader, indirect wholesale market forces" that will affect the affordability of retail customers' bills. Op. 31; SB2814 § 1.5 (SA.5).

**The ZEC Program's pricing mechanism is irrelevant under the governing law**. Even if the ZEC pricing were similar to the contract-

49

for-differences in *Hughes*, Plaintiffs' argument would still fail. Plaintiffs argue that *Hughes* invalidates state programs "tethered to wholesale prices." Br 7, 52. That is not what *Hughes* says. It described the illegal "tether" as one to "wholesale market *participation*," not wholesale market *prices*. 136 S. Ct. at 1299 (emphasis added). That is why the program's sole "fatal defect" was conditioning payment on wholesale auction sales, *i.e.*, market participation. 136 S. Ct. at 1299. The Court emphasized that "[n]othing in its opinion" condemned a state program lacking that "fatal defect." *Id.*; *id.* at 1297 & n.9.

That was no accident. FERC repeatedly told the Court that the *only* problem was the bidding-and-clearing requirement—affirming at argument that a state-imposed "contract for differences is not preempted here. It's just when there's a bidding-and-clearing requirement." Tr. Of Oral Arg. at 57:2-4, *Hughes*, 136 S. Ct. 1288, http://bit.ly/2q6rjeq; *see id.* at 50:16-51:2 ("contracts for differences" not "necessarily preempted," but "because of the bid-and-clear requirement" Maryland's program was).

In fact, States regularly take account of a particular generator's actual wholesale revenues when setting state-jurisdictional prices. In many States, including in PJM and MISO, generators are owned by vertically integrated utilities that are entitled under state law to recover their full costs of

operation from retail customers.  When setting retail rates to ensure cost recovery, States do (and have long done) exactly what Plaintiffs claim is impermissible: they set a price (a retail rate) by "subtracting" from the utility's costs the amount of its "revenue from wholesale electricity sales." Lowell E. Alt, Jr., *Energy Utility Rate Setting* 59 (2006).  States may do so consistent with the FPA because, as the Second Circuit explained, there is "a distinction between" a State actually "regulating [wholesale] sales" and a State "reflecting the profits from a reasonable estimate of those sales" when acting within its proper regulatory area.  *Rochester Gas*, 754 F.2d at 105.

For similar reasons, pricing is not a "fundamental difference" between ZECs and RECs that renders *WSPP* distinguishable.  Br. 52.  FERC's reasoning in *WSPP* did not turn on how RECs were priced.  Rather, ZECs, like RECs, fall within state authority because they base payment on a production method.  *WSPP*, 139 FERC ¶61,061, P.24.  Anyway, it is simply not true that REC prices are set in markets "determined by supply and demand."  Br. 52.  States price RECs in different ways.  Even when States use "markets," these markets are artificial and state-constructed—as are the prices that result.  Other REC prices are set administratively, *e.g.*, N.J. Stat. Ann. §48:3-87.1; Md. Code Ann., Pub. Util. §7-704.1, or by "price benchmarks" based on "expected current and future regional energy prices,"

20 ILCS 3855/1-75(c)(1)(D).  Nearly all States set an "alternative compliance payment" that caps prices at a state-determined amount.  Ivan Gold & Nidhi Thakar, *A Survey of State Renewable Portfolio Standards: Square Pegs for Round Climate Change Holes?*, 35 Wm. & Mary Envtl. L. & Pol'y Rev. 183, 195 & n.92 (2010).  No wonder, then, that FERC's approval of REC programs did not turn on their pricing mechanism.

