Nos. 17-2433, 17-2445

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| VILLAGE OF OLD MILL CREEK, FERRITE INT'L CO., GOT IT MAID, INC., NAFSICA ZOTOS, ROBERT DILLON, RICHARD OWENS, and ROBIN HAWKINS, individually and d/b/a ROBIN'S NEST, Plaintiffs-Appellants, | ) ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| v. | ) | |
| ANTHONY STAR, in his official capacity as Director of the Illinois Power Agency, Defendant-Appellee, | ) ) ) | No. 17-cv-1163 |
| and | ) | The Honorable |
| EXELON GENERATION COMPANY, LLC, Intervening Defendant-Appellee. | ) ) ) | MANISH S. SHAH, Judge Presiding. |
| ELECTRIC POWER SUPPLY ASSOCIATION, DYNEGY INC., EASTERN GENERATION, LLC, NRG ENERGY, INC., and CALPINE CORPORATION, Plaintiffs-Appellants, | ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| v. | ) | |
| ANTHONY STAR, in his official capacity as Director of the Illinois Power Agency, BRIEN J. SHEAHAN, JOHN R. ROSALES, SADZI MARTHA OLIVA, MIGUEL DELVALLE, and SHERINA MAYE EDWARDS, in their official capacities as Commissioners of the Illinois Commerce Commission, Defendant-Appellee, | ) ) ) ) ) ) ) ) | No. 17-cv-1164 |
| and | ) | The Honorable |
| EXELON GENERATION COMPANY, LLC, Intervening Defendant-Appellee. | ) ) ) | MANISH S. SHAH, Judge Presiding. |

## BRIEF OF STATE DEFENDANTS-APPELLEES

LISA MADIGAN
Attorney General of Illinois

DAVID L. FRANKLIN
Solicitor General

RICHARD S. HUSZAGH
Assistant Attorney General
100 W. Randolph S., 12th Floor
Chicago, Illinois 60601
(312) 814-2587
*rhuszagh@atg.state.il.us*

100 W. Randolph St., 12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for State Defendants-Appellees

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.   Plaintiffs Do Not Have a Cause of Action to Enjoin the ZEC Program
      on Preemption Grounds.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      A.    Plaintiffs Are Not the Object of a Potential Enforcement Action
            Under the Illinois Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    Plaintiffs' Claimed Right to Enjoin the ZEC Program as Field
            Preempted by the FPA Is Inconsistent with the FPA's Terms
            and Structure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  Plaintiffs Did Not Allege a Valid Claim that the FPA Preempts
      Illinois' ZEC Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    General Preemption Principles.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      B.    The FPA Does Not Invalidate Illinois' ZEC Program Under
            Field-Preemption Principles Because the Program Does Not Have
            the Aim or Effect of Usurping FERC's Authority to Determine Just
            and Reasonable Rates for Wholesale Sales of Power.. . . . . . . . . . . . . . . 29

            1.    The Target of the ZEC Program Is the Generation of
                  Environmentally Beneficial Energy, Not Setting Rates for
                  Wholesale Electricity Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            2.    The ZEC Program Does Not Have the Effect of Setting Rates
                  for Wholesale Electricity Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                  a.    Not All of FERC's Jurisdiction is Exclusive Jurisdiction.. . . . . 33

b.    The ZEC Program Does Not Set Wholesale Energy Rates.. . . . . 36

c.    The ZEC Program Does Not Usurp FERC's Exclusive Jurisdiction over Charges, Rules and Practices "In Connection With," or "Affecting," Wholesale Electricity Sales and Rates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

d.    Surface Similarities Between ZEC Payments and the Payments Held Preempted in Hughes Do Not Bring Them Within FERC's Exclusive Jurisdiction. . . . . . . . . . . . . . . 44

C.    The FPA Does Not Invalidate Illinois' ZEC Program Under Conflict-Preemption Principles.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

IV.    The District Court Correctly Dismissed Plaintiffs' Claim that Illinois' ZEC Program Violates the Dormant Commerce Clause. . . . . . . . . . . . . . . . . . . . 51

A.    General Commerce Clause Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

B.    The ZEC Program Is Not Subject to Strict Scrutiny on the Basis that It Discriminates Against Interstate Commerce.. . . . . . . . . . . . . . . . . . . . . . 54

1.    The ZEC Program Does Not Facially Discriminate Against Interstate Commerce.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

2.    Plaintiffs Have Not Validly Alleged That the Purpose of the ZEC Program Is to Discriminate Against Interstate Commerce. . . . . . . . . 57

3.    Plaintiffs Did Not Validly Allege That Illinois' ZEC Program Discriminates in Its Effects Against Interstate Commerce. . . . . . . . . 62

C.    The ZEC Program Advances a Valid Purpose and Does Not Inflict Burdens on Interstate Commerce That Are Clearly Excessive in Relation to the Program's Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . 60

*Alexander v. Sandoval*, 532 U.S. 275 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Allco Fin. Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . 61

*Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005). . . . . . . . . . . 57, 58, 60

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . 58, 60

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 47

*American Beverage Ass'n v. Snyder*, 735 F.3d 362 (6th Cir. 2013). . . . . . . . . . . . . . . . 65

*American Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003). . . . . . . . . . . . . . . . . . . . . . . . . 37, 41

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). . . . . . . . 14, 20-26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Baude v. Heath*, 538 F.3d 608 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 55, 61, 68

*Breard v. Alexandria,* 341 U.S. 622 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Brown v. Hovatter*, 561 F.3d 357 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Buck v. Kuykendall*, 267 U.S. 307 (1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 62

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994). . . . . . . . 51, 55, 61-62

*Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 50

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Coalition for Competitive Elec. v. Zibelman*, ___ F. Supp. 3d ___
   2017 WL 3172866 (S.D. N.Y., July 25, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46

*Commonwealth Edison Co. v. ICC*, 775 N.E.2d 113 (Ill. App. 2002). . . . . . . . . . . . . . 7

*Connecticut Dep't of Pub. Util. Control v. FERC*,
   569 F.3d 477 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008). . . . . . . . . . . . . . . . . 51, 54

*Doran v. Mass. Turnpike Auth.*, 348 F.3d 315 (1st Cir. 2003). . . . . . . . . . . . . . . . . . 67

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). . . . . . . . . . . . . . 20

*Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011). . . . . . . . 5

*Edison Electric Institute*, 69 FERC ¶ 61,344 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 41

*English v. General Electric Co.*, 496 U.S. 72 (1990). . . . . . . . . . . . . . . . . . . . . . . 27, 47

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
   733 F.3d 393 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ex parte Young*, 209 U.S. 123 (1908). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

*FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016). . . . . . . . . . . . . . . . . . . *passim*

*FPC v. Panhandle E. Pipe Line Co.*, 337 U.S. 498 (1949). . . . . . . . . . . . . . . . . . . . . 29

*Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206 (1st Cir. 1994). . . . . . . . . . . . . . . . . . 57

*Fisher v. Halliburton*, 667 F.3d 602 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 20

*Flying J, Inc. v. Van Hollen*, 621 F.3d 658 (7th Cir. 2010). . . . . . . . . . . . . . . . . . 48, 49

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
   841 F.3d 133 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997). . . . . . . . . . . . . 52, 54, 57, 63, 65

iv

*Goldfarb v. Supreme Court of Virginia*, 766 F.2d 859 (4th Cir. 1985). . . . . . . . . . 67, 68

*Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016). . . . . . . . . . . . . . . . *passim*

*Hunt v. Wash. Apple Advertising Comm'n*, 432 U.S. 333 (1977). . . . . 53, 54, 57, 63, 64

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960). . . . . . . . . . . . . . . . . 30, 52

*Ill. Commerce Comm'n v. FERC*, 721 F.3d 764 (7th Cir. 2013). . . . . . . . . . . . . . . . . 6

*Kassell v. Consol. Freightways Corp*., 450 U.S. 662 (1981). . . . . . . . . . . . . . . . . . 52, 53

*L C & S, Inc. v. Warren Area County Plan Comm'n*,
  244 F.3d 601 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Madison Gas & Elec. Co. v. U.S. EPA*, 25 F.3d 526 (7th Cir. 1994). . . . . . . . . . . . . . . 8

*Maine v. Taylor*, 477 U.S. 131 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*Maracich v. Spears*, 133 S. Ct. 2191 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Mason v. SmithKline Beecham Corp*., 596 F.3d 387 (7th Cir. 2010). . . . . . . . . . . . . 47

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011). . . . . . . . . . . . . . . . . . 19, 60

*McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873 (7th Cir. 2012). . . . . . . . . . . . . . 60

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981). . . . . . . . . . . . . . . . *passim*

*Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988). . . . . . . . . . . 35, 36

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*,
  341 U.S. 246 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 25, 26, 49

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of
  Snohomish Cty*., 554 U.S. 527 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*N.J. Bd. of Public Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014). . . . . . . . . . . . . . . . . 5, 6

*National Paint & Coatings Ass'n v. City of Chicago*,
  45 F.3d 1124 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 52, 54, 56, 57, 63, 64, 68

*New York v. FERC*, 535 U.S. 1 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 65

v

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987). . . . . . . . . . . . 57, 63, 64

*Northeast Rural Elec. Membership Corp. v. Wabash Valley
    Power Ass'n, Inc.*, 707 F.3d 883 (7th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . 34

*Northwest Central Pipeline Corp. v. State Corp. Commission of
    Kansas*, 489 U.S. 493 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30, 32, 34

*NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165 (2010).. . . . . . . . . . 5

*Oklahoma v. Hughes*, 441 U.S. 322 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation
    & Dev. Comm'n*, 461 U.S. 190 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Park Pet Shop, Inc. v. City of Chicago*,
    872 F.3d 495 (7th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 54, 55, 64, 66, 68

*Patriotic Veterans, Inc. v. Ind.*, 736 F.3d 1041 (7th Cir. 2013). . . . . . . . . . . . . . . . 27, 28

*Philadelphia v. New Jersey*, 437 U.S. 617 (1978). . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 63

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). . . . . . . . . . . . . . . . . . 53, 64, 66, 67, 68

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State
    Dep't of Health*, 699 F.3d 962 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . 20, 27, 28

*Public Utilities Comm'n of Rhode Island v. Attleboro Steam
    & Electric Co.*, 273 U.S. 83 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ray v. City of Chicago*, 629 F.3d 660 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8. 52, 54, 55, 58, 60

*Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). . . . . . . . . . 21, 22

*Scariano v. Justices of Supreme Court of Indiana*,
    38 F.3d 920 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 65

*SDDS, Inc. v. South Dakota*, 47 F.3d 263 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . 57

*Selvan v. New York Thruway Authority*, 711 F.3d 253 (2d Cir. 2013). . . . . . . . . . . . 66

*Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).. . . . . . . . . 50

*S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). . . . . . . . . . . . . . . . 19

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981). . . . . . . . . . . . . . . . . 24

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979). . . . . . . . . . . . . . . . . . . . . . . . . 24

*Thrun v. Cuomo*, 976 N.Y.S.2d 320 (N.Y. App. Div. 2013). . . . . . . . . . . . . . . . . . . . . . 7

*Verizon Maryland, Inc. v. Public Service Commission of Maryland,*
    535 U.S. 635, (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980). . . . . . . . . 52

*Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011).. . . . . . 20

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994). . . . . . . . . . . . . . . . . . . . . . . 51

*Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control,*
    531 F.3d 183 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 43, 44, 45, 49

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*WSPP Inc.*, 139 FERC ¶ 61,061, pars. 23-24 (2012). . . . . . . . . . . 37, 41-42, 44, 46, 49

*Yeftich v. Navistar, Inc.*, 722 F.3d 911 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 19

## Constitutional Provisions, Statutes and Court Rules

U.S. Const. art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. Art. I, § 8, cl. 3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

16 U.S.C. §§ 791 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. § 824. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 824a–3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16 U.S.C. § 824d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 41, 48

16 U.S.C. § 824e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 22, 48

16 U.S.C. § 825*l*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

16 U.S.C. § 825m. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16 U.S.C. § 825p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

20 ILCS 3855/1–10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

20 ILCS 3855/1–75. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

20 ILCS 3855/1–75(d–5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

220 ILCS 5/16–101 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

220 ILCS 5/16–108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

220 ILCS 5/16–111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

220 ILCS 5/16–111.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ill. Public Act 90–561. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ill. Public Act 95–481. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ill. Public Act 99–906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

FERC Order 888 (61 Fed. Reg. 21,540). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FERC Order 1000 (76 Fed. Reg. 49,842) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Other Authorities**

American Lung Association, *www.lung.org/healthyair/outdoor/air-pollution*. . . . . . 59

D. Regan, *The Supreme Court and State Protectionism*: *Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091 (1986) . . . . . . . . . . . . . . 63

Galen Barbose, Lawrence Berkeley Nat'l Lab., *U.S. Renewables Portfolio Standards: 2017 Annual Status Report* (available at https://emp.lbl.gov/sites/default/files/2017-annual-rps- summary-report.pdf . . . 8

HR 1146 Report, *www.icc.illinois.gov/downloads/public/HR1146%20Report.pdf* . . . . . 9, 11, 59, 61

NRG Energy, Inc., 2016 Form 10-K *https://www.sec.gov/Archives/edgar/data/1013871/000101387117000007/ nrg201610-k.htm* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*V. Arroyo, et al., State Innovation on Climate Change: Reducing Emissions from Key Sectors While Preparing for A "New Normal",* 10 Harv. L. & Poly Rev. 385 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*U.S. EPA, The Clean Air Act in a Nutshell: How It Works at 21 www.epa.gov/sites/production/files/2015-05/documents/caa_nutshell.pdf* . . . . . . . . . . 7

## JURISDICTIONAL STATEMENT

Plaintiffs-appellants' jurisdictional statements are complete and correct.

## ISSUES PRESENTED FOR REVIEW

Illinois Public Act 99–906 (the "Act") establishes a ratepayer-financed pollution-prevention program pursuant to which Illinois utilities are required to purchase state-law created property interests, known as "zero-emission credits" ("ZECs"), which represent the beneficial environmental attributes of emission-free nuclear power.

The issues in this appeal are:

1.     Whether Plaintiffs, who do not allege that they are exposed to a potential enforcement action under the Act, have a cause of action to seek an injunction against the Act's implementation based on the claim that it is preempted by the Federal Power Act (16 U.S.C. §§ 791 *et seq.*) (the "FPA").

2.     Whether, if Plaintiffs have such a cause of action, their complaints state a valid claim that the FPA preempts the Act, rendering it unconstitutional under the Supremacy Clause (U.S. Const. art. VI, cl. 2), on the basis that it (a) invades the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC") to set rates for interstate sales of wholesale electricity, or (b) conflicts with FERC's regulation of wholesale electricity sales and rates.

3.     Whether Plaintiffs' complaints state a valid claim that the Act violates the Commerce Clause (U.S. Const. Art. I, § 8, cl. 3) because it (a) discriminates against interstate commerce or (b) imposes burdens on such commerce that are clearly excessive compared to the Act's stated environmental goals.