## III.   The ZEC Program Is Not Conflict Preempted.

Because of how Congress divided electricity regulation between states and FERC, the bar for conflict claims is high.  The FPA prescribes "not only the intended reach of the [federal] power, but also … the areas into which this power was not to extend"—namely, generation and retail sales.  *Nw. Central*, 489 U.S. at 510 (quotation marks omitted).  Hence, "conflict-pre-emption analysis must be applied sensitively" "to prevent the diminution of the role Congress reserved to the States."  *Id.* at 515.  So long as the State is "regulat[ing] production or other subjects of state jurisdiction, and the means chosen [are] at least plausibly … related to matters of legitimate state concern," the program will stand unless it causes "*clear damage* to [FERC's] goals."  *Id.* at 518, 522 (emphasis added).  That is so *even* when the program is "[d]esigned as a counterweight to [FERC's] market, contractual, and regulatory forces."  *Id.* at 497.

52

Under these standards, Plaintiffs' conflict preemption claim fails. Illinois is regulating production, and Plaintiffs cannot dispute that the ZEC Program is "at least plausibly … related to matters of legitimate state concern." *Id.* at 518.  Its purpose is "to achieve the State's environmental objectives and reduce the adverse impact of emitted air pollutants on the health and welfare of the State's citizens."  SB2814 § 1.5 (SA.5).

Nor have Plaintiffs identified any FERC "goal" to which the ZEC Program causes "clear damage."  *Nw. Central*, 489 U.S. at 518, 522.  They claim the program conflicts with FERC's choice to set rates using "[a]pproved [a]uction [m]arkets," Br. 54,[28] because it allows participants to "remain in operation" when they would have "retire[d]" if relying solely on wholesale sales "at FERC approved rates," Br. 56, 58, and "distort[s] price signals" by "increasing supply" and decreasing "the market rates" that result.  Br. 57-58. But although FERC uses auctions to set prices and promote efficiency, Plaintiffs have invented the broader claim—essential to their argument—that FERC expects its auctions to be the *exclusive* driver of which plants operate and which retire, or of wholesale prices.  To support that broader claim, Plaintiffs cite only one paragraph from one FERC order, which does not get

---

[28] Plaintiffs' argument that "plants will be compensated for their wholesale electricity sales at rates above what FERC has" set, Br. 56, just repeats their field-preemption claim. *Supra* 27-52.

within a country mile of their novel theory. *PJM Interconnection, LLC*, 119 FERC ¶61,318, P.2 (2007) (cited at Br. 55). FERC's precedent actually establishes the opposite. Plaintiffs imagine "an idealized vision of markets free from the influence of public policies," but "such a world does not exist." *N.Y. State PSC*, 158 FERC ¶61,137, 2017 WL 496267, at *11 (2017) (Bay, concurring). FERC's auctions take existing state initiatives as a given, and use auctions to set prices against the *backdrop* of such initiatives.

To start, many plants owned by vertically integrated utilities remain in business *only because* States guarantee their financial viability by allowing them to "recover … all of their costs through cost-based retail rates." *Utilization of Elec. Storage*, 158 FERC ¶61,051, P.22. Yet "years of [FERC] precedent" allow them to participate in FERC's wholesale auctions, and FERC has not even "required any … measures to address the[ir] potential competitive impact." *Id.* Further, many initiatives—tax breaks, emissions allowances, cap-and-trade programs, REC programs—encourage clean or polluting generators to operate or to shut down, which undeniably affects clearing prices. *Supra* 5-7. But just last year, FERC affirmed that States are "free" to adopt such policies "even if the price signals in the … capacity market indicate" that the encouraged clean generation is "[not] needed." U.S. Amicus Br. 33.

FERC likewise has held that States may "grant loans, subsidies or tax credits to particular facilities on environmental or policy grounds," *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62, including when that makes clean generation "more competitive in a cost comparison with fossil-fueled generation," or "allow[s] states to affect the [wholesale] price." *S. Cal. Edison Co.*, 71 FERC ¶61,269, 62,080 (1995). States may also "require retirement of existing generators" or construction of "environmentally-friendly units, or … take any other action in their role as regulators of generation," even though doing so "affects the market clearing price." *Conn. DPUC*, 569 F.3d at 481.