**STATEMENT OF THE CASE**

**Introduction**

This appeal involves two actions that were filed on the same day, assigned to the same district court judge, and administered together. The two complaints alleged that certain provisions of the Act are preempted by the FPA and violate the Commerce Clause. These provisions of the Act (the "ZEC Program") establish a 10-year program of ratepayer-financed subsidies for nuclear power plants that otherwise would likely cease operations, resulting in large increases in emissions of greenhouse gases and other airborne pollutants from fossil fuel-burning power plants that adversely affect Illinois residents. Amid growing public concerns about the adverse environmental effects of fossil fuel-based power generation, and prompted by the announcement that several Illinois nuclear power plants might close, the ZEC Program was enacted after a multi-agency review of potential impacts. It builds on the example of an earlier Illinois law creating a program of renewable energy credits ("RECs") to promote the generation of renewable energy, such as wind and solar power.

The ZEC Program requires local Illinois electric utilities (which deliver power at the retail level to Illinois customers) to purchase a certain number of ZECs, which represent the environmental benefits associated with emission-free nuclear power, and the utilities then pass that cost along to their ratepayers. Two Illinois state agencies — the Illinois Power Agency (the "IPA") and the Illinois Commerce Commission (the "ICC"), whose officers are named as defendants in these actions — determine which nuclear power plants are selected to sell ZECs. The price of ZECs is set by a statutory formula described below.

2

Plaintiffs claimed that the ZEC Program is preempted by the FPA and regulates interstate commerce in a manner prohibited by the Commerce Clause. Doc. 1 at 6, pars. 12-13; 17-cv-1163 Doc. 1 at 19-26.[1] The district court dismissed these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 107 ("Op."); Doc. 108), and Plaintiffs in both cases appealed.

**Regulatory Background for the Transmission and Sale of Electricity**

When Congress enacted the FPA in 1935, the electric industry was dominated by vertically integrated companies operating as functional monopolies that generated, distributed, and sold electric power to end-users, with prices regulated by local public agencies. See *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1290, 1292 (2016); *New York v. FERC*, 535 U.S. 1, 5 (2002). At the same time, these companies' airborne emissions were largely unregulated by any laws to protect the environment. Subsequent decades have seen major changes in both areas.

After the Supreme Court held in *Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927), that States do not have authority to regulate either the interstate transmission of electricity or wholesale sales of electricity in interstate commerce, Congress enacted the FPA to fill this regulatory "gap." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 767 (2016) ("*EPSA*"). The FPA created FERC's predecessor (the Federal Power Commission) and gave it jurisdiction over those two categories of interstate activity, while preserving the States' traditional authority over other matters, specifically including the generation and retail sale of electricity. 16 U.S.C. §§ 824, 824d, 824e.

---

[1] Except as noted, citations to the record refer to the docket in Case No. 17-cv-1164.

Section 201(a) of the FPA declares that the public interest requires federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," but that "such Federal regulation [shall] extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). Section 201(b)(1) specifies that the FPA "shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce," but, except as otherwise expressly provided, "shall not apply to any other sale of electric energy." 16 U.S.C. 824(b)(1). Section 201(b)(1) further provides (*id.*):

> The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter . . . , over facilities used for the generation of electric energy or over facilities used in local distribution . . . .

Section 205(a) of the FPA states that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges[,] shall be just and reasonable." 16 U.S.C. § 824d(a). (Section 201(e) defines a "public utility" as "any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter . . . ." (16 U.S.C. § 824(e)).) Section 205(c) requires public utilities to file with FERC "schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(c). Section 206(a) provides that when FERC, "after a hearing held upon its own motion or upon complaint," finds with respect to any "transmission or sale subject to [its] jurisdiction" that any "rate, charge, or

4

classification, demanded, observed, charged, or collected by any public utility," or any "rule, regulation, practice, or contract affecting such rate, charge, or classification," is "unjust, unreasonable, [or] unduly discriminatory," it shall "determine the just and reasonable rate, charge, [or] practice" and "fix the same by order." 16 U.S.C. § 824e(a).

Beginning in the 1970s, advances in technology made it possible to generate electricity efficiently in different ways and in smaller plants, leading to a significant increase in the number of electricity generators, and the transmission of electricity progressively expanded over large areas through major networks, or "grids." *New York*, 535 U.S. at 9. As these developments occurred, FERC adopted a more market-based approach to setting rates for wholesale sales of electricity in interstate commerce.[2] FERC authorized the creation of voluntary associations of the transmission line owners, known as Independent System Operators and Regional Transmission Organizations (collectively, "RTOs"), to manage parts of the grid. *Hughes*, 136 S. Ct. at 1292; *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 169 n.1 (2010); *N.J. Bd. of Public Utils.*, 744 F.3d at 81-82 ("Each RTO acts as the system operator in its region, managing the transmission grid on behalf of transmission-owning member utilities").

Illinois is served by two RTOs: PJM Interconnection, LLC ("PJM"), which covers much

---

[2]     For example, FERC Order No. 888 (61 Fed. Reg. 21,540), which the Supreme Court upheld in *New York*, 535 U.S. at 10-14, ordered "functional unbundling" of wholesale generation and transmission services, pursuant to which, *inter alia*, each public utility (many of which at the time were still vertically integrated companies) was required "to state separate rates for its wholesale generation, transmission, and ancillary services, and to take transmission of its own wholesale sales and purchases under a single general tariff applicable equally to itself and to others." Ancillary services include services necessary for a reliable transmission system (e.g., voltage control, reactive supply, system control and dispatch, frequency response, and energy imbalance service). See *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1125 (D.C. Cir. 2011); FERC Order 888, 61 Fed. Reg. at 21,579-83; see also *N.J. Bd. of Public Utils. v. FERC*, 744 F.3d 74, 108-10 (3d Cir. 2014).

of northern Illinois and large parts of the eastern United States, and the Midcontinent

Independent System Operator, or "MISO," which covers most of Illinois and much of

the Midwest. Doc. 1 at 12-13, par. 30; see *Illinois Commerce Comm'n v. FERC*, 721 F.3d

764, 770 & Fig. 1 (7th Cir. 2013) ("*ICC v. FERC*").

To promote greater competition where possible in the interstate sale of wholesale

electricity, FERC shifted away from the traditional cost-plus-profit model of setting

wholesale rates and authorized RTOs to conduct auctions covering their respective areas

for interstate sales of wholesale "energy" (on a day-ahead and real-time basis) and

wholesale "capacity" (which help ensure sufficient supply to meet anticipated peak

demand). See *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish

Cty.*, 554 U.S. 527, 535-37 (2008); *N.J. Bd. of Public Utils.*, 744 F.3d at 82; *ICC v. FERC*,

721 F.3d at 770. In both types of auctions, RTOs accept bids starting with the lowest bid

until the anticipated need is met. The price for the last-accepted bid, referred to as the

"clearing price," then applies to all accepted bids. *Hughes*, 136 S. Ct. at 1290, 1293;

*EPSA*, 136 S. Ct. at 769 & n.1; *N.J. Bd. of Public Utils.*, 744 F.3d at 82-83.[3]

In 1997, Illinois enacted a law to restructure its electric energy industry, which

had the effect of largely separating the businesses of electric generation, transmission,

retail supply (the retail sale of electricity itself), and retail distribution (the delivery of

electricity to retail consumers), thus giving customers the ability to choose their energy

---

[3]    Local utilities (sometimes referred to as "load serving entities," or "LSEs") and power
generators may also enter into long-term bilateral contracts, outside the capacity auctions,
in which case the utility becomes the owner of the capacity, including for purposes of the
auctions. *Hughes*, 136 S. Ct. at 1292-93. FERC may review prices set in bilateral contracts
and set them aside on the basis that they are not just and reasonable if they seriously harm
the consuming public. *Morgan Stanley Capital Grp.*, 554 U.S. at 545-46.

supplier while retaining the regulated local utility's distribution service.  See Ill. Public

Act 90–561 (adding Article XVI to the Illinois Public Utilities Act, 220 ILCS 5/16–101

*et seq.*); 220 ILCS 5/16–111(g)(3); see generally *Commonwealth Edison Co. v. ICC*, 775

N.E.2d 113, 121 (Ill. App. 2002).  (Many other States have pursued a similar restructur-

ing of their electric power markets.  *Hughes*, 136 S. Ct. at 1292.)

**Adoption of Anti-Pollution Laws**

Recent decades have also seen major public initiatives to address the problem of

particulate matter and other airborne pollutants, including those emitted by power

plants.  Federal laws in this area, including the Clean Air Act, not only anticipate sub-

stantial state participation, but also allow separate state regulation of fixed-location

sources of airborne pollutants. See, e.g., U.S. EPA, *The Clean Air Act in a Nutshell: How

It Works* at 21 ("The Act does not restrict states' ability to adopt standards or require-

ments that are more stringent than federal requirements, except in the mobile source

arena.")  (available    at    *www.epa.gov/sites/production/files/2015-05/documents/caa_*

*nutshell.pdf*) (visited Oct. 26, 2017).

Even more recently, greater public awareness and concern about climate change

and associated environmental consequences have spurred a variety of national and local

efforts to reduce the human production of greenhouse gases.  These efforts include:

- The Regional Greenhouse Gas Initiative, in which 10 mostly north-
  eastern States established "a carbon dioxide cap-and-trade program
  to target emissions from electricity generating power plants." *Thrun
  v. Cuomo*, 976 N.Y.S.2d 320, 321 (N.Y. App. Div. 2013).

- California's Global Warming Solutions Act of 2006, which authorized
  the California Air Resources Board to develop emission-reduction
  measures, including a cap-and-trade program to enforce limits on

carbon emissions from various sources. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1079 (9th Cir. 2013).

• Renewable portfolio standards in 29 states and the District of Columbia, plus voluntary renewable energy goals in a number of other states. See Galen Barbose, Lawrence Berkeley Nat'l Lab., *U.S. Renewables Portfolio Standards*: *2017 Annual Status Report* (available at *https://emp.lbl.gov/sites/default/files/2017-annual-rps-summary-report.pdf*) (visited Oct. 26, 2017).

**Illinois' REC Program**

In 2007, Illinois adopted a statutory program to promote renewable energy (Ill. Public Act 95–481), codified in Section 1–75(c) of the Illinois Power Agency Act (20 ILCS 3855/1–75(c)). This program established state-law property interests in the environmental benefits of renewable energy — e.g., reduced consumption of fossil fuels and corresponding reduction of airborne emissions, including greenhouse gases — that are distinct from the underlying energy itself. These property interests take the form of "renewable energy credits" ("RECs") that are issued for each megawatt hour of energy produced, but are "unbundled" from that energy and traded in separate transactions from the sale of that energy. See, e.g., 20 ILCS 3855/1–10 (eff. June 1, 2017).[4] Illinois utilities must acquire RECs matching a statutory percentage of their retail distribution of electricity, with the prescribed percentage progressively increasing until it reaches

---

[4]     Similar programs have been established in many States. Op. 8, n.10; V. Arroyo, *et al.*, *State Innovation on Climate Change: Reducing Emissions from Key Sectors While Preparing for A "New Normal"*, 10 Harv. L. & Poly Rev. 385, 388 & n.14 (2016). These programs built on the successful framework for the federal program that created a market in sulfur-dioxide emission allowances to combat acid rain, described in *Madison Gas & Elec. Co. v. U.S. EPA*, 25 F.3d 526, 527 (7th Cir. 1994) ("The allowances can be bought and sold. This is the novel feature of the acid rain program. . . . A market in pollution is created."). They differ in that they attach an economic value to positive environmental benefits instead of negative environmental externalities.

25% in 2025. 20 ILCS 3855/1–75(c) (2016). Those purchases occur through procure-

ment events conducted by the IPA, with competitive bidding by REC sellers, and

winning bids subject to ICC approval. 20 ILCS 5/16–111.5(c)(1)-(2), 3855/1–75(a)-(b).

The utilities, as buyers of RECs, then pass the corresponding cost along to their Illinois

retail customers. 220 ILCS 5/16–108(k), 16–111.5(*l*).

**Events Leading to Passage of the Act**

Various factors, including the increased use of hydraulic fracturing, have substan-

tially lowered natural gas prices in recent years and, together with limited electricity

demand, led to lower electricity prices. See Potential Nuclear Power Plant Closings in

Illinois (the "HR 1146 Report") at 4, 116-17.[5] In 2014, Exelon Generation Co., LLC

("Exelon") announced that, in light of this trend, some of its Illinois nuclear power

plants were experiencing large operating losses and might be closed. *Id.* at 34. In

response, the Illinois House of Representatives commissioned the HR 1146 Report to

obtain information about the probable effects of such closures. *Id.* at 1. The Report,

prepared by four state agencies (the ICC, the IPA, the Illinois Environmental Protection

Agency (the "Illinois EPA"), and the Illinois Department of Commerce and Economic

Opportunity), with input from MISO, PJM, and PJM's independent market monitor

("IMM"), contained the following findings:

- PJM's analysis projected that, in the various scenarios it examined, avoiding closure of Exelon's Clinton and Quad Cities nuclear plants would prevent the following incremental emissions in Illinois in 2019: $CO_2$ – 4.7 to 5.9 million tons; $SO_2$ – 5.4 to 7.3 million tons; $NO_x$ – 2.2

---

[5]     The HR 1146 Report, described below, is mentioned in, but not attached to, Plaintiffs' complaint. It is available at *www.icc.illinois.gov/downloads/public/HR1146%20Report.pdf* (visited Oct. 26, 2017).

to 4.1 million tons.  (HR 1146 Report, ICC Appendix, PJM Response at 9-11.)

- This analysis also identified "significant thermal and voltage violations" that would likely take substantial time to correct.  (*Id.* at 6-7.)

- Using a mid-range federal calculation of the social cost of carbon, the Illinois EPA estimated that the social cost of carbon avoided under this same scenario over a 10-year period (assuming a replacement mix of 80% coal, 12% natural gas, and 8% renewable energy) would be $10.3 billion.  (*Id.* at 115-16, 119-20.)

**The Act**

The Act, which took effect on June 1, 2017, created the ZEC Program by adding new subsection (d–5) to Section 1–75 of the Illinois Power Agency Act.  20 ILCS 3855/1–75(d–5).  In the Act, the Illinois General Assembly made a series of detailed legislative findings regarding the zero-emission standards it adopted.  It found, in particular, that:

- Reducing emissions of carbon dioxide and other air pollutants, such as sulfur oxides, nitrogen oxides, and particulate matter, is critical to improving air quality in Illinois for Illinois residents.

- Sulfur oxides, nitrogen oxides, and particulate emissions have significant adverse health effects on persons exposed to them, and carbon dioxide emissions result in climate change trends that could significantly adversely impact Illinois.

- Preserving existing zero emission energy generation and promoting zero emission energy generation is vital to placing the State on a glide path to achieving its environmental goals and ensuring that air quality in Illinois continues to improve.

Ill. P.A. 99–906, § 1.5, Zero emission standard legislative findings (1), (2), (4).

Based on these findings, the Act requires Illinois electric utilities to acquire ZECs equal to approximately 16% of the electricity they distribute each year (which is the

average of Illinois utilities' REC requirements in the first five years of the ZEC Program). 20 ILCS 3855/1–75(d–5)(1); 3855/1–10 (defining "zero emission facility"). They must acquire ZECs from qualifying nuclear power plants that are connected to the MISO or PJM systems, and they may then pass along the corresponding costs to their customers as distribution surcharges. 20 ILCS 3855/1–75(d–5)(2). Under the Act, the IPA, subject to ICC review and approval, is directed to select nuclear power generators eligible to sell ZECs using a procurement process that uses the following public interest criteria:

- "minimizing carbon dioxide emissions that result from electricity consumed in Illinois";

- "minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State"; and

- "the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits" that would cease to exist without the procurement, "including the preservation of zero emission facilities."