Further, FERC has accommodated the price effects resulting from REC recipients' low bids. In *California ISO*, 145 FERC ¶61,254 (2013), FERC recognized that because renewable generators "receive, in addition to market revenues, … renewable energy credits," they are often willing to bid their energy into the auction at negative prices. *Id.* P.5. Yet FERC permitted this price-lowering practice. *Id.* P.34. So much, then, for Plaintiffs' contention—an essential predicate of their conflict claim—that FERC's policies flatly prohibit state initiatives with "distortive effects" on the outcomes of "FERC-approved auction[s]." Br. 57.

In a concession to this FERC precedent, Plaintiffs do not dispute Illinois's authority to "take … measures that may have an effect on … price

signals"—but claim that Illinois cannot "distort" these price signals. Br. 59. But "distort" is just a pejorative word for "affect," distinguished only by the degree of Plaintiffs' dislike. This Court should not invalidate the ZEC Program based on a nonexistent distinction that FERC has never drawn.

The district court was also correct to reject conflict preemption because any "market distortion caused by subsidizing nuclear power can be addressed by FERC." Op. 34. The Supreme Court explained in *Northwest Central* that when a "dual regulatory scheme" has "a mechanism for resolving jurisdictional conflicts," "conflict-pre-emption analysis ha[s] no proper place." 489 U.S. at 516 n.12. In *Northwest Central*, "there [was] no [such] provision … to resolve jurisdictional tensions," making conflict-preemption analysis necessary. *Id.* That was also true in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 356-57 (1988), where FERC had no way to review the state's cost-recovery determination, and thus, "[o]nly by applying conflict pre-emption analysis" could "some degree of harmony" be achieved. *Nw. Central*, 489 U.S. at 515 n.12.

Here, FERC's mechanisms are purpose-built to address any "tensions" caused by state initiatives that have too great an effect on wholesale prices, and thus conflict preemption has "no … place." *Id.* FERC reviews auction results, and if FERC determines wholesale auctions produce unjust or

unreasonable rates, FERC will alter the auction rules. *E.g.*, *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 660, 664 (D.C. Cir. 2017). Unlike courts entertaining conflict-preemption claims, FERC can distinguish between initiatives that "[a]ffect" price signals and those that "distort" them, and FERC can calibrate its remedy—minor tweak or substantial revision—to any problem it finds. *Supra* 17. The ZEC Program cannot be conflict-preempted when FERC has both approved of state subsidy programs and, if it thinks the ZEC Program problematic, can tailor a remedy.

None of Plaintiffs' authority is to the contrary. Plaintiffs recite *Hughes*' statement that a State cannot "require FERC to accommodate [the State's] intrusion." Br. 58 (alteration by EPSA) (quoting *Hughes*, 136 S. Ct. at 1298 n.11). But the premise of that statement was that the State was "regulat[ing] *in [the] domain Congress assigned to FERC*"—that is, it was field-preempted. *Hughes*, 136 S. Ct. at 1298 n.11 (emphasis added). EPSA cites similar verbiage from *Maryland v. Louisiana*, 451 U.S. 725 (1981), but that, too, is a field preemption case. *Id.* at 750-52 (relying on *Northern Natural*, a field preemption case).[29]

---

[29] Plaintiffs cite language from the Fourth Circuit's decision in the *Hughes* litigation. Br. 58-59 (citing *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 479 (4th Cir. 2014)). The Supreme Court, however, did not embrace that reasoning.

## IV.  Plaintiffs' Dormant Commerce Clause Claim Was Properly Dismissed.

The district court correctly dismissed Plaintiffs' dormant Commerce Clause claim.

### A.    Plaintiffs Lack Standing.

Plaintiffs lack standing to claim that the ZEC Program discriminates in favor of "Illinois nuclear power plants" and against out-of-state "nuclear facilities connected to MISO or PJM."  A.38, ¶90; *see* A.150, ¶85.  Plaintiffs do not own any such plants, so cannot claim injury from such alleged discrimination.