20 ILCS 3855/1–75(d–5)(1)(C). The Act also directed the IPA and ICC to consider the HR 1146 Report, as well as "publicly available analyses and studies performed by" PJM, IMM, and MISO. *Id.*

The price of ZECs is set by a statutory formula that includes a base price of $16.50 per MWh (identified in the Act as the "Social Cost of Carbon" as determined by the U.S. Interagency Working Group on Social Cost of Carbon's price, August 2016 Technical Update), which is increased each year by one dollar per megawatt hour starting in 2023. *Id.*, sub-§ (d–5)(1)(B)(i). That figure is reduced for a delivery year if wholesale prices and forward price estimates in the PJM and MISO areas (i.e., that year's market price index,

consisting of a combination of RTO capacity auction clearing prices and energy forward prices published by the Intercontinental Exchange) exceeds a $31.40 baseline. *Id.*, sub-§ (d–5)(1)(B). The purpose of this price adjustment is "to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase." *Id.*

**District Court Proceedings**

Plaintiffs in Case No. 17-cv-1164 are the Electric Power Supply Association ("EPSA"), an association of independent power generators located in multiple states, and several individual companies (Dynegy Inc., Eastern Generation, LLC, NRG Energy, Inc., and Calpine Corp.) that operate fossil-fuel plants in the PJM and MISO systems. Complaint (Doc. 1), pars. 15-19. No Plaintiff alleges that it operates a nuclear plant in Illinois or elsewhere in the PJM or MISO regions. Doc. 1 at 7-9, pars. 15-19; Op. n.18.[6] These Plaintiffs allege that the Act will injure them by lowering prices for wholesale electricity. *Id.*, pars. 49-50. They assert two legal theories: the Act is unconstitutional because it is preempted by the FPA, and it violates the Commerce Clause. *Id.*, pars. 69 *et seq.*

Plaintiffs in Case No. 17-cv-1163 are retail customers of Illinois electric utilities who allege that as a result of the Act their costs to purchase electricity will increase. (17-cv-1163 Doc. 1 at 4, par. 9.) They rely on the same two legal theories. (*Id.* at 23-26.) (They also asserted an equal protection claim (*id.* at 26-27), which the district court

---

[6]     EPSA has one member who operates a nuclear plant in the PJM area, but it asserts rights solely "as an organization" and specifically denied representing "any particular member with respect to any issue." Doc. 1 at 7, n.3. NRG is a minority owner of one nuclear plant in Texas, outside the PJM and MISO regions. See *www.sec.gov/Archives/edgar/data/1013871/000101387117000007/nrg201610-k.htm*, 25 (visited Oct. 27, 2017).

dismissed (Op. 41-43), and they do not challenge that ruling on appeal.)

Exelon, which operates the Quad Cities and Clinton nuclear power plants in Illinois (located, respectively, in the PJM and MISO areas), was granted leave to intervene. Docs. 24, 36. Defendants and Exelon filed separate motions to dismiss. Docs. 51-53. After briefing, the district court granted the motions and entered judgment against Plaintiffs. (Op.; Docs. 108.) (Plaintiffs also filed motions for a preliminary injunction that became moot, and were denied, when the district court dismissed their claims; Op. 45; Doc. 38; 17-cv-1163 Doc. 28.)

## SUMMARY OF ARGUMENT

The district court properly dismissed Plaintiffs' claims. That decision should be affirmed because Illinois' ZEC Program is a valid environmental initiative designed to prevent large-scale emissions of airborne pollution by fossil fuel-based power plants, it is consistent with the regulatory scheme established by the FPA, and it is not simple economic protectionism against out-of-state commercial activity.

First, Plaintiffs lack a cause of action to enjoin the ZEC Program on the ground that it is preempted by the FPA. In limited circumstances, a party may bring an equitable cause of action to enjoin conduct by state officials that is contrary to federal law, and therefore inconsistent with the Supremacy Clause. *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1385 (2015). Plaintiffs do not have such a cause of action, however. They are not faced with a potential enforcement action by state officials under the Act and therefore may not invoke the Supremacy Clause, by way of anticipatory defense, to seek an injunction against such future enforcement.

In addition, such injunctive relief is inconsistent with the text and structure of the FPA, which does not contain any language conferring personal rights on Plaintiffs; charges FERC with enforcing its terms, subject to review in court; expressly authorizes FERC, but not private parties like Plaintiffs, to seek judicial relief against violations; and prescribes governing standards — requiring FERC to determine whether particular practices are "just and reasonable" — that are "judicially unadministrable." See *Armstrong*, 135 S. Ct. at 1385. Plaintiffs' reliance on Section 317 of the FPA (16 U.S.C. § 825p) is misplaced, for that provision merely establishes exclusive federal court *subject matter jurisdiction* over claims under the FPA, and does not recognize or create an

*equitable cause of action* to enjoin conduct allegedly preempted by the FPA.

Second, the FPA does not invalidate the ZEC Program under either field-preemption or conflict-preemption principles. For field preemption purposes, FERC has exclusive jurisdiction under the FPA to set prices, or rates, for wholesale sales of electricity, but it does not have jurisdiction over power generation, which the FPA expressly reserves to the States. The ZEC Program, which attributes economic value to the environmental benefits of emission-free nuclear power, represents Illinois' exercise of that reserved authority over power generation. The program is not wholesale rate-setting or its legal equivalent. Plaintiffs' attempt to characterize the proceeds of ZEC transactions as state-mandated compensation for wholesale sales of electricity is unpersuasive.

The Supreme Court's decision in *Hughes v. Talen Energy Marketing* also does not aid their field preemption claim, because the Maryland program invalidated in *Hughes* established state-mandated prices for sales of *wholesale capacity* that were expressly conditioned on a sale being made in the FERC-approved auction, and then replaced the prices set in that auction. The Illinois ZEC Program, by contrast, provides subsidies for the *environmental benefits* of zero-emission power and, unlike the program addressed in *Hughes*, does not condition ZEC payments on the recipient's wholesale sale of electricity. Even FERC considers sales for RECs, which Plaintiffs agree are valid, to be outside its jurisdiction. And Plaintiffs' attempt to distinguish ZECs from RECs is inconsistent with their own preemption analysis.

The FPA also does not invalidate the ZEC Program under conflict preemption principles. Such preemption requires an "actual conflict" between state and federal law.

15

But FERC has not exercised its authority under the FPA, which is limited by the States' reserved authority over power generation, in any way that actually conflicts with the ZEC Program. Nor does the FPA embody a pure free-market philosophy that elevates pollution-blind cost-efficiency above all else and prohibits state initiatives to promote more environmentally benign forms of power generation because they incidentally affect wholesale rates. To the contrary, FERC has repeatedly recognized the validity of, and affirmatively accommodated, such initiatives.

Third, the ZEC Program does not violate the dormant Commerce Clause, which prohibits economic protectionism, not health and safety laws that adopt neutral, nondiscriminatory criteria and, at most, only incidentally burden interstate commerce. The ZEC Program does not facially discriminate against out-of-state activity in favor of comparable in-state activity. To the contrary, the ZEC Program contains neutral criteria that apply equally to in-state and out-of-state power generators and directly advance the program's environmental goals. Nor have Plaintiffs alleged facts justifying the plausible inference that the ZEC Program's primary purpose was economic protectionism instead of environmental protection. Plaintiffs (who do not allege that they operate any nuclear plants in Illinois or in the PJM and MISO regions) also admit that the program imposes economic burdens on *all* non-nuclear plants, including fossil fuel-based plants *in Illinois*. Finally, Plaintiffs have not alleged sufficient facts to support a plausible inference that any incidental burdens on interstate commerce clearly exceed the ZEC Program's intended environmental benefits.

## ARGUMENT

The district court's judgment should be affirmed because Plaintiffs' complaints do not allege legally sufficient claims to invalidate the ZEC Program on the basis that it is preempted by the FPA or violates the Commerce Clause. Neither the FPA nor the Commerce Clause is incompatible with, much less hostile to, environmental legislation that promotes public health by discouraging airborne pollution from electric power plants through the use of incentives for power generation with less or no airborne pollution. Historically, such pollution represented a classic environmental "externality," where the costs (respiratory diseases, higher rates of heart disease, cancer, etc.) were borne by the public at large, rather than by the companies that created them, who thereby obtained both an economic advantage against non-polluting sources of power and an incentive not to avoid those social costs. In recent decades, however, state and federal laws have pursued a variety of approaches to reduce both the pollution and the economic incentives that make it competitively advantageous compared to less polluting alternatives. Those include mandatory pollution-abatement rules, as well as regulatory programs that effectively "internalize" environmental externalities and use market-based incentives to achieve better results at a lower cost. See above at 7-8.

Amid mounting public concern about the environmental consequences of airborne pollution, including greenhouse gases, many States, including Illinois, have adopted programs that attach an economic value to the positive environmental attributes of renewable energy sources, such as wind and solar power, that do not have the same negative effects as fossil fuel-based electricity. *Id.* Many state programs establish state law-created property interests in the positive environmental attributes of renewable

17

energy production (RECs), give them a monetary value, and require local utilities to purchase a specified number of them, measured by the volume of the corresponding electricity produced. *Id.* To maximize the benefits of such programs, RECs are "unbundled" from the electricity itself and separately sold by renewable-energy producers to designated purchasers under state law. See above at 8-9 & n.4.

This case concerns a similar program designed to preserve the environmental benefits of zero-emission electricity generated by nuclear power plants. Prompted by the potential loss of several nuclear power plants in Illinois in the face of declining energy prices, likely triggering a large increase in greenhouse gases and other airborne pollutants, Illinois adopted the ZEC Program. This program, building on the model of Illinois' earlier REC program, established state-law created property interests — zero emission credits (ZECs) — that reflect the environmental benefits of emission-free electricity created by nuclear power plants.

The central issue in this case is whether the environmental values promoted by the ZEC Program, and the means chosen to advance those values, are compatible with (1) the FPA's grant of authority to FERC to determine whether the rates for interstate sales of wholesale electricity are just and reasonable, and (2) the Commerce Clause's prohibition against economic protectionism by individual States. As described below, the district court correctly held that neither the FPA nor the Commerce Clause prevents Illinois from using the ZEC Program to achieve these important goals. It also correctly held, as an initial matter, that Plaintiffs do not have a cause of action to enjoin the ZEC Program on preemption grounds under the FPA.

## I.     Standard of Review

The Court reviews *de novo* the district court's judgment granting Defendants'
motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. *Yeftich v.
Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).  Applying this standard, the Court
accepts as true all well-pleaded allegations and draws all reasonable inferences from
them in the plaintiffs' favor. *Ray v. City of Chicago*, 629 F.3d 660, 662 (7th Cir. 2011).
The Court may also take into account matters subject to judicial notice. *Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court "need not accept as
true legal conclusions, or threadbare recitals of the elements of a cause of action,
supported by  mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir.
2009); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (allegations that "are no more
than conclusions . . . are not entitled to the assumption of truth").  In addition, "[t]he
required level of factual specificity rises with the complexity of the claim." *McCauley v.
City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011).  The Court must then determine,
based on "judicial experience and common sense," whether the well-pleaded factual
allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.
Factual allegations that "are merely consistent with a defendant's liability" do not
satisfy this standard. *Id.* at 678.

## II.     Plaintiffs Do Not Have a Cause of Action to Enjoin the ZEC Program on Preemption Grounds.

Plaintiffs' preemption claim fails at the outset because they do not have a cause
of action for injunctive relief against implementation of the ZEC Program on the ground
that it violates the FPA.  (In *Hughes*, the Court assumed, without deciding, that such a

cause of action exists for preemption under the FPA. 136 S. Ct. at 1296 n.6.) An equitable cause of action for injunctive relief against implementation of a state law that allegedly violates a federal statute is available in limited circumstances, but they are not present here.

### A.   Plaintiffs Are Not the Object of a Potential Enforcement Action Under the Illinois Act.

An equitable action for an injunction on preemption grounds exists when the plaintiff asserts federal-law immunity against the enforcement against it of state law, and it brings suit, by way of anticipatory defense, to enjoin that enforcement. But Plaintiffs are not within that situation. (See Op. 21: "Plaintiffs agree that they are not the potential target of any state enforcement proceedings.")

"Federal preemption is an affirmative defense that a defendant must plead and prove." *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012). For practical reasons, however, a party facing an enforcement proceeding under state law that is preempted by federal law under the Supremacy Clause need not wait for that proceeding to commence, but may seek the protection of federal law affirmatively, by injunction. Thus, *Armstrong* recognized that, "if an individual claims federal law *immunizes him* from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." 135 S. Ct. at 1384 (emphasis added) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). See also *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642 (2011) (Kennedy, J., concurring); *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, J., dissenting); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 982-83 (7th Cir. 2012).

Thus, in *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016), which was decided after *Armstrong* (and on which Plaintiffs rely, Pl. Br. at 30, 38-39), the Second Circuit explained that where a cause of action for a preemption injunction does exist, "a plaintiff . . . generally invokes equity *preemptively* to assert a *defense* that would be available to it in a state or local enforcement action." *Id.* at 144 (citations omitted). In this case, Plaintiffs did not, and cannot, allege that they are the object of any potential enforcement proceeding under the Act. (Op. 21.) Accordingly, they do not have a cause of action for a preemption injunction on this basis.

### B. Plaintiffs' Claimed Right to Enjoin the ZEC Program as Field Preempted by the FPA Is Inconsistent with the FPA's Terms and Structure.

The district court also correctly held that, in light of the FPA's text and structure, Plaintiffs have no cause of action for a preemption-based injunction under the FPA. An action to enjoin state law on the ground that it is preempted by a federal statute is unavailable when such relief is inconsistent with the federal statutory scheme, including when the statute's express remedies implicitly exclude others, or the statute has "judicially unadministrable" criteria to decide the preemption issue. *Armstrong*, 135 S. Ct. at 1385. Both obstacles bar Plaintiffs' preemption claim under the FPA.[7]

---

[7] *Armstrong* left unclear whether both of these factors must be present, or either alone is enough. 135 S. Ct. at 1385 ("The provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief.") (emphasis in original). Given the focus on Congressional intent, as well as the significant federalism concerns embodied in the FPA, either is sufficient to foreclose a cause of action for a preemption-based injunction where the plaintiff is not the target of an enforcement proceeding under state law. Thus, even if the FPA had judicially administrable standards, its comprehensive remedial scheme, as well as the absence of individual rights-conferring language that embraces persons like Plaintiffs, should each foreclose the availability of a preemption cause of action by them. See *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 898-905 (10th Cir. 2017).

21

In *Armstrong*, the Court held that the plaintiffs did not have a cause of action for an injunction against state law based on the alleged preemptive effect of Section 30(A) of the Medicaid Act because it provided a specific enforcement procedure that did not include a private remedy, and the statutory provision on which the plaintiffs based their preemption claim — requiring service reimbursement rates "consistent with efficiency, economy, and quality of care" — established a "judgment-laden standard" that was "judicially unadministrable." 135 S. Ct. at 1385. Here, the same considerations indicate that the cause of action Plaintiffs seek to assert based on the FPA is unavailable.