Plaintiffs' alleged injuries are not caused by discrimination.  EPSA alleges "market impact on wholesale prices"; Retail Plaintiffs allege "increased rates passed on to consumers."  Op. 16.  Both stem from the subsidization of nuclear plants *at all*—regardless of location.  Op. 17.  So as in *Johnson*, Plaintiffs' injuries are not traceable to the alleged illegality: they "would continue to exist even if the [ZEC Program] were cured of" the alleged discrimination.  783 F.3d at 662.  Plaintiffs thus lack standing.  A "plaintiff cannot attack a perceived problem that does not cause him injury."  *Id.* at 663; *see Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 12 (1st Cir. 2007); *cf.*

*Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 500 (5th Cir. 2004) (same rule under "prudential standing").

Again, Plaintiffs only claim they have standing because their injuries would be *redressed* by the Program's invalidation.  Br. 60-62.  Again, that argument confuses traceability with redressability.  *Supra* 47-48.  And again, because the district court's opinion turned on traceability, Op. 16-17, Plaintiffs have waived any argument by failing to brief it.

### B.   The Dormant Commerce Clause Does Not Apply to Subsidy Programs Like the ZEC Program.

Plaintiffs' claim also fails because, as Plaintiffs admit, the ZEC Program is a "subsidy" for zero-emissions nuclear generation.  Br. 67.  The dormant Commerce Clause does not apply to subsidies addressing environmental problems.  *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976).  Although Plaintiffs address *Alexandria Scrap* under *Pike*, Br. 69-70, it precludes both *Pike* and discrimination-based claims.

*Alexandria Scrap* upheld a Maryland program that paid a "bounty" to third parties for destroying automobile hulks in junkyards, which "protect[ed] the State's environment" from their ill effects.  426 U.S. at 797, 809.  Like ZEC plants, these processors competed in an interstate market (for auto hulks).  The program's rules were more lax for in-state processors, which had the "practical effect" of limiting the bounty to them.  *Id.* at 799-

802, 803. Yet the Court held that because Maryland had not erected a "trade barrier of the type forbidden by the Commerce Clause," but merely provided a subsidy "payment" to "encourage the removal of automobile hulks," *id.* at 809-10, "the Commerce Clause" was "not … concerned." *Id.* at 805.

Similarly, Illinois has not enacted a "trade barrier" but provided a subsidy—a ZEC payment—for eliminating pollution. *Id.* The Commerce Clause has no application. On this ground, a district court recently held the "dormant Commerce Clause [did] not apply" to an indistinguishable REC program. *Allco Fin. Ltd. v. Klee*, No. 15-cv-608, 2016 WL 4414774, at *23-25 (D. Conn. Aug. 18, 2016), *aff'd on other grounds*, 861 F.3d 82 (2d Cir. 2017).

Plaintiffs argue that Illinois is not purchasing "energy [for] the state government," but "is subsidizing [ZEC plants'] sales to third-parties in transactions not involving the state." Br. 70. That does not distinguish *Alexandria Scrap*. Maryland was not purchasing hulks itself; it subsidized scrapyards' "sales to third-parties"—processors. 426 U.S. at 809.

In *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), this Court rejected a comparison to *Alexandria Scrap* where the State employed, not cash payments, but simple "regulat[ion] of utilities"—"require[ments to] install scrubbers"—that it tried to creatively recharacterize as *effectively* a

"subsid[y]." *Id.* at 595-96. This case, like *Alexandria Scrap*, concerns *actual* subsidies. It is irrelevant that Illinois uses regulations to implement its subsidy. Maryland did the same, imposing documentation requirements, penalties on scrapyards with old hulks, and grants of civil immunity. 426 U.S. at 796-97; *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 346 (2008) (plurality op.).