First, Plaintiffs concede that the FPA does not provide an express right of action authorizing them to enforce its terms, or even any language indicating that it confers personal rights on persons in their situation. See *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951) (holding that "just and reasonable" requirement of the FPA "is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce"); see also *Safe Streets Alliance*, 859 F.3d at 898-905 (discussing *Armstrong* and finding no preemption action under Controlled Substance Act to enjoin state law where that Act contained no language conferring any personal rights on plaintiffs).

Second, the FPA permits Plaintiffs to petition FERC for a finding that the ZEC Program is unlawful because it adopts an unjust or unreasonable rate, rule, or practice within FERC's review authority, and, if they are aggrieved by FERC's decision, to seek judicial review. 16 U.S.C. §§ 824e(a), 825*l*(b); see also *Montana-Dakota Utils. Co.*, 341 U.S. at 250-52 (holding that plaintiff could not pursue action based on allegedly unreasonable electricity rates in lieu of FPA procedure to seek FERC review of rate and

"review of the Commission's orders"). Allowing Plaintiffs to bypass this process entirely is fundamentally inconsistent with the FPA's legislative scheme. See *Montana-Dakota Utils. Co.*, 341 U.S. at 250-52. Third, the FPA gives FERC the right, on its own initiative, to bring an action for an injunction to restrain any act or practice that violates the FPA. 16 U.S.C. §§ 825m(a), (b).

This comprehensive remedial scheme in the FPA, which does not include any right by Plaintiffs to seek injunctive relief against a claimed violation of the FPA, is a powerful indication that Congress did not intend to permit that relief. See *Armstrong*, 135 S. Ct. at 1385; see also *Sandoval*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 74 (1996).[8]

The only provision of the FPA that Plaintiffs offer in opposition to this conclusion is Section 317 (16 U.S.C. § 825p). That provision states that district courts have "exclusive jurisdiction of violations" of the FPA and rules, regulations, and orders issued under it, and of "all suits in equity and actions at law" to enforce any liability or duty created by, or to enjoin any violation of" the FPA or any such rule, regulation, or order. But this section, by its terms, merely establishes *subject matter jurisdiction* in the federal courts, which includes FERC enforcement actions under Section 314 (16 U.S.C. § 825m). It does not impliedly recognize any *cause of action*, including, in particular, a

---

[8]     The Public Utility Regulatory Policies Act ("PURPA"), which was enacted to encourage cogeneration, geothermal, and other small power production, and was codified as part of the FPA, expressly provides for both FERC enforcement and private enforcement actions. 16 U.S.C. § 824a–3(g)(2), (h). As the district court noted (Op. 20-21), this further indicates that Congress did not intend other parts of the FPA to be the basis for similar private rights.

cause of action in equity for a private party to seek an injunction against violations of the

Act. See *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981);

*Montana-Dakota Utils. Co.*, 341 U.S. at 249 (holding, in suit asserting claim under FPA,

that provision of judicial code "vesting jurisdiction in the District Courts . . . does not

create causes of action, but only confers jurisdiction to adjudicate those arising from

other sources").

Plaintiffs' reliance on *Verizon Maryland, Inc. v. Public Service Commission of

Maryland*, 535 U.S. 635, 641-44 (2002), is misplaced for the same reason, as that case

just recognized, in the context of the claim asserted there, that the general federal-

question jurisdiction statute (28 U.S.C. § 1331) gives federal courts *subject matter

jurisdiction* over cases arising under federal law. Indeed, the Court considered

irrelevant, and so refused to address, the contention that because the statute relied on

"does not create a private cause of action to challenge the Commission's order, there is

no jurisdiction to entertain such a suit," stating: "the absence of a valid . . . cause of

action does not implicate subject-matter jurisdiction." *Id.* at 642-43.[9] The same

principle applies to laws that establish federal court jurisdiction for specific statutes.

See, e.g., *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576-77 & n.17 (1979).

Plaintiffs also invoke the courts' supposed longstanding practice of entertaining

injunction actions based on the alleged preemptive effect of the FPA and contend that,

because Congress on multiple occasions amended the FPA without repudiating this

---

[9]    *Verizon*'s further discussion of *Ex parte Young* also does not support Plaintiffs'
position. That discussion addressed whether the asserted claim fell within the *Ex parte
Young* exception to the Eleventh Amendment for prospective equitable relief against an
ongoing violation of federal law, which it did. *Id.* at 645-46.

practice, it is presumed to have adopted the interpretation that the FPA recognizes such actions. Pl. Br. at 28-29. But many of these cases, as well as preemption cases under other statutes, erroneously assumed that the Supremacy Clause itself provided a cause of action. *Armstrong* rejected that assumption, specifically noting that "a 'long-established practice' does not justify a rule that denies statutory text its fairest reading." 135 S. Ct. at 1386-87 (quoting *Verizon*, 535 U.S. at 647). Thus, absent amendments to the FPA specifically indicating an intention to recognize an implied general right to enforce its provisions, Congressional inaction in the face of this jurisprudential evolution provides no support for Plaintiffs' position.

Finally, as *Armstrong* also teaches, the unavailability of a preemption-based injunction under the FPA is confirmed by the judicially unadministrable nature of the statutory criteria that would supply the basis for that claim. In this claim, Plaintiffs admit that Illinois may provide general financial support to certain types of power generation, which will affect wholesale rates (Pl. Br. at 51-12; Doc. 1 at 23-24, pars. 51-52), but they contend that the ZEC Program goes too far by "distorting" such rates in a manner that defeats the capacity auctions' purpose (*id.* at 20-21, pars. 44-45, 47). This attempted distinction refutes Plaintiffs' position, for it necessarily implicates the type of expertise and "judgment-laden standard" the FPA entrusts to FERC. See *Montana-Dakota Utils. Co.*, 341 U.S. at 250-52; see also *Armstrong*, 135 S. Ct. at 1385 (holding that Congress, by enacting Medicaid Act § 30(A), "wanted to make the agency remedy that it provided exclusive," thereby achieving "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking") (citation and internal quotation marks omitted). Thus, courts

25

may not supplant FERC's responsibility to make subtle judgments as to what practices affecting wholesale rates are "just and reasonable" — a standard that is quintessentially unadministrable by the courts. *Montana-Dakota Utils. Co.*, 341 U.S. at 264-65; see also *Armstrong*, 135 S. Ct. at 1385.

## III. Plaintiffs Did Not Allege a Valid Claim that the FPA Preempts Illinois' ZEC Program.

Even if Plaintiffs have a preemption cause of action, their claim that Illinois' ZEC Program is preempted by the FPA is without merit as a matter of law. As described above, the ZEC Program promotes the environmental benefits of emission-free nuclear power by unbundling those benefits from electric power itself, giving them an economic value, and allowing their creators to receive that value. Plaintiffs ask the Court to disregard these facts about how the program actually operates and to focus instead on the incidental effects this program may have on prices in FERC-approved auctions for interstate sales of wholesale electricity. Specifically, Plaintiffs alternatively contend that the ZEC Program is field preempted because it invades FERC's sphere of exclusive jurisdiction to set rates for interstate sales of wholesale electricity, and that it is conflict preempted because it interferes with the prices set in RTO auctions for such sales. Neither claim has merit. The ZEC Program does not set prices for wholesale sales of electricity, but instead regulates the generation of electric power and protects the public health of Illinois residents, which are matters reserved to Illinois by the FPA. And any incidental effect on wholesale electricity markets by the program does not actually conflict with the FPA.

## A.    General Preemption Principles

Pursuant to the Supremacy Clause of the U.S. Constitution (U.S. Const. art. 6, cl. 2),  federal law preempts state law, rendering it invalid, only when:  (1) the express language of a federal statute declares that preemption;  (2) Congress intends the federal government to occupy a field exclusively, such as when the federal regulatory scheme is so pervasive that it may be assumed Congress "left no room for the States to supplement it"; or (3) state law actually conflicts with federal law because it is impossible to comply with both, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co.*, 496 U.S. 72, 78-79 (1990) (citations and internal quotation marks omitted); see also *Planned Parenthood of Ind.*, 699 F.3d at 984.

Both of Plaintiffs' preemption theories require the Court to determine the scope of FERC's jurisdiction under the FPA.  Plaintiffs' field preemption claim further requires the Court to define the scope of FERC's *exclusive* jurisdiction, which, as described below, is substantially narrower than its general regulatory jurisdiction.

When Congress acts in an area of traditional state authority, there is a strong presumption that it does not intend to limit that authority. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008); see also *Patriotic Veterans, Inc. v. Ind.*, 736 F.3d 1041, 1048 (7th Cir. 2013).  That presumption is enshrined in the FPA, which states that federal regulation extends "only to those matters which are not subject to regulation by the States," 16 U.S.C. § 824(a), and that FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy," 16 U.S.C. § 824(b)(1).  Even when Congress establishes federal authority in an area where States have historically exercised their

police powers, the continued exercise of those powers will not be deemed to conflict with federal law, and therefore be displaced, unless it does "'major damage' to clear and substantial federal interests." *Patriotic Veterans, Inc.*, 736 F.3d at 1050; see also *Planned Parenthood*, 699 F.3d at 949. These principles are directly relevant here.

Plaintiffs' preemption claims must also be evaluated in light of the FPA's unique structure, which establishes a system of shared regulatory authority between state and federal government. See *Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*, 489 U.S. 493, 513 (1989) ("In analyzing whether Kansas entered a pre-empted field, we must take seriously the lines Congress drew in establishing a dual regulatory system").[10] That structure is especially important because, as described above, the FPA expressly reserves certain areas of authority to the States, specifically including the regulation of power generation. See also *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015) (noting that NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way"). Thus, just as States may not operate in the field of FERC's exclusive jurisdiction, FERC's authority under the FPA cannot be read so broadly that it encroaches on the States' specifically reserved authority under the FPA.

By adopting a structure of shared regulatory authority, the FPA also established a system in which each sovereign's exercise of its responsibilities will inevitably affect the other's, preventing a "clear division between areas of state and federal authority"

---

[10]     While *Northwest Central Pipeline* involved the Natural Gas Act (the "NGA"), not the FPA, "the relevant provisions of the two statutes are analogous," and the Supreme Court "has routinely relied on NGA cases in determining the scope of the FPA, and vice versa." *Hughes*, 136 S. Ct. at 1298 n.10.

in all situations. *Oneok*, 135 S. Ct. at 1601. In this area, therefore, courts "must proceed cautiously, finding pre-emption only where detailed examination convinces [them] that a matter falls within the pre-empted field as defined by [Supreme Court] precedents." *Id.* at 1599; see *Nw. Cent. Pipeline*, 489 U.S. at 512 (stating that, "[t]o avoid encroachment on the powers Congress intended to reserve to the States," courts should not "'by an extravagant . . . mode of interpretation push powers granted over transportation and rates so as to include production'") (quoting *FPC v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 513-14 (1949)).

### B. The FPA Does Not Invalidate Illinois' ZEC Program Under Field-Preemption Principles Because the Program Does Not Have the Aim or Effect of Usurping FERC's Authority to Determine Just and Reasonable Rates for Wholesale Sales of Power.

Plaintiffs' field preemption claim fails because Illinois' ZEC Program does not set rates for interstate sales of wholesale electricity. Instead, the program operates firmly within the realm that the FPA expressly reserves to the States, including the authority to regulate power generation. 16 U.S.C. § 824(a), (b). Illinois' ZEC Program has the valid aim of encouraging environmentally preferable power generation. And neither the fact that the program may "affect" FERC-regulated rates for interstate sales of wholesale electricity, nor the fact that the program is tangentially "connected" to sales of wholesale power, brings it within FERC's exclusive authority under the FPA.

Analysis of Plaintiffs' claims is informed by a trilogy of recent Supreme Court cases: *Oneok*, *EPSA*, and *Hughes*. Briefly, in *Oneok*, involving the NGA, the Court held that field preemption did not bar state-law antitrust claims alleging that the defendants submitted false information to the natural-gas indices that affect both retail and

29

wholesale prices for natural gas.  135 S. Ct. at 1599.  In *EPSA*, the Court upheld a FERC rule that addressed wholesale price-spikes and grid reliability concerns during times of high demand for electricity through a "demand response" mechanism, pursuant to which parties who committed to reduce their electric demand, including retail customers, could bid those commitments into wholesale energy auctions, just like energy generators, thereby helping match supply and demand without relying on greater power generation. 136 S. Ct. at 767.  And in *Hughes*, the Court held that FERC's authority to regulate wholesale electricity rates preempted a Maryland program to promote the creation of a new power-generating facility by guaranteeing that, for its sales of electric capacity in RTO auctions, it would receive a state-mandated price, rather than the auction clearing price, as the result of payments from the State's utilities under the "contracts for differences." 136 S. Ct. at 1299.

1. **The Target of the ZEC Program Is the Generation of Environmentally Beneficial Energy, Not Setting Rates for Wholesale Electricity Sales.**

A claim that state law is field preempted by the FPA requires the court to consider "the *target* at which the state law *aims*," and in particular whether state measures are "aimed directly" at matters within FERC's exclusive jurisdiction, or instead at "subjects left to the States to regulate."  *Oneok*, 135 S. Ct. at 1599-1600 (original emphasis omitted) (quoting *Nw. Cent. Pipeline*, 489 U.S. at 94).  Here, the relevant regulatory authority reserved to the States by the FPA includes power generation specifically, as well as protection of public health generally. 16 U.S.C. §§ 824(a), (b)(1); see also *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960).  The ZEC Program validly targets those areas of reserved state authority by seeking to preserve emission-free

power generation by nuclear plants that otherwise would likely cease operations, likely leading to millions of tons of avoidable carbon dioxide emissions and other airborne pollutants from non-nuclear power plants.

Plaintiffs admit that promoting environmentally beneficial power generation is a valid state goal, consistent with the FPA. Pl. Br. at 51. See also *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013). Plaintiffs likewise acknowledge the validity of REC programs, whose "purpose . . . is to induce new entry by renewable generators," *Id.* at 51-52. Plaintiffs insist, however, that the ZEC Program does not similarly have a valid purpose. Yet the validity of Illinois' goals cannot plausibly depend on whether the State seeks to encourage *new* zero-emission generation from renewable energy sources, or to preserve zero-emission generation from *existing* nuclear power plants. There is no basis, therefore, to claim that the ZEC Program's real aim is to invade FERC's exclusive jurisdiction to set wholesale electricity rates.

Plaintiffs' complaints did include conclusory allegations suggesting that the ZEC Program's purpose was not really to promote environmental benefits, but instead to save Illinois jobs and tax revenues. Doc. 1 at 26, ¶ 58. As the district court observed, though, Plaintiffs did not allege that the ZEC Program's "purpose" was to invade FERC's exclusive authority. Op. at 26 n.27. And in light of the undeniable environmental benefits of the Act, Plaintiffs' conclusory assertion that the Act "is not environmental legislation," but "is just a mechanism to provide out-of-market funding" to two Exelon nuclear plants in Illinois (Doc. 1 at 26, ¶ 58), cannot be considered a legally sufficient allegation that the program's aim is one prohibited by the FPA. Nor does describing the

31

ZEC Program as providing "out-of-market funding" for nuclear power generation (which is typically also true for REC programs) plausibly justify the inference that the ZEC Program's actual aim was not to promote power generation and protect public health, but instead to usurp FERC's exclusive right to set wholesale rates. In any event, Plaintiffs' conclusory allegations about the purpose of the ZEC Program do not satisfy the pleading standards for stating a valid claim. They certainly do not justify disregarding the evident environmental benefits of the program.