### C.    Plaintiffs' Discrimination Claim Fails.

Even if the Court reaches Plaintiffs' discrimination claims, they fail. Plaintiffs concede that the ZEC legislation "does not expressly state that [ZECs] will be awarded only to the in-state Exelon plants." Br. 65. They do not dispute that *any* nuclear facility "interconnected with [PJM] or [MISO]," inside or outside Illinois, is a ZEC-eligible "Zero emission facility." 20 ILCS 3855/1-10. Nor do they dispute that the statute's air-pollution criteria are geographically neutral. 20 ILCS 3855/1-75(d-5)(1)(C-5). Nor do they allege that the ICC will "flout" its duty to apply these criteria impartially. Br. 66; Op. 37.

Plaintiffs nonetheless maintain that the "law itself" discriminates. Br. 66. In support, they cite one provision, Section 1-75(d-5)(1)(C), which they falsely assert requires the IPA to "give weight to the premature closure of existing nuclear power plants in Illinois." Br. 65 (quotation marks omitted).

The statute does not say that. The IPA need only "consider" certain reports, including *one* concerning Illinois plants, and *others* created "by or for [PJM or MISO]" concerning closures in *other* States. 20 ILCS 3855/1-75(d-5)(1)(C); PJM, *PJM Economic Analysis of EPA's Proposed Clean Power Plan* (Mar. 2, 2015), http://bit.ly/2pdKToc (PJM report analyzing "nuclear retirement" scenarios in every PJM state).[30] There is nothing discriminatory about considering environmental effects of closing plants in-state *and out*. Op. 37 n.34. Regardless, these reports are irrelevant. The ICC (not IPA) selects plants, and it may consider only three neutral environmental criteria. 20 ILCS 3855/1-75(d-5)(1)(C-5)(i)-(ii).

Without citing any *actual* statutory provision, Plaintiffs complain that the district court "disregarded" their "allegations" that Illinois plants will be selected. Br. 66. Plaintiffs apparently believe that the statute's geographically neutral criteria are illegal because in-state plants can satisfy them more readily. But if in-state plants best advance neutral environmental goals, their selection is not objectionable. That is a "reason, apart from their origin, to treat them differently," and so is permitted by the dormant

---

[30] Plaintiffs are wrong that Exelon did not cite these PJM reports below, Br. 65 n.5; Exelon did. SA.18 n.31.

Commerce Clause.  *City of Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978).

For example, in *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), the Ninth Circuit rejected a claim that California's Low-Carbon Fuel Standard discriminated "based on origin," advantaging California because its "generation is weighted toward lower-carbon sources such as … nuclear, and hydroelectric." *Id.* at 1088, 1091.  The Court explained that the dormant Commerce Clause forbids "distinctions that benefit in-state producers … based on state boundaries *alone*," but does not require ignoring "real variations in emissions from different methods and locations of … production," even if "intertwined with geography." *Id.* at 1089-90 (emphasis added).  The dormant Commerce Clause thus does not prohibit selection of in-state plants if they best serve neutral purposes; rather, Plaintiffs must show that the law favors plants *because of* their in-state location.

Plaintiffs assert that the statute discriminates "in effect," but do not develop the argument—for good reason.  Br. 65.  Absent facial discrimination, a "state's choice between … alternative environmental protection policies does not implicate the Commerce Clause simply because the alternative chosen may be in the best economic interests of the state."

*Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 402 (3d Cir. 1987).  The Supreme Court has repeatedly upheld statutes that benefitted in-state interests far more than others.  *E.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981) (upholding law despite "out-of-state plastics industry" being "burdened relatively more heavily than the [in-state] pulpwood industry"); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125-26 (1978) (upholding law despite *entire* impact being on out-of-state entities).  The Court has found a "discriminatory effect" when the legislature's *express* purpose was protectionist, or when disparate impacts on out-of-state businesses were unrelated to the legislature's *purported* non-protectionist purpose.  *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (express purpose); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 353-54 (1977) (non-protectionist purpose not advanced); *Norfolk S.*, 822 F.2d at 400 ("the 'discriminatory effect' cases are best regarded as cases of purposeful discrimination").  But Plaintiffs cite no case finding discriminatory effects where, as here, any disparate impacts would directly relate to how well they serve the State's neutral goals.