The Supreme Court rejected a similar contention in *Northwest Central Pipeline*. There the Court upheld, against field- and conflict-preemption challenges under the NGA, a state regulation to prevent waste and protect the shared production rights of multiple producers from common natural gas pools (referred to as "correlative rights") by cancelling the rights of producers who engaged in prolonged underproduction. 489 U.S. at 497-98. After holding that the effect of this regulation on interstate sales did not make it field preempted under the NGA, *id.* at 514, the Court rejected the contention that its purpose was "suspect" because it "will worsen correlative rights problems if in fact underages are cancelled." *Id.* at 519. Stating that the state agency's assumption that the regulation "would likely increase production" was not "implausible," the Court held: "We cannot conclude that [the regulation] lacks a proper state purpose, nor that it is so weakly related to such purpose that, because of its effect on federally regulated purchasing practices and pricing, it must be pre-empted." *Id.*

A similar conclusion is warranted here. Notwithstanding Plaintiffs' conclusory allegation that the ZEC Program "is not environmental legislation," Doc. 1 at 26, ¶ 58, it cannot be said that the program "lacks a proper state purpose" or that it is "so weakly

related" to that purpose that the Court may find that its true target, or aim, was to usurp FERC's exclusive jurisdiction to set wholesale electricity rates.

### 2. The ZEC Program Does Not Have the Effect of Setting Rates for Wholesale Electricity Sales.

There is likewise no merit to Plaintiffs' contention that the ZEC Program is field preempted because it has the prohibited effect of setting rates for wholesale sales of electricity. It is true that a valid target for a state law is not sufficient to sustain it when the means chosen to reach that target have the effect of usurping FERC's exclusive authority to set wholesale electricity rates. *Hughes*, 136 S. Ct. at 1298. But Plaintiffs are mistaken to claim that the ZEC Program is field preempted "because it replaces the FERC-determined just and reasonable prices for wholesale electricity with a different rate determined by the State." Pl. Br. at 3; see also *id.* at 18.[11]

### a. Not All of FERC's Jurisdiction is Exclusive Jurisdiction.

It is important to clarify that FERC's *exclusive* jurisdiction, which is the basis for Plaintiffs' field preemption claim, is significantly narrower than they assert. It applies to wholesale rate-setting as such, but not to everything that affects wholesale rates or is tangentially connected to them. And the FPA explicitly provides that it does not apply to the regulation of power generation. 16 U.S.C. § 824(b)(1). Thus, the Court must carefully distinguish between the scope of FERC's general regulatory authority regarding the transmission or wholesale sale of electricity in interstate commerce, and its *exclusive* jurisdiction in that area.

---

[11]     Plaintiffs state that "the district court acknowledged that the ZEC program . . . effectively replac[es] the auction clearing price." Pl. Br. at 44 (quoting Op. 10). But the district court was just quoting that characterization in Plaintiffs' complaint, which it then rejected.

As the Supreme Court observed in *EPSA*, "the wholesale and retail markets in electricity are inextricably linked." 136 S. Ct. at 766. Consequently, a variety of activities can affect matters within the regulatory authority of both FERC and the States. See *Oneok*, 135 S. Ct. at 1601. For example, power generation affects wholesale prices, and, conversely, capacity prices in wholesale markets influence generation. See also *EPSA*, 136 S. Ct. at 774 (noting that "markets in all electricity's inputs — steel, fuel, and labor most prominent among them — might affect generators' supply of power," and that "markets in just about everything — the whole economy, as it were — might influence [local utilities'] demand") (citation omitted). But the Supreme Court has rejected the notion that "there is, or should be, a clear division between areas of state and federal authority." *Oneok*, 135 S. Ct. at 1601; see also *id.* ("that Platonic ideal does not describe the natural gas regulatory world"). It has likewise rejected the proposition that FERC has *exclusive* authority to regulate any activity that affects matters within its jurisdiction. *Id.* at 1600 (holding that FERC's exclusive jurisdiction to set wholesale rates does not extend to "every other form of state regulation that affects those rates"); see also *Northwest Central Pipeline Corp.*, 489 U.S. at 514; *Northeast Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 893 (7th Cir. 2013); *id.* at 895 ("federal law leaves a role for state law in wholesale power regulation"). That is even more obvious when States exercise authority expressly reserved to them by the FPA. *Hughes*, 136 S. Ct. at 1290.

For field preemption purposes, therefore, it is necessary to define the scope of FERC's *exclusive* jurisdiction under the FPA. That definition finds its source primarily in the text of the FPA itself, which gives FERC the authority to *determine* whether

certain rates, charges, rules, and practices are *just and reasonable*, but does not give it exclusive authority to *adopt* or *establish* any rule, charge, or practice that affects the interstate transmission or wholesale sale of electricity.

Based on the FPA's text, it is well established that, for matters within FERC's jurisdiction relating to the interstate transmission or wholesale sale of electricity, only FERC may *determine* whether a wholesale rate is just and reasonable. See *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371 (1988) ("FERC has exclusive authority to *determine* the reasonableness of wholesale rates.") (emphasis added). By contrast, the text of the FPA does not support the conclusion that FERC alone may *adopt*, or *regulate*, any practices that *affect* wholesale rates, and the Supreme Court has repeatedly rejected that very proposition. *EPSA*, 136 S. Ct. at 774 (noting that this interpretation of the FPA would give FERC "near-infinite" jurisdiction); see also *Oneok*, 135 S. Ct. at 1600. Those holdings recognize that, given the interrelated nature of power generation, transmission, wholesale sales, and retail sales, it is inevitable that actions within the scope of the States' reserved authority will affect activity within FERC's authority, but are not for that reason alone preempted.

Indeed, it would be absurd to conclude that FERC alone may *adopt* rules or practices that *affect* wholesale rates, for then States could not even adopt such rules or practices that *are* just and reasonable — and could not do so even if they related to their reserved authority over power generation. It is not surprising, therefore, that the Supreme Court has rejected that reading of the FPA. See *Oneok*, 135 S. Ct. at 1600 ("no one could claim that FERC's regulation of this physical activity [reporting a price to a specialized journal] for purposes of wholesale rates forecloses every other form of state

regulation that *affects* those rates") (emphasis added);[12] see also *Hughes*, 136 S. Ct. at 1290 (reaffirming that "States may regulate within their assigned domain even when their laws incidentally affect areas within FERC's domain").

Of course, as a practical matter only one regulatory body can determine whether a *particular rate* for a wholesale sale of electricity is just and reasonable, which explains why FERC's rate-setting authority for such sales is exclusive. Thus, the Supreme Court has repeatedly confirmed that FERC has exclusive jurisdiction to set rates — i.e., to determine the just and reasonable rate — for wholesale sales of electricity. *Hughes*, 136 S. Ct. at 1291; *EPSA*, 136 S. Ct. at 773; *Miss. Power & Light*, 487 U.S. at 371. And that regulatory activity has a straightforward, common-sense meaning: "to establish the amount of money a [person] will hand over in exchange for power." *EPSA*, 136 S. Ct. at 777; see also *id.* at 778 ("Our decisions uniformly speak about rates, for electricity and all else, in only their most prosaic, garden-variety sense.").[13]

### b.   The ZEC Program Does Not Set Wholesale Energy Rates.

Under this common-sense definition of rate-setting, the ZEC Program does not trespass on FERC's sole right to set rates for wholesale sales of electric power. Plaintiffs agree that "a regulation sets retail rates if it 'establish[es] the amount of money a consumer will hand over *in exchange for power*.'" Pl. Br. at 50 (quoting *EPSA*, 136 S. Ct.

---

[12]    Dissenting in *Oneok*, Justice Scalia took the position that, under the FPA, "[i]f the Federal Government may regulate a subject, the States may not." 135 S. Ct. at 1603 (Scalia, J., dissenting). But the Court rejected that position, holding that areas in which FERC may regulate because they involve wholesale electricity rates are not automatically within its exclusive jurisdiction. *Id.* at 1600.

[13]    *EPSA* involved a claim that FERC was invading the States' exclusive authority to set retail electricity rates, 136 S. Ct. at 775, but nothing suggests that its definition of rate-setting depends on the wholesale or retail nature of the transaction.

at 777, emphasis added). But that is not what the ZEC Program does. The program does not specify the amount of compensation to be paid for the exchange of wholesale electricity. Instead, it creates new state-law property interests in the environmental benefits of zero-emission nuclear power that are separated from that power, and it gives the nuclear power generators that create those benefits the right to sell those interests at a defined price that reflects their environmental value. Act, § 1.5.

In *California Public Utilities Commission*, 133 FERC ¶ 61,059, FERC ruled: "RECs are separate commodities from the capacity and energy produced . . . . If a state chooses to create these separate commodities, *they are not compensation for capacity and energy*." *Id.*, par. 31 n.62 (2010) (emphasis added) (citing *American Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003)). Similarly here, each aspect of the ZEC Program operates within the scope of the States' authority over power generation and outside of FERC's exclusive authority to set rates for wholesale power sales. See *Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 190 (2d Cir. 2008) (per curiam) (rejecting claim that FPA field preempted sales of unbundled RECs pursuant to state law, and noting that FERC itself concluded that "'States . . . have the power to determine who owns the [RECs] in the initial instance and how they may be sold or traded'") (quoting *American Ref-Fuel*, 105 FERC ¶ 61,004, at 61,007 (2003); see also *WSPP Inc.*, 139 FERC ¶ 61,061, pars. 23-24 (2012) (discussed below).

*Hughes* is not to the contrary. There, the Supreme Court held that the FPA preempted a Maryland program to support more local power-generating capacity by replacing the rate for wholesale capacity sales set in FERC-approved auctions with a state-determined rate for those sales. 136 S. Ct. at 1297. The device this program used

37

was a state-mandated "contract for differences," under which local utilities did not receive any electric capacity but were required, if the generator's capacity bid cleared the RTO auction, to pay it an amount in addition to what it received from the auction. *Id.* at 1294-95. In effect, the program mandated side-payments for auction sales of whole-sale capacity. The Court held that it was preempted because it "disregard[ed]" a FERC-approved rate for wholesale sales of energy capacity "[b]y *adjusting* an interstate wholesale rate" set by the RTO auction. *Id.* at 1297, 1299 (emphasis added). The Court explained that because "[t]he contract for differences does not transfer ownership of capacity," but was conditioned on such a transfer in the auction, its effect was to substitute the state-mandated price for the auction price: "Maryland's program guarantees CPV [the generator] the contract price *rather than* the auction clearing price." *Id.* at 1295, 1297 (emphasis added). *Hughes'* holding therefore does not extend to Illinois' ZEC Program, which does not set the effective price for interstate sales of wholesale power, but instead exclusively regulates separate sales of ZECs, which represent the environmental benefits of nuclear power generation.

*Hughes* carefully noted the limited scope of its decision, stating that it did "not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, [or] direct subsidies," and that "[s]o long as a State does not *condition* payment of funds on capacity *clearing* the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Id.* at 1299 (emphasis added). Reiterating the point, the Court stated that "[n]othing in this opinion should be read to foreclose Maryland and other States from encouraging production of new or clean

generation through measures 'untethered to a generator's wholesale market participation.'"  *Id.* at 1299 (quoting respondents' brief).  That is just what the ZEC Program does.  In short, *Hughes*, contrary to Plaintiffs' reading of it, holds that a state program invades FERC's exclusive jurisdiction, and is subject to field preemption, when it determines applicable rates for wholesale sales of energy, not when it regulates some other transaction or aspect of the electric energy industry, including power generation, in a way that affects wholesale rates.

> ### c. The ZEC Program Does Not Usurp FERC's Exclusive Jurisdiction over Charges, Rules and Practices "In Connection With," or "Affecting," Wholesale Electricity Sales and Rates.

Plaintiffs nonetheless insist that FERC has "*broad* and exclusive authority over" interstate sales of wholesale electricity, "including regulation of any charges '*in connection with*' wholesale rates and any 'rules and regulations *affecting* or pertaining to such rates or changes.'"  Pl. Br. at 4 (emphasis added).  Plaintiffs then argue that the ZEC Program falls within this exclusive authority because it "affects" and is "connected" to wholesale rates and auction markets in various ways, including by supporting the *generation* of electricity that must be sold in wholesale energy auctions, subsidizing electric generating *capacity* that must be bid into the wholesale capacity auctions, and setting the ZEC price at an amount that varies depending on a formula which uses, as inputs, a composite of capacity auction results and indexes that provide an estimate of future power prices.  Pl. Br. at 7-9.  This argument, based on indirect effects and tangential connections between the ZEC Program and sales of wholesale power, is unpersuasive.  It attributes to the statutory terms "affecting" and "in connection with"

meanings that are inconsistent with the FPA's express reservation to the States of the authority to regulate power generation, and that the Supreme Court and FERC have both rejected.

As the Supreme Court has explained, terms like "affecting" and "in connection with" literally have a "near-infinite breadth." *EPSA*, 136 S. Ct. at 774; see also *id.* ("The phrase 'in connection with' is essentially indeterminat[e] because connections, like relations, stop nowhere") (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2200 (2013)) (internal quotation marks omitted). Thus in *EPSA* the Supreme Court, relying in part on FERC's own adoption of the same limitation (discussed below), adopted a "common-sense construction" of the FPA that "limit[s] FERC's 'affecting' jurisdiction to rules or practices that '*directly* affect the [wholesale] rate.'" *Id.* (citation omitted, emphasis in original).[14]  The Court then held that FERC acted within this authority by adopting its demand-response rule — under which electricity consumers may bid into wholesale markets commitments to reduce their *demand* — because "every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules." *Id.* at 776.  This careful limitation on the Court's holding undermines Plaintiffs' assertion that FERC has broad — and exclusive — authority over any practices affecting wholesale sales.

---

[14]    Underling the point, the Court in *EPSA* observed (136 S. Ct. at 774):

[M]arkets in just about everything — the whole economy, as it were — might influence [local utilities'] demand.  So if indirect or tangential impacts on wholesale electricity rates sufficed, FERC could regulate now in one industry, now in another, changing a vast array of rules and practices to implement its vision of reasonableness and justice.  We cannot imagine that was what Congress had in mind.

Plaintiffs' similar interpretation of FERC's statutory jurisdiction over "rates or charges for or in connection with" the interstate transmission or wholesale sale of electricity (16 U.S.C. § 824d(a)) is also incorrect. In particular, FERC, in a factual setting like the present one, adopted a carefully circumscribed interpretation of its jurisdiction over charges "in connection with" wholesale sales, holding that it does not extend to a transaction "that is *independent* of a wholesale electric energy transaction." *WSPP, Inc.*, 139 FERC ¶ 61,061, par. 24 (emphasis added). Given the indefinite nature of the qualifier "in connection with," that interpretation by FERC of its own statutory authority is entitled to near controlling weight. See *City of Arlington v. FCC*, 133 S. Ct. 1863, 1871, 1874-75 (2013).