Finally, Plaintiffs' claim of discriminatory "purpose" ignores the applicable standards.  Courts must "assume that the objectives articulated by the [state] are [the] actual purposes of the statute, unless an examination of

the circumstances forces [the Court] to conclude that they *could not have been* a goal." *Clover Leaf*, 449 U.S. at 463 n.7 (emphasis added) (quotation marks omitted); *id.* at 471 n.15 (applying same rule); *see, e.g.*, *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015) (same); *E. Ky. Res. v. Fiscal Ct. of Magoffin Cty.*, 127 F.3d 532, 542 (6th Cir. 1997) (similar). Here, the legislation itself states its purpose: to reduce emissions. *Supra* 9. Plaintiffs did not, and cannot, plead facts showing that this purpose "*could not* have been" at least "*a* goal." *Clover Leaf*, 449 U.S. at 463 n.7 (emphasis added). Plaintiffs cite statements by Illinois's Governor, but politicians often boast about job benefits. The Supreme Court has refused to look past a state's "environmental" purpose merely because legislators provided an "economic defense" based on "effects on state industry." *Id.*

### D.    Plaintiffs' *Pike* Claim Fails.

Plaintiffs have little to say regarding dismissal under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Pike* requires a "burden" that makes commerce more difficult, *id.* at 142, that the burden be "clearly excessive" relative to local benefits, *id.*, and "at least 'mild' discrimination against interstate commerce," *Cavel*, 500 F.3d at 555-56. Plaintiffs allege none of these. Plaintiffs do not allege that ZECs place any *burden* (like regulation or restrictions) on commerce; they only allege indirect price effects from a

subsidy.  A.38, ¶91.  That alleged "burden" is also not "clearly excessive" relative to the environmental benefits of preserving nuclear plants.[31]  *See Allco*, 861 F.3d at 107-08 (dismissing *Pike* claims against REC program on motion to dismiss given local benefits).  And beyond their claim that the ZEC statute itself discriminates, Plaintiffs do not allege that the ZEC Program affects in- and out-of-state competitors *differently*; thus, those impacts are not even "mild" discrimination.  *Cavel*, 500 F.3d at 555-56.  Because the Program "is an exercise of [Illinois's] traditional and congressionally recognized power over [electricity generation]," and because the Program applies evenhandedly to in and out-of-state facilities, it does not violate *Pike*. *Nw. Cent.*, 489 U.S. at 526.

## CONCLUSION

The judgments should be affirmed.

---

[31] Plaintiffs do argue that they have properly plead that the law's environmental purpose is pretextual, but they are wrong.  *See supra* 65.

Dated:  October 27, 2017                    Respectfully submitted,

                                        By:    /s/ Matthew E. Price
                                               Matthew E. Price
                                               David W. DeBruin
                                               Zachary C. Schauf
                                               William K. Dreher
                                               JENNER & BLOCK LLP
                                               1099 New York Avenue NW
                                               Suite 900
                                               Washington, D.C. 20001
                                               (202) 639-6000

                            *Attorneys for Intervenor-Appellee*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 14 point Georgia font for the main text and 12 point Georgia font for footnotes.

Dated: October 27, 2017

/s/ Matthew E. Price
Matthew E. Price

**CERTIFICATE OF SERVICE**

I, Matthew E. Price, an attorney, hereby certify that on October 27, 2017, I caused the foregoing Brief and Supplemental Appendix to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF Procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the **Brief** and 10 copies of the **Supplemental Appendix** to be transmitted to the Court via hand delivery within 7 days of that notice date.

/s/ Matthew E. Price
**Matthew E. Price**