In *WSPP, Inc.*, FERC reaffirmed its jurisdictional reasoning in *Edison Electric Institute*, 69 FERC ¶ 61,344 (1994), which addressed the relationship between FERC's jurisdiction under the FPA and sales of sulfur dioxide emission allowances issued under the 1990 Clean Air Act Amendments (described above at 8, n.4). As *WSPP, Inc.* explained, *Edison Electric* held that the sale of an emission allowance "may 'affect' the rates a utility charges 'for or in connection with' jurisdictional service," and that "if a wholesale sale of electric energy by a public utility *requires* the use of an emissions allowance, that sale, and the cost of allowances in connection with it, is subject to [FERC] review under section 205" to determine whether it is just and reasonable." *WSPP, Inc.*, 139 FERC ¶ 61,061, par. 23 (emphasis added). On the other hand, FERC held, "if the sale or transfer [of the allowance] occurs *independent* of a sale of electric energy for resale in interstate commerce, it is outside of Commission review under FPA section 205." *Id.* (emphasis added). See also *American Ref-Fuel Co.*, 105 FERC ¶ 61,004,

par. 23 (2003) ("States, in creating RECs, have the power to determine who owns the REC in the initial instance, and how they may be sold or traded").

Applying that jurisdictional principle to the sale of "bundled" and "unbundled" RECs (i.e., RECs sold with, and without, the associated energy), *WSPP, Inc.* held that "when an unbundled REC transaction is *independent* of a wholesale electric energy transaction, we conclude, based on available information, that [it] does not *affect* wholesale electricity rates, and the charge for the unbundled RECs is not a charge *in connection with* a wholesale sale of electricity." *Id.*, pars. 5, 24 (emphasis added). Thus, FERC ruled, "an unbundled REC transaction that is *independent* of a wholesale electric energy transaction does not fall within the Commission's jurisdiction under sections 201, 205 and 206 of the FPA." *Id.*, par. 24 (emphasis added). Conversely, FERC held that it does have jurisdiction "[i]n a bundled REC transaction, . . . , where a wholesale energy sale and a REC sale take place *as part of the same transaction*," in which case "RECs are charges *in connection with* a jurisdictional service that *affect* the rates for wholesale energy." *Id.* (emphasis added).[15]

Thus, FERC has adopted an "independent transaction" test — which turns on whether a sale of wholesale electricity requires the sale of another good or service as part of that same transaction — to define the scope of its review jurisdiction concerning rules, regulations, and practices "affecting" or "in connection with" wholesale electricity sales and rates. And it applied that test to a situation that is materially indistinguishable

---

[15]     FERC added that this is true for bundled sales, comprising a single transaction, even if "the contract price is allocated separately between the energy and RECs" and the parties use "separate documents." 139 FERC ¶ 61,061, par. 26.

from the one presented here.[16]

Consistent with the deference owed to FERC's interpretation of the scope of its authority under the FPA, judicial decisions follow that interpretation. Thus, in *Wheelabrator Lisbon, Inc.*, the Second Circuit rejected a field preemption challenge to a state REC program, noting, among other things, that FERC did "not evince an intent to occupy the relevant field — namely, the regulation of renewable energy credits," and instead "explicitly acknowledge[d] that state law governs the conveyance of RECs." 531 F.3d at 190. See also *Coalition for Competitive Elec. v. Zibelman*, ___ F. Supp. 3d ___, 2017 WL 3172866, *12-13 (S.D. N.Y., July 25, 2017).

*Hughes* applied this narrow interpretation by FERC of its jurisdiction relating to charges in connection with the interstate transmission or wholesale sale of electricity. Specifically, *Hughes* held that the contracts for differences usurped FERC's exclusive review authority under Section 205 because the payments they mandated were not *independent* of a wholesale sale, but instead were expressly *conditioned* on such a sale. *Id.* at 1297, n.9 ("because the payments are *conditioned on* CPV's capacity clearing the auction — and, accordingly, on *CPV selling that capacity* to PJM — the payments are certainly 'received . . . in connection with' interstate wholesale sales to PJM") (emphasis added). Thus, according to the Court, the "fatal flaw" in Maryland's program was that the contract-for-differences payments were not *independent* of wholesale sales on the

---

[16] The nature of the electric power industry explains why FPA Section 205 gave FERC authority to review rates and charges "for *or* in connection with" the interstate transmission or wholesale sale of electricity without intending a vast expansion of its regulatory powers. As detailed above (5, n.2), certain ancillary services beyond just the sale of electricity itself (e.g., voltage regulation) are necessary to ensure electricity's reliable transmission, and Congress naturally would have wanted to give FERC authority to review the rates and charges for these services as well.

RTO auction (i.e., "untethered to a generator's wholesale market participation"), but instead were expressly "condition[ed] . . . on capacity clearing the auction." *Id.* at 1299.

Under this "independent transaction" test, ZEC payments, which are unbundled from the associated electricity and sold in transactions independent from a wholesale sale of that electricity, are not within FERC's jurisdiction. Therefore, they cannot be field preempted under the FPA.

> ### d. Surface Similarities Between ZEC Payments and the Payments Held Preempted in *Hughes* Do Not Bring Them Within FERC's Exclusive Jurisdiction.

Attempting to overcome these defining elements of *Hughes*' holding, Plaintiffs contend that the ZEC Program is similar in many respects to the Maryland program that *Hughes* invalidated, and so must meet the same fate. Thus, Plaintiffs assert it is irrelevant whether the ZEC Program formally *requires* the selected nuclear power plants to sell their capacity or power in RTO auctions because, as a practical matter and under applicable RTO rules, "[a]ll of the electricity that these favored producers generate *must be bid into and clear* the PJM and MISO auctions." Pl. Br. at 43 (emphasis modified); see also *id.* at 49; Doc. 83 at 13. This attempt fails because it misapprehends the scope of FERC's exclusive jurisdiction under the FPA and the nature of the payments provided by the ZEC Program.

It cannot be the case under the FPA that a power generator's mere *production* of electricity, which is explicitly placed within the *States'* regulatory authority, establishes that such regulation is field preempted. The absurdity of this position is sufficient to reject it. It not only eliminates the State's statutorily reserved authority over power generation, but also conflicts with *Hughes*, *Wheelabrator Lisbon, Inc.*, and *WSPP, Inc.*,

by treating *independent* transactions — one for electricity, the other for ZECs — as a single, *dependent* transaction.

Unlike the statutory program in *Hughes*, which conditioned the generator's receipt of contract-for-differences payments on its capacity bids "clearing the auction," 136 S. Ct. at 1299, Illinois' ZEC Program only requires selected nuclear power plants to *generate* power. 20 ILCS 3855/1–75(d–5). That requirement, which is not conditioned on clearing an RTO auction, serves to ensure that the environmental benefits of the program are achieved. Naturally, the program anticipates that the selected plants will seek to sell the power that they generate. But the ZEC payments are not *conditioned* on those bids clearing the wholesale auctions because, unlike the situation in *Hughes*, the subject matter of the relevant transaction, consistent with the ZEC Program's goal, is the environmental benefit created by a certain type of power generation, not the wholesale sale of power or capacity.

Nor can it matter that FERC-approved rules may require generating capacity to be *bid* into the RTOs' capacity auctions and, if those bids *clear*, require energy-auction bids to sell the corresponding power. See Pl. Br. at 49; IMM Amicus Br. at 3; Doc. 88 at 10-11. The same requirement to *generate* power applies equally to RECs, which also establish environmental-benefit subsidies for the production of emission-free power, and which Plaintiffs admit are not within FERC's exclusive jurisdiction. Pl. Br. at 51-54. That REC producers typically also sell this power does not change the nature of the state-law property interest exchanged or the payment for it. See *Wheelabrator Lisbon,*

*Inc.*, 531 F.3d at 190; *WSPP, Inc.*, 139 FERC ¶ 61,061, par. 24.[17]

Plaintiffs unconvincingly contend that ZECs should be considered different in this regard from RECs. Pl. Br. at 51-54. In the district court, Plaintiffs maintained that RECs differ from ZECs because they "are independent from wholesale electricity sales." Doc. 83 at 6-7. Tellingly, they have now abandoned that argument. Instead, they assert only that ZECs and RECs are materially different because "the ZEC subsidy is tethered to wholesale prices," whereas "REC prices are essentially determined by supply and demand of renewable energy." Pl. Br. at 52. Yet this claimed difference is irrelevant under Plaintiffs' own analysis, in which FERC's exclusive jurisdiction field preempts any subsidy program that provides payments to power generators who actually sell that power. See *Zibelman*, 2017 WL 3172866, *12-13 ("The death knell for Plaintiffs' field-preemption argument is their failure to distinguish ZECs from RECs. . . . Although there are factual differences between ZECs and RECs, none is legally significant.").

In any event, there is no merit to Plaintiffs' argument that the price adjustment feature of ZEC payments condemns the ZEC Program under *Hughes*. The Court said its opinion should not be read "to foreclose Maryland and other States from encouraging production of new or clean generation through measures *untethered* to a generator's

---

[17]     The RTO rules, unlike the situation in *Hughes*, do not require any capacity or energy that is *offered* into PJM's capacity market to *clear*. In fact, as Plaintiffs admit (Appdx. 25, par. 55), one of Exelon's Illinois nuclear power plants did *not* clear PJM's recent capacity auctions, so it will not receive capacity revenues for the relevant period and is not required to bid the related electricity into the power auctions. For this reason as well, Plaintiffs' strained "price collar" characterization of the ZEC price is not only inapposite but factually inaccurate. In addition, nuclear power plants selected in the ZEC Program may enter into bilateral contracts *outside* the RTO auctions, in which event those contracts, not prices set in those auctions, determine the financial consequences to them of making that capacity available. See *Hughes*, 136 S. Ct. at 1292.

wholesale *market participation*."  136 S. Ct. at 1299 (emphasis added, citation and internal quotation marks omitted).  Plaintiffs attempt to alter this analysis, arguing that the ZEC Program, unlike a REC program, is preempted because the price adjustment makes its payments "tethered to wholesale *prices*" in RTO auctions.  Pl. Br. at 7, 52 (emphasis added).  But that is not the relevant analysis, which, as discussed above, turns on whether a REC or ZEC is sold in a transaction that is *independent* from an auction sale of electricity or, instead, is *conditioned* on such a wholesale sale of electricity.  The manner for determining the REC or ZEC price is not material.  Defendants note, however, that the ZEC price-adjustment serves the perfectly sensible objective of reducing the costs borne by ratepayers to subsidize emission-free power when higher prevailing energy- and capacity-market prices increase the costs passed through to ratepayers at the retail level.

Finally, even if Plaintiffs' price-tethering argument had any validity, it does not follow that they are entitled to the remedy they seek:  invalidating the ZEC Program in its entirety.  To the contrary, if it is the price adjustment that renders the ZEC Program infirm, that provision of the Act should be invalidated without also nullifying the entire ZEC Program.  See *Wyoming v. Oklahoma*, 502 U.S. 437, 459 (1992).

### C.  The FPA Does Not Invalidate Illinois' ZEC Program Under Conflict-Preemption Principles.

The district court also properly rejected Plaintiffs' alternate contention that the ZEC Program is conflict preempted by the FPA.  To sustain that claim, Plaintiffs must show an "actual conflict" between the program and federal law.  *Altria Grp., Inc.*, 555 U.S. at 76-77; see also *English*, 496 U.S. at 90; *Mason v. SmithKline Beecham Corp.*, 596

F.3d 387, 390 (7th Cir. 2010). They have not done so. A mere "hypothetical or potential conflict is insufficient" to meet this requirement. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); see also *Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 662 (7th Cir. 2010). But that is all Plaintiffs alleged here.

As described above, the ZEC Program regulates economic transactions in state-law property interests (ZECs) that represent the environmental benefits for a specific type of emission-free power, which are outside the scope of FERC's authority over wholesale electricity rates and firmly within the States' express authority under the FPA. Actions in compliance with the ZEC Program therefore do not actually conflict with any mandate or prohibition in the FPA.

Nor is there any merit to the suggestion that the ZEC Program actually conflicts with the FPA because actions pursuant to the program may "affect" wholesale electricity rates. Although the FPA requires FERC to determine whether rules and practices "affecting" rates or charges for sales within its jurisdiction are "just and reasonable," 16 U.S.C. §§ 824d, 824e, the Supreme Court, as noted above, has limited the scope of that "near-infinite" jurisdiction to reach only rules and practices that "directly affect" a wholesale rate. *EPSA*, 136 S. Ct. at 774. And, as explained above (at 40-41), *EPSA* gives that term a practical scope much narrower than Plaintiffs do, holding that FERC's demand-response plan fell within this authority because "*every* aspect of the regulatory plan happens *exclusively* on the wholesale market and governs *exclusively* that market's rules." *Id.* at 776 (emphasis added). By contrast, no action taken under the ZEC Program occurs in the FERC-regulated wholesale market.

Again, it is significant that FERC itself expressly acknowledges this distinction

and has ruled that state renewable-energy programs that divorce generation-related environmental benefits from electricity itself, and that regulate transactions in those benefits without also regulating wholesale electricity sales, are outside its regulatory authority.  See *WSPP Inc.*, 139 FERC ¶ 61,061, pars. 18, 23-24; see also *Wheelabrator Lisbon, Inc.*, 531 F.3d at 190.

Even if, however, actions taken under the ZEC Program could be considered to directly affect wholesale rates within FERC's jurisdiction, Plaintiffs' claim founders on the absence of any FERC order that actually conflicts with the Act or with any FERC orders entered under the FPA.  And the hypothetical possibility of such an order cannot be the basis to establish an actual conflict.  See *Rice*, 458 U.S. at 659; *Flying J, Inc.*, 621 F.3d at 662.  Similarly, even if FERC might, after administrative proceedings, conclude that ZEC payments are not just and reasonable, that still would not make the ZEC Program conflict preempted.  To the contrary, FERC's ability to make such a finding effectively defeats Plaintiffs' conflict preemption claim.  If the matter is within FERC's jurisdiction, the FPA plainly vests in FERC, not the courts, the responsibility to resolve it.  *Montana-Dakota Utils. Co.*, 341 U.S. at 254.  Saying that the ZEC Program's effects on the wholesale energy market will "distort" that market does not make the issue one the courts may resolve under the rubric of conflict preemption.

The Court should, in any event, reject the position advanced by Plaintiffs and several *amici* supporting them that the FPA mandates a pure free-market, externality-blind philosophy that elevates cost efficiency above all other considerations and is hostile to, or even prohibits, any accommodation of outside policies to protect public health.  (Pl. Br. at 7; Vill. of Old. Mill Creek Br. at 17; Am. Petrol. In-state. Inst. & Natural Gas Ass'n

49

Amicus Br. at 11-13; Energy Economists' Amicus Br. at 11-13; Ill. Chamber of Comm. Amicus Br. at 8.)   The economic advantages of energy production that generates significant environmental externalities are not guaranteed by the FPA or any FERC order under it.   To the contrary, state policies to counter the adverse effects of such environmental externalities, adopted as part of their own authority to regulate power generation, are beyond FERC's authority.

Addressing FERC's and the State's respective authority, the the D.C. Circuit observed in *Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009), that "State and municipal authorities retain the right . . . to limit new construction to more expensive, environmentally-friendly units, or to take any other action in their role as regulators of generation facilities without direct interference from the Commission." Consistent with that principle, FERC, while not assuming an affirmative regulatory policy to protect the environment, has repeatedly accommodated such policies by other government bodies. See, e.g., *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 89 (D.C. Cir. 2014) (upholding parts of FERC Order 1000 authorizing RTOs, in planning transmission facilities, to accommodate state and federal public policies, including ones to encourage renewable energy); FERC Order 1000, 76 Fed. Reg. 49,842, ¶¶ 109, 111, 206-10, 76 Fed. Reg. at 49,861-62, 49,877-78 (2011).[18]   FERC can

---

[18]      See also *S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995) ("States also may seek to encourage renewable or other types of resources through their tax structure, or by giving direct subsidies. . . . *By imposing a tax on fossil generators* or by giving a tax incentive to alternative generation, *states may allow the alternative generation to be more competitive in a cost comparison with fossil-fueled generation.*") (emphasis added); *Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, par. 31 & n.62 ("[A] a state may separately provide additional compensation for *environmental externalities*, outside the confines of, and, in addition to the PURPA avoided cost rate, through the creation of renewable energy credits (RECs).").

do so for the ZEC Program, as well as similar programs.  Thus, unless FERC takes action that actually conflicts with Illinois' ZEC Program, the Illinois legislature cannot be held to have exceeded its authority by enacting that program.

## IV.  The District Court Correctly Dismissed Plaintiffs' Claim that Illinois' ZEC Program Violates the Dormant Commerce Clause.

The district court also properly dismissed Plaintiffs' claims that Illinois' ZEC Program violates the Commerce Clause.  Under governing law, their pleadings did not validly allege that the ZEC Program actually discriminates against interstate commerce or imposes burdens on interstate commerce that clearly exceed the program's intended environmental benefits.

### A.  General Commerce Clause Principles

Responding to the proliferation of protectionist laws enacted by various colonies before and under the Articles of Confederation, see *Oklahoma v. Hughes*, 441 U.S. 322, 325-26 (1971), the Framers allocated to Congress the authority "to regulate Commerce . . . among the several States."  U.S. Const. Art. I, § 8, cl. 3.  Even when Congress does not affirmatively exercise that power, the Commerce Clause impliedly prohibits state laws that represent "simple economic protectionism," *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 341 (2008), and thus invite "retaliatory measures" by other States, *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).  The classic examples of such laws are embargoes and tariffs, which hoard resources located within a State or exclude goods or services produced in another State, thereby creating jurisdictional barriers to the free flow of commerce among the States.  See *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994).  This implied prohibition against such

state laws is often referred to as the "dormant Commerce Clause." *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017).

"The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values." *Maine*, 477 U.S. at 151. The Commerce Clause "was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *General Motors Corp. v. Tracy*, 519 U.S. 278, 306-07 (1997) (citation and internal quotation marks omitted). Thus, it does not prohibit a State from establishing a program that directly and effectively advances its local public health interests, even if the program incidentally burdens interstate commerce. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472 (1981); *Huron Portland Cement Co.*, 362 U.S. at 443-44; *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995); see also *General Motors Corp.*, 519 U.S. at 307; *Rocky Mountain Farmers Union*, 730 F.3d at 1106. The key distinction is between *economic* protectionism and legislation reasonably designed "to protect the social, *as distinguished from the economic*, welfare of a community." *Breard v. Alexandria*, 341 U.S. 622, 640 (1951) (emphasis added), *separate holding abrogated*, *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 631-32 (1980).

It is true that merely invoking a noneconomic justification is insufficient to sustain a state law that plainly discriminates against interstate commerce. *Clover Leaf Creamery Co.*, 449 U.S. at 473; see also *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981). Thus, where a state law poorly advances its purported noneconomic

goals, and the means selected to do so almost exclusively benefit in-state activity and burden similarly situated out-of-state activity, they violate the Commerce Clause. See *Hunt v. Wash. Apple Advertising Comm'n*, 432 U.S. 333, 350-54 (1977). As the Court stated in *Kassel*,

> Regulations designed for [a] salutary purpose nevertheless may *further the purpose so marginally*, and interfere with commerce so substantially, as to be invalid under the Commerce Clause. . . . [W]here, as here, the State's *safety interest has been found to be illusory*, and its regulations impair significantly the federal interest in efficient and safe interstate transportation, the state law cannot be harmonized with the Commerce Clause.

*Kassel*, 450 U.S. at 670, 672 (plurality opinion) (emphasis added). "The crucial inquiry, therefore, must be directed to determining whether [the law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

In light of this organizing principle, precedent applying the dormant Commerce Clause establishes that a state law is unconstitutional if (1) it patently discriminates against interstate commerce (unless it serves a legitimate local purpose that could not be served as well by available nondiscriminatory means), *Philadelphia*, 437 U.S. at 623-24; *Maine*, 477 U.S. at 151-52; or (2) it regulates even-handedly to effectuate a legitimate local public interest, but its incidental burdens on interstate commerce are clearly excessive in relation to its putative local benefits, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); see also *Park Pet Shop, Inc.*, 872 F.3d at 501-02. Plaintiffs advance both theories.

### B.   The ZEC Program Is Not Subject to Strict Scrutiny on the Basis That It Discriminates Against Interstate Commerce.

Patently discriminatory laws are subject to heightened scrutiny, rendering them virtually *per se* invalid. *Philadelphia*, 437 U.S. at 624. Such discrimination consists of different treatment for similarly situated in-state and out-of-state commercial activity that favors the former over the latter. *General Motors Corp.*, 519 U.S. at 298; see also *Davis*, 553 U.S. at 342-43. Discriminatory laws include, most obviously, those that discriminate on their face, explicitly subjecting goods or services to discriminatory treatment based on their State of origin or destination. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996); *Philadelphia*, 437 U.S. at 624; *Park Pet Shop, Inc.*, 872 F.3d at 501; *Rocky Mountain Farmers Union*, 730 F.3d at 1089. They also include laws whose primary purpose is economic protectionism. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984); *Clover Leaf Creamery Co.*, 449 U.S. at 471 n.15. Finally, a facially neutral law may have a profound discriminatory effect, employing ostensibly neutral rules to promote a noneconomic purpose that, in practice, powerfully differentiate between similarly situated in-state and out-of-state products or activity based on their location or origin. *Hunt*, 432 U.S. at 350-52; see also *National Paint*, 45 F.3d at 1131. Plaintiffs invoke all three forms of discrimination but have validly alleged none.

### 1.   The ZEC Program Does Not Facially Discriminate Against Interstate Commerce.

The district court correctly held that the ZEC Program does not discriminate against interstate commerce on its face. Cases finding facial discrimination against interstate commerce involve laws that contain an *explicit* geographic discrimination between goods or services based on where they are produced. *National Paint*, 45 F.3d

at 1131 (referring to "laws that *explicitly* discriminate against interstate commerce," such as a law that "forbid[s] the sale of spray paint manufactured outside Illinois") (emphasis added); see also *Park Pet Shop, Inc.*, 872 F.3d at 501; *Baude v. Heath*, 538 F.3d 608, 611 (7th Cir. 2008) (holding that challenged law did not facially discriminate because "[e]very rule applies to every winery, no matter where it is located"). The Act contains no such provision. As the district court explained, because the Act's process for selecting entities eligible to receive ZECs relies on "three neutral environmental criteria, . . . it does not discriminate based on a plant's geographic location." (Op. 37 n.34.) That description is plainly correct.[19]

Plaintiffs' response on appeal asserts, in conclusory fashion, that their complaint "allege[s] that the ZEC program discriminates on its face, and in effect and purpose, by deliberately propping up the in-state Exelon plants via a distortion of the interstate energy market." (EPSA Br. at 65; see also *id.* at 67.) But Plaintiffs do not identify any provision of the Act that *expressly* classifies electric power based on where it is *produced*. To the contrary, they admit that the ZEC Program will adversely affect *all* non-nuclear power plants, including ones *in Illinois*. Doc. 1 at 8, par. 16; Doc. 38-12 at 3, par. 6.

---

[19]    Plaintiffs rightly do not claim that the Act is facially discriminatory because, in promoting environmental benefits, it employs criteria that take into account whether avoided emissions would adversely affect Illinois residents, and whether greenhouse gases are emitted by power consumed in Illinois. The proper focus of Illinois laws is protection of the health and safety of *Illinois* residents. The Illinois legislature therefore need not — and perhaps could not — seek to force companies to reduce pollution affecting residents of other States or regulate the generation of electricity consumed in other States. See *C & A Carbone, Inc.*, 511 U.S. at 393; *Rocky Mountain Farmers Union*, 730 F.3d at 1104 (noting that California cannot "impose its own regulatory standards on another jurisdiction" but "may regulate with reference to local harms"); see also *id.* at 1089 (holding that law regulating fuel based on its total environmental impact, including from production and transportation, did not facially discriminate where any geographic disparity in its application is based not "on a fuel's origin but on its carbon intensity").

Nor do Plaintiffs' other allegations validly claim facial discrimination. Instead, they assert, without factual elaboration:

- Although "environmental protection" was the legislature's asserted goal, the clear and actual purpose of [the Act] was to save jobs and local tax revenues associated with these plants . . . .

- [The Act] is not environmental legislation; it is just a mechanism to provide out-of-market funding to Clinton and Quad Cities.

- Although the law states that the IPA is to award ZEC contracts to the "winners" of the procurement process, with the winners to be determined on the basis of "public interest criteria," . . . the process is a sham, as Clinton and Quad Cities have been pre-determined to be the "winners" of the ZEC contracts.

Doc. 1 at 26-27, pars. 58-59.[20]

Even if these allegations were treated as stating facts, as opposed to legal conclusions, the district court rightly held that whether a law discriminates on its face must depend on whether its *terms* expressly prescribe different treatment for in-state and out-of-state commercial operations. Op. 37; see *National Paint*, 45 F.3d at 1131. Plaintiffs point to nothing in the Act that does so. Instead, the Act, on its face, allows *all* nuclear power plants to apply to be eligible to sell ZECs, and non-nuclear power generators are uniformly ineligible to sell them, even if they operate in Illinois.

Plaintiffs nonetheless argue that the Act is facially discriminatory because it "accomplishes that discrimination with its 'tipped' scales" in favor of Exelon's Illinois power plants." Pl. Br. at 66. That misses the point. A law that adopts neutral criteria to advance a valid health-and-safety objective does not facially discriminate just because

---

[20]     The complaint also purports to discern a discriminatory purpose from "the very name of the law – Future Energy **Jobs** Act" (Doc. 1 at 26-27, pars. 58-59, emphasis in original), but the Court can take judicial notice that this is not, in fact, the Act's name.

application of those criteria may to some extent favor in-state activity. *Clover Leaf Creamery Co.*, 449 U.S. at 472; *General Motors Corp.*, 519 U.S. at 307; *National Paint*, 45 F.3d at 1131.

### 2.   Plaintiffs Have Not Validly Alleged That the Purpose of the ZEC Program Is to Discriminate Against Interstate Commerce.

There is likewise no basis for Plaintiffs' conclusory assertion that the Act had a discriminatory economic purpose.  Of course, laws often do not have a single purpose, and the relevant inquiry therefore must determine the Act's "primary," or "overriding," purpose.  See *Clover Leaf Creamery Co.*, 449 U.S. at 465; *Buck v. Kuykendall*, 267 U.S. 307, 315 (1925) (Brandeis, J.); *Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 214 (1st Cir. 1994); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 39 (1st Cir. 2005) ("Incidental purpose, like incidental effect, cannot suffice to trigger strict scrutiny under the dormant Commerce Clause.").

The starting point for determining the Act's primary purpose is its text, which is entitled to significant, if not controlling, weight.  *Clover Leaf Creamery Co.*, 449 U.S. at 463 n.7; see also *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 403 (3d Cir. 1987).  A discriminatory purpose may also be indicated by the fact that the law's ostensible purpose is poorly achieved, or not achieved at all, by the means chosen.  *Hunt*, 432 U.S. at 352 (noting that law regulating "only closed containers of apples" did not seem well designed to achieve State's "ostensible consumer protection purpose when apples are not generally sold at retail in their shipping containers"); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522-24 (1935); *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 268-69 (8th Cir. 1995).  Isolated remarks by individual lawmakers, by contrast, typically have little value,

especially when they merely indicate that an incidental effect of the law would be to help local businesses. *Clover Leaf Creamery Co.*, 449 U.S. at 462 n.7, 471 n.15; *Gwadosky*, 430 F.3d at 39; *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007); *Rocky Mountain Farmers Union*, 730 F.3d at 1100 n.13.   Here, Plaintiffs' bare-bones allegations of a discriminatory purpose are palpably wanting.

The Supreme Court's opinion in *Clover Leaf Creamery* is instructive. There, the Court upheld a Minnesota law that banned the use of single-use plastic milk containers, despite evidence that it primarily burdened out-of-state producers and favored in-state manufacturers of paperboard curtainers.  449 U.S. at 472-74.  Recognizing that "environmental protection and resource conservation" are "areas of legitimate local concern," the Court held that, for claims under the Equal Protection and Commerce Clauses, it would assume the law's stated purposes were its actual purposes "unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation." *Id.* at 462 n.7, 471 & n.15  (citation and internal quotation marks omitted). The Court added that a contrary finding would not be justified "merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry."  *Id.*  That reasoning applies here.

The Act's environmental purpose is evident from its text and design, which cannot simply be ignored.  As noted above, in the Act the Illinois General Assembly made a series of detailed legislative findings, grounded in detailed studies, described above (at 10).  Among other things, the legislature found that emissions of carbon dioxide and other air pollutants contribute to climate change and have significant adverse health effects, and that preserving zero-emission energy generation is vital to ensuring

continued improvement in the State's air quality.  Act, § 1.5.  Plaintiffs do not question the scientific validity of these public health findings.[21]  And the HR 1146 Report, referenced in the Act, projected that avoiding closure of various nuclear power plants in Illinois over the ZEC Program's ten-year duration would prevent the emission of millions of tons of greenhouse gases and other airborne pollutants.

In the face of these findings and solid factual foundation, Plaintiffs offer only conclusory allegations, again claiming that the Act's procurement process is a "sham," and that it "is not environmental legislation," but really "just a mechanism to provide out-of-market funding to Clinton and Quad Cities."  Doc. 1 at 26, par. 58.  Those allegations do not meet the minimum pleading requirements to justify further proceedings on the issue.

The Act's clear declaration of its purpose is consistent with its predicted effects based upon in-depth expert analysis; the means chosen by the Act reasonably accomplish these purposes; and the Act affects in-state and out-of-state fossil-fuel power plants alike.  In the face of these evident realities, Plaintiffs' bare assertion that the Act was "not environmental legislation" fails to provide the necessary factual specificity for a claim of this complexity to create a plausible inference of a discriminatory purpose.

In other contexts involving discrimination claims, this Court has required meaningful factual specificity to justify the inference that the defendant's actions were

---

[21]     Indeed, there can be no question that particulate emissions and ozone created by burning fossil fuels increase the risk of heart disease, lung cancer, and asthma attacks; create special risks for children, people over age 65, and individuals with a particular history of chronic obstructive pulmonary disease; and contribute generally to respiratory and cardiovascular disease. See American Lung Association, *www.lung.org/healthyair/outdoor/ air-pollution* (visited Oct. 25, 2017).

not consistent with lawful conduct. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014); *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 887 (7th Cir. 2012); *McCauley*, 671 F.3d at 618-19. A similar conclusion is justified here. Plaintiffs offer only conclusory allegations of a discriminatory purpose, devoid of meaningful facts more consistent with that characterization than with lawful conduct. Plaintiffs emphasize that the Act was a response to Exelon's announcement that it might close several of its nuclear plants in Illinois. But "[i]t is utterly commonplace for legislation to be incited by concern over one person or organization." *L C & S, Inc. v. Warren Area County Plan Comm'n*, 244 F.3d 601, 604 (7th Cir. 2001). The prospect of having several Illinois nuclear plants close brought to broad public attention the very real risk of a major shift to greater use of fossil fuel to generate electricity, with its attendant environmental consequences. Illinois' government was right to respond.

Individual lawmakers' comments about benefits to the Illinois economy, including comments attributed to the Governor when the Act became law, likewise cannot justify a finding that the Act's primary purpose was protectionism. See *Clover Leaf Creamery Co.*, 449 U.S. at 462 n.7; 471 n.15; *Gwadosky*, 430 F.3d at 39; *Allstate Ins.*, 495 F.3d at 161; *Rocky Mountain Farmers Union*, 730 F.3d at 1100 n.13. Nor can it plausibly be claimed that the Act seeks to achieve its legitimate environmental goals by plainly arbitrary or ineffectual means. Over the next several years at least, until a major increase in renewable energy generating capacity and supporting transmission infrastructure can be installed, continued use of existing nuclear-power generating capacity is an obvious and sensible way to avoid large increases in greenhouse gases and other

airborne emissions associated with burning fossil fuels.[22] Plaintiffs allege, with no factual detail, that these environmental goals can be achieved "more effectively" by other means that would not disadvantage their coal- and natural gas-fired plants. Doc. 1 at 7, par. 14, 37-8, par. 89. But that impermissibly invites the courts to judge the wisdom of a particular means chosen by the Illinois legislature to pursue these goals. See *Baude*, 538 F.3d at 611; *Brown v. Hovatter*, 561 F.3d 357, 365-66 (4th Cir. 2009).

Plaintiffs' reliance on *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), and *C & A Carbone, Inc.*, Pl. Br. at 64-65, is also misplaced. In each case, the *only* purposes for the challenged laws were the impermissible *economic* ones of hoarding local resources and protecting in-state businesses against out-of-state competition. In '*Coal*, the challenged statute required certain Illinois coal-fired power plants to install "scrubbers," helping Illinois-produced high-sulfur coal by eliminating the cost-advantage of low-sulfur coal from Western States. The law had no environmental or other health-related purpose, but instead expressly stated that its purpose was to "maintain and preserve . . . the mining of coal in Illinois"; and the defendants justified it "as a means of protecting Illinois and its citizens from economic harm that would result from a decline in the local coal industry." 44 F.3d at 596. Subsidizing a *less* environmentally benign activity, unlike the ZEC Program, is not a valid health and safety purpose.

---

[22]    In 2012 renewable energy represented only 4% of net electricity generated in Illinois, compared to almost 50% for nuclear power. HR 1146 Report at 117. See also *id*. at 25 (noting that "achieving various states' renewable energy goals in the most economical way is likely to require more power output from wind farms in the western portion of MISO than MISO can readily absorb without additional transmission capacity within and between it and the eastern load centers of PJM").

61

In *C & A Carbone, Inc.*, which struck down a flow-control ordinance requiring all waste to be processed at a local facility, the Court explained that the value in waste is the right to process it for profit, 511 U.S. at 390-91, and that the ordinance's central purpose was to "ensure[] that the town-sponsored facility will be profitable," *id.* at 393. Thus, the Court concluded, the law's "primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition." *Id.* at 394 (quoting *Buck*, 267 U.S. at 315 (Brandeis, J.)). That is the opposite of the situation here.

Significantly, in *C & A Carbone, Inc.* the Court added that any desire to address health and environmental problems could easily be accomplished by "uniform safety regulations enacted without the object to discriminate," and that such regulations "would ensure that competitors . . . *do not underprice the market by cutting corners on environmental safety*." *Id.* at 393 (emphasis added). Thus, the Court expressly approved a valid *environmental* rule intended to eliminate the cost advantages of environmentally harmful practices — exactly what the ZEC Program does for airborne emissions from fossil fuel-fired power plants. The district court properly held, therefore, that Plaintiffs did not validly allege a discriminatory purpose.

### 3.    Plaintiffs Did Not Validly Allege That Illinois' ZEC Program Discriminates in Its Effects Against Interstate Commerce.

Plaintiffs' argument that they adequately alleged that the Act has discriminatory effects against interstate commerce is equally untenable. A mere disparity in the effects of a facially neutral law that reasonably advances a legitimate state interest is insufficient, by itself, to establish actual discrimination, as opposed to mere incidental burdens on interstate commerce. *Clover Leaf Creamery Co.*, 449 U.S. at 474; *National*

*Paint*, 45 F.3d at 1131; see also *Park Pet Shop, Inc.*, 872 F.3d at 501. If such a difference were sufficient, the dormant Commerce Clause would condemn a host of laws that efficiently promote legitimate goals unrelated to economic protectionism. Thus, courts must undertake the sometimes-difficult task of distinguishing between disguised protectionism revealed by means that have obviously discriminatory economic effects, and the incidental burdens on interstate commerce of laws that effectively further noneconomic public-policy goals, including protecting public health. *Clover Leaf Creamery Co.*, 449 U.S. at 470-74. While much turns on it, there is no bright-line test to make this distinction. See *General Motors Corp.*, 519 U.S. at 298 n.12; *Scariano v. Justices of Supreme Court of Indiana*, 38 F.3d 920, 926 (7th Cir. 1994); *Norfolk Southern Corp.*, 822 F.2d at 402 (describing distinction as "both important and hazy").[23] Relevant factors include:

- the nature and importance of the law's noneconomic purpose;

- whether the means chosen to achieve this purpose are manifestly ill-suited to do so, or instead reasonably advance it;

- the extent to which the law's effects correspond to the in-state or out-of-state location of the business operations it affects.

See *Kassel*, 450 U.S. at 670, 672 (plurality opinion); *Hunt*, 432 U.S. at 352; *Philadelphia*, 437 U.S. at 626-27 (holding that legitimate noneconomic purpose "may not be accomplished by discriminating against articles of commerce coming from outside the State *unless there is some reason, apart from their origin*, to treat them differently")

---

[23]     Partly due to this difficulty, the discriminatory effects prong of Commerce Clause doctrine, which by itself almost never supports a finding of protectionist discrimination, has been subject to substantial criticism by courts and commentators. See *Norfolk Southern Corp.*, 822 F.2d at 400-01; D. Regan, *The Supreme Court and State Protectionism*: *Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1144-47, 1206-45 (1986).

(emphasis added); *National Paint*, 45 F.3d at 1132. Thus, a law may be said to have discriminatory effects if it adopts means that are manifestly ill-suited to achieve its stated policy objectives and, at the same time, their application creates a striking disparity between similarly situated in-state and out-of-state commercial activity. But that is not the case for a law that advances a valid noneconomic goal by neutral, reasonably efficient means, even if its effects are felt to a greater degree by out-of-state commercial activity. See *Clover Leaf Creamery Co.*, 449 U.S. at 474; see also *Norfolk Southern Corp.*, 822 F.2d at 400-01 (comparing *Hunt* and *Clover Leaf Creamery*).

As the Court explained in *National Paint*, disparate interstate impacts amount to discrimination "when the effect is *powerful*," but when "the discriminatory effect is *weak*," the court applies the *Pike* test, examining only whether these effects on commerce are clearly excessive compared to the noneconomic benefits. 45 F.3d at 1131 (emphasis added); see also *Park Pet Shop, Inc.*, 872 F.3d at 501; *Scariano*, 38 F.3d at 928 ("The cases upon which [plaintiff] relies . . . all deal with statutes having a profound and inevitable effect"). To support a discriminatory effects theory, therefore, a plaintiff must allege and prove a powerful disparity in a law's effects on similarly situated in-state and out-of-state commercial operations. Plaintiffs' complaints do not do so.

First, Plaintiffs fail to identify any real discrimination. For purposes of the state law-created ZEC market, Plaintiffs are not similarly situated to nuclear power plants, which produce no greenhouse gas or other airborne emissions from burning fossil fuels. The difference between Plaintiffs and nuclear plants selected to receive ZECs resides in their respective abilities to avoid pollution adversely affecting Illinois residents. Plaintiffs therefore have no basis to complain that they are ineligible to receive ZEC

64

payments that capture the environmental benefits of zero-emission nuclear power.  See *General Motors Corp.*, 519 U.S. at 298; *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 103-07 (2d Cir. 2017).

Even in the market for wholesale electricity, Plaintiffs' complaint fails to allege discriminatory effects because, as Plaintiffs admit, the ZEC Program excludes fossil fuel plants in Illinois and other States alike.  See *Scariano*, 38 F.3d at 927 ("Because Indiana accords [plaintiff] treatment *equal* to that which it accords to the vast majority of attorneys wishing to practice within its borders, no discrimination can be said to exist.") (emphasis in original); *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (finding no discrimination where law applied equally to all businesses and thus "burdens in-state beverage manufacturers . . . to the same extent it burdens out-of-state manufacturers").  The ZEC Program, therefore, does not disadvantage Plaintiffs' fossil fuel-based generating operations over similar plants in Illinois, much less do so because they are located out-of-state.

Plaintiffs do allege, in conclusory fashion, that the ZEC Program imposes "market-distorting burdens on interstate and international commerce."  Doc. 1 at 38, par. 91.  But Plaintiffs confuse activity *in* interstate commerce for FPA purposes, which includes all wholesale electricity supplied to the grid (see *New York*, 535 U.S. at 7 & n.5), and discrimination *against* interstate commerce for Commerce Clause purposes, which focuses on whether commercial activity is treated differently because it is located outside a State.  Thus, Plaintiffs' allegation that the Act affects wholesale electricity markets does not equate with an allegation that the Act discriminates against out-of-state commercial activity. And on the latter issue, Plaintiffs offer only threadbare allegations

of discriminatory effect, devoid of any meaningful allegation to justify a plausible inference that the Act invidiously treats out-of-state activity in a profoundly less favorable way than similarly-situated in-state activity.

In *Selvan v. New York Thruway Authority*, 711 F.3d 253, 261 n.8 (2d Cir. 2013), the Second Circuit held that conclusory assertions of disparate impact on out-of-state parties, without meaningful factual allegations to support them, were legally insufficient. The same conclusion is warranted here. Cf. *Park Pet Shop, Inc.*, 872 F.3d at 503 (holding, for Commerce Clause claim, that "conclusory allegations of disparate impact are not sufficient"). Plaintiffs' discriminatory effects theory is no better than the others.

### D. The ZEC Program Advances a Valid Purpose and Does Not Inflict Burdens on Interstate Commerce That Are Clearly Excessive in Relation to the Program's Benefits.

Plaintiffs finally argue that they have adequately alleged a *Pike* claim that the Act's burdens on interstate commerce are clearly excessive compared to its environmental benefits. Again, however, their allegations do not present actual facts sufficient to justify that characterization.

Plaintiffs allege, with no meaningful supporting detail, that the ZEC Program "is not even-handed with respect to other technologies that could produce carbon-free electricity," and that "the purported local benefits are largely illusory" because over time lower wholesale prices will reduce the creation of new generating capacity, and will ultimately "lead to reduced supply and higher prices," "hurt Illinois consumers and businesses," and "cost jobs." Doc. 1 at 38, pars. 90-92. These conclusory allegations of a Commerce Clause violation do not survive a motion to dismiss.

In *Park Pet Shop, Inc.*, the Court affirmed the dismissal of a *Pike* claim, holding

that "conclusory allegations of disparate impact are not sufficient," and that the plaintiffs failed to "plead specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce." 872 F.3d at 503. See also *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 322 (1st Cir. 2003) (affirming Rule 12(b)(6) dismissal of *Pike* claim containing merely conclusory allegations); *Goldfarb v. Supreme Court of Virginia*, 766 F.2d 859, 863 (4th Cir. 1985) (affirming dismissal of *Pike* claim at pleading stage despite plaintiff's suggestion of better means to achieve State's goals, stating that "[t]o require a hearing to weigh the relative impacts of all the other means the state might have chosen would deal a serious blow to the capacities of the states and localities to further even the most basic regulatory purposes"); *Vizio*, 2016 WL 1305116 at *8-9 (dismissing *Pike* claim where plaintiff did not allege that State's "health and safety interests . . . are illusory," and its "conclusory allegations as to incidental burdens on interstate commerce . . . would apply equally to intrastate commerce").

Plaintiffs have done no more here, and their *Pike* claim was properly dismissed. As noted above, with respect to supposed burdens on the wholesale power market, Plaintiffs confuse an impact on the wholesale electricity market, which operates *in* interstate commerce for purposes of the FPA, with a burden *on* interstate commerce, for purposes of the Commerce Clause. The latter, unlike the former, focuses on discrimination against out-of-state commercial activity. But Plaintiffs do not dispute that any adverse consequences for fossil-fuel plants resulting from the Act will affect Illinois and out-of-state plants alike. Even if the ZEC Program procurement process plays out as Plaintiffs predict, creating an advantage for an *Illinois* nuclear plant and a corresponding disadvantage for an *Illinois* coal- or gas-fired plant is not a burden on interstate

67

commerce.  Without a discriminatory burden on out-of-state commerce, the *Pike* test does not apply.  *Park Pet Shop, Inc.*, 872 F.3d at 501; *National Paint*, 45 F.3d at 1132.

Equally insufficient is Plaintiffs' assertion that reducing pollution by financially supporting zero-emission nuclear power plants will, over the long term, have trade-off effects for future power generation that will adversely effect the Illinois economy and possibly diminish the creation of other emission-free power.  Pl. Br. at 11-12.  Again, those indirect and remote effects, described in conclusory terms, are clearly insufficient for a court to substitute its judgment for the Illinois legislature's regarding what is more beneficial for the State's residents, or to conclude that the Act's supposed burdens on interstate commerce are clearly excessive compared its immediate benefits.  See *Baude*, 538 F.3d at 611; *Goldfarb*, 766 F.2d at 863.  This claim therefore also fails at the pleading stage.

## CONCLUSION

For the foregoing reasons, the district court's judgments should be affirmed.


October 27, 2017                              Respectfully submitted,

                                             **LISA MADIGAN**
                                             Attorney General
                                             State of Illinois

                                             **DAVID L. FRANKLIN**
                                             Solicitor General

  /s/ *Richard S. Huszagh*
**RICHARD S. HUSZAGH**
Assistant Attorney General
100 W. Randolph St., 12th Floor              100 W. Randolph St., 12th Floor
Chicago, Illinois  60601                     Chicago, Illinois  60601
(312) 814-2587                               (312) 814-3312
*rhuszagh@atg.state.il.us*

                                             Attorneys for State Defendants-Appellees

68

## Certificate of Compliance With Brief Requirements

I hereby certify that:

(1)    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6), as modified by Circuit Rule 32, in that the brief has been prepared in WordPerfect X4 using a proportionally spaced typeface using 12-point type (and 11.5-point type in the footnotes) in the Century Schoolbook family of fonts.

(2)    This brief complies with the type volume limitations set forth in Fed. R. App. P. 32(a)(7)(B), in that the text of the brief, including headings, footnotes, and quotations, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), contains  19,938  words.   In preparing this certificate, I relied on the word count of the WordPerfect X4 word processing system used to prepare this brief.

    /s/ Richard S. Huszagh

## Certificate of Filing and Service

I hereby certify that on October 27, 2017, I electronically filed the foregoing <u>Brief of State Defendants-Appellees</u> with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will effect service on the other participants in the case, all of whom are registered CM/ECF users.


<u>      /s/ *Richard S. Huszagh*      </u>